# EXHIBIT E

EXHIBIT E

---

**Exercise caution with links and attachments**

You may not have corresponded with this sender before. Exercise caution when engaging with this email.

---

Dear Crowell & Moring LLP,

My name is Yelisey Bohuslavskiy. I am a co-founder and member of RedSense, LLC, holding 25% of the allocated shares. I am cc'ing my partner and fellow 25% shareholder, Mr. Bryan VanSickle. Together, we represent 50% of the company's allocated ownership and leadership. I am also copying relevant Crowell & Moring LLP leadership for transparency and accountability.

I am writing in response to the March 17, 2025 letter (attached) issued by Ms. Preetha Chakrabarti on behalf of your firm, claiming to represent RedSense. Neither Mr. VanSickle nor I were informed of or authorized this engagement, and we were surprised to receive legal correspondence purporting to speak on behalf of our company without our knowledge or consent.

Despite this unclear basis for representation, the letter contains 28 separate claims and demands — many of which are unsubstantiated and raise serious legal and ethical concerns. I feel compelled to respond both in my capacity as a shareholder and partner of RedSense and personally as a refugee whose immigration status and identity may be directly impacted by some of the statements made.

EXHIBIT E PAGE 1

EXHIBIT E

My full commentary is attached to this email. However, I would like to highlight several of the most critical concerns to emphasize the significance of this matter — not only for myself and Mr. VanSickle, but also for RedSense as a business.

## 1. Improper Intellectual Property Demand
The demand to transfer massive volumes of protected intellectual property from third parties, among whom is my former employer and former RedSense competitor, Advanced Intelligence, LLC, within 24 hours — a demand I believe to be improper and legally unsound. RedSense definitely has no claim to this IP and any such transfer — if it were even possible — would violate binding agreements. Given Ms. Chakrabarti's stated expertise in intellectual property law, it is concerning that such a request would be made potentially without regard to legal and ethical boundaries defining RedSense property ownership. This transfer could have clearly damaged the company both legally and reputationally and will directly affect its shareholders.

## 2. Cease and Desist Demand Regarding Core Business Functions
The letter also demands that I immediately cease delivering cybersecurity alerts to RedSense clients — alerts that are a fundamental part of our service, clearly outlined in all of our client contracts. Halting this service would not only constitute a breach of contract but could irreparably harm our clients, including customer loss and potential demands for breach-of-contract refunds. Such an outcome would be catastrophic. RedSense leadership has estimated that the company could face up to $1.58 million USD in customer refund claims alone — approximately 50% of total revenue. Just like the demand for transferring Advanced Intelligence IP, this demand would not only damage the company's operational standing and shareholder value, including mine and Mr. VanSickle's — but also for our clients' security posture and, by extension, their own customers.

## 3. Unsubstantiated Allegations of Financial Misconduct
The letter also makes a number of extremely serious personal allegations, accusing not only me but also my subordinates of embezzlement, fraud, deception, and financial misconduct. These claims are baseless and directly contradicted by documentation and records that were available to your firm at the time this letter was prepared.

## The most concerning point: the mischaracterization and denial of Ethical Concerns related to anti-immigrant/refugee harassment

Most concerning for me, however, is the letter's repeated assertion — **made four times** — that my statement about resigning from my role as Chief Research Officer "due to ethical and contractual concerns" is "**false**" and must be retracted from all social media within 24 hours. Setting aside the problematic assumption that your firm can define the motivations behind my own resignation better than I can myself, this demand is especially troubling in light of the context.

As clearly stated in my resignation letter, which Ms. Chakrabarti and Crowell & Moring LLP evidently reviewed, the ethical basis for my departure was what I described as the **"legitimization and normalization of anti-immigrant hate speech by RedSense executives."**

I, along with my mother and brother, am a refugee as a result of the Russian invasion of Ukraine. On January 22, 2025 — just two days after the new U.S. administration began enacting immigration policy changes that stirred extreme concerns in refugee communities — RedSense's CTO Kevin Stear, apparently being aware of the fears incited by the new political climate, proactively reached out to me and sent me a series of insulting messages that referenced my immigration status, and that of

my mother and brother, in a context that suggested reporting us to immigration authorities for immigration fraud — an absolutely false accusation.

I reported this incident immediately, both privately and formally, and over the course of a month, repeatedly asked RedSense leadership, including CEO David Montanaro, to address and denounce this behavior. Instead, my concerns were dismissed and publicly mocked. Mr. Montanaro referred to them as quote "**ridiculous**," and Mr. Stear responded to formal concerns-related correspondence with "RoFL" emojis. (All records and screenshots are documented in the attached file)

Faced with a choice between continuing my formal employment role or standing by my principles as a refugee, I chose the latter. On February 24, 2025 — exactly one month after the incident — I stepped down from my operational role and began preparing formal complaints with the Equal Employment Opportunity Commission (EEOC) and the Immigrant and Employee Rights Section (IER).

Shortly after, I indeed posted a statement on LinkedIn referencing "ethical concerns," echoing what I had already communicated internally to the entirety of RedSense leadership after the initial incident on January 23:

***"Overall, I think that threatening a refugee with a report to immigration authorities is simply one of those ethical lines, like calling out someone based on race, gender, or sexuality, that are simply not crossed in a civilized society."***

Essentially, it is this ethical concern that your letter repeatedly labels "false" and demands a retraction. I consider this characterization not only inaccurate but deeply personal and offensive.

According to LinkedIn analytics, my post was viewed by over 6,500 individuals, many of whom are fellow cybersecurity professionals and fellow immigrants and refugees. To characterize my account as false may be interpreted as a public accusation of defamation, with potential consequences for my personal, immigration, and professional credibility.

***

Therefore, with all due respect, I must inform Ms. Preetha Chakrabarti and Crowell & Moring LLP that due to the seriousness of this immigration-related matter, I am prepared to issue a public response addressing your demands and denial of beliefs that are foundational to my identity, my refugee status, and my personal integrity. My ethical concerns were valid and are not "false," are well-documented, and grounded in lived experience and the right of free expression — and I will not be silenced or pressured to retract them simply because they are inconvenient or uncomfortable to those in RedSense who are engaged or normalize this recorded anti-immigrant harassment.

Additionally, since a demand to transfer Advanced Intelligence property puts RedSense at risk if such demands persist, I may need to reach out to Advanced Intelligence, LLC's last CEO, Mr. David Troha, and its major shareholder, Ms. Natalia Kremez, to clarify with Advanced Intelligence's former leadership that these claims were not authorized by the full RedSense leadership.

Finally, due to the severity of the accusations made in your letter and their implications for my personal, professional, immigration, legal, and public status, I am also considering submitting a formal grievance to the Attorney Grievance Committee of the Supreme Court, Appellate Division, First Judicial Department, regarding Ms. Chakrabarti's conduct in this matter.

That said, in accordance with my ethical and political consistency, I remain respectful of Crowell & Moring's long-standing demonstrated commitment to inclusion, particularly through initiatives like the Amica Center, ERC, and your pro bono work on behalf of immigrant and refugee communities. I am also aware of Ms. Chakrabarti's contributions to this work. Because of this context, I will approach this matter in good faith and assume that the denial of my ethical stance may have stemmed from a lack of full understanding rather than from ill intent.

The same good faith applies to all of the concerns raised in this letter. Before taking any further steps — whether public, corporate, or formal — I would like to offer you and Ms. Chakrabarti the opportunity to comment on and clarify the points I've raised.

For this purpose, I prepared the attached comment regarding your March 17, 2025 letter that highlights specific assertions and demands in your letter that appear unsupported, inaccurate, or potentially inconsistent with applicable ethical standards, including Crowell & Moring's own standards and the New York Rules of Professional Conduct. This document is not a formal grievance but rather an effort to enable Crowell & Moring and Ms. Chakrabarti to address these points internally through constructive dialogue, aiming for transparency, resolution, and avoidance of unnecessary escalation.

Please feel free to reach out if you have any questions.

I look forward to your response within one business week.

Kind Regards,

Yelisey Bohuslavskiy

Partner & Co-Founder at RedSense
yeliseybohuslavskiy@gmail.com
+1 (202) 751-99-57

**Introduction**

This comment is submitted to Crowell & Moring LLP ("Crowell & Moring") and Ms. Preetha Chakrabarti regarding your March 17, 2025 letter sent on behalf of Red Sense LLC ("RedSense"). It highlights specific assertions and demands in your letter that appear unsupported, inaccurate, or potentially inconsistent with applicable ethical standards, including Crowell & Moring's own standards and the New York Rules of Professional Conduct.

This document is not a formal grievance but rather an effort to enable Crowell & Moring and Ms. Chakrabarti to address these points internally through constructive dialogue, aiming for transparency, resolution, and avoidance of unnecessary escalation prior to submitting a formal complaint to the Attorney Grievance Committee Supreme Court, Appellate Division First Judicial Department.

I am a co-founder and equity partner of RedSense, involved — alongside co-founder Mr. Bryan VanSickle — in a corporate dispute regarding governance, ethical, and operational matters. Together, we represent 50% of RedSense's voting shares and allocated equity ownership. The assertions in Crowell & Moring's letter directly impact my professional reputation, legal rights, and obligations to RedSense clients and potentially harm RedSense as a business entity, thereby affecting Mr. VanSickle's shareholder rights as well.

I am not an attorney, and these observations were prepared without formal legal training. References to the Part 1200 Rules of Professional Conduct (as amended January 1, 2017) are informational, relying on an unofficial version provided by the New York State Unified Court System and not the one published by the New York State Department of State.

This document references the following rules from the Part 1200 Rules of Professional Conduct:

- Rule 1.1 (Competence)
- Rule 1.2(d) (Scope of Representation)
- Rule 1.3 (Diligence)
- Rule 1.7 (Conflict of Interest)
- Rule 1.13(a-b) (Organization as Client)
- Rule 3.1 (Non-Meritorious Claims and Contentions)
- Rule 4.1 (Truthfulness in Statements to Others)
- Rule 4.4(a) (Respect for Rights of Third Persons)
- Rule 8.4(c) (Misconduct — Misrepresentation)

**Executive Summary of Core Concerns**

**1. Dismissal of Discrimination Concerns and Potential Suppression of Expression:** The letter characterizes my documented, previously raised ethical concerns regarding anti-immigrant discrimination and harassment as "false," and demands the removal of references to these issues from my public statements. This request may unintentionally encourage or validate discriminatory practices by some RedSense executives and could discourage protected expression, potentially placing undue pressure on an individual raising legitimate discrimination concerns. This would contradict both general and Crowell & Moring's stated ethical framework.

