# EXHIBIT F

EXHIBIT F

## Hsu, Rachel

| | |
|---|---|
| **From:** | Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com> |
| **Sent:** | Monday, June 23, 2025 3:00 PM |
| **To:** | Chakrabarti, Preetha; David Montanaro |
| **Cc:** | Saber, Anna |
| **Subject:** | Re: Letter from P. Chakrabarti to Y. Bohuslavskiy |
| **Attachments:** | 2025-06-23-Evidence-Request.pdf |

Dear Preetha,

I have not yet received a response to my message of June 5, and therefore, I am writing to provide and request the practical details necessary to move your proposed mediation forward. At least for the issues you are seemingly willing to mediate.

1. Information schedule (attached)
Enclosed is a concise, without-prejudice list of factual clarifications tracking the allegations in RedSense's letters of 17 March and 17 April 2025. Providing this material will enable both sides—and any neutral parties—to work from a common evidentiary foundation and may resolve several issues outright.

2. Mediation logistics
Because Crowell first proposed mediation, I assume your team has preliminary thoughts on the customary organizational points. To avoid further delay, could you please:

- Supply a shortlist of three independent neutral third-party mediators acceptable to RedSense.
- Provide the claims that will be included in the mediation scope.
- Identify the RedSense representatives who will attend and confirm that each will have full settlement authority in accordance with the Wyoming LLC Act;
- Format & venue
- Pre-mediation statements
- Costs

Additionally, I renew—without delaying anything—the request that Crowell confirm its settlement authority on RedSense's behalf, providing supporting evidence for this authorization.

Finally, since February 25, 2025, RedSense managers have asserted that I am "dissociated" from the company and therefore lost my membership rights, and am barred from voting, participating in management, or inspecting company records. Based on the content of your March 17, 2025, letter, you adhere to their statement.

I have disputed that position from day one in letters of 31 March 2025 (to Crowell) and 14 April 2025 (to RedSense) and invoked my inspection rights under the Wyoming LLC Act as well a provided an extensive legal and evidential framework.

My April 14-15 requests for information access to both RedSense and relevant RedSense-affiliated third parties were unanswered. Moreover, on April 15, 2025, Mr. Montanaro specifically grounded the denial of this request in your instruction not to communicate directly with me. This would make you responsible

for processing this request via communication with me as a claimed RedSense council. Since no change has occurred since April 15, 2025, I assume that you, as a council, have made a decision to affirm RedSense's denial of my member rights, and you are acting upon this decision. This is confirmed by the fact that no change followed after I directly addressed the same request to you on May 23, 2025.

Indeed, in your 17 April 2025 reply to my April 14, 2025 correspondence, you seemingly reaffirmed the dissociation claim and threatened me with further litigation "we affirm the allegations raised in the RedSense Letter and would stand behind a lawsuit brought against you". Moreover, you made a second implicit litigation threat for me even attempting to seek restorations of my membership rights: "non-litigation solution, the likelihood of such a resolution appears difficult given your continued parallel emails to individuals at RedSense." (Letter from April 18, 2025).

For over four months, during which you claimed to represent RedSense and serve as their counsel, I have been denied my membership rights, apparently with your involvement. Therefore, please provide the following:

1 Statutory basis under specific provision of the Wyoming LLC Act WS 17-29-101, et. seq. (the "Act"), which RedSense uses in its February 25, 2025, letter to ground my dissociation.

2. Any other legal and/or contractual framework on which RedSense and you are grounding this denial.

3. Confirm that since April 14, 2025, Crowell has been insisting that all RedSense resolutions with me should be conducted through it, including my requests to stop permitting me from exercising my member rights.

4. If this is the case, please explain why Crowell becoming the responsible party for this resolution essentially denied my member rights and my requests to respect them, and is acting accordingly to this day.

I remain ready to move toward an amicable resolution for the matters discussed in your letters dated March 17 and April 17, 2025, and look forward to receiving the information above. As always, this correspondence and the attachment are submitted without waiver of any right, claim, privilege, or remedy.

I expect your substantive and complete response by the end of the day on July 7. I also expect a reply to my previous letter by the end of this business week, as it has not been answered for almost three weeks now.

Kind regards,

Yelisey Bohuslavskiy

On Thu, Jun 5, 2025 at 5:04 PM Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com> wrote:
  Dear Preetha,

  Thank you for your prompt reply.

  I remain committed to resolving as many matters as possible through alternative dispute resolution and

believe the uncertainty we encountered in May and June stems largely from the absence of a clearly defined mediation agenda.

To move matters forward, I propose that the forthcoming mediation be expressly partial and issue-based. Your letter of June 4, together with the lack of any response to my repeated requests that Red Sense cease ongoing violations of my membership rights, indicates that those membership-related issues are not within Red Sense's intended scope of mediation.

By contrast, you have expressed a willingness to address the claims set out in Red Sense's letters of 17 March and 17 April 2025. I therefore suggest limiting the mediation to those specific claims, with the option to include my related monetary claims arising from the alleged breaches of the Partnership Agreement and the 28 May 2024 agreement. Should you later wish to add further topics, I am open to expanding the agenda by mutual agreement.

All other matters—including but not limited to the continuing denial of my membership rights, minority-member oppression, and other violations of the Wyoming Limited Liability Company Act by Red Sense's current leadership—will be preserved for adjudication in the Wyoming District Court or, if preferred by both sides, in the Wyoming Chancery Court. These forums may also address the monetary claims referenced above. My discrimination complaints prepared for the appropriate federal agencies are likewise outside the scope of this mediation.

Defining the mediation in this manner should remove any remaining uncertainty regarding prerequisites and allow both sides to focus on issues realistically capable of settlement at this stage.

To ensure the mediation proceeds on a sound footing, I must again—now for the fourth time—request clarification that Crowell & Moring has been duly authorised to represent Red Sense and, most importantly, to settle on its behalf. As Red Sense is member-managed and, under W.S. § 17-29-407(b)(iii)(iv), retaining litigation counsel to pursue claims against an active member constitutes an disputed (requires a majority vote) and extraordinary (requires unanimous vote) act requiring proper member consent, please provide—on a non-privileged basis—any resolutions, written consents, minutes, or other contemporaneous records evidencing all or majority members' authorisation of Crowell & Moring's engagement in this dispute.

