Preetha Chakrabarti
Rachel Elaine Hsu (*pro hac vice* forthcoming)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
pchakrabarti@crowell.com
rhsu@crowell.com

Anna Z. Saber (*pro hac vice* forthcoming)
CROWELL & MORING LLP
3 Embarcadero, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827
asaber@crowell.com

*Attorneys for Plaintiff Red Sense LLC*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Red Sense LLC<br><br>     Plaintiff,<br><br>  v.<br><br>Yelisey Bohuslavskiy,<br>a.k.a. Elisei Boguslavskii<br><br>     Defendant. | Civil Action No. 2:25-cv-12281<br><br>**MEMORANDUM IN SUPPORT OF REDSENSE LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**REDACTED PURSUANT TO L. CIV. R. 5.3** |

## I.   __INTRODUCTION__

When Yelisey Bohuslavskiy ("Bohuslavskiy") announced his resignation as Chief Research Officer of Red Sense LLC ("RedSense"), he threatened to notify all of RedSense's current and prospective customers that the services the customers were contracting with RedSense to provide would no longer be offered by RedSense, and would instead be offered exclusively through Bohuslavskiy.  This was false. RedSense had developed relationships with numerous customers who entrusted RedSense with their cybersecurity needs.  Bohuslavskiy knew that RedSense was willing, capable, and committed to servicing these customers.  But Bohuslavskiy had other plans.

Knowing that he had no claim to these customer relationships and could not win them on merit alone, Bohuslavskiy devised a plan to destroy RedSense's customer relationships, steal the business away from RedSense for his own financial gain, and decimate the confidence customers had in RedSense to protect their cybersecurity concerns.  Within days of his resignation, his plan turned to action, as Bohuslavskiy methodically and persistently contacted RedSense customer after customer (using a personal Gmail email address), including RedSense's largest customers, where he raised vague "ethical" concerns about RedSense as a business and claimed that only he and his team (and, crucially, not RedSense) could provide the cybersecurity services that the customers had been paying RedSense to provide

and that RedSense was not equipped to service these relationships. In an even more direct attack on RedSense, Bohuslavskiy stated that unless the customer began working with his team directly (instead of RedSense), the customer would be at great risk of cybersecurity threats.

RedSense's customers were alarmed and confused to receive these communications. There were concerns that Bohuslavskiy's emails were part of a cyberattack because the language used by Bohuslavskiy and the content of these emails mirrored the language and tactics commonly used by cybercriminals or hackers in connection with phishing schemes, designed to trick the recipient into providing sensitive information that can then be used to unlawfully infiltrate computer systems. Because Bohuslavskiy was using a personal email address and had stated that he had resigned from RedSense but was simultaneously still affiliated with RedSense, customers were left wondering if RedSense or Bohuslavskiy had been compromised, if Bohuslavskiy was speaking on behalf of RedSense, whether this dispute with Bohuslavskiy was indicative of RedSense's instability, and whether this dispute with Bohuslavskiy would undermine RedSense's ability to continue to provide valuable cybersecurity services to its customers. This concern was not limited to RedSense's current customers. Even prospective customers actively engaged in sales conversations with RedSense are hearing industry rumors regarding

3

Bohuslavskiy's public campaign against RedSense and, because of this dispute, do not feel comfortable bringing their cybersecurity business to RedSense.

With each day that passes, Bohuslavskiy has inflicted and continues to inflict significant, irreversible, and irreparable damage on RedSense.  Bohuslavskiy has eroded RedSense customer trust and has sullied RedSense's reputation — in an industry where reputation and trust are crucial.  RedSense has attempted to resolve this amicably with Bohuslavskiy.  But Bohuslavskiy has refused to cease his customer communications.  The only way for RedSense to prevent further irreparable harm is through an injunction.

Accordingly, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, RedSense seeks a preliminary injunction to enjoin Bohuslavskiy from his continued and persistent communications with current customers of RedSense as part of a smear campaign against RedSense.  RedSense had no other option to protect its reputation, its customers, and its business.

## II.    STATEMENT OF FACTS

### A. RedSense's Business and Its Reputation in the Cybersecurity Industry.

RedSense delivers actionable, context-rich threat intelligence is proactive, targeted, and made easy for its customers, which can be leveraged by its customers to strengthen detection and response capabilities and enhance the ability to prevent and remediate cyber threats.  Montanaro Decl. ¶ 3.  RedSense empowers

organizations to stay ahead of evolving cyber threats with a flexible, defense-grade solution tailored to meet unique needs without the complexity of traditional approaches. *Id.* RedSense offers its customers a variety of subscription services that the customer can select based on its cyber security needs. *Id.*

The cybersecurity and threat intelligence market is highly competitive—cyberthreats are continually on the rise, as cybercriminals become more skilled at hacking and infiltrating systems. *Id.* ¶ 4. To combat this rise in cyberthreats, it becomes imperative for customers to employ proactive and complex security measures to protect the systems fundamental to their business operation. *Id.* ¶ 4. One such measure is to retain the services of companies like RedSense to provide innovative, high-quality, accurate, and timely threat intelligence data.

