Preetha Chakrabarti
Rachel Elaine Hsu (*pro hac vice* forthcoming)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
pchakrabarti@crowell.com
rhsu@crowell.com

Anna Z. Saber (*pro hac vice* forthcoming)
CROWELL & MORING LLP
3 Embarcadero, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827
asaber@crowell.com

*Attorneys for Plaintiff Red Sense LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Red Sense LLC<br><br>                    Plaintiff,<br><br>        v.<br><br>Yelisey Bohuslavskiy,<br>a.k.a. Elisei Boguslavskii<br><br>                    Defendant. | Civil Action No. 2:25-cv-12281<br><br>**DECLARATION OF DAVID MONTANARO IN SUPPORT OF RED SENSE LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**REDACTED PURSUANT TO L. CIV. R. 5.3** |

I, David Montanaro, declare as follows:

1.     I am the CEO of Red Sense LLC ("RedSense") and one of the partners of the LLC.  I make this declaration in support of RedSense's Motion for Preliminary Injunction.  This declaration is based upon my personal knowledge and experience at RedSense, as well as my review of the records that RedSense maintains.  If called upon to do so, I could and would testify competently as to the facts stated herein.

2.     I have over thirty-five years of experience in the technology, cybersecurity, and threat intelligence industry.  Prior to RedSense, I was VP of Global Sales at threat intelligence startup AdvIntel (Advanced Intelligence) where I first met Bohuslavskiy.  Before AdvIntel, I was the Global Go-To-Market and Sales Leader at RSA Security's RSA University business unit.

**RedSense's Business and the Cybersecurity Industry**

3.     RedSense delivers actionable, context-rich threat intelligence that is proactive, targeted, and made easy for its customers, which can be leveraged by its customers to strengthen detection and response capabilities and enhance the ability to prevent and remediate cyber threats.  RedSense empowers organizations to stay ahead of evolving cyber threats with a flexible, defense-grade solution tailored to meet unique needs without the complexity of traditional approaches.  RedSense

offers its customers a variety of subscription services that the customer can select based on its cybersecurity needs.

4.    As part of my experience in the cybersecurity and threat intelligence industry and as a CEO of a company operating in this space, I have become familiar with the industry, including what it takes to be successful in this sector. This industry is highly competitive.   This is due to an overall increase in cyberthreats as cybercriminals become more skilled and leverage new tactics, techniques and procedures as well as new technologies such as artificial intelligence—as cybercriminals get more sophisticated, companies such as RedSense have to innovate their solutions to remain competitive.   RedSense customers expect RedSense to offer them proactive and complex security measures to protect the systems fundamental to their business operation and stay one step ahead of the cybercriminals.  This industry is also highly competitive as a result of the sheer number of companies that provide threat intelligence and cybersecurity services.

5.    To stay competitive in this industry and differentiate itself from its many competitors, RedSense must be able to provide innovative, high-quality, accurate, and timely threat intelligence data.  Based on my experience in this industry, failure to provide such data or meet a customer's need would ruin RedSense's reputation as a trusted partner and undermine its competitive

advantage. I am aware of circumstances in the industry where inaccurate or untimely threat intelligence has caused a customer to waste resources in response to the threat intelligence, and that in turn, has ruined the reputation of company who provided inaccurate or untimely information and made it unlikely that the company would keep the business of those customers. I have no reason to doubt that if RedSense's reputation in the industry was attacked, RedSense would also lose customers.

6.    Also based on my experience, I believe the industry to be highly sensitive. Because service providers, like RedSense, deal with some of the most sensitive aspects of a customer's operation—for example, RedSense has knowledge of its customers' unique cybersecurity concerns and vulnerabilities— the customers place significant trust in their service providers. Customers, therefore, become highly attuned to the reputation of the third-party service providers they rely on to service their cybersecurity needs. Reputation is key in this closeknit and specialized industry. A rumor regarding impropriety, ethical concerns, or a similar vulnerability is enough to ruin the service provider reputation and cause a customer to seek their threat intelligence from another, more reputable source that they can trust. To that end, RedSense is also obligated by way of its customer service agreements to uphold strict operational security

measures, perform under industry-established and recognized standards, and that failure to do so is cause for breach and termination of said agreement.

