IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RED SENSE LLC,**<br><br>*Plaintiff,*<br><br>vs.<br><br>**YELISEY BOHUSLAVSKIY,**<br><br>*Defendant.* | Case No.: **2:25-cv-12281-EP-AME**<br><br>**DECLARATION OF MICHAEL ZEIGER IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**MICHAEL ZEIGER**, of full age, respectfully makes the following declaration pursuant to 28 U.S.C. § 1746(2):

1. I am a former colleague of Defendant Yelisey Bohuslavskiy ("Defendant" or "Bohuslavskiy") in the above-captioned matter. We worked together at both Advanced Intelligence LLC ("AdvIntel") and Red Sense LLC ("Plaintiff" or "Red Sense"), where I served as the founder and Chief Executive Officer ("CEO").

2. After reviewing the redacted Complaint in this matter, I feel compelled to provide this Court with critical and clarifying context.

3. The Complaint and motion for injunctive relief are riddled with misleading, deceptive, and outright false assertions. They reflect a troubling pattern of distortion and misrepresentation – particularly by David Montanaro ("Montanaro") – that demands correction.

1

4. Anticipating that Montanaro, acting under the guise of Red Sense's CEO, may allege this declaration breaches any non-disclosure agreement ("NDA"), I submit this statement under the crime-fraud exception. My intent is to expose misconduct and deception, not to disclose protected information in bad faith.

**FOUNDING RED SENSE AND BUILDING THE TEAM**

5. I am the original founder of Red Sense, which I established shortly after my departure from Advanced Intelligence LLC ("AdvIntel") in the spring of 2022.

6. While organizing the paperwork to formally incorporate Red Sense, I learned that Kevin Stear ("Stear") had recently been terminated from his position. Given our prior professional relationship and relying on Stear's initial explanation that his dismissal was the result of an "injustice," I extended an invitation for him to join me at Red Sense.

7. At the time, I had no reason to question Stear's account. However, I would later come to learn that his termination stemmed from allegations of harassment and inappropriate workplace conduct. These revelations, which were not disclosed to me when I invited him aboard, cast serious doubt on his integrity and judgment.

8. Red Sense's core mission was to create a researcher enablement organization that could provide value to its clients through a partnership structure that adapted to the market as it evolved.

9. In my experience, many companies don't fully understand what threat intelligence is supposed to do. Instead of building meaningful intelligence programs, they often assign a few engineers to string together tools from different vendors. This typically creates the appearance of security without delivering real protection or insight.

10. Red Sense aimed to change that. We offered threat intelligence as an external, specialized service – one that was directly integrated with our clients' needs. By working collaboratively, we focused on producing actionable results that could actually prevent major incidents, especially ransomware attacks.

11. To help build out the company, I brought in Montanaro to lead our sales efforts and develop relationships with potential clients.

**PROBLEMS BEGIN WITH STEAR AT RED SENSE**

12. Problems arose early on at Red Sense, when Stear, despite being the Chief Technology Officer ("CTO"), had very limited technical abilities relative to his previous representations.

13. It didn't take much time until I realized that Stear's representations were just "talk", and that he realistically had little skill to prove his claims.

14. Because Stear got "stuck" with our project very early on, he wanted to bring in another programmer with the little capital we had left: Brian Gardiner ("Gardiner").

15. I was hesitant with Stear's proposal. Not only was I concerned with his lack of basic technical ability (and what he was doing with his time as CTO), but we were also not making any money at that point. I knew Stear was living off his savings and his wife's income. In my case, I was driving for Uber Eats at night. In our current situation, I thought it irresponsible to hire a new employee, especially when we could not guarantee anyone's financial stability.

16. I then set up a test for Stear; if he could show me a working Jupyter Notebook instance using NetFlow, which was a very basic task, then I would approve hiring Gardiner. Despite having access to a detailed instruction manual, Stear could not perform the task. Instead, he focused on complaining that he would miss a family vacation if he had to complete the task.

