████████████

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RED SENSE LLC<br><br>      Plaintiff,<br><br>     v.<br><br>YELISEY BOHUSLAVSKIY, a.k.a.<br>ELISEI BOGUSLAVSKII,<br><br>      Defendant. | No. 25cv12281 (EP) (AME)<br><br>**OPINION**<br><br>████████████ |

**PADIN, District Judge.**

Plaintiff Red Sense LLC ("RedSense") offers cybersecurity services. Defendant Yelisey Bohuslavskiy is RedSense's former Chief Research Officer. In this highly contested action, RedSense asserts causes of action under federal and state laws concerning Bohuslavskiy's conduct before and after his resignation from RedSense. D.E. 1 ("Complaint" or "Compl.").

Shortly after filing its Complaint, RedSense moved to preliminary enjoin Bohuslavskiy from engaging in a variety of conduct, including publicly or privately associating with RedSense, contacting RedSense customers or soliciting their business, and using disputed intellectual property. D.E. 7 ("Preliminary Injunction Motion" or "PI Mot.") at 36. Bohuslavskiy opposes the Preliminary Injunction Motion, D.E. 22 ("Preliminary Injunction Opposition" or "PI Opp'n"), and RedSense replies, D.E. 32 ("Preliminary Injunction Reply" or "PI Reply").

After RedSense filed its Preliminary Injunction Motion, Bohuslavskiy filed a motion requesting the Court: (1) abstain from adjudicating three causes of action in the Complaint; and (2) stay the remainder of this case pending a determination in a case brought by Bohuslavskiy in Wyoming state court against RedSense that concerns those three causes of action. D.E. 34 ("Stay Motion" or "Stay Mot."). RedSense opposes the Stay Motion, D.E. 41 ("Stay Opposition" or "Stay

Opp'n"), and Bohuslavskiy replies, D.E. 43[1] ("Stay Reply").  The Court decides the motions without oral argument.  *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b).  For the reasons explained below, the Court will **GRANT in part** and **DENY in part** RedSense's Preliminary Injunction Motion and **DENY** Bohuslavskiy's Stay Motion.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    RedSense

RedSense provides cybersecurity threat monitoring and reporting services.  Specifically, it "delivers actionable, context‑rich threat intelligence . . . which can be leveraged by its customers to strengthen detection and response capabilities and enhance the ability to prevent and remediate cyber threats."  D.E. 7‑2 ("Montanaro Declaration" or "Montanaro Decl.") ¶ 3.  It offers different subscription services that customers can select based on their specific cybersecurity needs.  *Id.* RedSense's key clients include ███████████████████████████████ ████████████████████████████████.  *Id.* ¶ 9.

Michael Zieger founded RedSense in the spring of 2022 after leaving Advanced Intelligence LLC ("AdvIntel").  D.E. 22‑8 ("Zieger Decl.") ¶ 5.  Zieger hired Kevin Stear to be RedSense's Chief Technology Officer.  Montanaro Decl. ¶ 6.  RedSense's current CEO is David Montanaro.  *Id.* ¶ 1.  RedSense's current partners are CEO David Montanaro, Kevin Stear, and Bryan VanSickle.  *Id.* ¶ 20.  Zieger simultaneously onboarded Stear, Montanaro, and VanSickle to RedSense in mid‑2022.  D.E. 22‑1 ("Bohuslavsiky Decl.") ¶¶ 14‑15.  RedSense's client base is

---

[1] Bohuslavskiy's Stay Reply is overlength.  As indicated in section II.E.iv of her Individual Judicial Preferences, the Undersigned requires "strict compliance with the length limitations and format requirements for briefs set forth in Local Rule 7.2."  A future failure to comply with these requirements may result in rejection of the non‑compliant papers.

████████████████████████████ *Id.* ¶ 22. ████████████████████████

████████████████████████████████████████████ *Id.*

According to Montanaro, the cybersecurity and threat intelligence industry is highly competitive and companies like RedSense are expected to continuously innovate to remain ahead of increasingly complex cyberthreats.  Montanaro Decl. ¶ 4.  To stay competitive, RedSense must provide its customers with high-quality and timely threat intelligence data.  *Id.* ¶ 5.  A failure to do so could ruin its reputation and competitive advantage.  *Id.*  Companies in the cybersecurity space—which have intimate knowledge of their customers' vulnerabilities— must also maintain an excellent reputation.  *Id.* ¶ 6.  Therefore, a "rumor regarding impropriety, ethical concerns, or a similar vulnerability is enough to ruin the service provider's reputation and cause a customer to seek their threat intelligence from another more reputable source that they can trust."  *Id.*

2.    *Bohuslavskiy joins RedSense*

Montanaro and Zieger both knew Bohuslavskiy from AdvIntel[2] and in December 2022, they reached out to Bohuslavskiy about joining RedSense.  Compl. ¶ 16.  On December 22, 2022, RedSense's partners at the time[3] voted to onboard Bohuslavskiy as a partner of RedSense.  *Id.*  As a result of the decision to onboard Bohuslavskiy, RedSense executed a new onboarding agreement, which required each partner of RedSense to provide $100,000 in seed funding or in the alternative, an "in-kind" contribution.  *Id.* ¶¶ 17-18, Ex. A ("Onboarding Agreement") § 1.1.  Bohuslavskiy executed the Onboarding Agreement on behalf of himself and Affix Advisory, LLC (of which

---

[2] Bohuslavskiy, Zieger, and Montanaro all worked at AdvIntel.  Compl. ¶ 18 n.4.  Bohuslavskiy was one of AdvIntel's co-founders, and, prior to the founding of RedSense, AdvIntel ceased operations.  *Id.*

[3] At the time, RedSense's partners were David Montanaro, Kevin Stear, Michael Zieger, and Bryan VanSickle.  *Id.* ¶ 2.  Zieger no longer works at RedSense.  *See generally* Zieger Decl.

Bohuslavskiy is the sole member). *Id.* ¶ 20. Under the Onboarding Agreement, Bohuslavskiy agreed to provide "'in kind funding' in the form of Threat Intelligence and Intellectual Property for [RedSense's] benefit and use by [RedSense] in lieu of the $100,000 seed funding contribution." *Id.* ¶ 18 (quoting Onboarding Agreement § 1.1). This in-kind funding included, but was not limited to, certain intellectual property from AdvIntel, which Bohuslavskiy represented to RedSense to that he had ownership rights in as a co-founder of AdvIntel. *Id.* ¶ 18 & n.4. Providing this in-kind funding was a condition precedent for Bohuslavskiy joining RedSense as an equal partner of the LLC. *Id.* ¶ 18. According to Bohuslavskiy, his in-kind contribution was completed in 2023. Bohuslavskiy Decl. ¶ 26.

From January 23, 2023, through February 24, 2025, Bohuslavskiy served as RedSense's Chief Research Officer ("CRO"). Montanaro Decl. ¶ 10. As CRO, Bohuslavskiy had various responsibilities including budgeting, resourcing, managing, and staffing[4] the RedSense Engineering Team in his department. Compl. ¶ 23. Bohuslavskiy also led RedSense's Threat Intelligence Team, which was tasked with, among other things, "collecting cyberthreat intelligence, writing intel reports, providing customer briefings, assisting with the response to requests for information from customers, and participating in sales engagements/meetings." Montanaro Decl. ¶ 10.

Given his position, Bohuslavskiy routinely interacted with RedSense customers and knew the services that RedSense provided, as well as the value of the contracts between RedSense and its customers. *Id.* Through his role as CRO, Bohuslavskiy also learned sensitive information

---

[4] Bohuslavskiy hired three freelance engineers through a third-party service. *Id.* ¶ 24. RedSense agreed to pay the third-party for the worked performed by the freelancers. *Id.* In addition, Bohuslavskiy recommended that RedSense hire his brother Dimitriev to serve as a strategic consultant. *Id.* ¶ 25. Dimitriev joined RedSense on August 1, 2023. *Id.*

regarding the nature of RedSense's relationship with its customers. *Id.* ¶ 11. And, because Bohuslavskiy participated in conversations with current and prospective customers, he knew what products RedSense intended to provide and what services potential future customers may need. *Id.* RedSense "entrusted Bohuslavskiy to use this information only to advance the business of RedSense (deliver better services to the customers and obtain a competitive advantage in the market) and *not* to improperly compete with RedSense for the relationship or interfere with the customer relationships." *Id.*

### 3. Investigation into Bohuslavskiy

Initially, it appeared to RedSense that Bohuslavskiy provided the requisite in-kind funding in the form of AdvIntel threat intelligence reports and historical adversary infrastructure intelligence, along with the associated data sets, reports and access data he and his team incorporated into the deliverables RedSense sent its customers. Compl. ¶ 21. Although Bohuslavskiy provided the data, he maintained sole access to it. *Id.* Nevertheless, in reliance on his representations that he owned this intellectual property, the other partners of RedSense treated Bohuslavskiy as an equal partner of the LLC. *Id.*

It was not until mid-2024 when RedSense noticed a significant drop off in threat reporting that it began to investigate Bohuslavskiy. *Id.* ¶ 23. In early 2025, Montanaro and RedSense's interim Chief Operating Officer Damian Miller both began investigating Bohuslavskiy. Montanaro Decl. ¶ 12; D.E. 7-6 ("Miller Decl.") ¶ 2. Through these investigations, Montanaro learned that certain work product that Bohuslavskiy was responsible for delivering to RedSense customers was never delivered. Montanaro Decl. ¶ 12.

According to Montanaro, Bohuslavskiy was in the meetings with customers when these commitments were made, and in some instances, was the one promising the deliverables. *Id.* Therefore, Bohuslavskiy knew that customers expected these new features and that there were not

5

being delivered as promised. *Id.* For example, Bohuslavskiy promised multiple customers, including ███████████, [5] the AIDriven Intel Search ("AIDIS") Solution, an AI-driven search and report generation tool that would allow RedSense to provide more targeted threat intelligence reporting. *Id.* ¶ 13. Deploying this tool would provide RedSense with a strategic advantage over other threat intelligence providers. *Id.* The tool was being developed under the code name "Project Pylon." Miller Decl. ¶ 3.

During their investigations, Miller and Montanaro learned that although RedSense had been paying Bohuslavskiy and his team to produce AIDIS, no work product had been delivered. *Id.* ¶¶ 3-4; Montanaro Decl. ¶ 14. And, when RedSense requested access rights and demanded Bohuslavskiy turn over AIDIS, he refused. Montanaro Decl. ¶ 14. Because RedSense promised AIDIS to customers, and RedSense did not deliver AIDIS, key customers like ███████████ "have questioned the value of the RedSense deliverables absent this automation tool" and continue to express interest in RedSense delivering AIDIS. *Id.* ¶ 15. Montanaro has "no doubt" that RedSense's inability to deliver AIDIS is "eroding" its relationships with key customers. *Id.*

Bohuslavskiy disputes RedSense's account at its core. He rejects that Pylon and AIDIS are the same thing. Bohuslavskiy Decl. ¶ 52. While AIDIS is a "simple, though useful AI search feature for Red Sense's client portal" that utilized "various publicly available resources and simple scripts," *id.* ¶ 48, Pylon is a "semantic data correlation engine." *id.* ¶ 50. According to Bohuslavskiy, AIDIS—including all scripts and prompts—was delivered to Red Sense in November 2024. *Id.* ¶ 49. AIDIS does not have any source code. *Id.* ¶ 52.

---

[5] ███ RedSense's largest customer and ███████████ was a strategically important customer to RedSense. *Id.* ¶ 13.

While he was working at RedSense, however, Bohuslavskiy continued developing Pylon with his brother on the side through Affix. *Id.* ¶ 50. Bohuslavskiy started developing Pylon in 2019, but advancements in artificial intelligence in 2024 had become a "game changer" for Pylon. *Id.* Pylon, unlike AIDIS, has source code. *Id.* ¶ 52. Put simply, Bohuslavskiy states that Pylon has "nothing to do with RedSense." *Id.* Bohuslavskiy made clear to RedSense that Pylon could be offered via RedSense "if and only if" it was licensed under an agreement. *Id.* ¶ 51 (emphasis removed). However, no agreement was ever reached. *Id.*

### 4. *Post-investigation and pre-resignation*

Before Bohuslavskiy resigned, he had supposedly been laying the groundwork for his departure. *Id.* ¶ 16. For example, Bohuslavskiy cut out other members of the RedSense team when meeting with clients despite explicit requests for other RedSense employees to be included. *Id.* ¶ 17; *see also id.* ¶ 13 ("[Montanaro] specifically asked Bohuslavskiy to include either [RedSense's] Head of Product or [himself] in the meeting when he demonstrated AIDIS to █████ but he failed to do so."). It was only after a meeting that those at RedSense who were not on Bohuslavskiy's team would learn of these meetings. *Id.* ¶ 17.