**2. Unsupported and Significant Allegations:** The letter includes multiple serious accusations (e.g., fraud, embezzlement, deception, self-dealing, tortious conduct, and public false statements), presented as factual without accompanying evidence, documentation, or indication of sufficient prior inquiry — often despite evidence suggesting the contrary.

**3. Request for Transfer of Third-Party Intellectual Property:** The letter demands the transfer of intellectual property owned by an unrelated third party, Advanced Intelligence, LLC (AdvIntel), to which RedSense clearly has no legal entitlement. This request risks unintentionally prompting actions that could expose RedSense, Crowell & Moring, and myself to potential legal consequences.

**4. Interference with Important Client Security Communications:** The letter instructs me to cease delivering essential cybersecurity alerts to RedSense clients, including organizations in critical sectors such as healthcare, which support both RedSense's contractual obligations and public awareness. Complying with this directive may directly harm RedSense through potential breaches of contract and could expose clients to heightened cybersecurity risks without clear legal or business justification.

**5. Apparent Insufficient Due Diligence:** The letter contained an extensive list of 28 distinct claims and demands, none supported by factual evidence or legal authority. This high volume of unsupported assertions — issued formally and authoritatively — implied serious wrongdoing without apparent due diligence, potentially creating misleading portrayals and reputational harm. This raises concerns about adherence to standards of competence, diligence, and ethical responsibility.

Collectively, these issues raise serious concerns about the accuracy, scope, and foundation of the representations made in the letter. While I fully acknowledge that these may have stemmed from incomplete information or internal miscommunication, the resulting assertions — delivered in formal legal language and absent of evidentiary reference — warrant careful examination under the applicable ethical standards.

**Highlight Comment: Ethical Background**

The matters discussed in the March 17, 2025, letter directly relate to a broader, ongoing dispute within RedSense. This comment specifically addresses Crowell & Moring's repeated assertion (**stated four times in the March 17 letter**) that my expressed "ethical concerns" were "false," and your demand that I withdraw references to these concerns.

My mother, my brother, and I are refugees residing in the US and EU as a result of Russia's invasion of Ukraine. Throughout my entire involvement with RedSense, all partners have been fully aware of our refugee status and the personal hardships we faced — especially during 2024, as both my and my mother's cases underwent review by the USCIS asylum office that year.

These difficulties significantly intensified after **January 20, 2025**, when a new administration entered the White House and began immediately implementing new immigration regulations related to refugees.

Immediately following this, **likely aware of the heightened stress caused by the political climate** surrounding refugees, **on January 22, 2025** — during my scheduled day off for a family event, of which CTO Kevin Stear was informed — Mr. Stear sent offensive comments to me via Signal messenger, directly targeting my and my family's refugee status and threatening to report us to "immigration," meaning U.S. Immigration and Customs Enforcement (ICE) (see Appendix: 6. Screenshots of Messages from Kevin Stear, January 22, 2025).

On the following morning, **January 23, 2025**, I reported this incident to all four RedSense partners and the full RedSense leadership team. My statement was as follows:

"*I consider — and hopefully, you would agree with me here — that threatening someone's family members is deeply inappropriate. As some of you know, all of my close family members are refugees as a result of the Russo-Ukrainian war. Specifically, my mother and my brother Igor, mentioned in these messages, were both arrested, interrogated, and severely threatened by the Russian authorities for their active participation in anti-war protests during the first weeks of the war. Both Igor and my mother had to flee the country, losing their homes, their jobs, and their previous lives. I would leave you to your consideration regarding Stear's moral compass in the light of using my family's precarious position against me, but I personally consider this deeply disturbing.*"

"*Secondly, weaponizing my immigration case by suggesting immigration fraud on my end is deeply personal. … On November 6, 2024, the USCIS officially confirmed the I have proven my refugee claim and am qualified as a protected refugee due to my persecution in my home country and the impossibility of returning. I can assure you that the USCIS would have never made this*"

*conclusion if there had been any slightest hint of immigration violations. As such, the threat to report me to an immigration authority is profoundly offensive and unjust. **Especially considering the political climate related to immigration unfolding right now.** Overall, I think that threatening a refugee with a report to immigration authorities is simply one of those ethical lines, like calling out someone based on race, gender, or sexuality, that are simply not crossed in a civilized society."* (See Appendix: 8. Yelisey Boguslavskiy Letter to Partners Regarding Immigration-Based Attacks (January 23, 2025)

My concerns were supported by Mr. Bryan VanSickle. From **January 23** to **February 24, 2025,** we repeatedly urged RedSense leadership — especially CEO Mr. Montanaro — to address or condemn these anti-immigrant remarks. I also asked Mr. Stear and Mr. Montanaro, on at least six occasions (in writing and verbally), to provide any evidence of alleged misconduct and immigration fraud on my part. These requests were ignored. On one occasion Mr. Montanaro defined my concerns as "**ridiculous**".

The only response came from Mr. Stear, who mocked my concerns and requests for evidence using "ROFL" emojis in official email threads (See Appendix: 7. Screenshots of Reactions from Kevin Stear Regarding Immigration/Refugee Concerns (February 10, 2025). Despite being included, Mr. Montanaro offered no comment or reprimand for this mockery behavior.

After a month of leadership inaction, I was essentially forced to choose between my principles as a refugee and my employment role at RedSense. **On February 24**, I resigned with the intent of further defending my position, but now via the Eqaual Employment Opportunity Commission and the Immigrant and Employee Rights Section. I stated clearly that a key reason was the "legitimization and normalization of anti-immigrant hate speech by RedSense executives" (See Appendix: 3. Yelisey Boguslavskiy Resignation Letter, February 24, 2025). I publicly reiterated these reasons on LinkedIn as "ethical concerns," which genuinely reflect my motivation.

Given this, I ask Crowell & Moring LLP and Ms. Preetha Chakrabarti to clarify why your March 17, 2025 letter repeatedly (four times) labels these ethical concerns as "false" and on what basis you make this assertion and demand their retraction. Such dental and demand risks legitimizing anti-immigrant speech within RedSense by silencing my lawful and ethical right to object — an outcome seemingly at odds with your firm's stated values.

As a refugee, I respect Crowell & Moring's commitment to inclusion, and specifically your work through the Amica Center and ERC including your pro bono immigration services. To my knowledge, Ms. Chakrabarti herself contributed meaningfully to this pro bono work. I therefore assume the statements in the letter stem from a lack of context rather than ill intent. However, Given the clear sensitivity of these issues and the deeply offensive nature of labeling them as "false," I request a direct and detailed clarification.

EXHIBIT E

**Highlight Comment: List of Claims, Assertions, & Demands by Crowell & Moring That Had no Evidence Provided**

1. Crowell & Moring asserted that I resigned my partnership duties from RedSense as of February 24, 2025.
2. Asserted that I am not authorized to communicate with RedSense customers, partners, or prospective partners.
3. Claimed that I am merely purporting to represent the interests of RedSense.
4. Asserted that my statements about ethical and contractual concerns are false.
5. Claimed that those alleged false statements have harmed RedSense's reputation.
6. Claimed that my communications have disrupted or interfered with RedSense's relationships with customers.
7. Asserted that I have harmed RedSense's goodwill and industry reputation.
8. Claimed that my conduct rises to a tort for which RedSense may pursue damages, including punitive damages.
9. Asserted that I was responsible for approving company payments.
10. Claimed that I approved invoices from third-party vendors, such as Affix Advisory and EasyStaff UAB.
11. Alleged that those vendors were merely purporting to perform work for RedSense.
12. Asserted that the results from these vendors are now unaccounted for following my departure.
13. Alleged that I approved invoices to serve my own self-interests.
14. Further suggested that I inappropriately financially benefited from RedSense through this conduct.
15. Claimed that I retained significant amounts of RedSense company property.
16. Asserted that this property does not belong to me.

Crowell & Moring claimed that RedSense has ownership over:

17. Project Pylon (AIDIS), including software and documentation
18. The Pyrus platform, including all data since inception
19. Forum scraping code and results to date
20. The OpenCTU instance and all threat intelligence it contains
21. All AdvIntel reports and threat intelligence since inception
22. They asserted that I retained EasyStaff deliverables: code, data, research, LLM, and documentation.
23. They claimed that I retained Igor Dmitriev's deliverables.

Additionally, Crowell & Moring demanded that with no apparent justification or authority of this demand:

    24. I cease and desist all communications with RedSense customers.

    25. If I receive any replies, I must forward them to Legal@RedSense.com.

    26. I cease and desist from representing myself as affiliated with RedSense.

    27. I remove the phrase "due to ethical and contractual concerns" from my LinkedIn post.

    28. I cease and desist from making any further reference to that statement.

**No evidence or reference to evidence was provided to ground these claims**

**Part 1: Considerations, Observations, & Concerns Regarding Your Representation of Red Sense LLC**

**1.1. Authority to Engage Counsel**

Your March 17 letter states that your firm was retained to represent Red Sense LLC ("RedSense"). It is likely this engagement was authorized by Mr. Montanaro in his role as CEO. However, RedSense does not operate under a formal operating agreement granting the CEO unilateral legal authority. Governance has historically been guided by consensus among four equal partners, each holding a 15% equity stake, with approximately 40% of shares unallocated.

While Mr. Montanaro holds the CEO title, there is no documented delegation of exclusive decision-making power in matters involving internal disputes or partner standing. Moreover, there is not salary-type compensation for the CEO role at RedSense, as Mr. Montanaro receives K1 dividends and not a salary. As such this position is more symbolic and is used for external representations, while internal matters are defined by partners' vote. For instance, the February 6, 2025, partnership meeting clearly stated that: "Material decisions require 100% agreement among members". (See Appendix: 9.  Slides from Partner Emergency Meeting Highlighting Financial Distress and Risks (February 6, 2025)

This being said, neither I nor Mr. VanSickle — the remaining two equity partners — were consulted or informed of your engagement despite the fact that the claims in your letter directly affect my and Mr. VanSickle rights and interests as well as the general company's well-being.

**1.2. Scope of Representation**

The concern, therefore, is not whether the engagement from Mr. Montanaro has occurred but whether the positions advanced in your letter reflect a company-wide mandate or the perspective of only one faction in a 50/50 shareholder deadlock. When counsel acts on instructions that impact internal governance, equity rights, or reputational standing — particularly in the absence of a formal vote or board directive — there is a risk that the representation may not reflect the organization's interests as a whole.

**Under Rule 1.13(a),** a lawyer representing an entity must act in the interests of the entity itself, not its individual constituents. And **under Rule 1.7,** conflicts of interest must be avoided when acting for clients with diverging roles in the same dispute. If your March 17 letter was drafted based solely on input from Mr. Montanaro and Mr. Stear, without broader internal review, it may place your firm in a position of advancing personal positions as corporate ones.