This information request is made solely to confirm that each participant at the mediation table possesses full settlement authority; it is not intended to delay the ADR process, and I reserve all rights to seek fuller discovery in litigation if necessary.

This correspondence is submitted without waiver of any rights or remedies and is directed exclusively toward facilitating an amicable resolution of those matters presently suitable for mediation.

Please confirm your agreement to the general proposal or a limited-scope mediation, or if you would like to amend it. Please also provide the requested authorisation documents and/or clarification at your earliest convenience.

I am looking forward to further discussion.

Kind regards,

Yelisey

On Wed, Jun 4, 2025 at 9:16 PM Chakrabarti, Preetha <PChakrabarti@crowell.com> wrote:

> Dear Yelisey,
>
> Thank you for clarifying that it is not your position that you will only submit to a third-party neutral resolution only if Red Sense accepts the conditions set forth in your communications dated April 25 and/or May 23.
>
> Given the contradictory statements that you have made in response to our various communications, and the lack of any substantive response to the questions and issues raised in our April 17 letter, we are unable to respond to your request.  Indeed, only you have the necessary information to resolve these questions. Without you providing this information, Red Sense's investigation remains ongoing and is unable to comment on your status.
>
> To that end, please provide your availability for the week of June 9 or June 16 to discuss these questions.
>
> Sincerely,
>
> Preetha
>
> **Preetha Chakrabarti**
> Crowell & Moring LLP
> pchakrabarti@crowell.com
> +1.212.895.4327 direct  |  +1.401.439.0696 mobile
>
> ---
>
> **From:** Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com>
> **Sent:** Tuesday, June 3, 2025 12:00 PM
> **To:** Chakrabarti, Preetha <PChakrabarti@crowell.com>
> **Cc:** Saber, Anna <ASaber@crowell.com>; David Montanaro <dmontanaro@redsense.com>
> **Subject:** Re: Letter from P. Chakrabarti to Y. Bohuslavskiy
>
> Dear Preetha,

I would appreciate clarification regarding your stated attempts at mediation.

Since April 17, 2025, you have offered mediation in writing on at least three separate occasions. I also confirmed, as of April 25, 2025, that mediation is a positive option for resolving this dispute.

Regarding your confusion: No, it is not my position that I will submit to a third-party neutral resolution only if Red Sense accepts the conditions set forth in my communications dated April 25 and/or May 23. I have never stated this.

That said, since April 25, 2025, I have repeatedly requested clarification of your—and Red Sense's— current leadership's stance regarding my membership status, as I need to understand the opposing side's perspective, specifically, in what capacity, according to you, I will enter the mediation process - as a member or as a non-member. This is necessary to avoid any misunderstandings and ensure that both parties are aligned on the basic principles.

Please note that this is not a question regarding the objective legal status of my membership, but regarding your view, as you are offering to mediate.

Yet, for more than 45 days, you have failed to clarify something as simple and pivotal as your own view on my membership status at Red Sense LLC.

I do affirm my willingness to try to resolve this matter via mediation; however, your seeming inability— or unwillingness—to take a position on such a straightforward matter as a perspective on the membership status casts doubt on your, and Red Sense's, capacity or genuine will to mediate in good faith, particularly when the remaining issues in this dispute are far more, complex, nuanced, and hard to navigate.

Therefore, I am requesting for the fourth time to please confirm whether you and the current Red Sense leadership acknowledge my active-member status under the Wyoming LLC Act, W.S. § 17-29-101.

If you are indeed willing to mediate rather than prolong the time, since defining one's stance is a relatively simple task, and since this issue has now lingered for weeks, I expect your definitive response by no later than Wednesday, June 4, 2025.

The sole purpose of this letter is an information request. However, due to the ongoing and continuous infringement of my membership rights by the current Red Sense leadership, if your perspective on the membership matter is not clarified, and as such, the mediation process becomes objectively less and less feasible, my only remaining option will be to seek judicial resolution by filing a complaint with the Wyoming District Court for violation of these rights.

Sincerely,

Yelisey


On Wed, May 28, 2025 at 2:29 PM Chakrabarti, Preetha <PChakrabarti@crowell.com> wrote:

Dear Yelisey,


We are confused by your email. Is it your position that you will only submit to resolution of this dispute by a third-party neutral if Red Sense agrees to the conditions you have set forth in your April 25 and May 23 communications?


Please clarify.


Sincerely,

Preetha



**Preetha Chakrabarti**
Crowell & Moring LLP
pchakrabarti@crowell.com
+1.212.895.4327 direct  |  +1.401.439.0696 mobile

---

**From:** Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com>
**Sent:** Friday, May 23, 2025 5:16 PM
**To:** Chakrabarti, Preetha <PChakrabarti@crowell.com>; David Montanaro <dmontanaro@redsense.com>
**Cc:** Saber, Anna <ASaber@crowell.com>
**Subject:** Re: Letter from P. Chakrabarti to Y. Bohuslavskiy


Dear Preetha,

In my previous letter (Dated April 25, 2025 I asserted: "Furthermore, as of 25 April 2025, I am — and remain — a member of Red Sense LLC. By agreeing to mediation, both Mr Montanaro and Crowell & Moring acknowledge that status. In that capacity, I accept my duty to seek a peaceful resolution."

Your May 21 response states: "RedSense remains willing to resolve this dispute amicably and welcomes the chance to mediate.". This is an acknowledgement of my statement quoted above.

As such, since you acknowledge my rights as a member of the Red Sense LLC, I am expecting for Red Sense to immediately fulfill my request which has been dated April 14, 2025 for provision of information, and restoration of my email access under the W.S. 17-29-410(a)(i)-(ii).

I expect a response on this matter no later than Tuesday, May 27, 2025, EOD.

I reserve all rights and remedies (equitable or otherwise).

Kind Regards,

Yelisey

On Wed, May 21, 2025 at 2:05 AM Chakrabarti, Preetha <PChakrabarti@crowell.com> wrote:

Dear Yelisey,

We have received your April 25 and May 16 emails. RedSense remains willing to resolve this dispute amicably and welcomes the chance to mediate.

We were surprised, however, to receive your April 25 email, in which as a precondition to mediation you demanded that RedSense withdraw all its allegations against you, concede disputed points, and provide documents related to Crowell's representation of RedSense (which is unrelated to the merits of the disputed issues between the parties). The purpose of mediation is to have a neutral, third party assess the allegations and make a recommendation as to how to resolve these issues between the parties. Demanding that RedSense withdraw its allegations and affirmatively concede disputed issues contradicts your stated willingness to mediate, and indeed, defeats the purpose.