RedSense's reputation within the market, its ability to retain customers, and its ability to engage new customers depends on how successfully it can provide high-quality, accurate, and timely data. Montanaro Decl. ¶ 5. Conversely, if RedSense fails to provide such high-quality threat intelligence, RedSense's reputation will be damaged, which will undermine its competitive advantage in the market. *Id.* As an example, if RedSense provides a customer with inaccurate data, then the customer might waste resources to protect itself from the wrong threat. *Id.* Similarly, if RedSense is delayed in providing threat intelligence, a customer may not have enough time to protect against an imminent attack, or worse, the customer could

5

already have been attacked; this means that customer would have to spend significant resources to remediate what could have been avoided with timely threat intelligence. *Id.* In either instance, the provision of inaccurate or untimely threat intelligence would ruin RedSense's reputation and would cause customers to look elsewhere for their cybersecurity needs. *Id.*

Not only is this industry highly competitive, but it is also highly sensitive. Because companies like RedSense are dealing with the most sensitive aspects of a customer's operation, customers place significant trust in their cybersecurity service providers. *Id.* ¶ 6. Customers, therefore, become highly attuned to the reputation of the third-party service providers they rely on to service their cybersecurity needs. For example, a hint or even a rumor regarding impropriety, ethical concerns, or a similar vulnerability is enough to ruin the service provider reputation and cause a customer to seek their threat intelligence from another, more reputable source that they can trust. *Id.* Simply put, reputation is key within this industry. If RedSense's reputation is sullied and tarnished, repairing the reputation and earning back the trust are near impossible tasks. Montanaro Decl. ¶ 7. To that end, RedSense is also obligated by way of its customer service agreements to uphold strict operational security measures and perform under industry established and recognized standards. Failure to do so is cause for breach and termination of said agreements—agreements that Bohuslavskiy has an intimate knowledge of. *Id.* ¶ 8.

6

To be successful in this industry and to bolster its reputation, RedSense hass engaged significant efforts to be a threat intelligence service provider that its customers can rely on and trust. *Id.* ¶ 7. As a result of this effort, RedSense has developed a reputation of being reliable, trustworthy, and competent. *Id.*

## B. Bohuslavskiy's Responsibilities at RedSense and Access to Proprietary and Trade Secret Information Regarding Red Sense Customers.

From January 23, 2023 through his resignation on February 24, 2025, Bohuslavskiy served as RedSense's Chief Research Officer. Montanaro Decl. ¶ 10. One of his responsibilities in connection with this role was leading the RedSense Threat Intelligence Team, which includes, amongst other things, providing customer briefings, responding to requests for information from customers and potential customers, and participating in sales meetings. *Id.*

Accordingly, in connection with his role at RedSense, Bohuslavskiy had routine interactions with RedSense's customers, including RedSense's key customers. *Id.* ¶ 11. This also meant that Bohuslavskiy had direct access to information about RedSense's customers, including the contents of RedSense's contracts with these customers, which customers were RedSense's key or largest customers, and sensitive information about each customer's unique business needs. *Id.* RedSense considers this information about its customers to be confidential and trade secret information. *Id.* Because one of Bohuslavskiy's roles was to interface with current and prospective customers, RedSense entrusted Bohuslavskiy with its

trade secret information so that Bohuslavskiy could use such information to deliver better services to the customers and obtain a competitive advantage in the market. Montanaro Decl. ¶ 11. For example, to attract customers, Bohuslavskiy was entrusted with information regarding features that RedSense intended to add to its customers' deliverables and was encouraged to provide demonstrations to customers to garner additional interest. *Id.* Likewise, RedSense entrusted Bohuslavskiy with these customer relationships, and believed that Bohuslavskiy would act for the benefit of RedSense in connection with his interactions with these customers. *Id.*

## C. Bohuslavskiy Fails to Deliver Work Product That Is Promised to RedSense Customers.

During Bohuslavskiy's tenure at RedSense it became apparent that, although Bohuslavskiy was responsible for delivering certain work product, the work product was not delivered as promised. Montanaro Decl. ¶ 12. Of particular concern was that RedSense had already made commitments to customers regarding the delivery of new features and the incorporation of those features into the offering RedSense provides to customers, yet Bohuslavskiy failed to deliver those features and tools to the company. *Id.* Because Bohuslavskiy participated in customer meetings, he knew that RedSense made these commitments to the customers and that the customers expected these new features as part of their relationship with RedSense. *Id.*

One such feature is the AI-Driven Intel Search ("AIDIS") Solution, an automation tool that Bohuslavskiy was responsible for developing under the code

name Project Pylon.  The tool that would allow RedSense to deliver more targeted threat intelligence to its customers based on a more rapid AI-driven search and report generation capability.  *Id.* ¶ 13.  RedSense had already previewed this feature to some of its key customers, and these customers were eager to use this feature to increase the quality of the threat intelligence received.  *Id.*  Deploying this automation tool would provide RedSense with a strategic advantage and differentiated RedSense from other threat intelligence providers.  *Id.*  Because Bohuslavskiy was in these demonstrations, he also knew that this automation tool would be a value-add for customers and something that RedSense could leverage to obtain an advantage in the market.  Montanaro Decl. ¶ 13.

Because these features were promised to customers, Bohuslavskiy's failure to deliver these features (even though RedSense has already paid Bohuslavskiy and his team for the tool), meant that RedSense was unable to deliver on its promise, and customers were left questioning whether RedSense was a reliable provider of threat intelligence — and whether they are committed to innovating their products and services to meet the needs of their customers.  *Id.* ¶¶ 14-15.

**D. Bohuslavskiy's Resignation and His Threats Regarding RedSense Customers.**

In the weeks prior to Bohuslavskiy's resignation for Red Sense, Bohuslavskiy continued to meet with RedSense customers as part of his responsibilities. Montanaro Decl. ¶ 17. The only difference was that Bohuslavskiy began cutting out other RedSense partners, employees, and contractors out of these meetings. *Id.* This was not accidental, but strategic. In advance of his smear campaign and attempts to ruin RedSense's existing customer relationships, Bohuslavskiy attempted to cut RedSense out of the picture so that Bohuslavskiy was in position to better usurp these relationships following his resignation. *Id.* ¶ 16. Likewise, prior to Bohuslavskiy's resignation, Bohuslavskiy was supposed to conduct a scheduled briefing with ████████ another RedSense customer. *Id.* ¶ 18. Bohuslavskiy unilaterally cancelled the briefing without explanation, did not reschedule the meeting while he was still at RedSense, and resigned soon after. *Id.* Bohuslavskiy conveniently cancelled the briefing knowing that he was going to resign and knowing that he could use the promise of delivering this briefing as a way induce ████████ to retain Bohuslavskiy for the threat intelligence services. Montanaro Decl. ¶ 18.