7.      Accordingly, I believe that if RedSense's reputation is sullied and tarnished, repairing the reputation and earning back the trust are near impossible tasks.  As such RedSense had engaged significant efforts to be a threat intelligence service provider that its customers can rely on and trust.  This includes, for example, entering into partner agreements with like-trusted industry leaders with strong reputations such as CISA (Cybersecurity and Infrastructure Security Agency, a division within the United States Department of Homeland Security) and other industry leaders, actively participating to support the FBIs cyber missions, and taking proactive measures to align itself with industry proven standards such as SOC 2.[1]  As a result, I believe that customers and potential customers view RedSense favorably in the market, and that RedSense had developed a reputation for being reliable, trustworthy, and competent.

8.      RedSense is also obligated by way of its customer service agreements to uphold strict operational security measures, perform under industry-established and recognized standards, and that failure to do so is cause for breach and

---

[1] SOC 2 is a cybersecurity compliance framework developed by the American Institute of Certified Public Accountants and is considered to be the industry standard for demonstrating commitment to protecting consumer data.

termination of said agreements—agreements that Bohuslavskiy has an intimate knowledge of.

**RedSense's Existing Customer Relationships**

9.    RedSense maintains contractual relationships with all its customers, including but not limited to: ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████    In each of these instances, RedSense contracted to provide cybersecurity threat monitoring and reporting services to customers.

**Bohuslavskiy's Role at RedSense and Customer Interactions**

10.    From January 23, 2023, through his resignation on February 24, 2025, Defendant Yelisey Bohuslavskiy ("Bohuslavskiy") served as RedSense's Chief Research Officer.  He had many responsibilities, including leading the RedSense Threat Intelligence Team, which included, amongst other things, collecting cyberthreat intelligence, writing intel reports, providing customer briefings, assisting with the response to requests for information from customers, and participating in sales engagements/meetings.  Based on his role with RedSense, Bohuslavskiy would have knowledge regarding the contracts RedSense has with including but not limited to: ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ the value of the contracts, and the unique services each

customer is contracting for with RedSense.

11.    In connection with his role at RedSense, Bohuslavskiy had routine

interactions with RedSense's customers, including RedSense's key customers.

Bohuslavskiy also had intimate knowledge and direct access to information about

RedSense's customers, the nature of the contracts with these customers, which

customers were RedSense's key or largest customers, and sensitive information

about the customers' unique business needs.  RedSense considers this information

about its customers to be confidential and trade secret information, takes steps to

protect this information, and entrusted Bohuslavskiy to use this information only to

advance the business of RedSense (deliver better services to the customers and

obtain a competitive advantage in the market) and *not* to improperly compete with

RedSense for the relationship or interfere with the customer relationships.  Because

one of Bohuslavskiy's roles was to interface with current and prospective

customers and attract customers, Bohuslavskiy was entrusted with information

regarding features that RedSense intended to add to its customers' deliverables and

was encouraged to participate in pre-sales activities with prospective RedSense

customers to garner additional interest. Likewise, RedSense entrusted Bohuslavskiy with these customer relationships, and entrusted that Bohuslavskiy would act for the benefit of RedSense in connection with his interactions with these customers and safeguard these relationships.

## Bohuslavskiy Fails to Deliver Work Product That Is Promised to RedSense Customers

12. In early 2025, I began investigating Bohuslavskiy's conduct. Based on my investigation as well as the investigation of interim Chief Operating Officer of RedSense, Damian Miller, I became aware that although Bohuslavskiy was responsible for delivering certain work product to RedSense, the work product was not delivered as promised. As it related to the customer relationships, this was concerning because RedSense (and specifically Bohuslavskiy on behalf of RedSense) had already made commitments to customers regarding the delivery of new features and the incorporation of those features into the offering RedSense provides to customers, yet Bohuslavskiy failed to deliver those features and tools. Because Bohuslavskiy was in these customer meetings—and in many instances, he was the one providing the feature demonstrations or promising the deliverable—he knew that RedSense made these commitments to the customers and that the customers expected these new features as part of their relationship with RedSense.