17. In reality, it took me only fifteen minutes to set up the Jupyter notebook instance. I should have realized at this point that Stear was not a credible nor reliable team member; however, I trusted that he would rise to the challenge and prove himself. I hoped that his previous work experience would make up for his lack of technical skill; thus, we moved forward with hiring Gardiner.

## BOHUSLAVSKIY JOINS RED SENSE

18. Bohuslavskiy then joined Red Sense; upon his arrival at the company, we were perceived to be a continuation of AdvIntel.

19. Many previous AdvIntel clients knew that they could obtain value from joining Red Sense, given Bohuslavskiy's management of our intelligence program, which would work complementary to my well-known dark net connections capabilities. Together, we had high hopes for what NetFlow could provide.

20. Aside from his own extensive experience. Bohuslavskiy's key value to Red Sense was his team, who were all professionally trained by the late AdvIntel founder, Vitali Kremez ("Kremez"). They all possessed the ability to complete high-tier work; Bohusalvskiy's team's reports were truly many steps up from what Stear had been producing. No one on the Red Sense team at the time, including myself, had the knowledge or ability to understand the issues that needed to be covered in the cyber threat intelligence ("CTI") reports.

21. It was difficult to find professionals that (i) had expertise in generating reports with hard value (ii) could collect intelligence, and (iii) targeting adversary infrastructure (a task only a few were capable of).  Thus, after onboarding Bohuslavskiy and his team, we also onboarded his brother, Igor Dmitriev ("Dmitriev"), to help me put together a top-tier, scalable management program and manage this group in their native language. This, too, became a successful project.

22. We then began signing contracts with more clients – many of whom followed Bohuslavskiy to Red Sense after AdvIntel closed.

23. A key selling point for our company was the demonstration of programs we were currently developing and/or continuing. Intelligence is only as valuable as it is fresh, and clients do not receive much – if any – value from old reports and historical information, so showing that we had new and fresh data was critical.

24. Even at the early stages of business, we were receiving complaints regarding "false positives" stemming from Stear's running of Red Sense's NetFlow operations. After these complaints were raised, I worked with Gardiner to quickly diagnose and fix the issues. However, problems continued to regularly pop up.

25. Once, Stear misdiagnosed an active cobalt strike infection for one of our major clients. Given the extremely serious nature of such an infection and AdvIntel's low margin of error for such reports, the client immediately jumped into action, diverting resources from other duties to triage this alleged incident. However, it was found that there was no cobalt strike.

26. At this point, two issues became clear to me: (i) we needed someone with deeper NetFlow-specific skills to continuously monitor and comb through our data for any issues, and (ii) we needed to determine the exact nature and impact of how certain missing data was distorting our data, referred to as the "BGP issue". Though I asked Stear and Gardiner to address these matters, they did not. These issues remain unresolved to this day.

27. From then on, our two major clients decided to stop trusting our NetFlow data; instead they chose to be wholly depend on my and Bohuslavskiy's work until the NetFlow issues were saved.

28. As set forth above, the NetFlow issues still remain; hence, the reason why our clients signed and stayed (and continue to stay) with Red Sense is due to their heavy reliance on my and Bohuslavskiy's presence at the company.

29. It is categorically false that Montanaro and Stear were not aware of the long-standing client complaints and dissatisfaction. I also became aware that the vast majority of any "value" Stear brought to the company was by taking information, programs, and datasets from third parties and regurgitating/replicating the information to Red Sense.

30. I complained to several figures within our company, including Montanaro and Bryan VanSickle ("VanSickle"), about Stear's lack of technical acumen. I was also aware that Montanaro shared these concerns with Bohuslavskiy as early as 2023.

**MONTANARO AND STEAR TAKE ADVANTAGE OF ME**

31. In early 2024, I was struggling with personal matters in my life that were amplified by severe chronic pain and chronic tinnitus. The pain and stress were so unbearable that I even briefly contemplated suicide. Given the gravity of the

7

matter and my declining health, I confided in the Red Sense partners, including Montanaro, about my personal situation.

32. Within hours of confiding in Montanaro, Stear appeared at my house to discuss the matter. I told him that, in the event that I passed, that my father would be in control of my stocks through my death certificate.