Shortly before he left, Bohuslavskiy sent an email addressed to RedSense's current partners and staff, where he aired various grievances against Stear. *Id.* ¶ 19. In addition, Bohuslavskiy included the Senior Principal Scientist & Director of Threat Intelligence Research at █████ on this otherwise internal email. *Id.* Montanaro believes that Bohuslavskiy's inclusion of RedSense's point of contact at █████ in this internal email was a deliberate choice designed to give a RedSense customer a "preview" of RedSense "issues" that Bohuslavskiy could exploit post-resignation. *Id.*

###### 5.    *Bohuslavskiy's perspective on the events leading up to his resignation*

For Bohuslavskiy, the issues at RedSense date back to early 2024.  Bohuslavskiy Decl. ¶¶ 33-35.  A key rift in the RedSense partnership occurred in May 2024 when a membership resolution confirmed that Zieger had resigned from RedSense and resulted in Montanaro (formerly RedSense's Chief Revenue Officer) becoming its CEO.  *Id.* ¶ 39.  According to Bohuslavskiy, Zieger had technical expertise and his absence from RedSense was noticed by customers.  *See id.* ¶¶ 40-43.  Around that time, Bohuslavskiy also reported to Montanaro that Stear attacked Bohuslavskiy's ethnicity and immigration status.[6]  *Id.* ¶ 44.  No action was ever taken to redress these complaints.  *Id.*

In hindsight, it became clear to Bohuslavskiy that Montanaro and Stear had a plan to "freeze out" the other members of RedSense.  *Id.* ¶ 39.  It started with Zieger in 2024, *id.*, but continued throughout 2024 and into 2025 through various other conduct, *see id.* ¶¶ 54-55.  Part of the freeze-out plan included hiring Miller to join RedSense as COO.  *Id.* ¶ 56.  Bohuslavskiy asserts that Miller's role was to make RedSense a C-Corp and in the process, dilute the ownership interests of Bohuslavskiy and VanSickle, the two remaining minority owners.  *Id.*

On January 21, 2025, Bohuslavskiy and Miller discussed Pylon.  *Id.* ¶ 57.  During that conversation, Bohuslavskiy "confided" in Miller his concerns as an immigrant in light of the new administration.  *Id.*  The next day, Stear threatened Bohuslavskiy regarding his immigration status via text.  *Id.* ¶ 58.  In these texts (a screenshot is included in Bohuslavskiy's Declaration), Stear implied that he would report Bohuslavskiy and his family if Bohuslavskiy did not "do [his] job."

---

[6] Bohuslavskiy is of "Russo-Ukranian-Jewish origin" and is a refugee.  *Id.* ¶ 4.  He sought political asylum in the United States "after fleeing in 2014 . . . from persecution stemming from severe political unrest."  *Id.*

*Id.* ¶ 58; *see also id.* ¶ 51.  Around this time, Stear apparently also threatened VanSickle and

attempted to pressure VanSickle to forfeit his 20% stake in RedSense.  *Id.* ¶¶ 59-60.

On January 23, 2025, Bohuslavskiy emailed all RedSense partners requesting an

investigation into Stear's conduct.  *Id.* ¶ 62.  No action followed.  *Id.* ¶ 63.  In early February, an

emergency partner meeting was held, at which Montanaro stated that RedSense was "in the zone

of insolvency" and suspended all partner distributions.  *Id.* ¶ 66.  At this point, Bohuslavskiy's

position was rendered an "unpaid job."  *Id.* ¶ 67.  By mid-February, Bohuslavskiy and his team

had gone weeks without pay.  *Id.* ¶ 68.

### 6.    *Bohuslavskiy resigns*

On February 24, 2025, Bohuslavskiy resigned as CRO of RedSense.  Montanaro Decl. ¶

20.  At 4:49 PM that day, Bohuslavskiy sent Montanaro and the other current partners of RedSense

(VanSickle and Stear) an email where he stated that he and his brother were resigning "[d]ue to

the unilateral and arbitrary use of company finances by the CEO—actions [they] perceive as

coercion against our subordinates—as well as breaches of signed contracts and unresolved

financial disputes."    Montanaro Decl., Ex. A ("February 25, 2025 Email Chain") at 5.

Bohuslavskiy proposed that, for RedSense to continue working with Bohuslavskiy and his team,

RedSense enter a master services agreement with Affix Advisory (Bohuslavskiy's LLC) and

commit to settling all outstanding payments.  *Id.*  Bohuslavskiy's email also noted that a failure to

clearly respond by February 26, 2025, at 11:00 AM would be considered a rejection of his offer,

"in [which] case, Affix Advisory will directly notify all current and prospective customers that,

effective 11:00 AM ET on February 26, all intelligence services previously provided by the intel

team will now be delivered exclusively through Affix Advisory."  *Id.*

On February 25, 2025, at 12:55 PM, Montanaro replied, confirming that Bohuslavskiy had

resigned and withdrawn from RedSense, which constituted a dissociation under Wyoming law.

*Id.* at 3.  As a consequence of his resignation and dissociation, Montanaro informed Bohuslavskiy that he would no longer participate in RedSense's operations or have any voting rights in the management of RedSense.  *Id.*  Montanaro also reminded Bohuslavskiy that "he must account for any missing data and intellectual property assets used by his team, and reminded him of his duty of loyalty and related obligations to RedSense."  *Id.* (citing February 25, 2025 Email Chain at 3-4).

Bohuslavskiy responded at 3:15 PM that day, and in his email, rejected Montanaro's statement that Bohuslavskiy had resigned as a partner of RedSense—clarifying that he resigned only from the role of CRO.  February 25, 2025 Email Chain at 3.  Bohuslavskiy stated that RedSense had "zero rights to deprive him from his voting or operation rights" and that this "illegal and disruptive hostile takeover of the business aimed for normalizing the continious [sic] funds embezellment [sic] by executives."  *Id.*  He then stated that "as a partner of RedSense," he would "be informing each customer about this illegal action tomorrow, as well as what lead [sic] to it. With all screenshots and evidence attached."  *Id.*

At Montanaro's request, at 4:47 PM, RedSense's corporate counsel John Bacon sent Bohuslavskiy a cease-and-desist letter demanding he not communicate with RedSense customers and informed him of the irreparable harm that he would cause if he contacted those customers.  *Id.* He also stated that Bohuslavskiy's "decision to resign and dissociate from [RedSense's] operations was duly authorized and supported by all eligible voting members," a position that "is well supported by the facts and the law."  *Id.* at 1.

Beginning of March 6, 2025, Bohuslavskiy began contacting many of RedSense's existing and prospective customers.  *Id.* ¶ 22.  Bohuslavskiy has now contacted at least a dozen of RedSense's customers, including ██████████████████████████

████████████████  *Id.* ¶ 23.  In emails to at least two customers, Bohuslavskiy stated he "recently resigned from RedSense due to ethical and contractual concerns" and that despite his resignation, he remains a co-founder, partner, and shareholder of RedSense, and therefore, will continue to honor his obligations to ensure "seamless intel provision and continuity."  D.E. 7-2, Ex. B ("Bohuslavskiy Emails to Customers") at 4, 7.  In the Bohuslavskiy Emails to Customers, Bohuslavskiy noted, in similar language, that:

> As a major RedSense shareholder, I remain committed to the security and well-being of our clients. I will continue to provide critical alerts and assistance to the best of my ability. If you have any questions or require urgent cyber incident support, please feel free to reach out . . . .

> This alert and any assistance offered are strictly in accordance with my obligations as a RedSense partner and security expert working with law enforcement agencies, not as any separate or competing venture.

*Id.* at 2.  In some follow-up emails, Bohuslavskiy also provided threat intelligence reports and offered to schedule a briefing with a client "consistent with [his] previous briefings."  *Id.* at 13.

In March 2025, Montanaro learned that Bohuslavskiy had also made a public LinkedIn post regarding his resignation as CRO from RedSense:

## Posts by Yelisey



Yelisey Bohuslavskiy • 1st

RedSense Partner & AdvIntel Co-Founder | I obtain access to adversarial infra ...

View my blog

17h • Edited • 🌐

📢 Professional Announcement

Last week, I formally resigned as RedSense's Chief Research Officer due to ethical and contractual concerns.

It has been my privilege to contribute to ransomware threat prevention and work alongside my stellar team of researchers and engineers.

I am also grateful for all the support and care received this week!

On the business side, I remain a co-founder, co-owner, and partner of RedSense and will continue to fulfill our company obligations to RedSense customers. On the professional side, as my ex-AdvIntel team and I take the next step, I remain committed to advancing SIGINT and HUMINT action for proactive attack prevention and am looking forward to future collaborations.

Onwards and upwards 🫡

Danny Aga and 76 others                                    10 comments

---

👍 Like          💬 Comment          🔁 Repost          ➤ Send

Montanaro Decl. ¶ 25; *see also id.* Ex. C.  In response, RedSense sent Bohuslavskiy a second cease-and-desist letter on March 17, 2025, this time from its current counsel.  *Id.*  As the Bohuslavskiy Emails to Customers show, Bohuslavskiy continued to reach out to at least one client on March 17 and March 18.  *See* Bohuslavskiy Emails to Customers at 9-10.

According to Montanaro, Bohuslavskiy's conduct has not only been a nuisance for RedSense, but it has also impaired its relationships with customers.  Montanaro Decl. ¶ 33.  For instance, customers are not sure who is responsible for providing the contracted-for services—

RedSense or Bohuslavskiy. Montanaro Decl. ¶ 31 (citing Miller Decl. ¶¶ 6-8). Some customers have even asked whether Bohuslavskiy's emails are part of a scam or from an individual pretending to be Bohuslavskiy. Miller Decl. ¶ 8.

Similarly, customers are unsure of Bohuslavskiy's status with RedSense given his representations that he is still operating as a representative of RedSense. Montanaro Decl. ¶ 36. Bohuslavskiy also spoke at a conference in the healthcare sector[7] on June 24, 2025, and was listed on the event's agenda a "representative of RedSense." *Id.* ¶ 39. This prompted customers to contact Montanaro ask whether Bohuslavskiy was "back at" RedSense. *Id.*

RedSense is experiencing tangible setbacks with customers. Several customers who had previously been satisfied with RedSense's services "informed RedSense this ongoing issue with Bohuslavskiy has stained RedSense's reputation and has undermined the otherwise high quality of services customers have received from RedSense." Miller Decl. ¶ 11.

████—RedSense's largest customer—has directly expressed to Montanaro disappointment regarding the issues between Bohuslavskiy and RedSense and has yet to pay RedSense for outstanding amounts that are past due under its subscription contract with RedSense. *Id.* Prior to Bohuslavskiy's resignation, ████ had never raised any issues about the quality of RedSense's services or the value thereof. *Id.* Yet more recently, such as in an email ████ sent Montanaro on July 1, 2025 ████ complained of "serious concerns regarding the performance of the threat intelligence services provided," and what ████ claims is a "lack of fresh intelligence." *Id.* ¶ 34 (quoting an unattached email). ████ also stated it was placing the outstanding invoice on hold until resolution of the performance concerns. *Id.* The Director of Cyber Intelligence and Threat

---

[7] Several of RedSense's clients operate in the healthcare space. *Id.* ¶ 39.