### 1.3. Organizational Risk Considerations

**Rule 1.13(b)** further requires that counsel assess whether corporate officers are acting in ways that violate legal obligations or could cause substantial harm to the organization. In this matter, decisions by RedSense leadership — including the attempt to suppress critical threat alerts and the dismissal of raised discrimination concerns — may carry significant contractual and reputational risk.

If your firm was not fully aware of these issues at the time of your engagement, I understand how the March 17 letter may have taken shape. I am raising them now in the interest of clarity, to offer an opportunity for reflection, and to ensure that your firm's position remains aligned with the standards governing organizational representation.

Given the circumstances outlined above, there appears to be a risk that your firm was engaged without full corporate consensus or awareness of key internal issues. I fully acknowledge that this may have occurred in good faith and without complete visibility into RedSense's internal dynamics. I raise these concerns now to help clarify the foundation of your representation and avoid misunderstanding regarding the authority and context under which your letter was issued.

### 1.4. Concerns Involving Organizational Risk Factors

**Rule 1.13(b)** requires counsel to give due consideration when it appears that company executives may be engaged in conduct that violates legal obligations or risks substantial harm to the organization. In this case, three issues appear to fall squarely within that scope.

The first involves unresolved allegations of anti-immigrant discrimination and workplace harassment. These concerns were communicated in writing and supported by documentation including my resignation letter, internal correspondence, and screenshots (See Appendix: 2, 3, 6, 7, 8). The conduct involved direct statements by Mr. Stear and the absence of corrective action by Mr. Montanaro. As the only immigrant partner in RedSense — and a refugee — I raised these concerns in good faith. They remain unresolved.

As stated previously, it is troubling that your March 17 letter refers to and dismisses my ethical concerns multiple times without acknowledging the underlying context. Perceptions of discrimination are not only a protected legal matter, but also a human rights issue — particularly for individuals in vulnerable immigration categories. For transparency, I am in the process of preparing formal complaints with the Equal Employment Opportunity Commission (EEOC) and the Immigrant and Employee Rights Section (IER), and both executives were informed of this prior to your letter.

The second issue concerns the inclusion of a cease-and-desist demand that specifically targeted my continued communication with RedSense customers for the delivery of cybersecurity alerts. Your letter acknowledges that my messages involved "alerting the RedSense customers, partners, and prospective customers/partners to a potential adverse threat." Given RedSense's core business and contractual obligations, the request to halt those alerts raises serious concerns about the potential for organizational harm, specifically, customer withdrawal from contracts, claims of contractual breach from customers, and demands for refunds.

This risk was discussed at the February 6, 2025, Emergency Partner Meeting, which both Mr. Montanaro and Mr. Stear attended. The interruption of threat intelligence delivery was flagged as a serious risk with potential contractual, reputational, and financial consequences, especially considering the company's already fragile financial state.

As you can see, by March 17, 2025, the company had already been experiencing significant risks of refund claims, which would have been tremendously aggravated if the flow of security alerts had stopped. (See Appendix: 9.  Slides from Partner Emergency Meeting Highlighting Financial Distress and Risks (February 6, 2025)

My customer outreach focused on fulfilling RedSense's obligations and supporting client security. Phrases such as "ensuring seamless intel provision" and "honor my obligations to you as a RedSense customer" reflected a clear effort to protect both the company and its clients. Following those alerts, customers took meaningful defensive actions. Had I complied with the cease-and-desist, RedSense, and its customers could have faced not only operational disruption but also material liability and reputational damage. (See Appendix: 4.  Yelisey Boguslavskiy Email to Customers Regarding Security Alerts (March 14, 2025)

Thirdly, and most notably, the letter demands that I transfer *"all AdvIntel Reports and threat intelligence since inception."* These materials are proprietary to Advanced Intelligence LLC (AdvIntel) — a third-party company where I was employed from 2019 to 2022 — and are protected by standard confidentiality and intellectual property agreements. RedSense has no legal entitlement to these materials.

The demand made in Crowell & Moring's letter, especially demanded within 24 hours — had I complied — could have resulted in the unauthorized disclosure of confidential corporate materials belonging to a third party. While likely unintended, this may have inadvertently placed both myself and RedSense at risk of exposure to legal claims or reputational harm of:

- Potential civil claims by AdvIntel for IP infringement or breach of contract;
- Reputational harm in the cybersecurity industry, where respect for proprietary data is foundational;

- The appearance of unethical or improper competitive behavior.

This, along with the unresolved and well-documented discrimination concerns raised in writing by a refugee partner, falls squarely within the scope of **Rule 1.13(b)**. That provision requires counsel to evaluate and, where appropriate, act upon executive conduct that presents legal risk or organizational harm.

### 1.5. Additional Note on Scope and Alignment

I recognize that your March 17 letter may have been issued based on the direction provided by Mr. Montanaro in his executive capacity. However, as noted throughout this letter, he is also a shareholder engaged in an internal conflict, and the company remains in a state of unresolved governance deadlock. In such a context, **Rule 1.2(a)** highlights the importance of meaningful consultation with the organization as a whole — which, in this case, includes additional equity-holding partners who were neither informed nor involved.

Similarly, provisions under **Rule 1.7** caution against situations where representation may shift toward advancing the interests of individual constituents rather than the client entity. Given the overlapping roles of the executives involved and the substance of the legal demands issued in your name, it would be appropriate to reflect on whether this engagement remains fully aligned with the ethical boundaries governing organizational counsel.

Finally, **Rule 1.2(d)** prohibits an attorney from assisting a client in conduct the lawyer knows to be illegal or fraudulent. While I do not allege intent, the demand that I transfer proprietary data belonging to AdvIntel — a third-party company to which RedSense holds no legal rights — raises concern under this provision. If executed, this transfer could constitute unauthorized disclosure or misappropriation of protected intellectual property. To my understanding, even absent intent, this falls within the cautionary scope of **Rule 1.2(d)**.

## Part 2: Considerations, Observations, & Concerns Regarding Competence & Diligence

### 2.1. Overview: Volume and Seriousness of Assertions

Your March 17 letter, while brief in length (under 700 words), contains no fewer than 28 distinct statements — including sixteen accusations, seven factual assertions, and five formal demands. These statements concern matters of significant legal, reputational, and financial consequence. Given their weight, one would reasonably expect each to be grounded in factual evidence or supported by references to internal documentation.

However, the letter cites no evidence and attaches no materials. Based on information available to me — and appended to this letter — many of the claims appear either unsupported or directly contradicted by existing company records. I fully acknowledge that such issues may stem from oversight rather than intent, but the extent and seriousness of these unsupported claims raise appropriate concerns under the Rules of Professional Conduct, particularly:

- Rule 1.1 (Competence)
- Rule 1.3 (Diligence)
- To lesser extent Rule 4.1 (Truthfulness in Statements to Others)

The following observations are provided in that context.

### 2.2. Concerns Under Rule 1.1: Competence

**Rule 1.1(c)(1)** requires that attorneys seek their client's objectives through reasonably available means. In this case, before advancing serious claims — including those involving financial misconduct, intellectual property ownership, and misrepresentation — a review of key documents and communications could and should have been conducted. These materials include:

- The RedSense Partnership Agreement (the primary governance document, given the absence of a formal operating agreement);
- My formal resignation letter;
- Correspondence related to my resignation and the surrounding context;
- Internal records of financial transactions and invoice history;
- Communications related to contractor relationships and compensation;
- Direct contact with me or with Mr. Bryan VanSickle, the other co-founder and 15% equity holder.

Each of these sources was accessible and relevant. Had they been reviewed thoroughly, many of the letter's assertions would have been contradicted.

EXHIBIT E

### 2.2.1. Use of Undefined or Questionable Legal Terms

The letter states that I "resigned [my] partnership duties from RedSense." This phrase is not defined in the RedSense Partnership Agreement (see Appendix: 1.  RedSense Partnership Agreement (January 25, 2023), nor is it used in applicable Wyoming Statutes, which are used as RedSense governing principles due to the absence of an operating agreement. To my knowledge, in the RedSense context, it has no legal basis and appears to have been introduced solely within this letter. Its use as a justification for concluding that I am no longer affiliated with RedSense is, at minimum, unclear and misleading.

As the letter itself notes, I resigned from the role of Chief Research Officer. I did not resign from my position as a partner, shareholder, or co-founder — a point clearly stated in my resignation letter, which the March 17 communication does not reference or quote.

Similarly, the claim that I was "purporting to represent RedSense" overlooks the company's own precedent. Mr. VanSickle, who also holds a 15% stake, has never held an internal role but continues to represent the company and participate in partner decisions. Therefore, representational rights at RedSense have never been tied to employment status.

A review of company structure and precedent would have clarified these points. That review does not appear to have occurred.

### 2.2.2. Use of Legal Conclusions Without Supporting Framework

The letter also states that certain conduct "rises to a tort" and may support punitive damages. However, no specific tort is identified, no elements of the claim are stated, and no factual basis is offered. Legal conclusions of this kind, without a clear framework, can be confusing and potentially overreaching — particularly in formal communications between counsel and a third party. At minimum, they suggest that key legal issues may not have been fully evaluated before the letter was sent.

### 2.2.3. Financial Misconduct Allegations Made Without Evidentiary or Technical Basis

A particularly serious concern arises from the letter's suggestion that I — and those I worked with — may have been involved in financial misconduct, potentially amounting to embezzlement or fraud. The key sentence reads:

*"You were responsible for approving RedSense payments on invoices received from third-party companies, such as but not limited to Affix Advisory, LLC and EasyStaff UAB, purporting to perform work for RedSense."*

This wording not only implies that I had the real authority to approve payments — which is factually incorrect — but also questions the legitimacy of the work performed by these entities. It implicitly asserts that Crowell & Moring has concluded, on behalf of its client, that these services may have been fraudulent or fabricated. This is a highly consequential claim.

No evidence is cited to support this allegation. No documentation is referenced. No inquiry was made to me or to RedSense's other co-founder. In fact, a minimal factual review would have revealed that:

- I had no access to financial systems and no payment or approval authority.
- All payments — including those to Affix Advisory and EasyStaff UAB — were approved and processed by the finance team, with final sign-off by Mr. Montanaro and Mr. Stear.
- The structure used (e.g., through sole proprietorships) was well known and explicitly approved — and, in fact, mirrored the structure used by Mr. Montanaro for his own compensation.
- EasyStaff UAB was used to process payroll for RedSense's engineering team, oversight, and internal approval since February 2023.