Based on your recent May 16 email, it appears that there remains an opportunity to resolve this amicably. To that end, RedSense asks that you provide a succinct summary of the monetary and/or nonmonetary requests that you believe would resolve the dispute from your perspective.

RedSense expressly reserves all rights and remedies (equitable or otherwise).

Sincerely,

Preetha

EXHIBIT F

**Preetha Chakrabarti**
Crowell & Moring LLP
pchakrabarti@crowell.com
+1.212.895.4327 direct  |  +1.401.439.0696 mobile

---

**From:** Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com>
**Sent:** Friday, May 16, 2025 9:24 AM
**To:** Chakrabarti, Preetha <PChakrabarti@crowell.com>
**Cc:** Saber, Anna <ASaber@crowell.com>
**Subject:** Re: Letter from P. Chakrabarti to Y. Bohuslavskiy

Hello,

I have not received any reply to this email for three weeks.

Is my understanding correct that Crowell and RedSense have declined the meditation, and the sides are back to the litigation preparation phase?

Kind Regards,

Yelisey

On Fri, Apr 25, 2025 at 1:28 PM Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com> wrote:

Dear Preetha,

I remain committed to resolving our dispute through mediation. Before we convene, however, some extreme and ungrounded allegations levelled against me and my team, such as allegations of "false statements" on "ethical concerns," allegations that "Affix pocketed the money," assertions of zero performance by my team, and essentially any allegations related to border-line fraud, embezzlement, waste, or lie, are expected to be either withdrawn or supported by clear, factual, and contemporaneous evidence.

EXHIBIT F PAGE 8

Furthermore, as of 25 April 2025, I am — and remain — a member of Red Sense LLC. By agreeing to mediation, both Mr Montanaro and Crowell & Moring acknowledge that status. In that capacity, I accept my duty to seek a peaceful resolution.

Analogous concerns regarding authorization and legitimacy of representation also apply to your firm. Thus, consistent with my request of April 14, 2025 (inaccurately labeled a "demand"), please provide, excluding attorney-client-privileged documents:

1. Any documented Red Sense resolution, meeting minutes, recorded vote, or explicit written member consent authorizing Crowell's retention concerning the issues raised in Crowell's letters dated March 17 and April 17, 2025, beyond the May 28, 2024, resolution.

2. If no such documentation exists, please provide the documented legal grounds (beyond the May 28, 2024, resolution) allowing the Red Sense officer to retain Crowell without formal recorded authorization.

3. The date the retainer agreement with Crowell was executed.

4. The individual who executed the agreement and their official title within Red Sense LLC.

Finally, please clarify your rationale for involving an external third party. As previously communicated to Mr. Montanaro, mutual compliance with documented contractual obligations and applicable Wyoming law is the swiftest and most logical path to resolution; thus, involving a third party appears unnecessary.

I look forward to your comprehensive response and remain hopeful that we can swiftly proceed constructively toward resolution.

Nothing in this correspondence should be construed as a waiver of any rights or remedies available to me as a member of Red Sense LLC.

Sincerely,


Yelisey Bohuslavskiy
Member & Co-Founder at RedSense
yeliseybohuslavskiy@gmail.com
+1 (202) 751-99-57



On Fri, Apr 18, 2025 at 12:20 PM Chakrabarti, Preetha <PChakrabarti@crowell.com> wrote:

Dear Yelisey,

Thank you for your email. There has been no legal action initiated against you by RedSense at this time.

While RedSense is interested in an amicable, non-litigation solution, the likelihood of such a resolution appears difficult given your continued parallel emails to individuals at RedSense. To that end, we ask that you cease contacting RedSense directly and send all concerns and issues related to RedSense to us at Crowell. Further, we ask that you let us know by no later than April 25, 2025, whether you will be willing to engage in mediation with a neutral third-party.

We look forward to hearing from you.

Sincerely,

Preetha

**Preetha Chakrabarti**
Crowell & Moring LLP
pchakrabarti@crowell.com
+1.212.895.4327 direct  |  +1.401.439.0696 mobile

---

**From:** Yelisey Bohuslavskiy <eliseydmitriev@gmail.com>
**Sent:** Thursday, April 17, 2025 11:37 AM
**To:** Chakrabarti, Preetha <PChakrabarti@crowell.com>
**Cc:** Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com>; Saber, Anna <ASaber@crowell.com>
**Subject:** Re: Letter from P. Chakrabarti to Y. Bohuslavskiy

Dear Preetha,

Thank you for your email.

I will review this thoroughly. For right now, I would like to ask for a clarification of the following, at your earliest convenience.

You state: "we would stand behind a lawsuit brought against you based

on the same facts."

You also state: "we remain committed to resolving this matter amicably. To facilitate an amicable resolution, we propose engaging a neutral third-party mediator."

To my understanding, these two statements may be contradicting. Has there been a lawsuit brought against me or you, offering a path of potential non-litigation resolution?

Kind regards,

Yelisey

On Thu, Apr 17, 2025 at 11:19 AM Chakrabarti, Preetha <PChakrabarti@crowell.com> wrote:

Dear Mr. Bohuslavskiy,

Please see attached in response to your March 31 and April 14 emails.

Sincerely,
Preetha

**Preetha Chakrabarti**
pchakrabarti@crowell.com
+1.212.895.4327 direct  |  +1.401.439.0696 mobile
LinkedIn

Crowell & Moring LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001

EXHIBIT F

# Crowell

**Collaboration Powers Success**

crowell.com
Retail and Consumer Products Law Observer Blog

This message may contain privileged and confidential information. IF IT WAS SENT TO YOU BY MISTAKE, DO NOT READ IT. Instead, please notify the sender
(or postmaster@crowell.com) by reply e-mail, and delete this e-mail. Unauthorized dissemination, forwarding or copying of this e-mail is strictly prohibited.

**From:** Yelisey Bohuslavskiy <eliseydmitriev@gmail.com>
**Sent:** Monday, April 14, 2025 11:51 AM
**To:** Chakrabarti, Preetha <PChakrabarti@crowell.com> EXHIBIT F
**Cc:** Saber, Anna <ASaber@crowell.com>
**Subject:** Re: Ethical Concerns & Response to March 17, 2025 Letter Regarding RedSense, LLC

Dear Preetha,

I hope you're doing well and that your week has started off smoothly.