In other instances, Bohuslavskiy laid the groundwork for the customer to be swept into internal RedSense disputes. Prior to resigning from RedSense, Bohuslavskiy sent an email addressed to "Red Sense Partners" where he aired various grievances against Stear. *Id.* ¶ 19. In addition to emailing the RedSense

10

partners (CEO David Montanaro, Kevin Stear, and Bryan VanSickle), he also included other RedSense staff. *Id.* But most concerning is that Bohuslavskiy included a primary point of contact of RedSense customer ███ in the "TO" line of the email. *Id.* The point of contact is not a partner of RedSense, he is not an employee of RedSense, and he is not a contractor or staff member of RedSense. *Id.* Instead, the point of contact has a background as a digital forensic specialist and serves as Senior Principal at RedSense customer ███, as well as the primary the point of contact for the RedSense-███ relationship. *Id.* The inclusion of the point of contact was not accidental; Bohuslavskiy intentionally included the point of contact on the email airing out his internal dispute with RedSense so that ███ (and specifically, someone integral to RedSense-███ relationship) would become aware of this dispute. Montanaro Decl. ¶ 19. The only reason for Bohuslavskiy to do that is to sow doubt in the mind of ███

On February 24, 2025, Bohuslavskiy submitted his resignation as Chief Research Officer of RedSense. The following day, Bohuslavskiy sent an email to the other partners of RedSense threatening to go public with his grievances against RedSense, including "informing each customer" of what he perceived to be "illegal action" on the part of RedSense (requiring its partners, staff, and vendors to execute CIIAA to formalize the assignment of the assets RedSense already owned). *Id.* ¶ 20. Because of Bohuslavskiy's experience in the cybersecurity community and the

11

sensitivities that customers in this industry have, Bohuslavskiy knew that going public with false statements regarding RedSense would damage RedSense's reputation and harm existing and future customer relationships. This harm would be irreparable and irreversible to RedSense. *Id.* ¶ 21. To prevent such irreparable harm, RedSense's corporate counsel sent a cease-and-desist letter to Bohuslavskiy demanding he not communicate with RedSense customers. *Id.*, Ex. A (Cease and Desist Letter from John Bacon to Bohuslavskiy, dated February 25, 2025 and Bohuslavskiy Response Email, dated February 25, 2025). Bohuslavskiy was expressly cautioned that if he carried out his threats, such false disparagement of RedSense would irreparably harm the operations and business reputation of RedSense. *Id.* Bohuslavskiy responded with a threat: "I will be informing each customer about this illegal action tomorrow, as well as what lead [sic] to it. With all screenshots and evidence attached." *Id.* at 3.

### E. Bohuslavskiy Launches Smear Campaign Repeatedly Disparaging RedSense to Its Existing and Prospective Customers.

Bohuslavskiy made good on his threat and ignored the cease-and-desist demand. Beginning on March 6, 2025, and continuing to date, Bohuslavskiy continued to contact RedSense's customers and smear RedSense's reputation. Montanaro Decl. ¶ 22. Bohuslavskiy has engaged in a rampant campaign of disparaging RedSense to its existing and potential customers, claiming he had "ethical concerns" about the company, and insinuating that Red Sense cannot

adequately service the customer relationship, all the while peddling his own threat intelligence services, encouraging RedSense customers to forego their relationship with RedSense and obtain threat intelligence services directly through Bohuslavskiy directly to ensure "seamless intel provision and continuity." *Id.*

For example, beginning on March 6, 2025, Bohuslavskiy contacted at least a dozen RedSense customers, including ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████  *Id.* ¶ 23, Ex. B (Customer Emails from Bohuslavskiy). In these communications, he informed the customers of vague "ethical concerns" he had about RedSense, provided threat intelligence reports that were created by his team (and not RedSense), and encouraged the customers to contact him directly via phone, Signal, or email if the customer desired to engage his services. *Id.* ¶ 22. RedSense became aware of these emails when the customers forwarded the emails or reached out to RedSense, expressing concern and confusion about these emails, and raising questions as to whether RedSense and/or Bohuslavskiy had been compromised. *Id.* ¶¶ 23-24.

Simultaneously, Bohuslavskiy published a post to his public LinkedIn page regarding his resignation.  *See* Figure 1.  As with his customer emails, Bohuslavskiy explicitly and publicly complained of his "ethical concerns" regarding Red Sense.



**Figure 1, Bohuslavskiy LinkedIn Post, dated March 6, 2025[1]**

To further urge Bohuslavskiy to cease his harmful conduct and prevent further irreparable harm, RedSense sent Bohuslavskiy an additional demand letter, asking that Bohuslavskiy cease his conduct.  Montanaro Decl. ¶ 26, Ex. C (Cease and Desist Letter dated March 17, 2025).  Once again, Bohuslavskiy ignored the demands to stop contacting customers, stop his attempting to smear the reputation of RedSense,

---

[1] Montanaro Decl. ¶ 25.

and stop usurping RedSense's customer relationships. *Id.* In fact, the March 17 letter only emboldened his misconduct. *Id.* ¶¶ 26-28.