13. One deliverable Bohuslavskiy promised to customers, including at least ███████████████ (RedSense's largest customer and a customer that

8

is strategically important to RedSense's business goals, respectively[2]) was the AI-Driven Intel Search ("AIDIS") Solution, an automation tool that would allow RedSense to deliver more targeted threat intelligence reporting to its customers based on a more rapid AI-driven search and report generation capability. Bohuslavskiy has previewed these features to ████████████  I understand from talking with Bohuslavskiy and the points of contact at these customers that they were excited about being able to use this feature to increase the quality and timeliness of tailored and targeted threat intelligence reporting to quickly address executive requests and needs of the organization. AIDIS would also help our customers to understand threat actor Tactics, Techniques, and Procedures (TTPs), methodologies, and ultimately appeared to be the best way for customers to prevent against threat activity. Deploying this automation tool would provide RedSense with a strategic advantage and our promise to provide the AIDIS solution differentiated RedSense from other threat intelligence providers. Because Bohuslavskiy was in these demonstrations, he also knew that this automation tool would be a value-add for customers and something that RedSense could leverage

---

[2] Because I believed that Bohuslavskiy had provided the "in kind funding" that was required for him to become a partner of the LLC, I, and the other partners of Red Sense treated him as a partner. Accordingly, Bohuslavskiy would have access to this information about which customer relationships were important for strategic reasons.

to obtain an advantage in the market.  I specifically asked Bohuslavskiy to include either our Head of Product or myself in the meeting when he demonstrated AIDIS to ███ but he failed to do so.

14.    As part of my investigation and that of Miller, I learned that although RedSense had been paying Bohuslavskiy and his engineering team for the AIDIS deliverable, no work product had been delivered to RedSense.  When RedSense demanded Bohuslavskiy turn over AIDIS and asked for access rights, Bohuslavskiy refused.  This led me to believe that either *no work* had been done on the AIDIS deliverable or that Bohuslavskiy was keeping the work product for himself.  In either case, it was not available for RedSense to offer to its customers.

15.    Because these features were promised to customers, Bohuslavskiy's failure to deliver these features (even though RedSense has already paid for the tool), meant that RedSense was unable to deliver on its promise, and customers were left questioning whether RedSense was a reliable provider of threat intelligence—and whether they are committed to innovating their products and services to meet the needs of their customers.  Since Bohuslavskiy's resignation, customers such as ███████████ have commented on their desire for RedSense to deliver the AIDIS functionality and have questioned the value of the RedSense deliverables absent this automation tool.  Based on these conversations, I have no doubt that the inability of RedSense to deliver the tool is eroding the

relationship between RedSense and the customers such as these key customers who are aware of this offering which was on the RedSense 2025 Product Roadmap.

**Bohuslavskiy's Resignation and His Threats Regarding RedSense Customers**

16.    Prior to Bohuslavskiy's resignation, Bohuslavskiy began to take steps to cut out RedSense from customer interactions and began to sow concerns with the customers.  Based on the actions Bohuslavskiy took following his resignation, my only conclusion is that these actions were deliberate and were done to lay the groundwork for his false advertising and interference smear campaign that he launched post-resignation.

17.    For example, while Bohuslavskiy continued to meet with RedSense customers, he would schedule the meetings solo or with his team, excluding RedSense partners, employees, and contractors from these meetings.  It was only after the meeting had occurred that RedSense partners or other employees would learn that we had been excluded from the meeting.  I believe this conduct was intentional on the part of Bohuslavskiy and was done so that he could develop rapport with the customers without RedSense so that he was in a better position to usurp the relationship.

18.    As another example, just a few days prior to Bohuslavskiy's resignation, Bohuslavskiy was supposed to conduct a scheduled executive briefing with ███████, another particularly important RedSense customer.  I learned

11

that Bohuslavskiy unilaterally cancelled the briefing without explanation and did not reschedule the meeting while he was still at RedSense. Given thit this happened very close in time to his resignation, I believe that this was done conveniently and so that Bohuslavskiy would have reason to approach ███████ post resignation and use the promise of delivering this briefing as a way induce ████████ to retain Bohuslavskiy for his own threat intelligence services.