33. Montanaro and Stear took advantage of my situation. They issued a joint letter to all clients that I was "voluntarily resining", used their access to company finances to remove me from bank accounts, and block my access to all company infrastructure by spreading rumors to our vendors and partners.

34. A few days later, my suspicions were confirmed – one of my clients reached out to me to say that they were "sad to hear that [I] was resigning".

35. At this point, I considered various methods to protect my interest in Red Sense. One was to defend myself publicly – which I ultimately decided against due to the sensitivity and seriousness of the work Bohuslavskiy was engaged in, at the national security level – and the other, to walk away.

36. I waited six months to see if Red Sense's partners would come to their senses and realize they were engaged in unlawful coercion. They did not.

37. Ultimately, to protect my family from further attacks, I decided to simply take a buyout of my shares and walk away.

**MONTANARO AND STEAR'S CONTINUED CAMPAIGN**

8

38. As set forth above, Montanaro and Stear have a history of questionable, abusive, and coercive activity. I am making these statements under the crime/fraud provision of my NDA to bring these actions to light. It is clear to me that they are using the same tactics they used to kick me out of Red Sense against Bohuslavskiy, the only remaining partner of Red Sense with value.

39. Montanaro and Stear were both fully aware of the client complaints that occurred before my illegal ousting. I can reasonably assume that such complaints continued even after I left Red Sense, as neither Montanaro nor Stear took steps to improve Red Sense's production upon hearing of such complaints.

40. Later, I learned from VanSickle that on January 21, 2025, Stear called him, threatening to steal his shares and kick him out, and stating that the only reason VanSickle was going to get "anything" was because he had terminal cancer.

### RESPONSE TO PLAINTIFF'S MOTION

41. Plaintiff's motion is nothing more than a delusional attempt by Montanaro and Stear to deflect responsibility for their own failures. Neither was ever qualified to manage Red Sense, and the company's decline under their leadership is a direct result of that incompetence. Rather than acknowledge their shortcomings, they have chosen to scapegoat Bohuslavskiy. At its core, their failure stems from an inability – or outright refusal – to accept feedback and adapt accordingly.

42. While Red Sense may present "glowing" client reviews to the Court, it is important to understand the context in which such feedback arises. The threat intelligence industry is highly political and tightly interconnected, and as a result, most clients are reluctant to make negative public statements about a vendor. Rather than voice dissatisfaction, they typically choose to quietly discontinue the relationship once the contract ends.

43. I cannot emphasize enough the critical nature of Bohuslavskiy's work and its value to the national security and welfare of the United States. If he is blocked from doing his work, as Plaintiff seeks, there would be destructive and severe consequences.

44. Much of Bohuslavskiy's work is for the benefit of law enforcement and life-saving non-governmental organizations, including but not limited to hospitals, schools, and churches. He is at the forefront of live-saving work and is one of the only people who can perform the job at this level and at this breadth.

45. Bohuslavskiy's command of the Russian and Ukranian languages and cultures is a unique asset to his work, and an advantage that not many have. Most recently, he and his team have recently obtained access to a top Russian C2 (command and control center), leading to breakthrough findings allowing them to

identify ransomware criminals before they attack and inflict damage. Within the first two days of monitoring, he has identified four hospitals among the victims[1].

46. Montanaro and Miller's prioritization of their own commercial gain over Bohuslavskiy's ability to protect the public is astounding. The timing and secretive nature of Miller's hiring – a friend of Stear – also certainly raises eyebrows. Their motion is only the latest in their pattern of blatant disregard for reality and the truth.

47. Granting this motion would cause irreparable damage to many vulnerable healthcare providers and financial institutions – organizations the public depends on for real-time, secure operations – who are not present in these papers, whom I pray the Court will consider.

*I declare under penalty of perjury that the foregoing is true and correct.*

Executed on the __4th__ day of August 2025, in __Parker__, __Colorado__.

/s MICHAEL ZEIGER

---

[1] *See* Bohusalvskiy Decl. ¶ 7.

11