Engineering at ███████—a strategically important client of RedSense[8]—told Miller that RedSense needs to "work it out" with Bohuslavskiy. *Id.* ██████, a prospective client, halted discussions with RedSense when Bohuslavskiy made public comments regarding his resignation. *Id.* ¶ 14. A ██████ executive told Miller that the rumors about Bohuslavskiy and RedSense have been circulating around the threat intelligence industry, and that "unless RedSense is able to resolve this issue, ██████ would not feel comfortable retaining RedSense's services." *Id.*

### B.    Procedural History

The parties engaged in months of discussions in early 2025. *See* Stay Opp'n at 3-4. After it became clear to RedSense that these conversations would not resolve its disputes with Bohuslavskiy, RedSense filed its Complaint on June 27, 2025. Compl. The Complaint asserts claims for:

- False Advertising under the Lanham Act, 15 U.S.C. § 1125 (Count One);

- Tortious Interference with Contractual Relations (Count Two);

- Tortious Interference with Future Economic Advantage (Count Three);

- Trade Secret Misappropriation under the Defend Trade Secret Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* (Count Four)

- Fraud (Count Five);

- Conversion (Count Six);

- Unjust Enrichment (Count Seven);

- Declaratory Relief pursuant to 22 U.S.C. § 2201 (Counts Eight and Nine); and

---

[8] ██████ is a key customer of RedSense because it "operates within RedSense's largest vertical—customers within the healthcare industry represent RedSense's largest market and largest potential customer base." *Id.* ¶ 12.

- Breach of Fiduciary Duty (Count Ten).

*Id.*  RedSense's Preliminary Injunction Motion followed on July 1, 2025.  PI Mot.  RedSense asks for the Court to enjoin Bohuslavskiy from:

> (1) publicly or privately soliciting RedSense's current customers and prospective customers for business, (2) publicly or privately denigrating the quality of RedSense's cybersecurity services, (3) publicly or privately using RedSense proprietary or trade secret information or RedSense property that rightfully belongs to RedSense (but that Bohuslavskiy has absconded with) to improperly compete with RedSense, (4) publicly or privately making false statements about RedSense, its products and services for the purpose of stealing the business away from RedSense, (5) publicly or privately making false statements about RedSense not honoring its customer contracts, (6) holding himself out as a representative of RedSense or as someone who is authorized to act on behalf of RedSense at industry events or via other public platforms, and (7) engaging in speaking engagements where he purports to speak as a representative of or on behalf of RedSense.

*Id.* at 36.  After RedSense filed its Preliminary Injunction Motion, the Court first noted that RedSense was required to serve Bohuslavskiy with its Preliminary Injunction Motion, D.E. 9, proof of which RedSense provided the next day, D.E. 10.

Given representations in RedSense's filings that the parties had previous discussions regarding this dispute, the Court ordered the parties to meet-and-confer.  D.E. 11.  After the parties indicated that they could not reach an agreement, D.E. 19, the Court set a briefing schedule and encouraged the parties to continue to discuss settlement.  D.E. 20.

On August 4, 2025, Bohuslavskiy filed his Preliminary Injunction Opposition.  PI Opp'n.  That same day, Bohuslavskiy also filed suit against RedSense in Wyoming (herein, the "Wyoming Action").  *See* Stay Opp'n at 5.  On August 7, 2025, Bohuslavskiy filed his answer to the Complaint, which also includes counterclaims against RedSense, Montanaro, and Stear for breach of contract, oppression under the Wyoming LLC Act, and a buy-out demand under Wyoming law.  D.E. 23 ("Answer" or "Third-Party Complaint").  It appears that RedSense learned of the Wyoming Action through Bohuslavskiy's Answer.  Stay Opp'n at 5.

On August 8, 2025, Bohuslavskiy requested for summons to be issued as to Montanaro and Stear for his Third-Party Complaint.  D.E. 28.  On August 11, 2025, RedSense filed its Preliminary Injunction Reply.  PI Reply.

Then, on August 20, 2025, Bohuslavskiy filed the Stay Motion, in which he asks this Court to:  (1) abstain from adjudicating Counts Eight, Nine, and Ten; and (2) stay the remainder of this case pending resolution of the Wyoming Action.  Stay Mot.  On September 2, 2025, RedSense opposed the Stay Motion.  Stay Opp'n.  On September 8, 2025, Bohuslavskiy filed his Stay Reply.  Stay Reply.

On September 8, 2025, Montanaro and Stear filed a motion to dismiss the Third-Party Complaint, D.E. 44, which the Court administratively terminated due to their failure to comply with this Court's Individual Preferences.  D.E. 45.  After the parties filed their pre-motion letters, the Court indicated that third-party defendants' anticipated motion was premature as the window to serve third-party defendants had not closed.  D.E. 49.  On October 27, 2025, third-party defendants stipulated to allowing their counsel to accept service of the third-party complaint on their behalf.  D.E. 52.

## II.    STAY MOTION

### A.    Legal Standard

When a party asserts legal claims, "federal courts 'have a virtually unflagging obligation . . . to exercise the jurisdiction given them' except in certain exceptional circumstances when a parallel state court action exists."  *Philadelphia Indem. Ins. Co. v. Transit U, Inc.*, 550 F. Supp. 3d 140, 148 (D. Del. 2021) (quoting *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976)).  *Colorado River* abstention "allows a federal court to abstain, either by staying or dismissing a pending federal action, when there is a parallel ongoing state court proceeding."

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009). The *Colorado River* doctrine "is to be narrowly applied in light of the general principle that 'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" *Id.* (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)).

Determining whether to abstain under *Colorado River* is a two‑part inquiry. *First*, courts ask "whether there is a parallel state proceeding that raises 'substantially identical claims [and] nearly identical allegations and issues.'" *Id.* (quoting *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005)). *Second*, "[i]f the proceedings are parallel, courts then look to a multi‑factor test to determine whether 'extraordinary circumstances' meriting abstention are present." *Id.* at 307‑08 (citing *Spring City Corp. v. American Bldgs. Co.*, 193 F.3d 165,171 (3d Cir. 1999)).

Federal courts have more flexibility to abstain when a party seeks declaratory relief. Under the Declaratory Judgment Act ("DJA"), federal courts "*may* declare the rights of and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2202(a) (emphasis added). In *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, 494‑95 (1942), the Supreme Court held that when an action brought in federal court under the DJA "only presents questions of local laws, the court is under 'no compulsion to exercise [ ] jurisdiction' if a parallel state court proceeding would address the matters in controversy between the parties." *Marshall v. Lauriatt*, 372 F.3d 175, 183 (3d Cir. 2004) (quoting *Brillhart*, 316 U.S. at 494‑95). Permitting abstention allows federal courts to "avoid gratuitous interference with state court matters by abstaining from claims for declaratory judgment, specifically if the state court proceedings would address 'the same issues, not governed by federal law, between the same parties.'" *Id.* (quoting *Wilton v. Seven Falls*, 515 U.S. 277, 282 (1995)). In the Third Circuit, courts weigh several factors when determining whether to abstain

17

from hearing a case brought under the DJA. *See Philadelphia Indem. Ins. Co.*, 550 F. Supp. 3d at 148 (citing *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014)).

Problems arise when a plaintiff seeks both declaratory and legal relief. While circuits approach this situation differently, the Third Circuit has stated that:

> when a complaint contains claims for both legal and declaratory relief, a district court must determine whether the legal claims are independent of the declaratory claims. If the legal claims are independent, the court has a "virtually unflagging obligation" to hear those claims, subject of course to *Colorado River*'s exceptional circumstances. *Colo. River*, 424 U.S. at 817-19. If the legal claims are dependent on the declaratory claims, however, the court retains discretion to decline jurisdiction of the entire action, consistent with our decision in *Reifer*, 751 F.3d at 144-46.

*Rarick v. Federated Serv. Ins. Co.*, 852 F.3d 223, 229 (3d Cir. 2017). In *Rarick*, the Third Circuit adopted this "independent claim test" because it provides district courts with flexibility while simultaneously preventing "plaintiffs from evading federal jurisdiction through artful pleading." *Id.* at 229-30.[9]

Under the independent claim test, courts first consider whether the claims for legal relief are independent of the claims for declaratory relief. *Id.* at 228. "Legal claims must be able to 'stand alone in federal court—*both jurisdictionally and substantively*—irrespective of the declaratory claim.'" *Lukoil N. Am. LLC v. Rts. 94 & 515 Vernon, L.P.*, No. 16-8345, 2017 WL 6450482, at *5 (D.N.J. Dec. 18, 2017) (citing *R.R. St. & Co., Inc. v. Vulcan Materials Co.*, 569 F.3d 711, 717 (7th Cir. 2009)). Thus, "[n]ondeclaratory claims are independent of a declaratory claim when they are alone sufficient to invoke the court's subject matter jurisdiction and can be

---

[9] In *Rarick*, the Third Circuit explicitly rejected the "heart of the matter" test, which, up to that point, was the primary approach used by courts in the Circuit. 852 F.3d at 228. "Under that test, the court examines the relationship between the claims, and determines what the essence of the dispute concerns." *Id.* (citation modified).

adjudicated without the requested declaratory relief." *Cont'l Cas. Co. v. Westfield Ins. Co.*, No. 16-5299, 2017 WL 1477136, at *4 (E.D. Pa. Apr. 24, 2017) (quoting *Rarick*, 852 F.3d at 228).

"If the legal claims are independent, then the *Colorado River* doctrine applies, and courts can only stay the proceedings under exceptional circumstances." *Philadelphia Indem. Ins. Co.*, 550 F. Supp. 3d at 148 (citing *Rarick*, 852 F.3d at 229). On the other hand, if the legal claims are dependent on the declaratory claims, the Court considers whether to abstain under *Brillhart-Wilton* by applying the factors set forth in *Reifer*. *Rarick*, 852 F.3d at 229.

### B.    Analysis

RedSense brings claims for both legal and declaratory relief (Counts One through Seven and Ten, and Counts Eight and Nine, respectively). *See* Compl. Pursuant to *Rarick*, the Court will first consider whether the legal claims in the Complaint are independent of the declaratory claims. 852 F.3d at 229. This inquiry will determine whether "the *Brillhart* doctrine or *Colorado River* abstention doctrine will govern how much discretion the court has to decline to exercise jurisdiction." *Philadelphia Indem. Ins. Co.*, 550 F. Supp. 3d at 155 (citing *id.*).

Bohuslavskiy maintains that all claims in this case turns on a threshold question of Wyoming law: whether he remains a member of RedSense. Stay Mot. at 9. And, because a decision on that question could "resolve or moot, some, if not all" of Plaintiff's claims, the Court should abstain from deciding Counts Eight, Nine, and Ten, and stay the remainder of this action pending a decision in the Wyoming Action on those issues. Stay Reply at 4, 12. RedSense disagrees. It argues that although Bohuslavskiy's membership status is the determinative issue for those three counts,[10] the remaining seven counts do not turn on his membership status. *See*

---

[10] Because RedSense concedes that Count Ten is dependent on a resolution of Bohuslavskiy's membership status, Stay Opp'n at 18, the Court limits its below analysis of the independence of RedSense's legal claims to Counts One through Seven.

*generally* Stay Opp'n. Therefore, RedSense contends, Counts One through Seven are independent of Counts Eight through Ten.

After considering the parties' positions, the Court concludes that RedSense has the better of the argument. In turn, the Court does not find extraordinary circumstances present under *Colorado River* to otherwise stay this case, and accordingly, will **DENY** Bohuslavskiy's Stay Motion.

### 1.    *Independence of legal claims*

As noted above, legal claims must be both jurisdictionally and substantively independent of the declaratory claims. *See Lukoil N. Am.*, 2017 WL 6450482, at *5 (citations omitted).

With respect to the jurisdictional independence of its legal claims, RedSense asserts two legal federal causes of action: a false advertising claim under the Lanham Act and a trade secrets misappropriation claim under the DTSA.[11] Compl. RedSense also brings multiple state law claims—tortious interference with current and prospective contracts, fraud, conversion, and unjust enrichment—over which the Court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). *Id.* There can be no question that these causes of action have a jurisdictional basis in this Court independent of Counts Eight, Nine, and Ten. Accordingly, the legal claims in this action are jurisdictionally independent of the claims seeking declaratory relief.