To suggest that the work of these entities was merely "purporting" to support RedSense — and that I personally benefited from that work in a fraudulent manner — is inaccurate and, as issued without proper investigation, could carry reputational and legal implications.

Additionally, the services performed were not theoretical or vague. My team and I consistently delivered measurable results — including work products used directly by RedSense clients. That work is documented internally and externally. We also continued to provide those services even after our compensation was withheld in order to fulfill RedSense's obligations to its clients.

**Under Rule 1.1**, if an attorney lacks the expertise to evaluate complex, technical subject matter — such as the legitimacy of cybersecurity services or the structure of specialized staffing agreements — they are expected to seek appropriate guidance or refrain from making unsupported conclusions. In this case, the technical and organizational complexity of the matter should have warranted a more careful review. Proceeding without that review raises serious concerns about the level of competence exercised in issuing the March 17 communication.

### 2.2.4. Improper Demands for Property and Intellectual Assets

Crowell & Moring's claims regarding property retainment are among the most perplexing from a competence standpoint. Not only is no legal basis provided for the demand — given that no property agreement exists between myself and RedSense — but the list of items referenced

appears to consist largely of intellectual property unrelated to RedSense altogether but to third parties.

For instance, the letter demands a transfer of ownership over:

*"(2) Pyrus platform including all data since inception."*
The Pyrus platform is proprietary software owned by Pyrus LLC, a private company headquartered in San Francisco, CA. RedSense holds no rights to this intellectual property, and even if it did, any such claim should be directed to the company itself via legal@pyrus.com, not to me.

*"(3) EasyStaff Deliverables, including code, data, research, LLM, documentation."*
The software and the "large language model (LLM)" in question are a property of OpenAI. As with Pyrus, if Crowell & Moring or RedSense believe there is a valid claim to the LLM's ownership, the appropriate course of action would be to contact OpenAI at help.openai.com.

*"(6) OpenCTU instance and all RedSense Threat Intelligence contained therein."*
Even assuming the intended reference was to "OpenCTI" rather than the misspelled "OpenCTU," this demand reflects a fundamental misunderstanding of the platform's nature. OpenCTI is open-source software freely available for public deployment and use. While a RedSense-hosted instance may include internal threat intelligence or configuration data, the platform itself — and its standard deployments (i.e., instances) — are not proprietary assets. Referring to "the OpenCTI instance" as though it constitutes an exclusive, transferable property of RedSense misunderstands the technical model.

These types of requests may reflect an incomplete or insufficient due diligence process in assessing property rights and raise serious concerns regarding the accuracy and appropriateness of the demands set forth from a competence standpoint.

Finally, the last claim is the most concerning.

*"(7) All AdvIntel Reports and threat intelligence since inception."*
Advanced Intelligence, LLC (dba AdvIntel) is a separate entity where I was employed from 2019 to 2022. While I had access to certain reports and threat intelligence during my time there, this material is proprietary to AdvIntel. RedSense holds absolutely no rights to this intellectual property, especially for the years predating RedSense's existence ("since inception").

By demanding that I transfer these materials, Crowell & Moring is, in effect, requesting that I engage in unauthorized disclosure of confidential corporate assets and an unauthorized transfer

of intellectual property — conduct that may constitute a serious legal and professional violation, including potential intellectual property theft.

From a competence standpoint, it would have been advisable for Crowell & Moring to consider that demanding a former employee to transfer the proprietary material of a third-party company — particularly one to which its client holds no legal entitlement — is precarious. Moreover, making such a request on RedSense's behalf may expose the company to legal and reputational harm during the course of Crowell & Moring's representation. This, in turn, raises serious concerns under **Rule 1.1(c)(2)** of the Rules of Professional Conduct, which cautions against conduct that may prejudice the interests of the client through lack of competence.

This demand also raises concerns about **Rule 1.2(d)**, **Rule 1.13(b),** and potentially **Rule 4.1.**

### 2.2.5. The mischaracterization of Subjective Statements as Falsehoods

The March 17 letter asserts, on four separate occasions, that my stated reasons for resignation — including "ethical" and "contractual" concerns — are false. This repeated framing reflects a failure to distinguish between subjective rationale and objectively verifiable falsehoods. Concerns, especially ethical, are inherently personal and perception-based; they are not binary claims that can be deemed true or false in a legal sense.

By characterizing these statements as "false," the letter risks misrepresenting my motivations and blurring the legal distinction between expressed opinion and defamatory misstatement. This conflation not only misrepresents my position but may also reflect a lack of legal care in how such sensitive language was framed — especially given the reputational consequences of labeling one's resignation rationale as knowingly untrue.

### 2.3. Concerns Under Rule 1.3: Diligence

The March 17 letter issued by Crowell & Moring includes 28 statements, many of which are presented as definitive factual assertions or legal conclusions, yet no evidence is cited, and no supporting materials are referenced. This is concerning in itself. More troubling is that several of these claims are contradicted by documentation readily available to Crowell & Moring — including company agreements, tax filings, internal correspondence, and direct sources.

What is even more concerning, however, is that evidence that did contradict Crowell & Moring's statistics was available, and a due diligence review would have prevented dubious claims or direct exposure of RedSense to potential harm (such as in the case of demand to handle AdvIntel property to RedSense).

A diligence review would likely have prevented these misstatements. The following examples illustrate this concern:

### 2.3.1. Incorrect Legal Names

The letter misspells both my legal name ("Yelisey Bohuslavskiy" instead of Elisei Boguslavskii) and the company's registered name ("RedSense LLC" instead of Red Sense, LLC). While minor, these errors suggest a lack of document verification.

### 2.3.2. Misrepresentation of Resignation Timeline and Scope

The letter states: "It is our understanding that you have resigned your partnership duties from RedSense as of February 24, 2025." However, a review of my resignation letter — which should have formed the basis for such a claim — would have made clear that this is inaccurate on multiple levels.

First, I did not resign from my role as a partner; the letter explicitly states: *"Naturally, I will continue to perform my role as a partner and strive to resolve the ongoing misalignments within the partnership and shareholder domains."* (See Appendix: 2.  Yelisey Boguslavskiy Resignation Letter (February 24, 2025)

Second, I specified a resignation date effective as of February 26, 2025, from my operational role as Chief Research Officer, not as of February 24, as stated. This is important because my access to internal systems — and that of my entire engineering team, none of whom had resigned — was cut off early on February 25, prior to the resignation date I had indicated. This sequence suggests not a voluntary resignation from the CRO role but a de facto termination.

### 2.3.3. Clarification Regarding Representational Status Within the Company

The statements that I was "purporting to represent the interests of RedSense" and must "cease and desist representing that [I am] currently affiliated with RedSense" carry meaningful implications. Framed in this way, they suggest that I may be misrepresenting my legal standing within the company — a claim that could imply improper conduct if accurate.

However, this appears to reflect a misunderstanding of RedSense's internal structure. Even a brief review of the RedSense Partnership Agreement (See: Appendix: 1.  RedSense Partnership Agreement (January 25, 2023) and the company's most recent tax filings confirms that I remain a co-founder, equity partner, and shareholder of Red Sense, LLC. My resignation applied solely to an internal operational role, not to my legal position within the organization.

### 2.3.4. Inaccurate and Unsubstantiated Financial Allegations

The March 17 letter states: "Additionally, following your resignation, we have become aware that you were responsible for approving RedSense payments on invoices received from third-party companies, such as but not limited to Affix Advisory, LLC and EasyStaff UAB, purporting to perform work for RedSense."

This language implies that I may have misused company funds or participated in improper financial conduct — suggestions that, if unfounded, carry significant reputational, professional, and legal implications. Claims of this nature warrant careful investigation and evidentiary support. However, even a review of internal financial controls would have shown that I had no real authority to approve payments, nor did I have access to RedSense's financial systems, accounts, or banking credentials at any time during my tenure.

My role was limited to requesting payment for services already performed. All approvals and disbursements were executed by the finance department and formally authorized by Mr. Montanaro and Mr. Stear. In fact, I would not have been technically capable of approving an invoice even if I had attempted to do so.

Further, the vendor relationships in question were well-known and fully approved by RedSense leadership. Affix Advisory, LLC is a sole proprietorship I have used for over two years to receive payments — an arrangement explicitly approved by all acting partners, including Mr. Montanaro, who personally authorized those payments on all occasions.

Likewise, EasyStaff UAB has served as RedSense's payroll provider for the engineering team since early 2023. Payments to EasyStaff were reviewed, processed, and approved internally, and the services rendered under those contracts were fully delivered. The nature of these arrangements was indistinguishable from other contractor relationships maintained by the company and had not previously been questioned.

However, Crowell & Moring does not appear to have verified the scope or quality of the work performed under these engagements. My team consistently met all delivery requirements — including threat intelligence, research, and client reporting — as supported by internal performance records and client feedback. Despite lapses in compensation, the team continued to support RedSense clients in good faith.

Had this context been reviewed, the conclusion that these vendors were merely "purporting to perform work" would likely not have been reached. At a minimum, the potential absence of diligence before raising such serious allegations is concerning — and inconsistent with the standards set forth under Rule 1.3.

### 2.3.5. Absence of Legal Foundation for Asserted Property Claims

As outlined above, several of the property claims made in Crowell & Moring's letter appear to lack a legal basis. A diligence review would have revealed that many of the referenced items are not owned by RedSense and fall outside the scope of any reasonable company claim.

Importantly, to my knowledge, RedSense has not implemented any intellectual property assignment or confidentiality agreements with me — or, to my understanding, with other parties involved in the development of the materials in question. Mr. Montanaro, on the February 6, 2025 emergency meeting for partners, admitted this in writing by stating: "No Operating Agreement (NDA, CIAA, Code of Conduct, etc.)" (See Appendix: 9. Slides from Partner Emergency Meeting Highlighting Financial Distress and Risks (February 6, 2025). In the absence of such agreements, the ability to assert ownership over much of the referenced content is unclear and likely unenforceable.

The omission of this foundational context raises further concern regarding the level of diligence exercised prior to issuing the March 17 communication.