While I'm awaiting your substantive response to my earlier comment, I wanted to kindly — and in good faith — request a copy of the retention agreement with Red Sense LLC, as referenced in your letter dated March 17, 2025, where it's stated that "Crowell & Moring LLP has been retained to represent RedSense LLC."

From my understanding, the firm continues to engage in Red Sense's internal matters in the role of legal counsel. As a standing member of the company, I believe it would be helpful to understand the basis and scope of this engagement. Given the importance of the current internal dispute between standing members, clarity on this framework would really support efforts toward constructive dialogue, resolution, and, hopefully, de-escalation.

Thank you in advance, and I appreciate your time.

Sincerely,

Yelisey Bohuslavskiy

Partner & Co-Founder at RedSense
yeliseybohuslavskiy@gmail.com
+1 (202) 751-99-57

On Mon, Apr 7, 2025 at 10:03 AM Chakrabarti, Preetha <PChakrabarti@crowell.com> wrote:

EXHIBIT F

Dear Mr. Bohuslavskiy,

We are in receipt of your emails and letter dated March 31, 2025. We are reviewing the information you provided and will be providing a substantive response to your communication soon.

RedSense reserves all rights.

Sincerely,
Preetha


**Preetha Chakrabarti**
Crowell & Moring LLP
pchakrabarti@crowell.com
+1.212.895.4327 direct  |  +1.401.439.0696 mobile

---

**From:** Yelisey Bohuslavskiy <yeliseybohuslavskiy@gmail.com>
**Sent:** Monday, March 31, 2025 1:44 PM
**To:** Chakrabarti, Preetha <PChakrabarti@crowell.com>; Saber, Anna <ASaber@crowell.com>; Contreras, Efrain <EContreras@crowell.com>; McGorty, Glen <gmcgorty@crowell.com>; Schnorrenberg, David <dschnorrenberg@crowell.com>
**Cc:** bvansickle iq-share.com <bvansickle@iq-share.com>
**Subject:** Ethical Concerns & Response to March 17, 2025 Letter Regarding RedSense, LLC

---

> **Exercise caution with links and attachments**
>
> You may not have corresponded with this sender before. Exercise caution when engaging with this email.

Dear Crowell & Moring LLP,


My name is Yelisey Bohuslavskiy. I am a co-founder and member of RedSense, LLC, holding 25% of the allocated shares. I am cc'ing my partner and fellow 25% shareholder, Mr. Bryan VanSickle. Together, we represent 50% of the company's allocated ownership and leadership. I am also copying relevant Crowell & Moring LLP leadership for transparency and accountability.

I am writing in response to the March 17, 2025 letter (attached) issued by Ms. Preetha Chakrabarti on behalf of your firm, claiming to represent RedSense. Neither Mr. VanSickle nor I were informed of or authorized this engagement, and we were surprised to receive legal correspondence purporting to speak on behalf of our company without our knowledge or consent.

Despite this unclear basis for representation, the letter contains 28 separate claims and demands — many of which are unsubstantiated and raise serious legal and ethical concerns. I feel compelled to respond both in my capacity as a shareholder and partner of RedSense and personally as a refugee whose immigration status and identity may be directly impacted by some of the statements made.

My full commentary is attached to this email. However, I would like to highlight several of the most critical concerns to emphasize the significance of this matter — not only for myself and Mr. VanSickle, but also for RedSense as a business.

2

## 1. Improper Intellectual Property Demand

The demand to transfer massive volumes of protected intellectual property from third parties, among whom is my former employer and former RedSense competitor, Advanced Intelligence, LLC, within 24 hours — a demand I believe to be improper and legally unsound. RedSense definitely has no claim to this IP and any such transfer — if it were even possible — would violate binding agreements. Given Ms. Chakrabarti's stated expertise in intellectual property law, it is concerning that such a request would be made potentially without regard to legal and ethical boundaries defining RedSense property ownership. This transfer could have clearly damaged the company both legally and reputationally and will directly affect its shareholders.

## 2. Cease and Desist Demand Regarding Core Business Functions

The letter also demands that I immediately cease delivering cybersecurity alerts to RedSense clients — alerts that are a fundamental part of our service, clearly outlined in all of our client contracts. Halting this service would not only constitute a breach of contract but could irreparably harm our clients, including customer loss and potential demands for breach-of-contract refunds. Such an outcome would be catastrophic. RedSense leadership has estimated that the company could face up to $1.58 million USD in customer refund claims alone — approximately 50% of total revenue. Just like the demand for transferring Advanced Intelligence IP, this demand would not only damage the company's operational standing and shareholder value, including mine and Mr. VanSickle's — but also for our clients' security posture and, by extension, their own customers.

## 3. Unsubstantiated Allegations of Financial Misconduct

The letter also makes a number of extremely serious personal allegations, accusing not only me but also my subordinates of embezzlement, fraud, deception, and financial misconduct. These claims are baseless and directly contradicted by documentation and records that were available to your firm at the time this letter was prepared.

## The most concerning point: the mischaracterization and denial of Ethical Concerns related to anti-immigrant/refugee harassment

Most concerning for me, however, is the letter's repeated assertion — **made four times** — that my statement about resigning from my role as Chief Research Officer "due to ethical and contractual concerns" is "**false**" and must be retracted from all social media within 24 hours. Setting aside the problematic assumption that your firm can define the motivations behind my own resignation better than I can myself, this demand is especially troubling in light of the context.

As clearly stated in my resignation letter, which Ms. Chakrabarti and Crowell & Moring LLP evidently reviewed, the ethical basis for my departure was what I described as the **"legitimization and normalization of anti-immigrant hate speech by RedSense executives."**

I, along with my mother and brother, am a refugee as a result of the Russian invasion of Ukraine. On January 22, 2025 — just two days after the new U.S. administration began enacting immigration policy changes that stirred extreme concerns in refugee communities — RedSense's CTO Kevin Stear, apparently being aware of the fears incited by the new political climate, proactively reached out to me and sent me a series of insulting messages that referenced my immigration status, and that of my mother and brother, in a context that suggested reporting us to immigration authorities for immigration fraud — an absolutely false accusation.