On March 17 and March 18, 2025, Bohuslavskiy reached out to ███ and potentially other customers, with an update regarding upcoming ransomware attacks targeting healthcare companies. As in his prior communications, Bohuslavskiy encouraged the customer to contact him and his team directly, claiming that his team, and not RedSense, could protect the customer's interests. *Id.* ¶ 27, Ex. B. On April 29, 2025, Bohuslavskiy emailed ███ and potentially other customers with a request to meet for a Q1 intelligence briefing, which he claims that Red Sense failed to deliver. *Id.* ¶ 28, Ex. B. These claims by Bohuslavskiy are false and were made to further denigrate Red Sense, such that ███ would erroneously believe that RedSense was not honoring its contractual obligations to ███ *Id.* ¶ 28. This, of course, would make ███ less likely to continue its relationship with RedSense or, at minimum, cause ███ to have concerns about the viability of RedSense as its provider of threat intelligence. *Id.*

Bohuslavskiy further attempted to distinguish the services that *he* was able to provide as compared to what *RedSense* would be able to provide, specifically emphasizing that his team relies on "unique" access to adversarial sources, and that he was not offering to deliver publicly-available, open-source, or recycled intelligence (implying that RedSense does not provide such one-of-a-kind or state-

15

of-the-art threat intelligence). Montanaro Decl. ¶ 30. Although he made references to his continued affiliation with RedSense, like with his other customer emails, Bohuslavskiy encouraged the customers to reach directly to him with questions about the services Bohuslavskiy could provide. *Id.* ¶¶ 29, 31.

Because Bohuslavskiy has absconded with RedSense assets and property, Bohuslavskiy is in the position of offering such "unique" features (such as the AIDIS solution) and passing them off as *his* features for his own benefit. *Id.* ¶ 32. Bohuslavskiy knows that these assets and property belong to RedSense, that RedSense spent money, time, and resources to develop these assets, and that it should be RedSense who offers these features to customers. *Id.* Instead, because Bohuslavskiy has stolen this property, he is able to falsely claim that he can offer better, more innovative solutions than RedSense, and improperly compete for the business with RedSense's customers. *Id.*

In carrying out this campaign, Bohuslavskiy leveraged existing customer relationships with RedSense (Bohuslavskiy likely used the RedSense name as a way lend credibility to these communications) while advertising his personal ability to meet customers' needs and fulfil RedSense's contractual duties (and insinuating that RedSense *could not* fulfil these duties), ultimately associating his name and services with the company from which he had already resigned, appropriating the RedSense name to bolster credibility,    deceiving RedSense's customer base as to

16

Bohuslavskiy's role within and his ability to speak on behalf of RedSense, and creating customer confusion as to who (RedSense or Bohuslavskiy) was the party responsible for servicing the account. *Id.* ¶ 31.

### F. RedSense Customers Express Concern Regarding Bohuslavskiy's Conduct.

Since this smear campaign began, customers have reached out to RedSense with confusion and concern. Miller Decl. ¶ 7-9. Because Bohuslavskiy sent these communications via a *personal Gmail* email address and included a statement that he resigned from RedSense, customers have asked whether the email is legitimate (because they expect RedSense communications to come via a RedSense email address), whether it is a scam, whether the email is a phishing lure, and whether the email is actually coming from Bohuslavskiy or if someone is impersonating Bohuslavskiy. *Id.* ¶ 7. Customers who expect to receive correspondence regarding RedSense services via official RedSense channels are confused when communications come from personal email addresses and do not understand why they are coming from an individual who has stated in the outreach that he has resigned from RedSense. *Id.* ¶¶ 7-8. Customers, who are unfamiliar with the corporate structure of RedSense, are left wondering whether Bohuslavskiy is speaking on behalf of RedSense and whether he is authorized to do so. *Id.* ¶ 7. This confusion is further compounded by Bohuslavskiy offering to provide continued

threat intelligence through Affix (Bohuslavskiy's LLC), which would be an unknown and unfamiliar entity to RedSense's customers. *Id.*

Bohuslavskiy continues to communicate with RedSense customers to date. These customers have had to spend considerable time and resources dealing with Bohuslavskiy's emails because they have had to carefully determine if Bohuslavskiy's emails are a scam, if RedSense can service the relationship, and whether the customer would be better served by Bohuslavskiy's team. Miller Decl. ¶¶ 9-10.

It would be bad enough if Bohuslavskiy's interference was limited to improperly competing with RedSense for the business of RedSense's customers and using RedSense stolen property for this improper competition. But Bohuslavskiy has taken it a step further and is determined to permanently ruin RedSense's reputation. *Id.* ¶¶ 5, 15. Based on the highly competitive and sensitive nature of the threat intelligence industry, an insinuation that there are "ethical concerns" surrounding RedSense would be enough to permanently damage RedSense's reputation within this market. *Id.*; *see also* Montanaro Decl. ¶ 6. Because of these increased sensitivities when dealing with cybersecurity protection, regardless of what the "ethical concern" is or whether there is any merit to it (there is not), such insinuations may lead a customer to believe that it can no longer entrust RedSense to service the relationship without compromise.

18

After repeatedly charging RedSense with incapacity and misconduct so severe as to influence customers' business decisions, Bohuslavskiy promoted his services — not just as an alternative, but as a "seamless" continuation of the customers' existing relationships with RedSense.  Montanaro Decl. ¶ 21.  In doing this, Bohuslavskiy actively deceived customers to divert business from RedSense to himself.  *Id.*

### G. Bohuslavskiy Attends Industry Events as a "Representative of RedSense," Sowing Further Confusion.

Many of RedSense's largest customers are within the healthcare industry, where they face unique concerns and have heightened sensitivity regarding data protection and preventing breaches of health information.  Montanaro Decl. ¶ 37.  As a result, many of RedSense's customers are members of Health-Information Sharing & Analysis Center ("Health-ISAC"), which is a non-profit organization that provides a platform for security professionals in the health industry to share insights, best practices, alerts, and intelligence.  *Id.* ¶¶ 37-38.  Health-ISAC is also the preeminent industry organization for key players in the industry, such as the points of contact for RedSense's healthcare customers.  *Id.* ¶ 38.  Health-ISAC offers events for its members, including monthly threat briefings.  *Id.*