19.    As another example, Bohuslavskiy laid the groundwork for the customer to be attuned into internal RedSense disputes. Prior to resigning from RedSense, Bohuslavskiy sent an email addressed to "RedSense Partners" (myself, Kevin Stear, and Bryan VanSickle) where he aired various grievances against Stear. He sent this email to the current RedSense partners and RedSense staff. He also included a primary customer contact in the "TO" line of the email. The contact is employed at █████, a RedSense customer. Based on my interactions with him, I understand that his current role at ██████ is Sr. Principal Scientist & Director of Threat Intelligence Research, he is the point-person at █████ for the RedSense-█████ relationship, and he has deep experience in the cybersecurity field. Given that the email from Bohuslavskiy concerned an internal grievance from Bohuslavskiy against Stear, there was no reason for Bohuslavskiy to include a customer contact on the email. It is not a practice for RedSense to include its

customers on communications regarding internal disputes, and RedSense encourages and promotes good email hygiene by requiring care and attention when sending emails to ensure that only the appropriate individuals receive the email. Based on this, I believe that Bohuslavskiy's inclusion of the customer point of contact was intentional and was designed to give a RedSense customer a "preview" of RedSense "issues" that Bohuslavskiy could exploit post-resignation. Based on emails that █████ has forwarded to me, I know that Bohuslavskiy contacted █████ as part of his smear campaign.

20.    On February 24, 2025, Bohuslavskiy submitted his resignation as Chief Research Officer of RedSense. The following day, Bohuslavskiy sent an email to me and other partners of RedSense (Stear and VanSickle) threatening to go public with his grievances against RedSense, including "informing each customer" of what he perceived to be "illegal action" on the part of RedSense (requiring its partners, staff, and vendors to execute CIIAA to formalize the assignment of the assets RedSense already owned).

21.    Based on Bohuslavskiy's experience in the cybersecurity community and the sensitivities that customers in this industry have, I believe that Bohuslavskiy knew that going public with false statements regarding RedSense would damage RedSense's reputation and harm existing and future customer relationships. He would also know that such reputational damage would be

irreparable and irreversible for RedSense. In my immediate response to Bohuslavskiy's resignation, I confirmed his dissociation from the partnership, noted that he must account for any missing data and intellectual property assets used by his team, and reminded him of his duty of loyalty and related obligations to RedSense. A true and accurate copy of this email chain is attached to my declaration as **Exhibit A**. Bohuslavskiy did not appear to be willing to engage in constructive communications. Instead, he responded with a threat: "I will be informing each customer about this illegal action tomorrow, as well as what lead [sic] to it. With all screenshots and evidence attached." **Exhibit A** to my declaration also contains a true and accurate copy of his response email dated February 25, 2025. At my request, John Bacon (RedSense's corporate counsel) responded with a cease-and-desist letter to Bohuslavskiy demanding he not communicate with RedSense customers and informing him of the irreparable harm he would cause if he carried out his threats. This response, which I was copied on, is also included in **Exhibit A.**

**Bohuslavskiy Launches Smear Campaign Attacking RedSense**

22.    Beginning on March 6, 2025 and continuing to date, Bohuslavskiy made good on his threat. He has engaged in a rampant campaign of disparaging RedSense to its existing and potential customers, disparaging RedSense, claiming he had "ethical concerns" about the company, insinuating that RedSense cannot

adequately service the customer relationship, all the while peddling his own threat intelligence services, encouraging RedSense customers to forego their relationship with RedSense and obtain threat intelligence services directly through Bohuslavskiy directly to ensure "seamless intel provision and continuity."

23.    Beginning on March 6, 2025, Bohuslavskiy contacted at least a dozen customers, including but not limited to: ███████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ I presently have no reason to believe that any less than all customers have been contacted repeatedly.  Some of these customers forwarded the emails they received from Bohuslavskiy to RedSense raising concern about the content of Bohuslavskiy's email.  A true and accurate copy of the customer emails Bohuslavskiy sent following his resignation is attached to my declaration as **Exhibit B**.  In these communications, he informed the customers of vague "ethical concerns" he had about RedSense, provided threat intelligence reports that were created by his team (and not RedSense) and encouraged the customers to contact him directly via phone, Signal, or email if the customer desired to engage his services.

24.    Some other customers did not forward the emails but instead contacted me or Kevin Stear directly to share that Bohuslavskiy had been sending them emails and that they also had concerns about Bohuslavskiy's communications.    Customers expressed their confusion about these emails and asked if either Bohuslavskiy or RedSense email systems were compromised.