Whether the claims are substantively independent is a more involved question. "Legal claims are substantively independent of declaratory actions 'when they . . . can be adjudicated

---

[11] Bohuslavskiy's assertion that Plaintiff has brought these federal causes of action as a jurisdictional hook is unpersuasive. Stay Mot. at 8-9. A review of the Complaint and Plaintiff's Preliminary Injunction Motion (both filed before his Stay Motion) make clear that RedSense's allegations regarding Bohuslavskiy's public statements and its dispute with Bohuslavskiy regarding Pylon are key issues in this case and to those causes of action. In addition, even if these claims were "ancillary to the real controversy" as Bohuslavskiy suggests, Stay Mot. at 9, he has provided no support that this Court's analysis would change in any respect.

without the requested declaratory relief.'" *Lukoil N. Am.*, 2017 WL 6450482, at *8 (quoting *Rarick*, 852 F.3d at 228). In *Vulcan Materials*—the Seventh Circuit case the Third Circuit relied on in *Rarick* when adopting the independent claim test—the court explained that a legal claim was substantially independent if it "would continue to exist if the request for a declaration simply dropped from the case." 569 F.3d at 717 n.6.

Bohuslavskiy argues that the question of whether he remains a member of RedSense under the parties' Onboarding Agreement is at the "core" of this case. Stay Mot. at 9. But the "heart of the matter" test Bohuslavskiy relies on was rejected by the Third Circuit in *Rarick*. *See supra* n.9. Under the independent claim test, the question for the Court is not whether Bohuslavskiy's membership status is at the heart or "core" of this case, but whether the "viability" of RedSense's requested legal relief is "wholly dependent upon the success of the declaratory claim." *Vulcan Materials*, 569 F.3d at 717 n.6.

Many of RedSense's causes of action do not turn on this membership question. For example, RedSense's Lanham Act false advertising claim is not determinative of whether Bohuslavskiy is a member of RedSense. The same goes for Bohuslavskiy's tortious interference claims. While Bohuslavskiy is correct that, *in general*, an individual cannot tortiously interfere with his or her own contract, Stay Mot. at 10 (citations omitted), there are exceptions for employees acting outside the scope of their employment or agency. *See DiMaria Const., Inc. v. Interarch*, 351 N.J. Super. 558, 568 (App. Div. 2001), *aff'd*, 172 N.J. 182 (2002). Indeed, the Third Circuit has held that an employee or agent acts outside the scope of the privilege and may held liable for tortious interference when they act "for personal motives, out of malice, beyond his [or her] authority, or otherwise not in good faith in the corporate interest." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 849 n.11 (3d Cir. 1996) (citation modified). As RedSense notes, it is accusing

Bohuslavskiy of trying to "usurp the relationship RedSense has with its customers so that Bohuslavskiy him [sic] can contract with them directly." Stay Opp'n at 14. RedSense also alleges that Bohuslavskiy's conduct was not in the best interests of RedSense and that he was motivated by a desire to smear RedSense's reputation. *See e.g.*, Compl. ¶¶ 50, 56. Thus, contrary to Bohuslavskiy's assertion that a determination of his membership status is dispositive of RedSense's tortious interference claims, Stay Mot. at 10, the above demonstrates it is not.

The Court further agrees with RedSense that Bohuslavskiy's characterization of its claims for fraud, conversion, and unjust enrichment as "depend[ing] in significant part on whether Bohuslavskiy owed fiduciary obligations as a member of acted outside his authority" presents an incomplete picture of these claims. Stay Opp'n at 14 (quoting Stay Mot. at 10-11). RedSense's unjust enrichment claim stems from allegations that he approved invoices to Affix and took property that belongs to RedSense. Stay Opp'n at 15 (citing Compl. ¶¶ 136-41). RedSense's fraud claim concerns Bohuslavskiy's alleged wrongful approval of invoices to Affix and for "inducing RedSense to pay third parties for work that was never done." *Id.* at 14-15 (citing Compl. ¶¶ 113-24). Similarly, RedSense alleges in its conversion claim that Bohuslavskiy took steps to deprive RedSense of the property it owns through RedSense's contracts with third parties. *Id.* at 15 (citing Compl. ¶¶ 136-41). Because Bohuslavskiy may be liable for these torts even if he is found to be a member of RedSense, *id.* at 15 (citing Wyo. Stat. Ann. § 17-29-409), the claims are not "wholly dependent upon the success of the declaratory claim," *Vulcan Materials*, 569 F.3d at 717 n.6. Moreover, Bohuslavskiy has not responded to RedSense's arguments as to the independence of these causes of action in his Stay Reply, which the Court deems a waiver of the opportunity to oppose them. *See Leisure Pass N. Am., LLC v. Leisure Pass Group, Ltd.*, No. 12-3375, 2013 WL

4517841, at *4 (D.N.J. Aug. 26, 2013) (holding that a party waived its opposition to an argument by failing to respond to it.).

In sum, the Court finds that Counts One through Seven are both jurisdictionally and substantively independent of Counts Eight through Ten. Accordingly, the Court will proceed to consider whether this Court should abstain under *Colorado River*.[12]  *See Philadelphia Indem. Ins. Co.*, 550 F. Supp. 3d at 148.

2.    *Colorado River* abstention

Under *Colorado River*, this Court first asks "whether there is a parallel state proceeding that raises 'substantially identical claims [and] nearly identical allegations and issues.'" *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 307 (quoting *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005)). Then, if the proceedings are parallel, the Court applies a multi-factor test to determine whether there are exceptional circumstances present that warrant abstaining. *Id.* at 307-08 (citing *Spring City Corp. v. American Bldgs. Co.*, 193 F.3d 165, 171 (3d Cir. 1999)). There are six factors courts consider under this test:

> (1) [in an *in rem* case,] which court first assumed jurisdiction over [the] property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties.

*Id.* (citing *Spring*, 193 F.3d at 165). No one factor in this test is determinative. *Id.* Only the clearest of justifications will warrant dismissal. *Colorado River*, 424 U.S. at 819.

---

[12] RedSense claims that the Court's inquiry should end if the Court determines that Counts One through Seven are independent. Stay Opp'n at 18 (citing *Rarick*, 852 F.3d at 229). *Rarick* states that in a case like the present where the Court finds the legal claims independent of the declaratory judgment claims, "the court has a 'virtually unflagging obligation' to hear those claims, subject of course to *Colorado River*'s exceptional circumstances." *Id.* (quoting *Colorado River*, 424 U.S. at 817-19). Thus, *Rarick* instructs this Court to proceed to analyze whether it should abstain under *Colorado River*.

### a.    *Parallel cases*

"[C]ases are parallel when they involve the same parties and claims." *Ryan v. Johnson*, 115 F.3d 193, 196 (3d Cir. 1997). For proceedings to be considered parallel, they must be "'truly duplicative, 'that is, when the parties and the claims are 'identical,' or at least 'effectively the same.'" *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 285 (3d Cir. 2017) (quoting *Trent v. Dial Med. of Fla., Inc.*, 33 F.3d 217, 223‑24 (3d Cir. 1994), *superseded by statute on other grounds as recognized in Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 83 (3d Cir. 2011)). Nevertheless, "'[s]trict identity between parties and claims is not necessary 'so long as the state and federal actions involve 'substantially similar parties and claims.'" *Gentles v. Blue Horizon Innovations*, No. 21‑16420, 2022 WL 1683748, at *3 (D.N.J. May 26, 2022) (quoting *Kelly*, 868 F.3d at 285 & n.8). In *Kelly*, the Third Circuit explained that:

> "[s]ubstantial similarity" only means that the parties involved are closely related and that the resolution of an issue in one will necessarily settle the matter in the other. *See, e.g.*, *Fru-Con Constr. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 535 (8th Cir. 2009) ("[Substantial similarity] occurs when there is a substantial likelihood that **the state proceeding will fully dispose of the claims presented in the federal court.**" (citing *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 592 (7th Cir. 2005)); *Scottsdale Ins. Co. v. Detco Indus., Inc.*, 426 F.3d 994, 997 (8th Cir. 2005) (holding that state tort actions and a related federal insurance declaratory judgment action were not parallel, even though "the issues in each proceeding may depend on some of the same facts," because the state lawsuits "involve parties, arguments, and issues different from those in federal court proceedings").

*Kelly*, 868 F.3d at 285 n.8 (emphasis added).

Neither party addresses whether this action and the Wyoming Act are parallel under *Colorado River*. However, the Court has considered the parties' arguments as to whether the actions are parallel under the "substantial similarity" test used in the context of the *Brillhart-Wilton*

24

doctrine.[13]  While it is undeniable that the Wyoming Action overlaps with this one, the Court finds the cases are not parallel.  "[W]hen a federal court case involves claims that are distinct from those at issue in a state court case, the cases are not parallel and do not justify *Colorado River* abstention."  *Cont'l Cas. Co.*, 2017 WL 1477136, at *6 (quoting *Trent*, 33 F.3d at 224).  For example, in *Gentles*, this Court determined that a federal and state action were not parallel where the plaintiff in the state court action sought a declaratory judgment as to whether the defendant had an ownership interest in the plaintiff but had also brought claims for breach of contract and violations of federal security laws in the federal action.  2022 WL 1683748, at *3.  Because "resolution of the ownership question asserted in the [state] action may not dispose of all of [p]laintiff's contract and securities claims pending before this Court," the cases were not parallel. *Id.*

In *supra* Section II.B.1, the Court determined that RedSense asserts causes of action (Counts One through Seven) that will not be fully disposed of by the Wyoming Action.  In fact, Bohuslavskiy's counterclaims filed in this action will not be fully disposed of by that action, either. Stay Opp'n at 20.  Thus, although the Wyoming Action and this action are related, they are insufficiently parallel for the Court to find they are substantially similar under *Colorado River*. Accordingly, the Court will not abstain from deciding Counts Eight, Nine, and Ten, and in turn, will **DENY** Bohuslavskiy's Stay Motion.[14]

---

[13] Although the tests under both abstention doctrines "require evaluating similar factors, the 'district court's discretion under the [DJA] is significantly greater than under *Colorado River*.'" *Id.* (quoting *United States v. Com. of Pa., Dep't of Env't Res.*, 923 F.2d 1071, 1074 (3d Cir. 1991)*.*

[14] Because the Court has determined the cases are not parallel, it will not consider the multi-factored test at the second step of the *Colorado River* inquiry.

### III.    PRELIMINARY INJUNCTION MOTION

#### A.    Legal Standard

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994).  The status quo is "defined as the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)).

> To obtain a preliminary injunction, the moving party must show:
>
> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

The movant bears the burden of establishing the first two factors, which are considered the "most critical" factors. *Id.* at 179 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

The burden of proof for a plaintiff seeking injunctive relief is high. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (noting that the requirement for proof to prevail on a preliminary junction is "much higher" than on surviving a motion for summary judgment). A preliminary injunction "should not be granted unless the movant, <u>by a clear showing</u>, carries the burden of persuasion." *Id.* (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed.1995)).

Importantly, a preliminary injunction should not be issued where there are key issues of fact in dispute that prevent the Court from deciding whether the moving party has established a likelihood of success on the merits. *PRS In Vivo Holdings, Inc. v. Peters*, No. 24-8223, 2024 WL 3995167, at *4 (D.N.J. Aug. 28, 2024) (citing *Vita-Pure*, 2015 WL 1496396, at *3 (D.N.J. Apr. 1, 2015)); *Collick v. Weeks Marine, Inc.*, 397 Fed. App'x 762, 764 (3d Cir. 2010) (explaining that issuing a preliminary injunction is inappropriate where there is an "abundance of contradictory facts on both sides of the record").[15]   When deciding a preliminary injunction motion, "a court may properly rely on affidavits and hearsay materials." *Startrak Sys., LLC v. Hester*, No. 07-3202, 2007 WL 2705159, at *8 (D.N.J. Sept. 14, 2007) (citing *Kos Pharms.*, 369 F.3d at 718-19); *see also Kos Pharms.*, 369 F.3d at 718 ("It is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less

---

[15] Bohuslavskiy cites *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.* for the proposition that courts "should be particularly reluctant to grant injunctive relief when the record is undeveloped and discovery is incomplete." PI Opp'n at 7 (quoting 108 F.4th 194, 197 (3d Cir. 2024)). Like RedSense, the Court finds that case distinguishable from the present because "there, plaintiffs put forth *no evidence* that Delaware had engaged in the purported harm." PI Reply at 4 n.1 (citing *Delaware State Sportsmen's Ass'n*, 108 F. 4th at 198).

complete than in a trial on the merits.'" (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981))).[16]

### B.    Success On the Merits

"To satisfy the first prong of the preliminary injunction inquiry, a plaintiff must demonstrate a likelihood of success on the merits of the action." *JRM Constr. Mgmt., LLC v. Plescia*, No. 23-932, 2023 WL 2770479, at *3 (D.N.J. Apr. 4, 2023) (citing *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012)). This has been understood to mean that "a plaintiff need only show a reasonable chance of winning or, in other words, a chance that is 'significantly better than negligible but not necessarily more likely than not.'" *Id.* (quoting *Reilly*, 858 F.3d at 179). The Third Circuit has equated the plaintiff's burden to proving a "'prima facie case,' not a 'certainty she'll win." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001)).