### 2.3.6. Mischaracterization of Resignation Rationale Without Evidentiary Review

The repeated claim that my stated reasons for resignation — namely, ethical and contractual concerns — are "false" directly contradicts documentary evidence that was available to Crowell & Moring and should have been reviewed prior to making such assertions. My resignation letter clearly states:

*"I find it necessary to step away as CRO due to ethical and operational concerns that I can no longer overlook. The absence of formalization of my role, breach of partnership agreements, legitimization and normalization of anti-immigrant hate speech by Red Sense executives, and, most importantly, critical mass mistreatment of my subordinates have all compromised my ability to act as a CRO."* (See Appendix: 2. Yelisey Boguslavskiy Resignation Letter (February 24, 2025)

These same reasons for resignation were reiterated in a contemporaneous email to leadership:

*"Due to the unilateral and arbitrary use of company finances by the CEO — actions we perceive as coercion against our subordinates — as well as breaches of signed contracts and unresolved financial disputes, we are formally resigning from our respective roles."* (See Appendix: 3. Yelisey Boguslavskiy Resignation Email to Leadership (February 24, 2025)

Supporting documentation includes references to: (1) breach of clause 4.3 of the RedSense Partnership Agreement (See: Appendix: 1.  RedSense Partnership Agreement (January 25, 2023); (2) non-payment for completed engineering work; and (3) statements made by Mr. Stear, which were perceived as discriminatory. Even if such issues were disputed or not independently verified, the rationale expressed in my resignation materials was subjective and clearly framed as a personal decision. Labeling these motivations as "false" suggests a misreading of the distinction between a personal account and a falsifiable legal claim — a distinction that should have been recognized and respected. A review of the resignation letter and accompanying context would likely have prevented this mischaracterization.

### 2.3.7. Unclear Legal Threats and Lack of Tort Basis

The statement: "This rises to a tort, for which RedSense can pursue damages, including punitive damages against you" constitutes a serious legal allegation. To my udnersntaing, statements of this nature must be grounded in a clearly articulated legal basis, including: (1) identification of the tort alleged; (2) the elements supporting liability; and (3) evidence of actual damages.

No such foundation is provided in the March 17 letter. Without these elements, this claim appears speculative and unsubstantiated. The inclusion of a threat involving punitive damages — particularly in the absence of any clear legal theory — raises substantial concerns under Rule 1.3, which requires attorneys to act with diligence and presumes that attorneys refrain from asserting claims without adequate investigation or preparation. In contexts involving potential reputational or legal harm, this obligation is especially critical.

### 2.4. Observations Regarding Rule 4.1: Truthfulness in Statements to Others

I raise the following observations in good faith and without alleging intentional misconduct. However, given the seriousness of the March 17 letter and the potential legal and reputational consequences of the statements it contains, I believe it is appropriate to highlight certain representations that may raise concerns under Rule 4.1 of the New York Rules of Professional Conduct, which governs the duty of truthfulness in statements to others.

**Rule 4.1** prohibits attorneys from knowingly making a false statement of material fact or law to a third party. While I do not suggest that any such statements were made knowingly or with intent to mislead, several assertions in the March 17 letter appear to be contradicted by readily available evidence — or rely on legal characterizations that may not be factually or contractually supported.

These concerns are not raised to challenge Crowell & Moring's or Ms. Preetha Chakrabarti's integrity but rather to emphasize the importance of ensuring that any communications made on

behalf of RedSense — particularly those involving legal threats or reputational implications — reflect an accurate and complete understanding of the relevant facts and context.

### 2.4.1. Affiliation and Standing Mischaracterization

The statements directing me to "cease and desist representing that [I am] currently affiliated with RedSense," and asserting that I am "purporting to represent RedSense," appear difficult to reconcile with documentation that was either already in RedSense's possession or readily accessible. As of the date of the letter, I remained a co-founder, shareholder, and equity partner in Red Sense, LLC — a status reflected in the company's own tax records, governing agreements, and internal correspondence, including my resignation letter, which confirmed my continued participation as a partner.

Given the availability of this information and the definitive nature of the language used in the letter, it is unclear how the conclusion about my lack of affiliation was reached. While I make no assumption as to the process underlying these statements, this disconnect may raise concern under Rule 4.1 if the representations were made without a full review of the relevant documentation.

### 2.4.2. Invoice Approval and Financial Misconduct Implications

The letter also states that "you were responsible for approving RedSense payments on invoices received from third-party companies… purporting to perform work for RedSense," and that this conclusion was based on "our investigation to date." This language suggests that improper financial conduct may have occurred and that a formal inquiry preceded the letter. Given the seriousness of this implication, the evidentiary basis for such a conclusion is highly material.

If the referenced investigation did occur, it is reasonable to expect that these facts would have been discovered. If it did not, then the representation that it did may be misleading. While I do not suggest any intent to misstate, the inclusion of such serious allegations — without apparent consideration of available counter-evidence — these concerns may warrant further reflection under Rule 4.1, which cautions against making material misstatements of fact in representations to others.

### 2.4.3. Intellectual Property Claims Regarding Third-Party Materials

As with the other examples, the demand for the transfer of intellectual property materials — including assets belonging to third parties — may have resulted from oversight or an incomplete understanding of the facts. I want to emphasize clearly that I do not believe this was done with any intent to mislead.

However, the March 17, 2025 letter was signed by Ms. Preetha Chakrabarti, whose profile on Crowell & Moring's website describes her practice focus as "Intellectual Property Litigation" and "IP Prosecution and Portfolio Management." Given this stated expertise, it would be reasonable to expect that, prior to making formal claims on behalf of RedSense regarding ownership of external or third-party assets, the following baseline steps would have been taken:

- Reviewing or requesting legal documentation establishing RedSense's ownership over the property in question;
- Verifying whether companies such as Pyrus or AdvIntel were, in fact, the rightful legal owners;
- Determining whether there was any evidence that I had retained intellectual property belonging to RedSense.

Such a review would have shown that no intellectual property agreement existed between myself and RedSense, and that there is no indication I retained any proprietary company assets. More critically, it would have confirmed that RedSense has no legal claim to the intellectual property of entities like AdvIntel — making the request that I transfer such material unsupported and arguably inappropriate.

While I recognize that this may have resulted from miscommunication or an incomplete factual record, the inclusion of these demands — especially in a formal letter signed by an IP specialist — raises questions about whether sufficient care was taken to verify the basis for the claims. In that context, and given the identifiable professional expertise involved, the statements may raise concerns under Rule 4.1 if they were made without confirming material facts relating to ownership and legal entitlement.

### 2.4.4. Misstatement Regarding Resignation Motivations

Crowell & Moring's repeated assertion that my resignation was "due to ethical and contractual concerns" appears to presume a level of insight into my personal reasoning that is not only difficult to justify but also unsupported by any reference to contrary facts. The March 17 letter categorically labels my stated rationale as "false" four times without citing or acknowledging my resignation letter or contemporaneous resignation email — both of which clearly articulate the ethical and contractual issues that led to my decision.

The letter's framing risks implying that I knowingly misrepresented the basis for my resignation — an implication that, if unfounded, could have damaging reputational consequences. This is especially relevant in light of my professional role in the cybersecurity industry, where I maintain a highly visible presence, longstanding client relationships, and a public platform that includes over 21,000 LinkedIn followers. Based on LinkedIn data, my resignation announcement

EXHIBIT E

was viewed by thousands of industry professionals, and any suggestion that I publicly mischaracterized my departure could have lasting consequences for my credibility and professional integrity.

While I recognize that this may have resulted from a narrow or incomplete review of the circumstances, the documentation supporting my resignation rationale was available and could have easily been consulted. Additionally, it is a basic and well-accepted principle that individuals are best positioned to express their own motivations for a decision — particularly one involving ethics, contract interpretation, or personal conviction.

**Part 3: Considerations, Observations, & Concerns Regarding Unsupported Legal Claims and Disregard for Dignity and Fairness**

**3.1. Concerns Under Rule 4.4(a): Respect for Rights of Third Persons**

**3.1.1 Suppression of Cybersecurity Alerts with Potential Harm to Third Parties**

One of the most troubling aspects of the March 17 letter is its directive that I "cease and desist all communications with RedSense customers." In practical terms, this would have halted the delivery of time-sensitive cybersecurity alerts to RedSense's clients — alerts that, at the time, represented the only active communication channel available to those clients regarding ongoing adversarial activity.

These alerts were not routine messages. They addressed active campaigns by threat actors such as INC, BlackSuit, Safepay, Supershell, Matanbuchus, Bashlite, Gafgyt, and Akira — intelligence derived from internal sources and, in some cases, corroborated through law enforcement contacts. (See Appendix: 4.  Yelisey Boguslavskiy Email to Customers Regarding Security Alerts (March 14, 2025). Multiple customers responded with appreciation and acted immediately on the information with quotes like: "this is invaluable insight.", "This is really good information", "Acknowledge and thank you", "Thank you, we're one it!". "Please keep us updated on any new developments." Literally none expressed concern about impropriety or confusion.

Notably, approximately 40% of the discovered targeted organizations for these alerts were in the healthcare sector (See Appendix: 5.  Target Victimology Chart for Alerted Campaign (March 17, 2025), where ransomware events can have real-world implications for patient care, data integrity, and operational continuity. The demand to stop these alerts risked leaving clients exposed — with no identifiable benefit to RedSense itself. At best, this directive served the personal purposes of Mr. Montanaro and Mr. Stear with no business or legal function; at worst, it placed clients at risk.

While I continued to deliver these alerts in good faith — even after team compensation had lapsed — the March 17 letter sought to terminate that work abruptly; if I had complied, several of the threat scenarios later mitigated by customers might have escalated into operational or reputational damage. This concern is not hypothetical; correspondence at the time confirms that multiple alerts resulted in direct defensive action.

In light of this, the cease-and-desist directive raises serious ethical concerns under Rule 4.4(a), which prohibits the use of legal measures that serve no substantial purpose beyond burdening or harming third parties. Here, the affected third parties were RedSense's own customers — whose

security posture would have been materially undermined by compliance with the demand. Given the public interest and potential national security implications, this type of legal threat — without a clear factual or contractual basis — appears not only inappropriate but ethically fraught.

### 3.1.2. Attempt to Silence Ethical Concerns, Including Discrimination and Anti-Immigrant Harassment

One of the primary reasons for my resignation — as clearly stated in my resignation letter and resignation-day correspondence — was my ongoing concern over discrimination, harassment, and disparate treatment based on my refugee and immigrant status. These concerns were not hypothetical. They were supported by direct evidence and known to multiple members of RedSense leadership.

Over the course of my time at RedSense, I experienced and reported discriminatory conduct, including explicit verbal threats from CTO Kevin Stear (See Appendix: 6.  Screenshots of Messages from Kevin Stear Regarding Immigration/Refugee Status (January 22, 2025). These comments were not just unprofessional — considering their data (right after the new administration took office), they were targeted, personal, and directly tied to my identity as a refugee. Several were directed not only at me but at members of my family, who also fled the Russian invasion in Ukraine and are refugees as well.