I reported this incident immediately, both privately and formally, and over the course of a month, repeatedly asked RedSense leadership, including CEO David Montanaro, to address and denounce this behavior. Instead, my concerns were dismissed and publicly mocked. Mr. Montanaro referred to them as quote "**ridiculous**," and Mr. Stear responded to formal concerns-related correspondence with "RoFL" emojis. (All records and screenshots are documented in the attached file)

Faced with a choice between continuing my formal employment role or standing by my principles as a refugee, I chose the latter. On February 24, 2025 — exactly one month after the incident — I stepped down from my operational role and began preparing formal complaints with the Equal Employment Opportunity Commission (EEOC) and the Immigrant and Employee Rights Section (IER).

Shortly after, I indeed posted a statement on LinkedIn referencing "ethical concerns," echoing what I had already communicated internally to the entirety of RedSense leadership after the initial incident on January 23:

*"Overall, I think that threatening a refugee with a report to immigration authorities is simply one of those ethical lines, like calling out someone based on race, gender, or sexuality, that are simply not crossed in a civilized society."*

Essentially, it is this ethical concern that your letter repeatedly labels "false" and demands a retraction. I consider this characterization not only inaccurate but deeply personal and offensive.

According to LinkedIn analytics, my post was viewed by over 6,500 individuals, many of whom are fellow cybersecurity professionals and fellow immigrants and refugees. To characterize my account as false may be interpreted as a public accusation of defamation, with potential consequences for my personal, immigration, and professional credibility.

*** 

Therefore, with all due respect, I must inform Ms. Preetha Chakrabarti and Crowell & Moring LLP that due to the seriousness of this immigration-related matter, I am prepared to issue a public response addressing your demands and denial of beliefs that are foundational to my identity, my refugee status, and my personal integrity. My ethical concerns were valid and are not "false," are well-documented, and grounded in lived experience and the right of free expression — and I will not be silenced or pressured to retract them simply because they are inconvenient or uncomfortable to those in RedSense who are engaged or normalize this recorded anti-immigrant harassment.

Additionally, since a demand to transfer Advanced Intelligence property puts RedSense at risk if such demands persist, I may need to reach out to Advanced Intelligence, LLC's last CEO, Mr. David Troha, and its major shareholder, Ms. Natalia Kremez, to clarify with Advanced Intelligence's former leadership that these claims were not authorized by the full RedSense leadership.

Finally, due to the severity of the accusations made in your letter and their implications for my personal, professional, immigration, legal, and public status, I am also considering submitting a formal grievance to the Attorney Grievance Committee of the Supreme Court, Appellate Division, First Judicial Department, regarding Ms. Chakrabarti's conduct in this matter.

That said, in accordance with my ethical and political consistency, I remain respectful of Crowell & Moring's long-standing demonstrated commitment to inclusion, particularly through initiatives like the

Amica Center, ERC, and your pro bono work on behalf of immigrant and refugee communities. I am also aware of Ms. Chakrabarti's contributions to this work. Because of this context, I will approach this matter in good faith and assume that the denial of my ethical stance may have stemmed from a lack of full understanding rather than from ill intent.

The same good faith applies to all of the concerns raised in this letter. Before taking any further steps — whether public, corporate, or formal — I would like to offer you and Ms. Chakrabarti the opportunity to comment on and clarify the points I've raised.

For this purpose, I prepared the attached comment regarding your March 17, 2025 letter that highlights specific assertions and demands in your letter that appear unsupported, inaccurate, or potentially inconsistent with applicable ethical standards, including Crowell & Moring's own standards and the New York Rules of Professional Conduct. This document is not a formal grievance but rather an effort to enable Crowell & Moring and Ms. Chakrabarti to address these points internally through constructive dialogue, aiming for transparency, resolution, and avoidance of unnecessary escalation.

Please feel free to reach out if you have any questions.

I look forward to your response within one business week.

Kind Regards,

Yelisey Bohuslavskiy

Partner & Co-Founder at RedSense
yeliseybohuslavskiy@gmail.com
+1 (202) 751-99-57

**Crowell**

| | |
|---|---|
| **Preetha Chakrabarti** | Crowell & Moring LLP |
| PChakrabarti@crowell.com | Two Manhattan West |
| (212) 895-4327 direct | 375 Ninth Avenue |
| | New York, NY 10001 |
| | +1.212.223.4000 main |
| | +1.212.223.4134 fax |

April 17, 2025

**VIA EMAIL**

Yelisey Bohuslavskiy
7000 JFK Blvd E, Apt. 42D
Guttenberg, NJ 07093
eliseydmitriev@gmail.com
yeliseybohuslavskiy@gmail.com

Dear Mr. Bohuslavskiy,[1]

We have received your emails and response letter dated, March 31, 2025 ("Bohuslavskiy March 31 Letter"). We have reviewed the information that you have provided in detail and provide this response.

As an initial matter, Crowell & Moring LLP ("Crowell") represents the corporate entity, Red Sense, LLC (RedSense) and its interests. Contrary to your claims, Crowell does not represent any one member of the RedSense partnership.

In a resolution dated May 28, 2024, the members agreed that "Chief Executive Officer David Montanaro hereby is authorized, for and on behalf of the Company and in its name, to prepare, execute, acknowledge, file, record and deliver, under seal if required or desirable, all such other agreements, instruments and other documents, and to take all such other actions, as the officer or officers so acting shall deem necessary, desirable or convenient to give effect to, or otherwise carry out the purposes of, any of the foregoing resolutions and that the execution, acknowledgment, filing, recording or delivery of any such agreement, instrument or document, or the taking of any such action, by any such officer shall be conclusive evidence of its having been authorized by this resolution." Accordingly, Mr. Montanaro was authorized by all members of the partnership, including yourself, to take certain actions on behalf of RedSense. This includes retaining legal counsel to represent RedSense.

We have also received your email demand dated April 14, 2025, for the retention letter between Crowell and RedSense. We understand that you have also demanded the same from RedSense. We are unable to share a copy of the retention letter between Crowell and RedSense, as that is protected by the attorney client privilege, and disclosing such communications would be a breach of Crowell's duty of confidentiality to its client, RedSense.

---

[1] In your March 31 communications you used "Yelisey Bohuslavskiy," "Elisei Boguslavskii,"and "eliseydmitriev" interchangeably, and our understanding is that you have used both spellings interchangeably in connection with your role at RedSense.