On June 24, 2025, RedSense learned from several of its healthcare customers who had attended the Health-ISAC June Monthly Threat Briefing (that occurred earlier that day), that Bohuslavskiy was a speaker at the briefing and based on the

event agenda was speaking as a "representative of RedSense." *Id.* ¶ 39. RedSense partners and leadership did not have any visibility into this speaking engagement. *Id.* As such, it did not authorize Bohuslavskiy to speak at this event on "behalf" of RedSense or as its "representative" and did not approve any messaging that Bohuslavskiy presented at this event. Montanaro Decl. ¶ 39. Multiple RedSense customers who attended this event and had previously received correspondence from Bohuslavskiy reached out to RedSense with confusion. *Id.* They asked whether Bohuslavskiy was "back at" RedSense and did not understand why Bohuslavskiy was advertised as being a "representative of RedSense." *Id.* Although RedSense does not have visibility as to the substance of Bohuslavskiy's speaking engagement, given the tenor of his other communications to the industry and directly to RedSense's customers, RedSense is confident that Bohuslavskiy did not "represent" RedSense in a positive light. *Id.* At minimum, he has created further confusion as he attempts to market his own threat intelligence offering while taking advantage and misusing RedSense's reputation to the detriment of RedSense's customer relationships. *Id.* RedSense has no reason to believe that the Health-ISAC was an isolated speaking event for Bohuslavskiy where he held himself out as a "representative of RedSense."

**H. Several Customers Refuse to Work with RedSense Due to Bohuslavskiy's Misconduct.**

RedSense maintains contractual relationships with all its customers, including

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Montanaro

Decl. ¶ 9.  In each of these instances, RedSense contracted to provide cybersecurity threat monitoring and reporting services to customers.  *Id.*  These customers have had to spend considerable time, effort, and resources to deal with these unwanted communications.  Miller Decl. ¶ 10.  RedSense customers who have otherwise been happy with the services that Red Sense has provided, have informed RedSense this ongoing issue with Bohuslavskiy has caused a dark stain on RedSense's reputation and has undermined the otherwise high quality of services customers have received from RedSense.  *Id.* ¶ 11.  In many instances, it is the Chief Information Security Officer ("CISO") of each respective RedSense customers (an executive who controls the purse strings with respect to that company's cybersecurity expenditures and has final say as to which service providers the customer will rely on for its cybersecurity needs), who has expressed their concern or otherwise uneasiness with the Bohuslavskiy communications.  *Id.*  Receiving communications from a customer's CISO is of particular concern to RedSense because that indicates that the executive

who controls the cybersecurity purse strings — and ultimately the decision-maker with respect to continued relations with RedSense — has become involved.  *Id.*

In at least one instance, ████ which is RedSense's largest customer, expressed disappointment regarding the issues between Bohuslavskiy and RedSense.  Montanaro Decl. ¶ 34.  ████ has also become less engaged and responsive to RedSense and has yet to pay RedSense the outstanding amounts that are past due under the RedSense Advantage subscription contract.  *Id.*  Given the timing of Bohuslavskiy's communications with ████ coinciding with ████ recent refusal to make payments to RedSense, it is highly likely that Bohuslavskiy is behind this change in the relationship between RedSense and ████  *Id.*  On Tuesday, July 1, 2025, RedSense received an email from ████ where ████ complains of "████ ████████████████████████████████████████████████████████ and what it claims is a ██████████████████████  *Id.*  In the same email, ████ informs RedSense that it is placing payment of the outstanding invoice on hold until RedSense resolves these "performance concerns."  *Id.*  The timing of this communication is suspicious.[2]  Given that this occurred following Bohuslavskiy becoming aware of RedSense commencing litigation against Bohuslavskiy,

---

[2] RedSense filed its complaint on Friday, June 27, 2025.  On the same day, RedSense's counsel informed Bohuslavskiy that RedSense would be proceeding with litigation against Bohuslavskiy.  Montanaro Decl. ¶ 34

RedSense believes that this Bohuslavskiy escalating his conduct in retaliation for RedSense filing a lawsuit against Bohuslavskiy.

Prior to Bohuslavskiy's email smear campaign, RedSense leadership and ███ leadership routinely were in communication and ███ raised no issue or concerns about RedSense, the quality of the services RedSense provided, or the value that ███ obtained from RedSense. *Id.* Recently, however, ███ (prior to them becoming less engaged and responsive) has raised questions about the quality of the services and the value-add RedSense can provide. *Id.* Specifically, they have requested RedSense provide the AIDIS Solution automation tool that Bohuslavskiy previously previewed to ███ The problem, however, is that Bohuslavskiy has absconded with the AIDIS code and refuses to return it to RedSense. *Id.* Because Bohuslavskiy knows that RedSense does not have the AIDIS code, Bohuslavskiy is holding hostage and leveraging AIDIS Solution's functionality and capabilities in his conversations with Red Sense customers to cause them to doubt RedSense's capabilities and value. *Id.* ¶ 35. This is not an isolated result.

███ is another customer of RedSense. Miller Decl. ¶ 12. Retaining this customer is strategically important for RedSense, as this customer operates within RedSense's largest vertical — customers within the healthcare industry represent RedSense's largest market and largest potential customer base. *Id.* By virtue of his involvement with RedSense, Bohuslavskiy knew of the strategic importance of the

23

relationship with ▮▮▮▮▮ *Id.* Following Bohuslavskiy's contacting of key stakeholders at ▮▮▮▮ and disparaging RedSense, the Director of Cyber Intelligence and Threat Engineering at ▮▮▮▮ has instructed RedSense that it needs to "work it out with Bohuslavskiy." *Id.* ▮▮▮▮ also received a preview of AIDIS and has requested that RedSense provide the AIDIS tool immediately. *Id.* ¶ 13. Because Bohuslavskiy is aware of the strategic importance of the ▮▮▮▮ customer relationship, Bohuslavskiy has incentive to market the AIDIS capabilities as a selling point as to why customers should use his services over those of RedSense. *Id.* ▮▮▮▮ highly unusual request that the parties "work it out" shows that Bohuslavskiy has successfully placed pressure on the RedSense-▮▮▮▮ relationship, and that ▮▮▮▮ believes its services may be compromised absent resolution between RedSense and Bohuslavskiy. *Id.*