25.    In March 2025, I also became aware of a LinkedIn post from Bohuslavskiy regarding his resignation.    My understanding is that Bohuslavskiy has a public LinkedIn page, meaning that everyone could see his post, regardless of whether they were connected to Bohuslavskiy or not.    A true and accurate screenshot of Bohuslavskiy's LinkedIn post is included in my declaration as **Figure 1**.    As with his customer emails, Bohuslavskiy explicitly and publicly complained of his ethical concerns regarding RedSense.



**Figure 1, Yelisey Bohuslavskiy LinkedIn Post**

26.     RedSense sent a subsequent cease and desist letter, this time from Crowell & Moring, LLP ("Crowell"), RedSense's counsel of record in this case.  A true and accurate copy of the letter from Crowell to Bohuslavskiy, which was forwarded to me by Crowell, is attached to my declaration as **Exhibit C**.  This letter also demanded that Bohuslavskiy cease his communications with RedSense customers.  Bohuslavskiy was not willing to engage in amicable discussions, did not cease his conduct, and in fact, *increased* his customer contacts.

27.     On March 17 and March 18, 2025, Bohuslavskiy reached out to ██████ with an update regarding upcoming ransomware attacks targeting healthcare companies, and like with these prior communications, Bohuslavskiy

encouraged the customer to contact him and his team directly, claiming that his team and not RedSense could protect the customer's interests. A true and accurate copy of Bohuslavskiy's email to ████ which was forwarded to me, is included in **Exhibit B** to my declaration.

28.    On April 29, 2025, Bohuslavskiy emailed ████ with a request to meet for a Q1 intelligence briefing, which he claims that RedSense failed to deliver. A true and accurate copy of Bohuslavskiy's email to ████, which was forwarded to me is included in **Exhibit B** to my declaration.   To my knowledge, the claims made by Bohuslavskiy to ████ are false and were made to further denigrate RedSense, such that ████ would erroneously believe that RedSense was not honoring its contractual obligations to ████  Based on my experience dealing with RedSense customers, (if successful and customers took the bait put forth by Bohuslavskiy) this would make customers like ████ less likely to continue its relationship with RedSense or, at minimum, cause ████ to have concerns about the viability of RedSense as its provider of threat intelligence.

29.    Both the ████████ communications included attempts by Bohuslavskiy to distinguish the services that *he* was able to provide as compared to what *RedSense* would be able to provide, specifically emphasizing that his team relies on "unique" access to adversarial sources, and that he was not offering to deliver publicly available, open-source, or recycled intelligence (implying that

RedSense does not provide such one-of-a-kind or state of the art threat intelligence). In these emails he encouraged the customers to reach directly to him with questions about the services Bohuslavskiy could provide.

30. Because Bohuslavskiy has absconded with RedSense assets and property, Bohuslavskiy is in the position of offering such "unique" features (such as, for example, the AIDIS automation tool) and passing them off as *his* features for the benefit of himself. He knew, based on being involved with the AIDIS demonstrations, that at least two customers have conveyed that the AIDIS tool is a value-add. Bohuslavskiy also knows that RedSense paid for Bohuslavskiy and his team to develop the tool. He does not have the right to claim that these tools are something only *his* team can offer—they belong to RedSense and were planned to be an innovative solution enhancement to the RedSense subscription offering that set *RedSense* apart and would give *RedSense* a competitive advantage in the market. It is improper for Bohuslavskiy to use these tools to elevate his own competitive profile. What is even more troubling, is that on one of the many calls that I had with Bohuslavskiy just prior to his resigning from RedSense, Bohuslavskiy said to me personally that there was more than AIDIS that he was not fully sharing with RedSense partners and leadership.

31. In carrying out this campaign, Bohuslavskiy leveraged the existing customer relationship with RedSense while advertising his personal ability to meet

customers' needs and fulfill RedSense's contractual duties (and insinuating that RedSense *could not* fulfill these duties), ultimately associating his name and services with the company from which he had already resigned, deceiving RedSense's customer base as to Bohuslavskiy's role within RedSense and his ability to speak on behalf of RedSense. Based on communications with customers this has created confusion as to who (RedSense or Bohuslavskiy) is responsible for providing the contracted-for service.[3]