RedSense seeks a preliminary injunction for the first three counts of the Complaint: (1) false advertising under the Lanham Act (Count I); (2) tortious interference with RedSense's current contracts (Count II); and (3) tortious interference with RedSense's prospective contracts (Count III). PI Mot. at 27. As explained in more depth below, the Court finds that RedSense has failed to establish it is likely to succeed on the merits of its Lanham Act claim, but has established a likelihood of success on the merits of its tortious interference claims.

---

[16] Bohuslavskiy repeatedly argues in his Preliminary Injunction Opposition that RedSense's proofs are largely inadmissible. *See, e.g.*, PI Opp'n at 7 ("Plaintiff relies heavily on hearsay, conjecture, and inference – none of which satisfies the evidentiary burden at this stage."). But as the above shows, this is not the law. The Court can consider affidavits and hearsay when deciding a motion for a preliminary injunction. How much *weight* the Court gives those proofs—including a party's reliance on speculation when making its arguments—is separate and apart from whether the Court can consider them altogether.

1.    *Lanham Act (Count I)*

Section 1125 of the Lanham Act prohibits making a false or misleading representation of fact in connection with commercial advertising or promotion concerning another person's goods, services, or commercial activities.  15 U.S.C. § 1125(a)(1)(B).  To establish a false advertising claim, a plaintiff must show:

> (1) the defendant made false or misleading statements about the plaintiff's product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, *e.g.*, declining sales and loss of good will.

*Highmark*, 276 F.3d at 171 (citing *Warner–Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91-92 (3d Cir. 2000)).

RedSense argues that Bohuslavskiy has violated the Lanham Act.  PI Mot. at 29-30.  Its Preliminary Injunction Motion focuses on "Bohuslavskiy's email campaign," in which Bohuslavskiy "falsely insinuated ethical issues relating to RedSense" in emails sent directly to a handful of RedSense's customers.  *Id.* at 29-30 (citing Montanaro Decl. ¶¶ 21-23, 27-32 and Miller Decl. ¶ 7).  Like RedSense, the Court will focus its analysis on the emails that Bohuslavskiy sent RedSense's customers following his resignation from RedSense.[17]

---

[17] To the extent that RedSense seeks an injunction on the basis that Bohuslavskiy violated the Lanham Act for false advertising based on other statements he made, such as his LinkedIn post, the Court finds RedSense has not sufficiently raised those issues in its Preliminary Injunction Motion for the Court to consider it.

The section of RedSense's Preliminary Injunction Motion that argues Bohuslavskiy violated the Lanham Act extensively analyzes the substance of the emails that he sent RedSense's customers. PI Mot. at 27-30.  But that section of the brief does not reference his LinkedIn post, nor does it cite to the paragraphs of the Montanaro Declaration that mention his LinkedIn post.  RedSense only addresses Bohuslavskiy's LinkedIn post in connection to the Lanham Act violation in its Preliminary Injunction Reply after Bohuslavskiy referenced it in his Preliminary Injunction

b.    *Commercial advertising and promotion*

However, before analyzing the elements of a Lanham Act false advertising claim, the Court must first address the "threshold question" of whether an allegedly false statement constitutes "commercial advertising or promotion" such that it is actionable under the Lanham Act. *Wakefern Food Corp. v. Marchese*, No. 20-15949, 2021 WL 3783259, at *4 (D.N.J. Aug. 26, 2021) (quoting *Refundo, LLC v. Drake Enters., Ltd.*, No. 13-643, 2013 WL 1750016, at *3 (D.N.J. Apr. 22, 2013)).

> Though not defined by the Lanham Act itself, courts in this District and elsewhere have identified four primary elements of commercial advertising as used in Section 43(a)(1)(B): "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy the defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within the industry."

*Id.* (quoting *N.Y. Machinery, Inc. v. Korean Cleaners Monthly*, No. 17-12269, 2018 WL 2455926, at *3 (D.N.J. May 31, 2018)).

After considering the record, the Court concludes that Bohuslavskiy's emails are not actionable under the Lanham Act because they were not disseminated sufficiently within the context of the cybersecurity and threat protection industry to be considered commercial advertising.

i.    Sufficiently disseminated to the relevant purchasing public

While the Third Circuit has not considered what evidence is needed to prove that a commercial advertising or promotion was sufficiently disseminated to the relevant purchasing public to be actionable under the Lanham Act, several district courts in the Third Circuit have. *See*

---

Opposition.  But a "party's argument is waived if it is raised for the first time in a reply brief." *United States v. Heilman*, 377 F. App'x 157, 198 (3d Cir. 2010); *see also Anspach v. City of Philadelphia*, 503 F.3d 256, 258 n.1 (3d Cir. 2007) (considering a party's failure to raise an argument in its opening brief as a waiver).  RedSense's inclusion of the LinkedIn post in paragraph 68 of its Complaint (within Count One) does not suffice as RedSense has failed to argue this point in its Preliminary Injunction Motion.

*Premier Comp Sols., LLC v. Penn Nat. Ins. Co.*, No. 07-1764, 2012 WL 1038818, at *8 (W.D. Pa.

Mar. 28, 2012) (collecting cases).  In one of those cases, a court explained that:

> Courts have generally distinguished between "advertising" and "promotion"—
> "[a]lthough advertising is generally understood to consist of widespread
> communication through print or broadcast media, 'promotion' may take other
> forms of publicity used in the relevant industry, such as displays at trade shows and
> sales presentations to buyers." [*Fashion Boutique of Short Hills, Inc. v. Fendi USA,
> Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)].  "Rather than focusing on widespread
> impersonal activity, the inquiry focuses on the 'relevant industry' and whether the
> communication was sufficiently disseminated in that context." *Gonzalez v. Allstate
> Ins. Co.*, No. 04-1548, 2005 WL 5891935, at *7 (C.D. Cal. Aug. 2, 2005)
> (discussing the "teaching of" [*Coastal Abstract Serv., Inc. v. First Am. Title Ins.
> Co.*, 173 F.3d 725 (9th Cir. 1999)], in which the Ninth Circuit "concluded that even
> though the statements had been made directly to only one potential customer, there
> was sufficient dissemination to constitute promotion").  Thus, "[w]here the
> potential purchasers in the market are relatively limited in number, even a single
> promotional presentation to an individual purchaser may be enough to trigger the
> protections of the Act." [*Seven-Up v. Coca-Cola*, 86 F.3d 1379, 1386 (5th Cir.
> 1996)] (concluding that a presentation made to eleven out of seventy-four bottlers
> constituted "promotion").

*TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, No. 10-1054, 2011 WL 6372324, at *9 (E.D.

Pa. Dec. 19, 2011).

Ultimately, "[t]he precise boundary at which a statement is considered sufficiently

disseminated is heavily fact dependent" and varies on the industries relevant in a given case.

*Wakefern Food Corp.*, 2021 WL 3783259, at *4; *see also Innovasystems, Inc. v. Proveris Sci.

Corp.*, No. 13-5077, 2014 WL 3887746, at *7 (D.N.J. Aug. 6, 2014) ("[C]ommunications must be

'disseminated sufficiently to the *relevant* purchasing public to constitute advertising or promotion

*within that industry.*'" (emphasis added) (quoting *New Jersey Physicians United Reciprocal Exch.

v. Boynton, Inc.*, No. 12-5610, 2014 WL 317179, at *5 (D.N.J. Jan. 28, 2014))).  For instance, if

the purchasing public of an industry "is relatively small and it is typical to advertise through

person-to-person promotion, that practice will constitute promotion for purposes of the Lanham

Act." *Gonzalez*, 2005 WL 5891935, at *7.

The question then is whether, within the context of the cybersecurity threat monitoring and reporting services industry, Bohuslavskiy's emails were sufficiently disseminated to the relevant purchasing public to be actionable under the Lanham Act.  This is a question of fact for the Court to decide.  *Wakefern Food Corp.*, 2021 WL 3783259 at *4.

While Bohuslavskiy does not address this issue, *see* Opp'n, RedSense points to two cases where courts have found commercial statements sufficiently disseminated even when shared with a limited and private audience, *see* PI Mot. at 28-29 (first citing *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1235 (S.D.N.Y. 1991); then citing *N. Shore Med. Ctr., Ltd. v. Evanston Hosp. Corp.*, No. 92-6533, 1993 WL 141717 at *3 (N.D. Ill. April 28, 1993)).  In *National Artists*, the district court found the defendant's badmouthing of the plaintiff to ten of the plaintiff's thirty clients and to ten of the plaintiff's customers enough to consider defendant's statements widely disseminated within the theater-booking industry, which was "indisputably small and closely interconnected."  769 F. Supp. at 1235.  In *Evanston Hospital Corp.*, the court denied a motion to dismiss because the plaintiff sufficiently alleged that the defendant "deceived a substantial segment of those with whom plaintiffs intended to engage in commercial activities."  1993 WL 141717, at *3.  In these two cases, the fact the defendant reached a significant portion of the target audience with its statements was key to the determination that the sharing of information even with a small number of individuals was sufficiently disseminated to be actionable under the Lanham Act.  *See also Coastal Abstract*, 173 F.3d at 735 (where the Ninth Circuit found that a defendant's statement made to one of three potential customers was sufficient within the context of the plaintiff's industry).

By contrast, in this action, RedSense has only provided the Court with proof that Bohuslavskiy contacted slightly more than a dozen of its customers.  *See* PI Mot. at 13 (citing

Montanaro Decl. ¶ 23). And while RedSense has not explicitly stated its total number of customers, it has represented that the cybersecurity and threat intelligence market is large and highly competitive, PI Mot. at 5, and that its products and services are applicable to companies across various industries, *see* Miller Decl. ¶¶ 11-12. Miller states that ███████—one of RedSense's clients—is strategically important to RedSense as it operates within the healthcare industry, which is RedSense's largest market and largest potential customer base. *Id.* ¶ 12. The Court takes these statements to indicate that RedSense's potential purchasing public includes entire industries, and therefore, is comprised of at least hundreds, if not thousands of companies.

Because the Court finds that the potential purchasing public for RedSense is significantly larger than in cases like *National Artists* or *Evanston Hospital Corp*, the Court concludes that Bohuslavskiy's emails have not been sufficiently disseminated to be considered commercial advertising under the Lanham Act. *See Fashion Boutique*, 314 F.3d at 58 (finding that "twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers" was insufficient). While the Court recognizes that Montanaro states he "presently ha[s] no reason to believe that any less than all customers have been contacted repeatedly," Montanaro Decl. ¶ 23, the Court does not accept this representation in the absence of more definitive proof as to how many customers Bohuslavskiy *actually* contacted. *See* 11A Charles Allen Wright, et al., *Federal Practice and Procedure* § 2949 (3d ed. 2014) ("[W]hen the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction."). RedSense is seeking injunctive relief, and the Court will not grant it based on Montanaro's assumptions as to the number of RedSense's customers that have been contacted by Bohuslavskiy. Thus, the Court rejects RedSense's assertions that Bohuslavskiy's emails to clients amounted to a "campaign" actionable

33

under the Lanham Act. PI Mot. at 29; *see also Innovasystems*, 2014 WL 3887746, at *7 (dismissing Lanham Act false advertising claim as insufficiently disseminated where an employee of the defendant "emailed particular individuals with whom [plaintiff] sought to do business . . . [b]ecause these emails do not constitute the type of advertisements or promotions the Lanham Act regulates").