I have immediately reported this incident to all RedSense partners and members of leadership - on the morning of January 23, 2025, right after the incident. (See Appendix: 8.  Yelisey Boguslavskiy Letter to Partners Regarding Immigration-Based Attacks (January 23, 2025).

Here, I clearly explained to the entirety of RedSense leadership the ethical aspect of the ongoing attack on me, which provides clear ethical grounds for the statements that Crowell & Moring claim to be false and demand to retract:

*"As such, the threat to report me to an immigration authority is profoundly offensive and unjust. Especially considering the political climate related to immigration unfolding right now. Overall, I think that threatening a refugee with a report to immigration authorities is simply one of those ethical lines, like calling out someone based on race, gender, or sexuality, that are simply not crossed in a civilized society."* (See Appendix: 8.  Yelisey Boguslavskiy Letter to Partners Regarding Immigration-Based Attacks (January 23, 2025).

Incidents like this were raised internally before 2025. CEO Dave Montanaro was made aware as early as April 2024. Other partners, including Bryan VanSickle and former partner Michael Zeiger, also acknowledged the potential presence of ethnic or immigration-based bias against me

from both Mr. Stear and Mr. Montanaro. Yet, no action was taken. No investigation occurred. No apology was offered.

The pattern of disparate treatment is well documented:

- Like Mr. VanSickle, I held no formal title at RedSense. But unlike him, my standing as a partner was questioned.
- Payments routed through sole proprietorships or contractors — a common structure used by both myself and Mr. Montanaro — were only treated as suspicious in my case.
- When Mr. Stear abruptly resigned and disappeared for a week in June 2024, no disciplinary consequences followed. When I resigned formally, my accounts were shut off within 24 hours, and legal threats immediately followed.

In this context, the March 17 letter's demand that I remove any reference to "ethical and contractual concerns" from my resignation and public communications — paired with its repeated claim that my concerns were "false" — was both inaccurate and especially concerning given the sensitive nature of the concerns raised. It appears to go beyond legal positioning and veers into an effort to silence a person raising credible discrimination-related concerns, all while I am preparing a legal action before the Equal Employment Opportunity Commission (EEOC) and the Immigrant and Employee Rights Section (IER).

There is no legal foundation for this removal demand. No confidentiality agreement. No defamation ruling. No contractual or procedural restriction. Yet the demand was made through formal counsel, with implied threat, in a letter distributed to others. The practical effect of the demand — even if unintended — may have been to discourage protected expression, inhibit internal transparency, and place additional stress on an individual, raising concerns rooted in identity-based discrimination.

Viewed in that light, the inclusion of this demand may raise serious concern under Rule 4.4(a) of the New York Rules of Professional Conduct, which prohibits using legal tools in a way that causes harm or embarrassment to third parties without a legitimate legal purpose. It may also invite deeper scrutiny, as the apparent intent — or at least the foreseeable outcome — was to intimidate and silence someone attempting to speak openly about mistreatment rooted in discrimination.

### 3.1.3. Tone, Threats, and the Potential Use of Legal Instruments to Intimidate

Beyond the factual and procedural issues raised throughout the March 17 letter, its overall tone, structure, and presentation convey an approach that feels less like a good-faith legal engagement and more like an attempt to exert personal, reputational, and emotional pressure.

Most notably, the letter demands that I "respond… within 24 hours to confirm that [I] have complied with the demands." This deadline is presented as binding, yet no legal authority — no court order, contractual clause, or emergency basis — is cited to justify it. There is no explanation for the timeframe nor any indication of what consequence might follow. This may have created a sense of urgency that was not supported by any cited legal basis or contractual authority, which, when paired with serious accusations and a formal letterhead, carries the appearance of coercion, not resolution.

The letter goes further. It includes over a dozen serious claims — including allegations of misconduct, deception, misuse of funds, and misappropriation of property — without citing evidence, referencing any investigation, or offering an opportunity for response. The tone is accusatory and categorical. At no point is there any recognition of my standing as a co-founder, equity partner, or contributor to the company's growth. There is no acknowledgment of my attempts to continue serving customers in good faith — or of the internal context in which these allegations arise.

The March 17 letter also includes language that may understate or fail to properly acknowledge the role of those who worked under my leadership and contributed meaningfully to RedSense operations. It describes third-party contractors — including members of my engineering and threat intelligence team — as having "purported to perform work for RedSense." This phrase not only questions the legitimacy of their contributions, it disrespects professionals who delivered critical services during a period of operational uncertainty. These individuals, including international engineers hired through vetted channels, continued supporting RedSense clients without pay out of loyalty to the company and its mission. The letter's tone misrepresents their contributions and may undervalue the legitimate work performed by these professionals.

These elements — the 24-hour deadline, the personal tone, the broad, unsupported claims, and the dismissal of legitimate work — suggest that legal instruments invoked in the March 17 letter — particularly in tone, structure, and urgency — may have had the unintended effect of placing disproportionate pressure on the recipient, rather than fostering resolution.

**Under Rule 4.4(a)** of the New York Rules of Professional Conduct, lawyers must not use legal means that have no substantial purpose other than to embarrass, delay, or burden a third party. When a communication asserts serious accusations, demands immediate compliance, dismisses

critical work, and pressures a partner and their colleagues without substantiation or legal necessity, that boundary may have been crossed.

## 3.2. Concerns Under Rule: 3.1. – Non-Meritorious Claims and Contentions

### 3.2.1. Unsupported Legal Claims and Demands Without Evidential Basis

Crowell & Moring's March 17 letter includes a substantial number of accusations and demands that, on review, appear to lack both legal and factual foundation. Many are unsupported by the company's own records or contradicted by existing documentation that the firm either did not review or disregarded.

The following assertions made in the letter exemplify this pattern:

1. That I "resigned [my] partnership duties" as of February 24, 2025 — despite my resignation letter stating otherwise and reaffirming continued partnership standing.
2. That I am "not authorized" to communicate with customers or partners — with no reference to any policy or agreement limiting this activity.
3. That I am merely "purporting" to represent RedSense — despite tax filings, internal correspondence, and the Partnership Agreement confirming my legal status as a co-founder and equity partner.
4. That my stated reason for resignation — "ethical and contractual concerns" — is false, even though those concerns were expressed consistently across resignation documents, and internal emails.
5. That my communications "disrupted" customer relationships — with no evidence of harm and positive feedback documented from recipients.
6. That my conduct "rises to a tort" — without identifying the tort, the elements of harm, or any actionable theory under the law.
7. That I approved payments or had control over vendor invoices — despite internal RedSense processes showing I held no such access.
8. That third-party vendors (Affix Advisory, LLC and EasyStaff UAB) were "purporting" to perform work — even though these were longstanding, approved vendors with documented deliverables.
9. That I financially benefited or improperly enriched myself — a claim of extraordinary seriousness made with no supporting detail or evidence.
10. That I retained RedSense property I was not entitled to — despite the lack of any intellectual property, employment, or confidentiality agreement defining such rights.

Additionally, the following demands appear similarly ungrounded and possibly overreaching:

11. That I cease all communications with RedSense customers — despite the absence of any contractual or legal bar to doing so.

12. That I forward replies from those customers to Legal@RedSense.com — a directive with no cited basis in policy, agreement, or law.

13. That I cease representing myself as affiliated with RedSense — in contradiction to my ongoing ownership status.

14. That I delete references to ethical or contractual concerns from my resignation post — despite that statement being protected opinion and expression and tied to discrimination claims.

That I make no further reference to the same — a sweeping and vague prohibition with no apparent legal enforceability.

Together, these claims form a pattern of legal claims presented without cited evidentiary or contractual support and in a tone that implies formal authority while failing to meet the threshold of legal substantiation. When a firm of Crowell & Moring's stature sends a letter of this magnitude and tone yet declines to cite a single piece of evidence, policy, or governing law to support its contentions, it raises serious concerns under Rule 3.1.

In particular, the gravity of some of these accusations — including implied fraud, embezzlement, and intellectual property theft — demands the highest level of diligence. To assert them without clear supporting facts or contractual foundation does not merely suggest carelessness; it may reflect the use of legal threats to gain leverage in an internal corporate dispute rather than to assert valid rights.

Rule 3.1 is designed to prevent this very scenario — where the legal process is used not to pursue legitimate claims, but to pressure, burden, or delegitimize another party, especially when that party lacks equivalent resources or representation.

**Part 4: Considerations, Observations, & Concerns Regarding Misrepresentation**

## 4.1. Concerns Under Rule 8.4(c) — Misrepresentation

Several statements and demands contained in Crowell & Moring's March 17, 2025 letter appear to reflect a mischaracterization of both factual and legal circumstances, particularly in light of information that was available and could have supported a more accurate or balanced presentation.

While these issues may not reflect an intent to mislead intentionally, they raise concern that the letter may have adopted — perhaps inadvertently — the perspective of a single faction within RedSense leadership, namely Mr. Montanaro and Mr. Stear, as if it reflected the unified and authorized position of the company. This framing has contributed to a number of significant misstatements, particularly in the following areas:

### 4.1.1. Misrepresentation of Property Claims

Crowell & Moring's request for the transfer of materials, including proprietary content belonging to third parties such as AdvIntel, and its characterization of certain third-party platforms (such as Pyrus and OpenCTI) as RedSense property appear to reflect a misunderstanding of established ownership principles.

Similarly, the suggestion that I have improperly retained RedSense property lacks foundation. To date, there is no intellectual property assignment, NDA, or other agreement in place defining the company's exclusive rights over the collaborative materials in question. As previously stated, RedSense partners, including Mr. Montanary, openly recognized this as late as February 6, 2025, by stating: "No Operating Agreement (NDA, CIAA, Code of Conduct, etc.)" (See Appendix: 9. Slides from Partner Emergency Meeting Highlighting Financial Distress and Risks (February 6, 2025)

Throughout my tenure, all my shared work was conducted on RedSense-managed systems and to the best of my knowledge, remains fully accessible to the organization.

By framing these ownership claims as settled facts, the letter conveys an impression of misconduct that is not supported by available documentation. Without a contractual basis or clearly identified assets, the implication that I have withheld or misappropriated company property appears overstated and may mislead the reader regarding the legal and factual circumstances.

As a co-founder and equity holder in RedSense, I retain certain access rights to joint work products and internal materials. No specific property in my control or possession has been identified as inaccessible, and no evidence has been presented that I declined to return any company-owned assets which I supposedly owned. These omissions — combined with the absence of agreements establishing proprietary claims — raise concern that the March 17 letter misrepresents RedSense's legal position and overstates the facts in a manner that may implicate Rule 8.4(c).