Given that RedSense is represented by counsel, we ask that you direct all communications regarding RedSense to Crowell, rather than contacting RedSense officers, partners, or affiliated individuals directly.

Additionally, based on the substance of your letter, we have reason to believe that you have been in consultation with an attorney regarding the March 17, 2025 letter on behalf of RedSense ("RedSense March 17 Letter") and the Bohuslavskiy March 31 Letter.  **If this is correct and you are in fact represented by counsel, please provide us with your attorney's contact information immediately, so that Crowell can direct all future communications to your counsel.  As you may be aware, our professional obligations require us to communicate with your counsel if you are represented.  Should you respond to this letter directly, we will understand that to mean that you are not presently represented by counsel, and we will rely on that.**

Substantively, RedSense disagrees with your characterization of the facts.  Crowell has conducted an investigation based on information received from RedSense as well as the information that you provided in the Bohuslavskiy March 31 Letter.  Based on our investigation, we affirm the allegations raised in the RedSense Letter and would stand behind a lawsuit brought against you based on the same facts.  That you and RedSense have differing interpretations of the events that transpired between you and RedSense does not negate the validity of RedSense's position.

Based on your letter, you appear to sincerely believe that you are acting in the best interests of RedSense's customers.  Bohuslavskiy March 31 Letter at 9, 23.  However, your actions have had the opposite effect.  Since you first began communicating with RedSense customers regarding these cybersecurity alerts at least as of February 26, 2025, customers have reached out to RedSense with confusion and concern.  Because you are sending these communications via a *personal Gmail* email address and by way of your stated resignation are not affiliated with RedSense,  customers have asked whether the email is legitimate (because they expect RedSense communications to come via a RedSense email address), whether it is a scam, whether the email is a phishing lure, or whether the email is actually coming from you or if a threat actor is impersonating you.  Likewise, customers who expect to receive correspondence regarding the RedSense services via official RedSense channels are confused when communications come from personal email addresses.  This confusion is further compounded because as you state in your customer communications "I, in my capacity as Chief Research Officer have recently resigned from RedSense."  Bohuslavskiy March 31 Letter, Appendix 4.  Customers do not understand why a former officer and member is involved in the day-to-day communications regarding the services RedSense provides.  Particularly, where your preceding sentence is that you are "a partner and shareholder at RedSense" (*id.*), customers who are unfamiliar with the corporate structure of RedSense have no idea if you are authorized to speak on behalf of RedSense or if you remain affiliated with the corporate entity.  This is particularly confusing where in communications with customers you inform them that future communications and intelligence services will be delivered through Affix Advisory—an entity that would be unfamiliar to the customers.

Additionally, your customer outreach includes vague allegations of ethical impropriety.  As you are well aware RedSense customers retain RedSense to provide cybersecurity services.  A vague reference to "ethical concerns" may be interpreted by the customer to mean that there are ethical concerns that relate to the safety and security of the customer or that RedSense has been compromised in some fashion.  All of this serves to confuse the customer, negate the trust they have in RedSense, sully RedSense's reputation, and undermine the relationship.  If your claims that your outreach was focused on "fulfilling RedSense's obligations" are sincere (Bohuslavskiy March 31 Letter at 9), then you

2

Crowell

will understand that the resulting customer confusion and concern does not align with your stated purpose. Accordingly, we renew the request that you cease communicating with RedSense customers.

Regarding RedSense's request that you return certain property, it is RedSense's position that the property identified in the RedSense Letter belongs to RedSense. For some of the property, the basis of RedSense's ownership claim is that RedSense paid third parties to develop the technology and paid for the rights to the technology. In other instances, you and your team were working on the technology in your capacity as an officer of RedSense, on RedSense's time, and on RedSense's dime. Quintessentially, these are works for hire, which RedSense owns.

With respect to the AdvIntel Reports, that you now claim are owned by a third party (Advance Intelligence), at the time that you joined the partnership you agreed "to provide 'in kind funding' in the form of Threat Intelligence and Intellectual Property for Company benefit and use by the Company." RedSense Restructuring & New Owner Onboarding (following a meeting held on Thursday, December 22, 2022), signed, dated, and notarized January 25, 2023, Section 1.1. In the same agreement, you represented and warranted that you were not party to any other agreement that would restrict your ability to perform your obligations. You also represented and warranted that "no third party can claim rights to any intellectual property or other proprietary right possessed by that Founder as it relates to the Company." *Id.* Section 6.1. Unequivocally, this representation and warranty also covers the in-kind funding you agreed to provide. Now, you are claiming that this threat intelligence that you provided as part of your "in kind funding" belongs to a third party. At minimum, you are in breach of your representations and warranties. If you knowingly did not possess the right to provide the threat intelligence as part of your "in kind funding," then your representation and warranty was knowingly false.

RedSense made payments based on invoices received from third party companies, including Affix Advisory, LLC, for work performed for RedSense. However, RedSense has not received these services nor the technology promised to them. Essentially RedSense has made thousands of dollars in payments and has received nothing in return. RedSense maintains that you were the individual solely responsible for the works, management, and payments for EasyStaff, Irasel, and Pyrus. You additionally confirmed this in your most recent communication dated April 14, 2025, Section 6 ("The engineers under my direction . . . .").[2] You would submit invoices for EasyStaff, Irasel, and Pyrus to RedSense on Affix, LLC paper (which we understand to be a Domestic Limited Liability Company with business ID 0450721054 that you retain exclusive ownership of). Then you would provide an email to RedSense accounting requesting to remit payment to Affix for Irasel and Pyrus, yet to remit payment to EasyStaff directly despite each third party having its own invoicing. By submitting these invoices on Affix paper you were providing tacit approval of the invoiced amounts. RedSense had made multiple requests for you to provide access to the deliverables and an accounting of what these third parties have provided to RedSense. In each instance, its requests were denied. To date RedSense has not received any quantifiable deliverable that would justify the payments, including but not limited to source code, documentation, data sets, original invoices, project roadmaps, task history, or time tracking. Given that it was your responsibility to manage the work performed by EasyStaff, Irasel, and Pyrus (which you did through Affix), this denial of access and accounting negates your claims that the work was done. When RedSense remitted payments it believed it was paying for tangible results. But your refusal to even substantiate the existing of the deliverables makes RedSense question if the work was ever done (and if

---

[2] *See* email and letter enclosed therein from Y. Bohuslavskiy to D. Montanaro et al. (April 14, 2025).