On June 30, 2025, RedSense received an email from ▮▮▮▮ Miller Decl. ¶ 12. In this email, ▮▮▮▮ complained that since February (*i.e.*, since Bohuslavskiy's resignation) ▮▮▮▮ has not received reports related to regions of interest and has experienced an overall decline in reporting. *Id.* Additionally, ▮▮▮▮ also stated that it was getting more valuable threat intelligence and stolen credentials data from other vendors, compared to RedSense. *Id.* Like with the recent ▮▮▮ communication, the timing of this recent outreach from ▮▮▮▮ is also

suspicious.  RedSense has no reason to believe that this is not an act of retaliation on the part of Bohuslavskiy.

Bohuslavskiy's conduct has not only caused irreparable harm to RedSense's existing customer relationship, but also to its relationship with prospective customers. Montanaro Decl. ¶ 40-41.  Based on its positive reputation for providing high quality cybersecurity services, RedSense had the expectation that it would continue to expand its customer base (including expanding the current relationships RedSense has with existing customers) by being able to leverage existing customers' satisfaction.  *Id.*  Bohuslavskiy's email campaign where he repeatedly indicated that customers should distrust the quality of RedSense's services and that they should turn to him for cybersecurity needs going forward was knowingly done to undermine RedSense's future economic expectancy.  *Id.*

In at least one instance, RedSense and ▇▇▇ were engaged in serious discussions regarding ▇▇▇ reattaining the services of RedSense.  During this time, RedSense viewed ▇▇▇ as a prospective customer.  Miller Decl. ¶ 14.  These discussions with ▇▇▇ have since come to a halt.  *Id.* ¶ 14.  A ▇▇▇ executive revealed to RedSense that there was too much of a cloud over RedSense as a result of Bohuslavskiy's smear campaign and the rumors about Bohuslavskiy and RedSense that have been circulating in the threat intelligence industry.  *Id.* ¶¶ 14-15.

25

The same executive informed RedSense that unless RedSense is able to resolve this issue, ███████ would not feel comfortable retaining RedSense's services.  *Id.*

## III.  **LEGAL STANDARD**

A party seeking a preliminary injunction must establish that "[RedSense] is likely to succeed on the merits, that [RedSense] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [RedSense's] favor, and that an injunction is in the public interest." *Sec. & Exch. Comm'n v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024 (*quoting Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The first two factors are considered to be the two "gateway" factors, and the Third Circuit places an "elevated value" on these factors.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017).  Once the two gateway factors are met, the Court balances the factors to determine if relief is warranted. *Id.* at 179.

## IV.  **ARGUMENT**

RedSense's requested relief is warranted.  RedSense is likely to succeed on the merits of its claims.  If an injunction enjoining Bohuslavskiy is not entered, Bohuslavskiy will continue to impermissibly commit violations of the Lanham Act and interfere with RedSense's customer relationships.  With each day that goes by with Bohuslavskiy's email smear campaign being unchecked, Bohuslavskiy is successfully sullying RedSense's reputation and goodwill in the threat intelligence

market.  Due to the nature of this industry, such attacks on RedSense's reputation will cause irreparable harm to RedSense, as customers lose the trust they have in RedSense and even consider taking their future business elsewhere.  RedSense's requested relief is warranted because the balance of equities favors granting an injunction.  Additionally, granting an injunction to prevent customer confusion and preventing interference with existing contracts is in the public interest.

**A. RedSense Is Likely to Succeed on the Merits.**

RedSense is likely to succeed on the merits of its claims, and as such its request for a preliminary injunction should be granted.  The Complaint sets forth, in part, the following statutory and common law claims: False Advertising under the Lanham Act (15 U.S.C. 1125 *et seq*.), tortious interference with contractual relations, and tortious interference with prospective contract.  Even at the early stage of this litigation, the record demonstrates that RedSense will be able to establish ample evidence in support of these claims.  Given the strength of the evidence favoring RedSense, this factor weighs in favor of granting injunctive relief.

**1.  Bohuslavskiy Violates the Lanham Act.**

Section 1125 of the Lanham Act prohibits making a false or misleading representation of fact in connection with commercial advertising or promotion concerning another person's goods, services, or commercial activities.  15 U.S.C. § 1125(a)(1)(B).  To succeed on the merits of a false advertising claim, RedSense

needs to demonstrate that (1) Bohuslavskiy made false or misleading statements about RedSense's products or services, (2) that there is actual deception or a tendency to deceive a substantial portion of the intended audience, (3) that the deception is material in that it is likely to influence purchasing decisions, (4) that the advertised good traveled in interstate commerce, and (5) the resulting injury to RedSense, such as the declining of sales of loss of goodwill. *Highmark Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir. 2001). For purposes of a false advertising claim, commercial advertising or promotion must be commercial speech, by a defendant in commercial competition with the plaintiff, made for the purposes of influencing customers to buy defendant's good or services, and disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within the industry. *NY Machinery Inc. v. Korean Cleaners Monthly*, 2018 WL 2455926 at *3 (D. N.J. 2018).