32.    His communications have also contained numerous falsehoods. By virtue of his affiliation with RedSense, I believe that Bohuslavskiy would know these statements were false. He falsely insinuated ethical issues relating to RedSense. He also claimed that he could offer "unique" access and solutions, while failing to reveal that the "unique" solutions belonged to RedSense, and he had absconded with the property belonging to RedSense (and had no right to demonstrate it and engage in discussions about it with anyone without the knowledge and alignment with the rest of RedSense partners and leadership). Finally, he falsely claimed that RedSense had failed to deliver briefings as promised and implied that RedSense was in breach of its customer contracts. Bohuslavskiy knew that these statements about the quality of RedSense's services

---

[3] *See* Declaration of Damian Miller ¶¶ 6-8, concurrently filed herewith.

was false and misleading and knew, based on his interactions with these customers and his cybersecurity experience, that this deception about RedSense's reputation, the low quality of RedSense's services, and its inability to honor its contractual obligations constituted a material deception that would influence the purchasing decisions of RedSense's customers.

**Bohuslavskiy's Conduct Harms The Relationships Between RedSense and Its Customers**

33.    As a result of Bohuslavskiy's conduct, the RedSense customers and RedSense itself have had to spend considerable time, effort, and resources to deal with what the customers have described as unwanted communications.  Beyond being a nuisance, Bohuslavskiy's communications with RedSense customers have harmed, soured, or undermined the relationships it has with existing customers.

34.    In at least one instance, ████, which is RedSense's largest customer, expressed disappointment regarding the issues between Bohuslavskiy and RedSense.  I have been on multiple calls with ████ leadership to try and repair the relationship with ████ ████ has become less engaged and responsive to my outreach.  More concerning is that ████ has yet to pay RedSense outstanding amounts that are past due under the RedSense-████ subscription contract.  Given the timing of Bohuslavskiy's communications with ████ coinciding with ████ recent refusal to make payments to RedSense, I believe that Bohuslavskiy is responsible for this interference between RedSense and ████.    Prior to

Bohuslavskiy's email smear campaign, I was routinely communicating with █████ leadership. At no point did █████ raise issues or concerns about RedSense, the quality of the services RedSense provided, or the value that █████ obtained from RedSense. Recently, however, █████ (prior to becoming non-responsive to my request) has raised questions about the quality of the services and the value-add RedSense can provide. I have been involved in conversations where █████ has requested when RedSense can deliver the AIDIS Solution automation tool that Bohuslavskiy previously promised to █████ On Tuesday, July 1, 2025, I received an email from █████ In this email, █████ complains of ███████████████ ████████████████████████████████████ and what █████ claims is a ██████████████████ █████ also stated it was placing the outstanding invoice on hold until resolution of the performance concerns. The timing of this email is suspicious because RedSense filed its Complaint against Bohuslavskiy on Friday, June 27, 2025 and I am aware that RedSense's counsel informed Bohuslavskiy that RedSense would be proceeding with litigation against Bohuslavskiy. Given the timing of RedSense's complaint and the email from █████ I have reason to suspect that this recent communication from █████ is a result of Bohuslavskiy retaliating in response to the Complaint.

35. RedSense does not have the code to AIDIS—either because Bohuslavskiy and his team never completed the work product or because

Bohuslavskiy and his team have stolen the code and destroyed the file system that housed the code.  Therefore, RedSense cannot deliver this tool to its customers. Bohuslavskiy knows this.  Although he has not mentioned this tool by name, in his emails with customers he advertises that he offers innovative solutions.  Based on my communications with the customers, I believe that the innovative solution he is referring to is the AIDIS tool and that Bohuslavskiy is likely leveraging the tool's functionality and capabilities in his conversations with RedSense customers to cause them to doubt RedSense's capabilities and value.

36.    Customers have also expressed confusion as to his status with the company and his capacity to represent RedSense because in these emails and in public facing social media posts he had continued to hold himself out as a RedSense representative.  By sowing confusion and using the RedSense name, Bohuslavskiy has caused our existing customers to question RedSense's reliability.

**Bohuslavskiy Attends Industry Events as a "Representative of RedSense," Sowing Further Confusion.**

37.    Many of RedSense's largest customers are within the healthcare industry.  Based on my communications with RedSense customers, I understand that healthcare customers face unique concerns and have heightened sensitivity regarding data protection and preventing breaches of health information.  I am also aware that many of these healthcare customers are members of Health-Information Sharing & Analysis Center ("Health-ISAC"), which is a non-profit organization

23

that provides a platform for security professionals in the health industry to share insights, best practices, alerts, and intelligence.