Having found that Bohuslavskiy's emails were not sufficiently widely disseminated to be considered "commercial advertising" actionable under the Lanham Act, the Court must conclude that RedSense has failed to prove it is likely to succeed on the merits of its Lanham Act claim.[18]

### 2.    *Tortious interference (Counts II and III)*

RedSense also asserts that Bohuslavskiy has: (1) tortiously interfered with RedSense's current contracts (Count II); and (2) tortiously interfered with RedSense's prospective contracts (Count III). PI Mot. at 30-31. Before addressing the merits of RedSense's claims, the Court must first decide whether New Jersey or Wyoming law applies. RedSense applies New Jersey law in its Preliminary Injunction Motion, PI Mot. at 30-31, while Bohuslavskiy applies Wyoming law, PI Opp'n at 26.

"When a district court sits in diversity jurisdiction over state law claims, it should apply the choice of law rules of the forum in which it sits." *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 333 (D.N.J. 2005), *aff'd*, 691 F.3d 527 (3d Cir. 2012) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). In the Third Circuit, "this same principle applies when a district court has federal question jurisdiction over an action, and is exercising pendent jurisdiction over state or common law claims." *Id.* (citing *Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555

---

[18] Given the Court's conclusion that Bohuslavskiy's emails do not pass the threshold issue of constitute commercial advertising commercial advertising or promotion that it is actionable under the Lanham Act, it will not consider whether RedSense has established the elements of a false advertising claim. *Wakefern Food Corp.*, 2021 WL 3783259, at *4.

F.2d 1131, 1136 (3d Cir. 1977)).  As Bohuslavskiy notes, RedSense brought a Lanham Act claim and based its jurisdiction of this action under 28 U.S.C. § 1331; therefore, this Court exercises supplemental jurisdiction over RedSense's state-law claims pursuant to 28 U.S.C. § 1367(a). Opp'n at 26-27.

In New Jersey, courts follow the "'governmental-interest' choice-of-law test for tort claims, applying the law of 'the state with the greatest interest in governing the particular issue' in the underlying litigation."  *Marks v. Struble*, 347 F. Supp. 2d 136, 142 (D.N.J. 2004) (quoting *Veazey v. Doremus*, 103 N.J. 244, 248 (1989)).  "The initial step in this analysis considers whether a conflict exists between the laws of the interested jurisdictions."  *Id.*  "A conflict of law arises when the application of one or another state's law may alter the outcome of the case . . .  or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 54 (App. Div. 2019) (quoting *In re Accutane Litig.*, 235 N.J. 229, 254 (2018)).  "If a court determines that an actual conflict exists, then a court must weigh the competing states' interests . . . . In the absence of an actual conflict, the court applies the law of the forum state."  *Prima v. Darden Restaurants, Inc.*, 78 F. Supp. 2d 337, 345 (D.N.J. 2000) (citations omitted).

Both New Jersey and Wyoming rely on the Restatement (Second) of Torts definitions of tortious interference with current and prospective contracts.  *See DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002) (citing *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751-52 (1989)); *HRH, LLC v. Teton Cnty., Wyoming*, 596 F. Supp. 3d 1275, 1288-89 (D. Wyo. 2022).  Because there is no discernable conflict between these tests, the Court will apply New Jersey law.

### a.    *Tortious interference with contract (Count II)*

To bring a claim for tortious interference of a contract under New Jersey law, a movant must establish: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages."

*Stryker Corp. v. Hagag*, No. 21-12499, 2022 WL 3107163, at \*18 (D.N.J. Aug. 3, 2022) (quoting

*Fid. Eatontown, LLC v. Excellency Enter., LLC*, No. 16-3899, 2017 WL 2691417, at \*5 (D.N.J.

June 22, 2017)).  In addition, a plaintiff must prove the existence of a valid contract.  *Med Alert*

*Ambulance, Inc. v. Atl. Health Sys., Inc.*, No. 04-1615, 2007 WL 2297335, at \*14 (D.N.J. Aug. 6,

2007) (citing *Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.*, 256 F.Supp.2d 249, 288

(D.N.J. 2003)).

### i.    The existence of valid contracts and the expectation of economic advantage through those contracts

RedSense has clearly established that it has multiple valid customer contracts.  PI Mot. at

31 (citing Montanaro Decl. ¶ 9).  And it has also established through these contracts that it has a

reasonable expectation of economic advantage.  *See Printing Mart–Morristown*, 116 N.J. at 751.

### ii.    Intentional interference done with malice

"In order to show intentional interference, a plaintiff must demonstrate that the defendant

acted with either an intent to interfere with plaintiff's contract right or acted with knowledge that

his actions would interfere with the contract right."  *DiGiorgio*, 230 F. Supp. 2d at 564 (citing

*Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49 (App. Div. 1997)); *see also Peoplestrategy, Inc. v.*

*Lively Emp. Servs., Inc.*, No. 20-2640, 2020 WL 7869214, at \*8 (D.N.J. Aug. 28, 2020)

("Interference is intentional when the 'actor desires to bring it about or if he knows that the

interference is certain or substantially certain to occur as a result of his action.'" (quoting *Cargill*

*Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 575-76 (D.N.J. 2010))).  In this context,

malice is not a "general ill-will towards the victim," but rather, "intentional interference without justification or excuse." *Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323, 2013 WL 3772724, at *4 (D.N.J. July 17, 2013) (citing *Printing Mart–Morristown*, 116 N.J. at 751-52). To determine whether an individual acted with malice, the Court should ask whether the interference was "sanctioned by the rules of the game." *Printing Mart–Morristown*, 116 N.J. at 757 (internal quotations omitted).

Bohuslavskiy's emails to RedSense clients demonstrate a clear intention to maliciously interfere with RedSense's current contracts. For example, in his March 6, 2025 email to known RedSense customer ▮▮▮▮▮▮▮▮ Bohuslavskiy states, among other things, that: (1) he resigned from RedSense due to "ethical and contractual concerns"; (2) RedSense blocked his corporate means of communication; (3) he was reaching out to "honor [his] obligations to ▮▮▮▮ as a RedSense customer, ensuring *seamless intel provision and continuity*"; (4) he and his team had "*preserved the unique visibility* into top-tier ransomware groups, botnets, forums, and vetted Telegram communities—an intelligence network we have built over six years since AdvIntel's establishment as a part of close cooperation with law enforcement on ransomware threat prevention"; (▮▮▮▮ could contact him if they had any questions or "require urgent cyber incident support"; and (6) he could be reached on his phone number (provided in the email) for "urgent matters involving Russian-speaking ransomware APTs, top-tier botnets, criminal forums, or exploited credentials." Bohuslavskiy Emails to Customers at 4-5 (emphases added). Then, in a March 13, 2025, unsolicited follow-up email, Bohuslavskiy adds that "we" obtained access to Supershell, a tool that has been used to facilitate ransomware attacks in Asia. *Id.* at 4. He also attaches to his email a bespoke report that includes analysis for ▮▮▮▮ on its particular vulnerabilities and adds that the attachment is just the "initial investigation." *Id.*

It has long been held one may not interfere with another's economic advantage through fraudulent, dishonest, or illegal conduct. *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140, 205 (App. Div. 1995). Deceit and misrepresentation have also been found to constitute wrongful means of interference. *Nostrame v. Santiago*, 213 N.J. 109, 124 (2013). Here, Bohuslavskiy knew or (at the very minimum) should have known that sending emails directly to known RedSense customers could lead to interference with RedSense contracts. *See Walters*, 167 N.J. at 309 (explaining that the "taking of plaintiff's confidential and proprietary property and then using it effectively to target plaintiffs' clients, is contrary to the notion of free competition that is fair"). His emails make clear he resigned due to ethical and contractual concerns and that RedSense cut his access to corporate channels of communication, but he also referenced "we" and an intent to ensure seamless integration and continuity. Despite his arguments otherwise,[19] Bohuslavskiy cannot escape the conclusion that by reaching out to known RedSense clients and providing them with bespoke information and data relevant to their specific needs, he knew or was substantially certain that he would be maliciously interfering with RedSense's contracts.[20]

---

[19] The Court is not persuaded by Bohuslavskiy's argument that his knowledge of some clients from his time at AdvIntel and through industry events means that RedSense cannot establish a valid business expectancy. *See* PI Opp'n at 28. The Court agrees with RedSense that this argument "is a non-sequitur, and does not change the fact that he knew that RedSense had or hoped to have contracts with these customers." PI Reply at 11. The Court also finds Bohuslavskiy's argument that his communications with customers were "done transparently" to be a mischaracterization of the facts. *Id.* at 29. RedSense was not copied on the emails that Bohuslavskiy sent RedSense customers in which Bohuslavskiy provided clients bespoke reports, opportunities for briefings, and offered to assist with urgent matters. *See generally* Bohuslavskiy Emails to Customers.

[20] In support of its argument that Bohuslavskiy sought to lure RedSense customers away, RedSense claims that Bohuslavskiy pitched his "superior" services. PI Mot. at 31 (quoting generally Montanaro Decl. ¶¶ 20-32). Those paragraphs cite to the Bohuslavskiy Emails to Customers. After reviewing those emails, the Court cannot find any use of the word "superior," and accordingly, does not credit this representation as it is not clear what this quotation references.

iii.   Loss, causation, and damages

For a plaintiff to establish loss and causation, "there must be proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 383 (3d Cir. 2016) (internal quotations omitted). "New Jersey law requires that a plaintiff . . . present proof that *but for* the acts of the defendant, the plaintiff would have received the anticipated economic benefits." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1168 (3d Cir. 1993). Courts do not require a plaintiff to show that the defendant's conduct was the *sole cause* of the conduct, but rather, only that "if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Leslie Blau Co. v. Alfieri*, 157 N.J. Super. 173, 185 (App. Div. 1978) (citing *Myers v. Arcadio, Inc.*, 73 N.J. Super. 493, 498 (App. Div. 1962)).

RedSense relies on two examples that purportedly show loss at the hands of Bohuslavskiy. A major customer—███—told RedSense that it was placing its outstanding invoice on hold amid "serious concerns regarding the performance of the threat intelligence services provided" and a "lack of fresh intelligence." Montanaro Reply Decl., Ex. B. While RedSense attempts to tie these issues to Bohuslavskiy's communications with ███, *see* Montanaro Decl. ¶ 34, its attempts have failed. It appears that ███ complaints are rooted in product and service-related issues and the emails make no mention of Bohuslavskiy or his emails to ███. *See* Montanaro Reply Decl., Ex. B (noting a "significant decline in both the quality and relevance of the intelligence being received"). Although RedSense may assert that these concerns trace back to Bohuslavskiy's alleged failure to deliver AIDIS (or Pylon), that is separate from whether he has tortiously interfered with RedSense's contract with ███ by sending them emails. The Court therefore

39

concludes that RedSense has failed to show that Bohuslavskiy's outreach was the cause of ███ halting of payment as described in the email it sent RedSense.

RedSense has also represented that ██████████ informed RedSense that it would not be renewing its subscription service with RedSense. Montanaro Reply Decl. ¶ 17. According to the Montanaro Reply Declaration, ██████████ cited "Bohuslavskiy's actions as a primary concern" for not renewing its contract, and that despite blocking "Bohuslavskiy's personal Gmail address . . . Bohuslavskiy continued to make contact on non-blocked platforms, including on Signal using an alias." *Id.* In addition, ██████████ "articulated security concerns about Bohuslavskiy, including that it feels vulnerable due to Bohuslavskiy's knowledge of the customer's cybersecurity concerns." *Id.*

While more detail regarding ██████████ decision not to renew its contract with RedSense would have aided the Court in determining the extent to which Bohuslavskiy's conduct contributed to ██████████ decision,[21] the Court nevertheless comfortably finds that on the facts represented to the Court, there was a "reasonable probability" that the contract would have been renewed absent Bohuslavskiy's multiple forms of outreach. The Court comes to this conclusion based on the fact ██████████ specifically told RedSense that Bohuslavskiy's emails were a primary concern in its decision and that it feels vulnerable due to Bohuslavskiy's knowledge of its cybersecurity concerns. Accordingly, RedSense has established

---

[21] "District courts must exercise their discretion in 'weighing all the attendant factors" to assess whether, and to what extent, affidavits or other hearsay materials are 'appropriate given the character and objectives of the injunctive proceeding.'" *Kos Pharms.*, 369 F.3d at 719 (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)). Other information regarding ███ ██████████ decision not to renew its contact would strengthen RedSense's claim.

that Bohuslavskiy's conduct has resulted in a loss of business to RedSense.  And through its loss of a renewed contract with ███████████████ RedSense has established actual damages.