### 4.1.2. Misrepresentation of RedSense Partnership Structure and Rights

As a one-quarter allocated equity holder in Red Sense, LLC, I retain clearly defined rights under both the company's governing documents and applicable LLC law. Several statements in Crowell & Moring's March 17 letter appear to overlook these rights, leading to a number of significant mischaracterizations, including assertions that:

- I resigned from my duties or rights as a partner, member, or owner;
- I do not represent RedSense;
- I am no longer affiliated with the company.

These statements are inconsistent with the written record. My resignation letter clearly states that I was stepping down from my operational role as Chief Research Officer while affirming my continued participation in the partnership. No board resolution, partner vote, or ownership transaction has occurred to alter my standing within the company.

On this basis, several of the demands made in the letter appear to be predicated on a misunderstanding of RedSense's internal governance. For example, the letter purports to:

- Prohibit or authorize my communications with customers;
- Issue cease-and-desist directives in connection with internal company matters;
- Require the transfer of intellectual property not owned by RedSense;
- Instruct me to remove public language referencing "ethical and contractual concerns";
- Demand compliance with all of the above within 24 hours.

There is no legal contractual or company-wide authority cited to support these directives. As an equity holder and co-founder, I retain the right to communicate with customers — many of whom were introduced to RedSense through my professional relationships. My communications were clearly factual, non-commercial, and focused on active cybersecurity threats. (See Appendix: 4. Yelisey Boguslavskiy Email to Customers Regarding Security Alerts (March 14, 2025).

I have signed no confidentiality, non-compete, or assignment agreement that would prohibit such outreach. Additionally, no formal company action — such as a partner vote — appears to have been taken to justify these restrictions.

Crowell & Moring's suggestion that these communications were "improper," and its instruction to redirect all replies to Legal@RedSense.com, further misrepresents the nature of both my standing and my outreach. The content of these messages reflected:

- My fiduciary obligations as a shareholder;
- My professional and ethical duties within the cybersecurity community;
- My right to lawful, non-defamatory expression.

The implication of wrongdoing in this context is not only inaccurate but also potentially misleading in light of the documented purpose and content of my communications.

Finally, the statement that my resignation "due to ethical and contractual concerns" was false — offered without acknowledgment of my resignation letter or the broader documented context — further distorts the facts. My stated concerns were consistent, well-documented, and tied to protected activity. Characterizing them as false appears to misframe a personal and good-faith rationale can be seen as a form of a reputational attack without supporting evidence.

Taken together, these assertions and demands suggest a pattern of factual overreach or omission that may raise ethical concerns under Rule 8.4(c), particularly where they contribute to a materially inaccurate portrayal of my role, rights, or intent.

### 4.1.3. Misrepresentation of Financial Processes

As referenced multiple times in this document, Crowell & Moring's March 17 letter includes statements regarding RedSense's financial operations that appear to misrepresent both internal processes and my role within them. Most notably, the letter asserts that I was responsible for approving (and not requesting) invoices submitted by third-party vendors — a claim that suggests both improper authority and potentially unlawful conduct. This characterization does not reflect the operational reality and, without supporting documentation, may be misleading.

Also, the language used — referencing third-party invoices and alleging that I acted to "benefit personally" — appears to cast suspicion on a routine contractor arrangement. In practice, the use of my sole proprietorship, Affix Advisory, LLC, as a payment vehicle was fully disclosed and approved by RedSense leadership. In fact, a nearly identical structure is used by Mr. Montanaro himself for his own compensation, further illustrating that such arrangements were neither unusual nor improper within the company's operational model.

Additionally, the claim that vendors such as Affix Advisory, LLC and EasyStaff UAB only "purported" to perform work is particularly concerning. That phrasing implies fraud or deception and constitutes a serious allegation — one that, to date, has not been supported by any reference to evidence. My team's contributions over a two-year period were substantial, consistent, and well-documented, including internal deliverables, client-facing output, and external validation. To imply otherwise, without addressing that body of work, presents a misrepresented picture of the facts.

These statements — particularly when framed as findings of an "investigation" — appear to suggest financial misconduct where no factual basis has been provided and where internal records directly contradict the implication. Such representations may cause significant reputational harm to both myself and my team and, in doing so.

**Appendix**

The following documents, referenced herein, are attached or were previously provided and support the concerns raised:

1.  RedSense Partnership Agreement (January 25, 2023)
2.  Yelisey Boguslavskiy Resignation Letter (February 24, 2025)
3.  Yelisey Boguslavskiy Resignation Email to Leadership (February 24, 2025)
4.  Yelisey Boguslavskiy Email to Customers Regarding Security Alerts (March 14, 2025)
5.  Target Victimology Chart for Alerted Campaign (March 17, 2025)
6.  Screenshots of Messages from Kevin Stear Regarding Immigration/Refugee Status (January 22, 2025)
7.  Screenshots of Reactions from Kevin Stear Regarding Immigration/Refugee Concerns (February 10, 2025)
8.  Yelisey Boguslavskiy Letter to Partners Regarding Immigration-Based Attacks (January 23, 2025)
9.  Slides from Partner Emergency Meeting Highlighting Financial Distress and Risks (February 6, 2025)

## 1. RedSense Partnership Agreement (January 25, 2023)

### Red Sense Restructuring & New Owner Onboarding

The undersigned (a "**Founder**" acting on behalf of all "**Founders**") following a meeting on Thursday, December 22, 2022, whereby the Founders of **Red Sense, LLC** (the "**Company**") with headquarters at 109 E. 17th Street, Suite #5968, Cheyenne, WY 82001 have unanimously voted in the affirmative to onboard Elisei Boguslavskii as an equal Partner of Red Sense.

In consideration for equal ownership and equal partner status as the original Founders, the undersigned hereby agree as follows:

### 1. SEED FUNDING FOR THE COMPANY

Section 1.1 Each Red Sense, LLC Founder has agreed to provide $100,000 in seed funding or in-kind contribution for the formation of the Company:

**Kevin Stear** – to provide the initial cash infusion of $100,000 on or by [Funding Complete].

**Michael Zeiger** – to provide a follow-on cash infusion of $100,000 on or by December 31, 2022. Due to the theft of funds by AdvIntel, the partner committee has agreed to allow additional time for payment via partial forfeiture of sales revenue and bonuses until the remaining $55,000 owed is contributed.

**David Montanaro** – to provide a follow-on cash infusion of $100,000 [Funding Complete].

**Tarik Rahmanovic** – to provide "In kind funding" in the form of software and Intellectual Property for Company benefit and use by the Company in lieu of the $100,000 seed funding contribution.

**Bryan VanSickle** – to provide a follow-on cash infusion of $100,000 [Funding Complete].

**Based upon this binding agreement, in consideration for becoming a full and equal Red Sense Partner (Owner);**

**Elisei Boguslavskii** – to provide "In kind funding" in the form of Threat Intelligence and Intellectual Property for Company benefit and use by the Company in lieu of the $100,000 seed funding contribution as part of this agreement with Red Sense, LLC.

Section 1.2 Any future agreement that requires an ownership interest in Red Sense, LLC or additional company funding must be agreed to by a majority of the Founders.

### 2. OWNERSHIP STRUCTURE UPON FORMATION

Section 2.1 The Founders have also decided and agree that each of the (6) owners of Red Sense, LLC (upon the addition of Elisei Boguslavskii becoming an equal partner/owner with the same standing as the Founders); will own 15% of the company and will reserve the remaining 10% interest and ownership in the Company for strategic hires, advisory shares, and an employee stock option pool. For purposes of the rest of this agreement, we will use the term "Founder(s)" to mean the same as "Partner", "Founding

Partners" or "Equal Owner" as the company philosophy is that we all bring different points of value to the company, but we will all win together as one team.

Section 2.2 The shares issued to each Founder shall vest on a vesting schedule to be determined by the Founders. The purpose of the vesting schedule is to encourage the Founders to stay with the Company over the vesting period. If a Founder departs the Company prior to full vesting of his shares, the remaining portion of any unvested shares shall be returned to the Company in accordance with that vesting schedule.

Section 2.3 The shares issued to each Founder shall come from the same series and class of shares, such that there is no difference in the rights (including but not limited to voting and distribution rights) accorded to the shares issued to each Founder.

### 3. CONFIDENTIALITY

Section 3.1 The Founders agree to keep the terms of this collaboration and funding agreement confidential; disclosure of the collaboration and funding agreement will occur only on an as-needed basis and only upon consent of all Founders.

### 4. Red Sense FOUNDING PARTNER (OWNERS) COMPENSATION FRAMEWORK

Each of the Red Sense (Founding Partners / Owners) will be compensated according to the following principles:

Section 4.1. First, all Red Sense employees, contractors, and any general company expenses are paid before the quarterly profits are distributed to the Red Sense Owners in accordance with the percentage ownership of the Company. For example, at this time in January 2023, there are (6) Founding Partners (Owners) of Red Sense, LLC each with a 15% ownership stake.

Section 4.2. Second, before any quarterly profits are distributed to the Owners, 10% of all Sales Revenues which are recognized / received by Red Sense will be taken off the top and be put into a general pool (the Red Sense Company Growth and Operating Fund) which will be accrued and used by Red Sense, LLC to grow the business or for special cases. At any time, should the size of this fund grow larger that which is needed to accommodate anticipated company growth projections and needs, the Owners can vote by majority vote to distribute some of these funds to the Owners.

Section 4.3. Third, before any profits are distributed to the Owners, 10% of all Sales Revenues generated by Red Sense, LLC will be distributed to the Individual or individual(s) responsible for bringing such leads or opportunities to Red Sense, LLC which convert to a sale and company revenue. Payment of this distribution will be made upon receipt of revenue by Red Sense, LLC and the specific split of the 10% will be managed by the Red Sense Chief Revenue Officer (Head of Sales).

### 5. CONTRACTUAL COMMUNICATION AND DISPUTE RESOLUTION

Section 5.1 In the highly unlikely event that the Founders do not wish to continue their mutual collaboration in the Company, the Founders shall discuss a mutually agreeable separation and division of assets of the Company to ensure that the Founders have provided equivalent seed funding. More details will be documented in the Red Sense, LLC operating agreement (by-laws and buy/sell agreement).

## 6. REPRESENTATIONS AND WARRANTIES

Section 6.1 Each Founder has represented and warranted that he is not a party to any other agreement that would restrict such Founder's ability to perform his obligations as set forth in the original Founder Collaboration & Funding Agreement. Each Founder represents and warrants that no third party can claim any rights to any intellectual property or other proprietary right possessed by that Founder as it relates to the Company.

Likewise, Elisei Boguslavskii agrees to the above as well in consideration of becoming an Equal Owner of Red Sense, LLC.