**Crowell**

it was done, why have the deliverable been kept away from RedSense) or whether no work was done and instead Affix pocketed the money.

Finally, the Bohuslavskiy March 31 Letter alleges that your reason for resignation relates to what you describe as "anti-immigrant hate speech."  Bohuslavskiy March 31 Letter at 4.  You also included several screenshots that you describe as supporting this narrative.  *Id.* at 3, 4, 24 (identifying Appendices 6 and 7).  We have reviewed these screenshots and believe that they do not substantiate your allegations.  For example, the screenshots are cropped in such way that critical context in missing.

At its core, there appears to be a fundamental difference between the understanding of the events that transpired between you and RedSense and the events that transpired following your resignation.  Although we are prepared to litigate to protect RedSense's rights, we remain committed to resolving this matter amicably.  To facilitate an amicable resolution, we propose engaging a neutral third-party mediator.

RedSense expressly reserves all rights and remedies (equitable or otherwise).

Sincerely,

Preetha Chakrabarti

**WITHOUT PREJUDICE — FOR SETTLEMENT / MEDIATION PURPOSES ONLY**

This schedule of requests is tendered solely to assist the parties' confidential mediation. It is not a discovery demand or an admission of liability and preserves every right, claim, privilege and defence of all participants.

**Part 1. Clarification of key matters of investigations:**

In your April 17, 2025, correspondence, you state:

- *"However, RedSense has not received these services … promised to them."*
- *"Essentially RedSense has made thousands of dollars in payments and has received nothing in return"*
- *"To date RedSense has not received any quantifiable deliverable that would justify the payments"*
- *"When RedSense remitted payments it believed it was paying for tangible results"*
- *"no work was done and instead Affix pocketed the money."*

Kindly explain how those statements accord with the contemporaneous record, which includes hundreds of intelligence reports, RFI responses, favourable client testimonials, and the underlying data deliverables. Please identify the evidence that supports the statements quoted above and explain how you reconciled it with the deliverables stored on server XX.XX.XX.15.

To the best of my knowledge, the agreed-upon datasets and collection outputs, which were deposited since 2023, are stored on server XX.XX.XX.15. Please confirm that RedSense admits that it has maintained full and uninterrupted administrator-level access since commissioning and whether the agreed datasets are present there, and if they were moved after February 25, 2025, when the access to this server was terminated. Internal and external correspondence, portal postings, and related reports document continuous adversary-infrastructure monitoring, report production, investigative support, direct client engagement, and RFI fulfilment.

The engineers remained on RedSense's payroll through EasyStaff until February 25, 2025, and were available to address any outstanding items; however, management revoked their credentials instead. I recall only one case - the August 2024 combolist question, which was resolved immediately in RedSense's favour. Please identify any documented dispute over scope or quality that RedSense raised before February 2025, and specifically, a case of a dispute that was not answered from my side.

To my knowledge, apart from this case, no documented disagreement over scope or quality was raised. Payments were authorised through 24 February 2025, and performance bonuses were offered as late as August 2024 with the approval of Messrs. Montanaro, Klein, and Stear, together with Mighty Financial.

To advance our mediation, please confirm whether this evidence was reviewed during the two investigations you reference and, if so, outline the reasoning that nevertheless led to the conclusion that no deliverables or services existed. In addition, specify the precise misconduct you attribute to me: if a written agreement exists that the engineers breached, kindly share it, and provide the evidence

supporting any allegation that I directed—or knowingly permitted—such a breach or concealed it when invoices were submitted.

**Part 2. Issues raised in the March 17, 2025, Letter**

**2.1 Resignation**. Your letter states: "It is our understanding that you have resigned your partnership duties from RedSense as of 24 February 2025." Please state the factual basis for your assertion that I resigned my partnership duties. Please also explain how that understanding arose when the same letter you cite says, "Naturally, I will continue to perform my role as a partner and strive to resolve the ongoing misalignments within the partnership and shareholder domains."

**2.2 Alleged falsity of my stated reason**. You have repeated four times that my explanation for resigning—contractual and ethical concerns—is false. Identify the evidence on which you rely to allege that my stated reasons for resigning were false and specify the alternative motive you attribute to me.

**2.3 Invoice-approval authority.** This is my second request for the documents supporting your assertion that I "approved RedSense payments on invoices received from third-party companies." Produce all documents that support your claim that I approved RedSense payments on third-party invoices, including any record of credentials or sign-off authority held by me.

Your 17 April letter recasts this history as my "tacit approval of the invoiced amounts." This approval was the verbal consensus, reached by all partners in February 2023, on the engineers' rate schedule—an agreement that is distinct from exercising final authority over each payment. Please let us review whatever evidence, if any, indicates that I possessed or exercised such payment authority.

**2.4 Self-interest accusation**. You further allege that I approved invoices "to further [my] own self-interests and financial benefit from RedSense," a charge that would amount to serious misconduct. Provide the factual basis and supporting documents for the allegation that I approved invoices for my personal benefit. This is my third request for the evidence supporting that allegation.

**2.5 Alleged retention of company property.** You write that I "have retained…significant amounts of RedSense company property." Kindly identify the evidence for that claim. Each item listed in your 17 March letter falls into one of three categories:

- assets that have always been, and remain, in RedSense's possession—"(1) AIDIS, (3) Easy Staff Deliverables, including code, data, research, LLM, documentation; (4) Igor Dmitireiv's deliverables as stated in the agreement dated August 1, 2023, (5) Forum Scraping results to date";
- items to which clarification is required—"(6) OpenCTU instance and all RedSense Threat Intelligence contained therein. (2) Pyrus data since inception.";
- assets that have never belonged to RedSense—"(1) Pylon, (2) Pyrus platform, (7) All AdvIntel Reports, and threat intelligence since inception."

If you contend otherwise, please share the documents showing RedSense's ownership or my continued possession, together with any agreement allegedly breached. Where the issue concerns work performed by the engineers or by Mr Dmitriev, the claim should be directed to them or EasyStaff.