Whether the commercial statement was sufficiently disseminated for a false advertising claim is a question of fact. *Wakefern Food Corp. v. Marchese*, 2021 WL 3783259 at *4 (D. N.J. 2021); *Premier Comp Sols., LLC v. Penn Nat. Ins. Co.*, 2012 WL 1038818, at *8 (W.D. Pa. Mar. 28, 2012) ("Rather than focusing on widespread impersonal activity, the inquiry focuses on the 'relevant industry' and whether the communication was sufficiently disseminated in that context."). For example, even private conversations can be actionable if defendant promoted her services over that

of plaintiff.  *National Artists Management Co. v. Weaving*, 769 F.Supp. 1224 (S.D.N.Y. 1991); *see also North Shore Medical Center, Ltd. v. Evanston Hospital Corp.*, 1993 WL 141717 at *3 (N.D.Ill. April 28, 1993) (recognizing that under broad remedial purposes of § 43(a), "courts have held that false representations contained in private letters sent from one company to another are actionable under § 43(a) of the Lanham Act.")

As part of Bohuslavskiy's email campaign, he falsely insinuated ethical issues relating to RedSense.  Montanaro Decl. ¶¶ 21, 28, 32.  He peddled his own cybersecurity and threat intelligence services, all while disparaging the quality of services that RedSense could provide to customers.  *Id.* ¶¶ 22, 30, 40.  In these communications, he falsely emphasized that only he (and not RedSense) could adequately service the needs of RedSense's customers.  *Id.* ¶¶ 23, 27, 31.  He confusingly made references to his continued affiliation with RedSense even though he encouraged RedSense customers to contact him directly and procure services through Affix Advisory LLC (the LLC where Bohuslavskiy was the sole member). *Id.* ¶ 32; Miller Decl. ¶ 7.  He also claimed that he could offer "unique" access and solutions, while failing to reveal that the "unique" solutions belonged to RedSense, and he that he was furnishing his customers with  the absconded property belonging to RedSense (that Bohuslavskiy had not right to provide to the customers).  Finally, he falsely claimed that RedSense had failed to deliver briefings as promised and

implied that RedSense was in breach of its customer contracts. Montanaro Decl. ¶ 29, 30, 32.

Each of these statements was made by Bohuslavskiy, who was in competition with RedSense for the business of RedSense's customers. Further, these statements were made for the purpose of deceiving and influencing the customers to seek Bohuslavskiy's services instead of RedSense's services and to ruin the RedSense customer relationships, constituted false statements because they were literally false. These statements were also misleading because they were designed to mislead RedSense customers into believing that their cybersecurity needs were not safe with RedSense. Bohuslavskiy knew that these statements about the quality of RedSense's services was false and misleading and knew, based on his interactions with these customers and his cybersecurity experience, that this deception about RedSense's reputation, the low quality of RedSense's services, and its inability to honor its contractual obligations constituted a material deception that would influence the purchasing decisions of RedSense's customers. *Id.* ¶¶ 21, 27-32.

Bohuslavskiy's conduct constitutes clear violations of the Lanham Act, and RedSense is likely to succeed on the merits.

### 2. Bohuslavskiy Has Tortiously Interfered with RedSense's Current and Prospective Contracts.

To prevail on its claim that Bohuslavskiy tortiously interfered with RedSense's customer contracts, RedSense must provide (1) the existence of a

contract between RedSense and its customers, (2) that Bohuslavskiy knew of these customer contracts, (3) that Bohuslavskiy intentionally and unjustifiably interfered with RedSense's customer relationships, and (4) that RedSense suffered damages resulting from such interference. *Fleming v. United Parcel Service, Inc.,* 255 N.J.Super. 108, 604 A.2d 657 (Law Div.1992). With respect to tortious interference with prospective contracts, RedSense would also have to prove "a reasonable likelihood that the relationship would have occurred but for Bohuslavskiy's interference." *Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 189 (3d Cir. 2012).

There is no question that RedSense has valid customer contracts with multiple customers, including with ███ and ███████ Montanaro Decl. ¶ 9. Given that Bohuslavskiy was involved in customer briefings and working with customers, Bohuslavskiy cannot deny that he knew of these customer contracts and the terms contained therein. *Id.* ¶ 10. Next, the intentional nature of Bohuslavskiy's conduct is evident from his communications with these customers. *See generally id.* ¶¶ 20-32. Bohuslavskiy was not shy about his motive—he wanted to pitch his "superior" cybersecurity services to existing RedSense customers in the hope that they would forgo their relationship with RedSense and ruin the existing relationships RedSense had with its customers and the prospective relationships RedSense expected to attain. *Id.* In at least one instance, Bohuslavskiy has been successful, as RedSense's largest

customer is yet to pay RedSense for the outstanding amounts owned under the RedSense-███ contract. *Id.* ¶ 34. In another instance, a strategically important customer has demanded that RedSense "work it out" with Bohuslavskiy, indicating the strain Bohuslavskiy has placed on the customer relationship. Miller Decl. ¶¶ 12-13. And even if RedSense has not yet lost a customer, because the purpose of the preliminary injunction is to prevent such loss of a customer, the demonstration by RedSense of a "presently existing actual threat of injury" suffices. *Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434 (3d Cir. 2005).

Further, there is no doubt that RedSense has clearly been harmed and has lost customer goodwill because of Bohuslavskiy's missives against RedSense's reputation. Montanaro Decl. ¶ 40-41. This is demonstrated by ███ a prospective customer that RedSense was in discussions to provide ███ with cybersecurity services conveyed to RedSense that it was not comfortable proceeding with a relationship with RedSense because of what Bohuslavskiy had been publicly saying about RedSense. Miller Decl. ¶ 14.

Because of Bohuslavskiy's interference with RedSense contracts, RedSense has lost credibility with its current and prospective customers, and as a result, has suffered a loss of reasonably relied-upon future economic advantages. Accordingly, RedSense is likely to succeed on its tortious interference with contract and

prospective contract claims.  *Score Bd., Inc. v. Upper Deck Co.*, 959 F. Supp. 234, 239 (D.N.J. 1997); *Bancroft*, 456 F. App'x at 189.

## B. Bohuslavskiy's Misconduct Has Caused and Will Continue to Cause Irreparable Harm.

"Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction is a trademark case." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir.1992) (noting that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill"). "In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citations omitted).  Likewise, irreparable injury can also be based on likely confusion.  *Opticians*, 920 F.2d at 196.