38.    Based on my discussions with RedSense's healthcare customers, I understand that Health-ISAC is the preeminent industry organization for key players in the industry, such as key points of contact of RedSense's healthcare customers.  Health-ISAC offers events for its members, including monthly threat briefings.

39.    On June 24, 2025, several RedSense customers who had attended the Health-ISAC June Monthly Threat Briefing (that occurred earlier that day) reached out to me and informed me that Bohuslavskiy was a speaker at the briefing and based on the event agenda was speaking as a "representative of RedSense." RedSense partners and leadership, including myself, did not have any visibility into this speaking engagement.   As such, none of the partners authorized Bohuslavskiy to speak at this event on "behalf" of RedSense or as its "representative" and did not approve any messaging that Bohuslavskiy presented at this event.   Multiple RedSense customers who attended this event and had previously received correspondence from Bohuslavskiy reached out to me with additional confusion.  Some customers asked me whether Bohuslavskiy was "back at" RedSense and they expressed confusions as to why Bohuslavskiy was advertised as being a "representative of RedSense."  Because the Threat Briefing

was a closed event limited only to Health-ISAC members, I do not have visibility as to the substance of Bohuslavskiy's speaking engagement. However, given the tenor of his other communications to the industry and directly to RedSense's customers, I have no reason to doubt that Bohuslavskiy did not "represent" RedSense in a positive light. At minimum, I believe he has created further confusion as he attempts to market his own threat intelligence offering while taking advantage and misusing RedSense's reputation to the detriment of RedSense's customer relationship.

**Harm to RedSense's Reputation and Brand**

40.    Bohuslavskiy's conduct has not only caused irreparable harm to RedSense's existing customer relationship, but also to its relationship with prospective customers. By continuing to provide high quality cybersecurity services, RedSense had the expectation that it would continue to expand its customer base (including expanding the current relationships RedSense has with existing customers) by being able to leverage the satisfaction of existing customers and its positive reputation. Based on the threats made by Bohuslavskiy around the time of his resignation, I have no doubt that Bohuslavskiy's email campaign where he repeatedly indicated that customers should distrust the quality of RedSense's services, and that they should turn to him for cybersecurity needs going forward was done with the intent goal of sullying RedSense's reputation and goodwill,

interfering with current relationships, and undermining RedSense's future ability to compete for business in the market.

41.    If Bohuslavskiy is successful, RedSense's reputation will be ruined, it will lose key customer relationships, and because of the sensitive and competitive nature of the cybersecurity industry, will be permanently and irreparably harmed.

**Requested Scope of Injunction Against Bohuslavskiy**

42.    RedSense seeks an injunction that enjoins Bohuslavskiy from the following conduct: (1) publicly or privately soliciting RedSense's current customers and prospective customers[4] for business, (2) publicly or privately denigrating RedSense or its team and the quality of RedSense's cybersecurity services, (3) publicly or privately using RedSense proprietary or trade secret information or RedSense property that rightfully belongs to RedSense (but that Bohuslavskiy has absconded with) to improperly compete with RedSense, (4) publicly or privately making false statements about RedSense, its products and services for the purpose of stealing the business away from RedSense, (5) publicly or privately making false statements about RedSense not honoring its customer

---

[4] By virtue of Bohuslavskiy's involvement with RedSense, he was aware of prospective customer relationships that arose during his time as Chief Resource Officer.  RedSense seeks to limit the injunction with respect to the prospective customers to those relationships that were in the pipeline prior to Bohuslavskiy's resignation as well as those that Bohuslavskiy otherwise has knowledge of.

obligations and agreements, (6) holding himself out as a representative of RedSense or as someone who is authorized to act on behalf of RedSense at industry events or via other public platforms, and (7) engaging in speaking engagements where he purports to speak as a representative of or on behalf of RedSense.

I declare under penalty of perjury under the laws of the United State that the foregoing is true and correct to the best of my knowledge.

Executed on July 1, 2025 in Waltham, Massachusetts.

David Montanaro
CEO and Partner
Red Sense LLC