In sum, the Court finds that RedSense has demonstrated it would likely prevail on the merits of its tortious interference with current contracts claim.  Next, the Court will consider whether RedSense has also established likely success on the merits of its claim of tortious interference with prospective contracts.

> b.  *Tortious interference with a prospective economic advantage (Count III)*

Under New Jersey law, tortious interference with a prospective economic advantage is separate and distinct from tortious interference with an existing contract.  *Mu Sigma*, 2013 WL 3772724, at *3 (citations omitted).  "An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation free from undue influence or molestation."  *Printing Mart–Morristown*, 116 N.J. at 750 (internal quotations omitted).  The five elements of a claim of tortious interference with a prospective or existing economic relationship are:

> (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference.

*Lightning Lube*, 4 F.3d at 1167 (citations omitted).

> i.  Reasonable expectation of economic benefit and that RedSense would have received that benefit in the absence of interference

Bohuslavskiy disputes that RedSense has identified a valid business expectancy.  *See* PI Opp'n at 28 ("Plaintiff has not identified – even once – a single prospective client, contract, or commercial opportunity that was actually lost because of anything Bohuslavskiy said or did.").

41

Bohuslavskiy imposes too high a burden on RedSense. "[A] plaintiff does not need to show actual loss of a contract, only that but for the defendant's interference, there was a reasonable probability that the plaintiff would have received the economic benefit." *Mu Sigma*, 2013 WL 3772724, at *3 (citations omitted). It also is not "necessary that the prospective relation be expected to be reduced to a formal, binding contract." *Avaya*, 838 F.3d at 382 (quoting *Printing Mart–Morristown*, 116 N.J. at 756). Satisfaction of this element turns on whether the facts "giv[e] rise to some reasonable expectation of economic advantage." *Id.* (quoting *Printing Mart–Morristown*, 116 N.J. at 753). A protectable economic expectation can arise from both existing and potential customers. *Id.*

RedSense has shown a reasonable expectation of economic benefit with a prospective customer: ███ RedSense was engaged in serious discussions with ████, and an executive at ████ told Miller that unless RedSense resolves its issues with Bohuslavskiy, ████ would not retain RedSense's services. Mot. at 25 (citing Miller Decl. ¶¶ 14-15).[22] RedSense has also established a prospective economic benefit with a current customer. A prospective economic advantage can be found in a variety of contexts, including "a reasonable expectation of ongoing business with its own customers." *Avaya*, 838 F.3d at 385. RedSense has demonstrated through its declarations and moving papers that it has a reasonable expectation on going business with its customer.

---

[22] Without citing to any authority, Bohuslavskiy asserts that RedSense's contentions are not supported by admissible evidence. Opp'n at 28. As noted above, "a court may properly rely on affidavits and hearsay materials" when deciding a preliminary injunction motion. *Startrak Sys.*, 2007 WL 2705159, at *8; *see also Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 325 (3d Cir. 2015) ("[T]here is no 'rule in the preliminary injunction context akin to the strict rules governing the form of affidavits that may be considered in summary judgment proceedings.'" (quoting *Kos Pharms.*, 369 F.3d at 718)).

The Court need not look further than ███████████ decision to not renew its contract with RedSense to determine that there was a reasonable probability that RedSense would have received the anticipated economic benefit in the absence of interference. According to RedSense, ██████████████ represented that Bohuslavskiy's outreach was "a primary concern" in its decision not to renew its contract. Montanaro Reply Decl. ¶ 17. ███████████ even "articulated security concerns about Bohuslavskiy, including that it feels vulnerable due to Bohuslavskiy's knowledge of the customer's cybersecurity concerns." *Id.* Although RedSense has not provided the Court with additional detail as to the other concerns that ███ ████████████ raised when it decided not to renew its contract, the Court still finds that RedSense has shown but for Bohuslavskiy's outreach that "there was a reasonable probability that [RedSense] would have received the economic benefit" of their future business. *Mu Sigma*, 2013 WL 3772724, at *3. Moreover, other clients, like ████████ have told RedSense to work things out with Bohuslavskiy and have started to complain about the quality of RedSense's services (after historically being satisfied with RedSense's services). PI Reply at 4 (first citing PI Mot. at 24; then citing Miller Decl. ¶ 13).[23] Based on the above, the Court finds that RedSense has established that it had a reasonable expectation of economic benefit both from current and prospective customers, and that there was a reasonable probability that it would have received the anticipated economic benefit in the absence of Bohuslavskiy's interference. *Lightning Lube*, 4 F.3d at 1167.

---

[23] The Court gives some credit to RedSense's contention that ████████ complaints about the quality of its services are pretextual because RedSense has substantiated that position. PI Reply at 3. Specifically, RedSense has shown that ████████ complaints followed a preview of AIDIS (which the Court assumes includes the capabilities of Pylon) and ████████ request for immediate access to the tool. Miller Decl. ¶ 13.

ii.    <u>Knowledge of the expectancy</u>

Given Bohuslavskiy emailed over a dozen current clients, *see* Bohuslavskiy Emails to Customers, he clearly has knowledge that these customers exist.  RedSense has also stated that Bohuslavskiy had access to key customer information including the terms of RedSense's contracts with its customers.  Mot. at 31 (citing Montanaro Decl. ¶ 10).  He also knew of these customers' unique business needs.  Montanaro Decl. ¶ 11.  The Court finds this sufficient for RedSense to establish that Bohuslavskiy knew that RedSense had a reasonable expectation of future economic advantage in these customers.  *See Freedom Funding Grp., Inc. v. Freedom Fundinggroup L.L.C.*, No. 20-18404, 2022 WL 3681281, at *16 (D.N.J. Aug. 25, 2022) (finding a plaintiff established a former employee's knowledge of a business expectancy by alleging, among other things, that the employee had unrestricted access to customer information had knowledge of potential clients).

However, while RedSense may be able to establish a valid business expectancy in its advanced discussions with ████ it has not shown that Bohuslavskiy had knowledge of that expectancy or that he knew his conduct would lead ████ to not enter a contract with RedSense.  Courts in this District have previously held that "a person cannot intentionally interfere with a contract that he knows nothing about.  In order to subject someone to liability under this tort, the individual must have knowledge of the contract with which he allegedly interfered." *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998) (quoting *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1051 (D.N.J. 1990)).  For example, in *Florian Greenhouse*, this Court found allegations sufficient to survive a motion to dismiss where it was implicit from the facts of the case that the defendant was on notice of the specific transactions with which it had allegedly interfered.  *Id.*    Unlike in that case, here, RedSense has failed to establish that Bohuslavskiy had any knowledge of its discussions with ████ or that RedSense sought to develop ████ as a customer.

Still, the Third Circuit has held that even if a defendant did not know of a *specific* contract, he may still be liable for tortious interference if he intended to harm a specific plaintiff, had knowledge of a particular "category of contracts," and "the resulting consequential damage to that plaintiff was a proximate result of the defendant's conduct." *Lightning Lube*, 4 F.3d at 1170. As succinctly summarized by another court, in *Lightning Lube*:

> plaintiff was a quick-lube franchisor that bought oil-dispensing equipment from defendant on credit for installation at its franchise locations. In the midst of a commercial dispute between plaintiff and defendant, defendant caused plaintiff's franchisees to doubt that plaintiff owned the equipment, and threatened to confiscate the equipment from franchise locations unless the franchisees terminated their contracts with plaintiff. Defendant's scheme was successful. Several franchisees, fearing loss of their equipment, terminated their franchise agreements.

*In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-2262, 2015 WL 4634541, at *73 (S.D.N.Y. Aug. 4, 2015), *amended sub nom. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-2262, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015). The Third Circuit was not persuaded by the defendant's argument that it should not be liable for tortious interference for all the terminated franchise agreements because it only sought to interfere with a few of the plaintiff's franchisee agreements; once it was determined by a factfinder that the defendant sought to interfere with *some* of the agreements, the question became whether the plaintiff's injury was a foreseeable result of the interference. *Lightning Lube*, 4 F.3d at 1170-71. For the Third Circuit, "proximate cause [wa]s as determinative as specific intent," *id.* at 1171 n.9, and in turn, it concluded that the complained-of conduct (several franchisees terminating their agreements) was proximately caused by the defendant's efforts to get other franchisees to terminate their agreements. *Id.* at 1172.

*Lightning Lube* suggests that Bohuslavskiy could be liable for tortious interference with prospective contracts if: (1) he sought to —through his LinkedIn post—tortiously interfere with other contracts; (2) all of RedSense's customer contracts fall into the same category; and (3) it was

foreseeable that others would terminate their agreements with RedSense. After reviewing the record and considering the parties' arguments, the Court concludes that the above chain is too tenuous at this juncture.

*First*, and most importantly, the Court is not convinced that Bohuslavskiy's LinkedIn post can serve as the basis of a tortious interference claim of any contract. While Bohuslavskiy's LinkedIn post states that he resigned from RedSense due to "ethical and contractual concerns"—a concerningly vague and ominous remark—it is not the type of conduct that is generally actionable under a claim for tortious interference. "What is actionable is '[t]he luring away, by devious, improper and unrighteous means, of the customer of another.'" *Avaya*, 838 F.3d at 382 (quoting *Printing Mart–Morristown*, 116 N.J. at 750); *see also Sterling Nat'l Mortg. Co. v. Mortg. Corner*, 97 F.3d 39, 42 (3d Cir. 1996) (describing the "luring away" of a third-party as the "gravamen of a tortious interference claim") (citations omitted). For example, in *Walters*, the Supreme Court of New Jersey found that the "taking of plaintiff's confidential and proprietary property and then using it effectively to target plaintiff['s] clients" was sufficient to establish a claim of tortious interference. 167 N.J. at 309. Unlike in *Walters*, or above with respect to RedSense's tortious interference claim premised on emails Bohuslavskiy sent directly to known RedSense clients, here, it is not clear that Bohuslavskiy sought to target any one in particular through his LinkedIn post or sought to "lure" any customer away from RedSense. In other words, the Court believes that Bohuslavskiy's conduct falls outside the bounds of what this tort is supposed to govern and declines to push the bounds of this cause of action.[24]

---

[24] The Court identified one case in this Circuit which held that allegations that a business executive knowingly made statements made to a reporter which the speaker knew would and did injure the plaintiff's ability to raise capital was sufficient to survive a motion to dismiss on a tortious

*Second*, it is not clear to the Court that RedSense's contracts with customers should be considered one "category" the way the franchisee agreements in *Lightning Lube* were. Thus, even if the Court found that the LinkedIn post was an effort to tortiously interfere with RedSense's current contracts, the Court is unsure whether *all* of RedSense's current and prospective contracts should be grouped together.

*Third*, it is not clearly reasonably foreseeable that prospective clients like ███ would decide not to enter agreements with RedSense based on Bohuslavskiy's LinkedIn post. The chain of inferences the Court would be required to draw to make that finding is too attenuated. Accordingly, the Court concludes that RedSense has not established that Bohuslavskiy had knowledge of its expectancy in ███ However, because Bohuslavskiy had knowledge over RedSense's current contracts, the Court will proceed to consider the remaining elements.

### iii.    Remaining elements

The remaining elements of RedSense's tortious interference with prospective contract claim are: (1) that Bohuslavskiy intentionally interfered with its expectancy; and (2) that it has suffered damages. Because the Court relies on the same set of facts as it did for RedSense's tortious interference with current contracts claim—namely, Bohuslavskiy's outreach to ███ ████████ and ██████████ decision to not renew its contract with RedSense—the Court adopts that reasoning and applies it to RedSense's tortious interference with future economic advantages claim. *See supra* Section III.B.2.a.ii-iii. Accordingly, RedSense has also established

---

interference claim. *In re Spree.com Corp.*, No. 00-34433, 2001 WL 1518242, at *7 (Bankr. E.D. Pa. Nov. 2, 2001). Putting aside the fact this case is at best persuasive authority, the Court finds *In re Spree.com* distinguishable given the statements made to the reporter were far more specific in nature than Bohuslavskiy's statement that he resigned from RedSense due to "ethical and contractual concerns."

it will likely succeed on the merits of its tortious interference with prospective economic advantage claim.