## 7. CHOICE OF LAW

This Agreement shall be governed by and construed in all respects in accordance with the law of the state of Wyoming.

IN WITNESS WHEREOF for THIS AGREEMENT, and on behalf of Red Sense, LLC on January 25, 2023.

_____

Michael Zeiger

IN WITNESS WHEREOF for THIS AGREEMENT, and on behalf of Elisei Boguslavskii and AFFIX Advisory, LLC on January 25, 2023.

_____

Elisei Boguslavskii

EXHIBIT E

## 2. Yelisey Boguslavskiy Resignation Letter (February 24, 2025)

From:
Yelisey Bohuslavskiy
7000 JFK Blvd E,
Gutenberg, New Jersey, 07093
(202) 751-99-57

To:
David Montanaro
CEO
Red Sense, LLC
109 E. 17th St., Suite #5968
Cheyenne, WY 82001

Subject: Resignation from Chief Research Officer

Dear David,

I am writing to formally resign from my position as Chief Research Officer at Red Sense, LLC, effective 11 AM Wednesday, February 26, 2025.

I find it necessary to step away as CRO due to ethical and operational concerns that I can no longer overlook. The absence of formalization of my role, breach of partnership agreements, legitimization and normalization of anti-immigrant hate speech by Red Sense executives, and, most importantly, critical mass mistreatment of my subordinates have all compromised my ability to act as a CRO.

Remaining in my role under these circumstances would conflict with my professional ethics and personal principles. For over a year, I have attempted to reason with the company leadership, as I had hoped for a resolution that aligned with the values I strive to uphold, but given the current state of affairs, I see no viable path forward within Red Sense.

To facilitate a smooth transition during this period. I will ensure that all outstanding responsibilities are appropriately documented to minimize disruption.

Naturally, I will continue to perform my role as a partner and strive to resolve the ongoing misalignments within the partnership and shareholder domains.

Sincerely,

Yelisey

### 3. Yelisey Boguslavskiy Resignation Email to Leadership (February 24, 2025)

Hello,

This is an official notice from the management of the RedSense Intelligence Team:

- Yelisey Bohuslavskiy – Chief Research Officer, Head of Intelligence
- Igor Dmitriev – Strategic Manager, Head of Engineering

Due to the unilateral and arbitrary use of company finances by the CEO—actions we perceive as coercion against our subordinates—as well as breaches of signed contracts and unresolved financial disputes, we are formally resigning from our respective roles. (Resignation letters are attached.)

Should RedSense wish to continue working with us and our team, all future engagements must be conducted through a vendor agreement between RedSense and Affix Advisory.

- A Master Services Agreement (MSA) will govern the relationship between RedSense and the engineering team, including Igor Dmitriev.
- A separate MSA for CRO services will determine the relationship between RedSense and Yelisey Bohuslavskiy.

These agreements maintain the same budget and fund allocation previously designated for payments to the five team members, ensuring the following obligations are met:
- Payments to engineers
- Payment to the Strategic Manager
- Payment to the CRO
- All outstanding payments for work performed since January 1, 2025
- Withheld AdvIntel bonus payments, which constitute a direct breach of the partnership agreement
- Minimal operational spending costs

Should RedSense wish to engage under these new terms, it must first commit to settling all outstanding payments, including February 2025 payments for the engineering team, Igor Dmitriev, and Yelisey Bohuslavskiy, no later than Friday, February 28, 2025.

If RedSense does not provide a clear response indicating agreement or disagreement by 11:00 AM ET on Wednesday, February 26, 2025, Affix Advisory will consider this a rejection of the proposal. In that case, Affix Advisory will directly notify all current and prospective customers that, effective 11:00 AM ET on February 26, all intelligence services previously provided by the intel team will now be delivered exclusively through Affix Advisory.

### 4. Yelisey Boguslavskiy Email to Customers — March 14, 2025

This is Yelisey Bohuslavskiy, a partner and shareholder at RedSense.

I am writing from my personal email because my team and I, in my capacity as Chief Research Officer, have recently resigned from RedSense due to ethical and contractual concerns. As a result, RedSense terminated my access to my corporate email, Slack, and other formal means of communication.

Despite resigning as head of the RedSense intel team, I remain a co-founder, partner, and shareholder. As such, I continue to honor my obligations to you as a RedSense customer, ensuring **seamless intel provision and continuity**.

This letter concerns an **active adversarial campaign** that may target you based on previous targeting patterns of the ransomware groups involved.
This campaign is clearly aimed at major US healthcare firms, among other targets.

*I also encourage you to contact RedSense directly for any additional insights regarding the adversarial threat I am alerting you about or any other threat alerts in the future.*

Yesterday, we identified a major initiative launched by top Russian-speaking ransomware APTs, including **BlackSuit** and **Safepay** (with **Akira, Fog, Play, Lynx,** and **former BlackBasta** likely involved), aiming to industrially bruteforce vulnerable endpoints while simultaneously conducting a large-scale OSINT-based phishing campaign against major U.S. corporations.

The full report, highlighting 10 critical defensive measures, is attached as a PDF.

As this campaign is rapidly evolving, we are closely monitoring developments and will continue to provide updates.

As a major RedSense shareholder, I remain committed to the security and well-being of our clients. I will continue to provide critical alerts and assistance to the best of my ability. If you have any questions or require urgent cyber incident support, please feel free to reach out.

My team and I have preserved the unique visibility into top-tier ransomware groups, botnets, forums, and vetted Telegram communities—an intelligence network we have built over six years since AdvIntel's establishment as a part of close cooperation with law enforcement on ransomware threat prevention. Naturally, I am obligated to provide you with immediate alerts regarding any adversarial campaigns that we observe via this visibility.

EXHIBIT E

This alert and any assistance offered are strictly in accordance with my obligations as a RedSense partner and security expert working with law enforcement agencies, not as any separate or competing venture.

For the purpose of future alerts, please whitelist my email: **yeliseybohuslavskiy@gmail.com.**
For urgent matters involving Russian-speaking ransomware APTs, top-tier botnets, criminal forums, or exploited credentials, contact me **via phone or Signal: +1 (202) 751-99-57.**

(At least unless RedSense unblocks my accounts for proper alerting via corporate channels.)

I appreciate your attention to this matter and look forward to restoring a more direct and formal collaboration soon.

Kind Regards,
Yelisey Bohuslavskiy
Partner & Co-Founder at RedSense
yeliseybohuslavskiy@gmail.com
+1 (202) 751-99-57

EXHIBIT E

### 5. Target Victimology Chart for Alerted Campaign (March 17, 2025)





### 6. Screenshots of Messages from Kevin Stear Regarding Immigration/Refugee Status (January 22, 2025)



EXHIBIT E

**7. Screenshots of Reactions from Kevin Stear Regarding Immigration/Refugee Concerns (February 10, 2025)**



### 8. Yelisey Boguslavskiy Letter to Partners Regarding Immigration-Based Attacks (January 23, 2025)

Dear RedSense Partners,

I am sorry to begin your mornings with this, but I do want to bring your attention to this immediate issue.

Yesterday, during my day off, Kevin Stear messaged me, accusing me of allegations of immigration fraud and business misconduct and threatening me with a report to the immigration authority, as well as implicitly threatening my family. The screenshots of his messages are attached.

These messages came during my celebration of my grandmother's birthday, for which I took the day off to be with my family. This is why it took me a while to process this.

However, since the allegations have been made, I would like to bring them to the attention of all partners, as these are dire accusations. As such, to respect proper business conduct, and general integrity, I consider this my ethical duty to inform the entirety of the RedSense leadership that such allegations against me exist.

I would also like to ask Stear to provide evidence and explanations for the claims made.

I would also like to state that I have never violated US immigration laws and have never been participating in immigration fraud. The same relates to running the business. As you know, since January 2023, I have been involved in a coordinated project with (...) law enforcement agencies, and as a part of this project, I as a subject of regular (...) checks and reviews of my work, my finances, and my activities. Considering that I have been passing all of these reviews successfully, I would assume that no wrongdoings exist.

Finally, I would like to address the moral component of this situation.

First of all, I consider — and hopefully, you would agree with me here — that threatening someone's family members is deeply inappropriate. As some of you know, all of my close family members are refugees as a result of the Russo-Ukrainian war. Specifically, my mother and my brother Igor, mentioned in these messages, were both arrested, interrogated, and severely threatened by the Russian authorities for their active participation in anti-war protests during the first weeks of the war. Both Igor and my mother had to flee the country, losing their homes, their jobs, and their previous lives. I would leave you to your consideration regarding Stear's moral

compass in the light of using my family's precarious position against me, but I personally consider this deeply disturbing.

Secondly, weaponizing my immigration case by suggesting immigration fraud on my end is deeply personal. As some of you know, I have been an active participant in the Russian opposition, working directly with the late Alexy Navalny and joining the Ukrainian Euromaidan. As a result, I have requested asylum in the United States back in 2016. This has been an extremely personal story for me, as this asylum claim is foundationally rooted in my beliefs. When I applied for asylum, I had an H1B at Kroll and could have simply waited on it for three years to get a green card. Instead, I dropped the H1B and fought for my case for 8 years, and was only able to push it by bringing the USCIS to a Court. As a result, after a 9-hour interview on November 6, 2024, the USCIS officially confirmed the I have proven my refugee claim and am qualified as a protected refugee due to my persecution in my home country and the impossibility of returning. I can assure you that the USCIS would have never made this conclusion if there had been any slightest hint of immigration violations. As such, the threat to report me to an immigration authority is profoundly offensive and unjust. Especially considering the political climate related to immigration unfolding right now. Overall, I think that threatening a refugee with a report to immigration authorities is simply one of those ethical lines, like calling out someone based on race, gender, or sexuality, that are simply not crossed in a civilized society.

Conclusions:

Back in April 2024, when Mike Zeiger's situation was unfolding, I used my role as RedSense chief investigator to call for Zeiger's suspension due to suspected funds mismanagement on his end — you have all received my email on this matter. While the suspension was not authorized, and while my further investigation concluded that no mismanagement had taken place, with that letter, I had created a precedent of stating that if there are allegations of fraud, the partner should be suspended until the investigation concludes.

As such, to preserve my business integrity and to remain consistent with the precedent that I myself have established, I am self-suspending myself from the role of Chief Research Officer, until the allegations against me are investigated and evidence is presented.

Kind Regards,

Yelisey

**9. Slides from Partner Emergency Meeting Highlighting Financial Distress and Risks
(February 6, 2025)**





EXHIBIT E



EXHIBIT E



EXHIBIT E