**2.6 Cease-and-desist directive.** Your letter instructs me to "cease and desist all communications with RedSense customers, partners and prospective customers/partners." Please identify the contractual or statutory authority for that demand. Even if you dispute my continuing partnership status, I remain free to communicate with these firms in an individual capacity unless a specific legal restriction applies. If you believe such a restriction exists, kindly cite it and explain its scope.

**Part 3. Issues raised in your April 17, 2025, letter.**

**3.1 Customer-outreach allegation.** You contend that my personal-email contact "confused" customers, "negated their trust," "sullied RedSense's reputation," and "undermined the relationship." Kindly offer whatever complaints, refund demands, or cancelled contracts substantiate those consequences and explain how a routine identity-verification step—common in cybersecurity—creates a cognisable tort.

You also assert that I told customers that future intelligence would come through Affix Advisory. Please provide any communication in which I told customers that future intelligence would come through Affix.

**3.2 Third-party development claim.** You state that certain technology belongs to RedSense because the company "paid third parties to develop the technology and paid for the rights." I am unaware of any agreement to that effect. Please share the contract or written promise on which you rely and any evidence of my involvement in its negotiation or execution. Specifically, please provide the work-for-hire contracts, statements of work, invoices, and any assignment agreements that transfer ownership of that technology to RedSense.

**3.3 "On RedSense's dime" assertion.** You further allege that my team and I developed technology "in [our] capacity as an officer of RedSense, on RedSense's time, and on RedSense's dime." Please identify the technology in question and provide the evidence showing that it was created during RedSense-funded hours or with RedSense resources.

**3.4 AdvIntel property claim.** Please explain the relevance of your sole citation for RedSense's claimed ownership of AdvIntel via the 25 January 2023 "RedSense Restructuring & New Owner Onboarding,", since this document does not mention AdvIntel. Kindly explain how that paper supports a claim to AdvIntel property "since inception," and is at all relevant to this matter.

**3.5 Threat-intelligence "in-kind funding."** You now characterise my threat-intelligence contribution as belonging to a third party and assert a violation of Section 6.1 of the Agreement. The intelligence at issue was mine when contributed and was delivered to RedSense throughout 2023 as reports and consulting, and is reflected in RedSense's own filings listing me as a 20 percent shareholder for 2023 and 25 percent (draft) for 2024. Please point to any instance in which I represented that this contribution was owned by someone else or that I breached Section 6.1.

**3.6 Alleged denial of access.** Throughout the April 17, 2025, letter, you state four times that RedSense "made multiple requests" for access to deliverables; that I "refused to substantiate" their existence; and that, in each instance, RedSense's requests were "denied." Identify the access request you contend was denied.

**3.7 Undefined categories of material.** Your letter references requests for "source code, documentation, data sets, original invoices, project roadmaps, task history, [and] time tracking." Please specify which of these items RedSense requested, when the request was made, and how it was allegedly refused. In particular, identify the "source code" and "data sets" you claim were withheld and point to the contract that obliges their production.

Regarding "original invoices," RedSense had direct access to the EasyStaff portal and received originals from both Irasel and Pyrus. Identify any occasion on which an invoice request went unanswered.

**3.9 "Works-for-hire" claim.** You describe certain assets as "works for hire, which RedSense owns." Please clarify whether you are referring to technology, deliverables or both, and provide the agreement that transfers ownership of the technology allegedly used to create those deliverables.

**3.10 Non-receipt of technology.** Finally, you state that RedSense "has not received these services nor the technology promised to them." Please provide any invoice or other document in which specific technology, as opposed to services, was promised to RedSense.

These clarifications will enable a focused discussion in mediation and help settle the factual record. In case any materials are voluminous or privileged, please propose a reasonable staging or redaction protocol.

**Appendix**

**Yelisey Boguslavskiy Email to Partners Regarding Engineering Team — February 21, 2025**

Hello, Team,

I am addressing this to all RedSense partners with ownership in the company, as it concerns the overall standing of the organization.

David Montanaro unilaterally decided that our team of engineers will not be paid for their work from January 16 to February 16, as well as for future periods. He used his position as CEO to block the payment, despite informing me that the team would be paid and despite finance confirming the payment to me.

Based on this trend, Igor Dmitriev's position is also at risk.

As a result, the engineers will cease all duties effective immediately. This will directly impact our ability to address customer RFI requests. For context, these are the customers whose RFIs the engineering team has processed over the past four weeks:

[Specific clients' names redacted]

A total of 18 RFIs in four weeks.

Additionally, the team is actively supporting [Specific clients' names redacted] with dark web infiltrations and advanced SIGINT operations, while also conducting continuous monitoring of forum data and credential data. We have three special engagements scheduled with [Specific clients' names redacted], [Specific clients' names redacted], and [Specific clients' names redacted], all of which heavily depend on engineering support.

Without the engineers performing their duties, we will be unable to fulfill critical intelligence functions.

As a CRO, and as I am responsible for HUMINT and SIGINT provision dependent on engineers and Igor, I will have to inform the customers regarding the disruption early next week, if the operations are not restored.

I consider Mr. Montanaro's unilateral decision to withhold payment not only highly unethical but also extremely disruptive and irresponsible to the company's business.

This decision is particularly reckless given that the company is in a state of financial distress and facing insolvency, making customer relationships more crucial than ever.

I want to also anticipate any comments regarding the formal reason of holding the payment - i.e. the CIIAA signing. This cannot be used as justification for withholding payments for the following reasons:

1. The CIIAA was sent on February 20, while our engineers' payment period begins on the 16th of each month. Any new conditions should only apply to future payments, not past obligations.

2. I submitted an invoice on Friday, February 14, before the CIIAA was issued. At that time, David Montanaro assured me twice that the past month's payment would be processed, and finance confirmed it. There was no indication of any issue until today—one full week after the invoice was originally submitted.

3. The current CIIAA is poorly drafted and requires significant review, editing, and redlining. While this process takes place, the team should continue working.

4. For over two years, the company has functioned without a CIIAA. Though admitting that this is an important document, I don't see the extreme urgency for signing.

There is no justification for disrupting an entire division's operations or mistreating individuals who have invested in the company by withholding their overdue payments. This approach is unethical, unjust, and, most importantly, poses serious risks to contract renewals.

I urge shareholders to intervene and ensure the payment is approved today so we can fulfill our obligations to customers. Meanwhile, we will review, comment on, and finalize the CIIAA through proper due diligence—without undue pressure or coercion.