Here, Bohuslavskiy's smear campaign is designed to accomplish one objective: to ruin RedSense's reputation in the cybersecurity industry by convincing RedSense customers that their cybersecurity needs cannot be served by a continued relationship with RedSense, and then capitalizing on this ruined reputation by swooping as the only person who can provide the cybersecurity services that the customers need.  If Bohuslavskiy is successful, RedSense's reputation will be ruined,

it will lose key customer relationships, and because of the sensitive and competitive nature of the cybersecurity industry, will be permanently and irreparably harmed.

Given Bohuslavskiy's escalation in response to RedSense filing this action (*see* Montanaro Decl. ¶ 34; Miller Decl. ¶ 12), it is clear that absent court order, nothing will stop Bohuslavskiy. Indeed, his behavior since he was informed that RedSense was pursuing litigation suggests that his conduct has become vindictive, punishing RedSense for choosing to resolve this dispute via litigation.

## C. The Balance of Equities Favor Granting an Injunction Against Bohuslavskiy.

When balancing the relative harms to the parties (the potential injury to the plaintiff if an injunction is not issued compared to the potential injury to the defendant if an injunction is issued), "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

Put another way, Bohuslavskiy cannot manufacture a harm by claiming his business suffers if he cannot do something he is not permitted to do in the first instance (improperly compete with RedSense for the business of its customers). *Id.* By comparison, if an injunction is not issued, RedSense will continue to suffer reputational harm via the false statements made by Bohuslavskiy and will continue to lose customers. Additionally, "[t]he more likely the plaintiff is to win, the less

heavily need the balance of harms weigh in his favor." *NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1568 (7th Cir.1996).  Such is the case here.

## D. The Public Interest Strongly Favors a Preliminary Injunction.

There is a "strong public interest in the prevention of misleading advertisements."  *Novartis,* 290 F.3d at 597; *see also Crime Control, Inc. v. Crime Control, Inc.,* 624 F. Supp. 579, 582 (D.D.C. 1984) (granting preliminary injunction because "the public has a right not to be deceived or confused"); *Hanley-Wood LLC v. Hanley Wood LLC,* 783 F. Supp. 2d 147, 151 (D.D.C. 2011) (granting permanent injunction because "the public interest favors protecting against further violation of federal copyright and trademark laws").  Here, the preliminary injunction RedSense is seeking is designed to protect the public against Bohuslavskiy's false and misleading advertising.  It is in the public interest.

Moreover, the public has an interest in "prevent[ing] one company from interfering with the legally protected contractual rights of another."  *Score Bd.,* 959 F. Supp. at 240.  This is particularly true where the interference is occurring in a highly competitive industry "in which the contractual relationship is the coin of the realm."  *Id.*  In general, the public "has a strong interest in seeing that contract . . . rights are respected."  *Ride the Ducks,* 138 F. App'x at 434-35.  Here, RedSense has valid contracts with RedSense's customers and simply seeks to prevent Bohuslavskiy from improperly interfering with these relationships by spreading

false information for the retributive purpose of ruining RedSense's customer relationships in retribution for his grievances with RedSense.

**E. RedSense Seeks a Narrow Injunction to Prevent Irreparable Harm.**

RedSense seeks an injunction that enjoins Bohuslavskiy from the following conduct: (1) publicly or privately soliciting RedSense's current customers and prospective customers[3] for business, (2) publicly or privately denigrating the quality of RedSense's cybersecurity services, (3) publicly or privately using RedSense proprietary or trade secret information or RedSense property that rightfully belongs to RedSense (but that Bohuslavskiy has absconded with) to improperly compete with RedSense, (4) publicly or privately making false statements about RedSense, its products and services for the purpose of stealing the business away from RedSense, (5) publicly or privately making false statements about RedSense not honoring its customer contracts, (6) holding himself out as a representative of RedSense or as someone who is authorized to act on behalf of RedSense at industry events or via other public platforms, and (7) engaging in speaking engagements where he purports to speak as a representative of or on behalf of RedSense.

---

[3] By virtue of Bohuslavskiy's involvement with Red Sense, he was aware of prospective customer relationships that arose during his time as Chief Resource Officer. Red Sense seeks to limit the injunction with respect to the prospective customers to those relationships that were in the customer pipeline for RedSense prior to Bohuslavskiy's resignation as well as those that Bohuslavskiy otherwise had knowledge of.

The proposed scope of the injunction is narrowly tailored to prevent Bohuslavskiy from carrying out further wrongs and is necessary to prevent irreparable harm to RedSense.

V.     **<u>CONCLUSION</u>**

For the reasons stated herein, RedSense respectfully requests that the Court grant a preliminary injunction requiring Bohuslavskiy cease his communications with RedSense's customers and to be enjoined pending resolution of this case from engaging in his harmful smear campaign of RedSense to steal the business away from RedSense.

Dated:        July 1, 2025               CROWELL & MORING LLP

                                         By: s/ Preetha Chakrabarti
                                         Preetha Chakrabarti

                                         pchakrabarti@crowell.com
                                         Rachel Elaine Hsu (*pro hac vice* forthcoming)
                                         rhsu@crowell.com
                                         Crowell & Moring LLP
                                         Two Manhattan West
                                         375 Ninth Avenue
                                         New York, NY 10001
                                         Telephone: (212) 223-4000
                                         Facsimile: (212) 223-4134

                                         Anna Z. Saber (*pro hac vice* forthcoming)
                                         asaber@crowell.com
                                         Crowell & Moring LLP
                                         3 Embarcadero, 26th Floor
                                         San Francisco, CA 94111
                                         Telephone: (415) 986-2800
                                         Facsimile: (415) 986-2827

                                         *Attorneys for Plaintiff Red Sense LLC*