### C.    Irreparable Harm

The party seeking injunctive relief also must make a "clear showing of immediate irreparable injury" absent the requested relief. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Stryker*, 2022 WL 3107163, at *19 (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)). "[D]emonstrating the mere possibility of harm is not enough. Instead, a plaintiff must show an imminent risk of irreparable injury that cannot wait to be redressed until trial is over." *Vita-Pure*, 2015 WL 1496396, at *4 (citing *Hynoski v. Columbia Cnty. Redevelopment Auth.*, 485 F. App'x 559, 563 (3d Cir. 2012)). "In addition, the movant must establish that without an injunction, it will suffer harm that cannot be sufficiently redressed after trial." *Stryker*, 2022 WL 3107163, at *19. For that reason, "economic loss does not constitute irreparable harm." *Id.* (quoting *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 528 (D.N.J. 1999)).

Because RedSense has failed to establish a likelihood of success on the merits of its false advertising claim, it follows that RedSense cannot show irreparable injury as to Count One. *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) ("The moving party's failure to show a likelihood of success on the merits "must necessarily result in the denial of a preliminary injunction." (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982))). However, because the Court determined that RedSense has established a likelihood of succeeding on the merits of its tortious interference claims, the Court will consider whether RedSense has established irreparable harm as to Counts Two and Three.

RedSense argues, and the Court agrees, that it has demonstrated irreparable harm absent an injunction. Bohuslavskiy has already played a meaningful role in one customer ██████ ██████ deciding to not renew its contract with RedSense. While "a showing of past harm, without more, is insufficient to justify the issuance of a present-day preliminary injunction," *Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F. Supp. 3d 491, 507 (E.D. Pa. 2021), here, RedSense has "something more"—the fact that Bohuslavskiy has reached out to over at least a dozen other RedSense clients in a similar manner to how he contacted t██████ ██████ It is entirely reasonable for RedSense to fear that Bohuslavskiy's others may terminate their current contracts or decide not to renew their contracts the way ██████████ did.[25]

The loss of goodwill is also sufficient to demonstrate irreparable harm. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195-97 (3d Cir. 1990). RedSense has demonstrated that it has lost goodwill with current, former, and prospective customers: ██████ (a current customer) has told RedSense to resolve its issues with Bohuslavskiy, Montanaro Decl. ¶ 12; ██ ██████████ (a former customer) did not renew its contract given its concerns regarding Bohuslavskiy (including considering him a security risk), Montanaro Reply Decl. ¶ 17; and ██████ (a prospective customer) has refused to proceed with RedSense until its issues with Bohuslavskiy are resolved, Miller Decl. ¶¶ 14-15. Thus, RedSense faces "presently existing actual threat[s]" that warrant injunctive relief. *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980); *see also Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434 (3d Cir. 2005) (granting a preliminary injunction on a tortious interference claim although an injury had not occurred "because the purpose of a preliminary injunction is to prevent the

---

[25] While ██████████ chose not to renew its contract (as opposed to terminating a contract), the Court concludes that the risk of termination applies to the non-expiring contracts RedSense has with its customers.

occurrence of injuries, [and] the demonstration by [plaintiff] of a presently existing actual threat of injury was sufficient to establish success on the merits and to establish irreparable harm) (citation modified)).

Bohuslavskiy claims that RedSense's "delay" in filing its preliminary injunction motion belies its contention it is suffering irreparable harm. PI Opp'n at 9-10. While he is correct that in some instances a plaintiff's delay in bringing a motion for injunctive relief can undermine an irreparable harm argument, the Court must analyze the delay within the proper context. *See JRM Constr. Mgmt.*, 2023 WL 2770479, at *6 (collecting cases). The record shows that the parties were engaged in extensive discussions during the period between Bohuslavskiy's resignation and the commencement of this suit.[26] As RedSense points out, the Third Circuit and courts in the Third Circuit have found on multiple occasions that a delay may be justified due to ongoing negotiations between the parties. PI Reply at 6; *see also Times Mirror Magazines Inc. v. Las Vegas Sports News*, 212 F.3d 157, 169 (3d Cir. 2000) (15-month delay not unreasonable where it was attributable to negotiations); *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, No. 21-00705, 2022 WL 605724, at *20 (D. Del. Jan. 25, 2022) (three months is "not an unreasonably long period in which to prepare a preliminary injunction motion together with a detailed brief, exhibits, and an expert report" where parties were also seeking an informal resolution of the dispute during that period). It appears both parties were attempting to resolve this matter before this suit was filed. *See e.g.*, Stay Mot. at 3 (noting a belief that "serious settlement negotiations were ongoing"). The Court will not hold it against RedSense that it waited until it believed those discussions had broken

---

[26] Bohuslavskiy's positions across his briefs as to the discussions between the parties are inconsistent. Here, he argues that RedSense's delayed too long in bringing its Preliminary Injunction Motion. PI Opp'n at 14. But in his Stay Motion, he claims that RedSense "preemptive[ly] rush[ed] to the courthouse." Stay Mot. at 3.

down before bringing this action. Holding otherwise would incentivize parties to skip attempting to resolve their disputes before filing a suit and reward defendants who purportedly sought to negotiate but who were surreptitiously running out the clock. Accordingly, RedSense has established irreparable harm.

### D.    Balance of the Harms

"A district court must balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis*, 290 F.3d at 596. As the parties both note, "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Id.*

Bohuslavskiy asserts that RedSense "is the author of its own misery," Preliminary Injunction Opposition at 36, but it is Bohuslavskiy who penned over a dozen unsolicited emails to known RedSense customers that are the subject of this injunction. Similarly, Bohuslavskiy has maintained that his outreach to customers was solely in his capacity as a RedSense partner—not as part of a competing venture. PI Opp'n at 12 (citing Bohslavskiy Decl. ¶¶ 71-75); *see also id.* at 29-30. If that is true, then Bohuslavskiy has no competing venture that faces a potential loss of business from an injunction, and given his position that he is a partner in RedSense, he has a strong interest in limiting reputational and financial harm to RedSense.[27]  Given Bohuslavskiy's

---

[27] Bohuslavskiy asserts that RedSense's contention that he is on a "campaign of retribution" is "inherently contradictory" with his position that he is a member of RedSense. PI Opp'n at 36. In the Court's view, however, it is Bohuslavskiy whose actions and words are in tension. He has maintained throughout this action that he is a member of RedSense, and in turn, he stands to benefit from RedSense's financial success. Thus, Bohuslavskiy has a tangible interest in RedSense keeping its customers. Yet it is Bohuslavskiy who has told customers that he resigned due to "ethical and contractual concerns" without any additional context and has sent unrequited emails

insistence that he is not acting in a competitive capacity, the Court struggles to discern any harm that *Bohuslavskiy* faces by way of an injunction.   Therefore, the Court finds this factor weighs in favor of granting the injunction.

   **E.    Public Interest**

   Finally, the Court considers whether the public interest weighs in favor of granting the injunction.  When deciding this factor, courts "consider the fact that enforcement of the restriction should not cause harm to the public."  *ADP, LLC v. Pittman*, No. 19-16237, 2019 WL 5304148, at *17 (D.N.J. Oct. 18, 2019).

   Although this is a dispute between private parties, the "issuance of an injunction to enforce an agreement and private contractual rights between sophisticated parties serves the public interest."  *PRS In Vivo Holdings*, 2024 WL 3995167, at *8 (citing *See Score Bd. Inc. v. Upper Deck Co.*, 959 F. Supp. 234, 240 (D.N.J. 1997)).  The Third Circuit has found that the "public has a strong interest in seeing that contract and property rights are respected."  *Ride the Ducks of Philadelphia*, 138 F. App'x at 434-35.  Plus, because RedSense "has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction."  *Novartis*, 290 F.3d at 597.  Accordingly, the Court finds that RedSense has satisfied this prong of the Court's preliminary injunction analysis.

---

to at least a dozen of RedSense customers outside the presence of RedSense.   Although Bohuslavskiy made clear in these emails that he was seeking to act solely in his capacities as a member of RedSense, his actions seem to be hurting RedSense.  Some of his alleged conduct, such as putting a client in the "TO" line on an internal email, *see* Montanaro Decl. ¶ 19, appears to serve no beneficial purpose to RedSense.

### F.     Preliminary Injunction Determination

Based on the above, the Court will grant RedSense a preliminary injunction to limit Bohuslavskiy's tortious interference with current and prospective business expectancies. Specifically, Bohuslavskiy will be enjoined from:  (1) publicly or privately soliciting and/or contacting RedSense's current customers and known prospective customers[28]; (2) publicly or privately denigrating the quality of RedSense's cybersecurity services to RedSense's current customers and known prospective customers; and (3) publicly or privately making statements about RedSense and/or its products and services for the purpose of stealing business away from RedSense.[29]

"Injunctive relief should be 'no more burdensome to the defendant than necessary to provide complete relief to plaintiffs.'"  *Novartis*, 290 F.3d at 598 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  In the Court's view, the present injunction strikes the appropriate balance between providing RedSense the relief it has established it is entitled to while not unduly burdening Bohuslavskiy.

---

[28] That is, customers Bohuslavskiy specifically knows RedSense was soliciting.  Given wide swaths of companies could *potentially* be RedSense customers, the Court will not prohibit Bohuslavskiy from seeking to do business with companies he is not aware RedSense sought to do business with.

[29] Although RedSense has requested injunctive relief on other grounds, the Court will deny those specific requests.  With respect to enjoining Bohuslavskiy from making false statements publicly or privately about RedSense, RedSense failed to establish a violation of the Lanham Act.  The issue of ownership over AIDIS or Pylon was not a ground on which RedSense has moved for a preliminary junction, and therefore, the Court cannot find that Bohuslavskiy has "absconded" with RedSense property as it suggests.  *See* Mot. at 36.  Nevertheless, the Court notes that RedSense has shown that prospective clients have seen Bohuslavskiy's LinkedIn post, and that the post has already caused one prospective client to not move forward with RedSense at this time.  The Court cautions Bohuslavskiy that future public statements may further interfere with RedSense's business expectancies.

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court will also order RedSense to post a bond for the payment of such costs and damages as may be incurred or suffered by Bohuslavskiy in the event he is ultimately found to have been wrongfully enjoined. *Score Bd.*, 959 F. Supp. at 241 (citing *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 209‑11 (3d Cir. 1990)). The amount of the bond is a matter within the discretion of the court. *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.*, 715 F. Supp. 616, 641 (D.N.J. 1989).

Bohuslavskiy suggests a $1,000,000 bond is "appropriate due to the anticipated duration of this litigation and to rehabilitate the tarnish on Bohuslavskiy's reputation from accusations of theft and dishonor in an industry where trust is crucial." It is not clear to the Court how this number was derived, and, as this Court has previously explained, the Third Circuit requires district courts "to provide 'analysis as to the economic impact of' the preliminary injunction." *In re Selenious Acid Litig.*, No. 24‑7791, 2025 WL 1900949, at *26 (D.N.J. July 8, 2025) (quoting *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015)). The parties have not provided the Court with the necessary information to conduct an analysis of the impact of the bond, and accordingly, the Court will order the parties to provide additional information to the Court (or meet‑and‑confer regarding a potential agreement). Nevertheless, the Court recognizes that "the only recourse against wrongful enjoinment is . . . the bond," which is why "courts often conclude that '[w]hen setting the amount of security, district courts should err on the high side.'" *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 06‑1105, 2011 WL 4916397, at *4 (M.D. Pa. Oct. 17, 2011) (quoting *Scanvec Amiable Ltd. v. Chang*, No. 02‑6950, 2002 WL 32341772, at *3 (E.D. Pa. Nov. 1, 2002)). For present purposes, the Court will set a temporary bond in the amount of $100,000, which will be subject to revision after the parties provide the Court‑ordered information or alternatively agree to a bond amount.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT in part** and **DENY in part** RedSense's Preliminary Injunction Motion and **DENY** Bohuslavskiy's Stay Motion.   An appropriate order accompanies this Opinion.


Date: November 21, 2025


Evelyn Padin, U.S.D.J.