# EXHIBIT 1

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RED SENSE LLC,<br><br>Plaintiff,<br><br>v.<br><br>YELISEY BOHUSLAVSKIY, a.k.a.<br>ELISEI BOGUSLAVSKII,<br><br>Defendant. | No. 25cv12281 (EP) (AME)<br><br>**ORDER**<br><br>**TO BE FILED UNDER SEAL** |

**PADIN, District Judge.**

Presently before the Court is a dispute between Plaintiff RedSense LLC ("RedSense") and Defendant Yelisey Bohusalvskiy concerning the appropriate bond amount to be set following this Court's partial grant of RedSense's motion for a preliminary injunction.[1]

In the Court's Order partially granting the PI Motion, the Court set a temporary bond in the amount of $100,000 for the payment of such costs and damages as may be incurred or suffered by Defendant in the event he is ultimately found to have been wrongfully enjoined, and ordered the parties to meet-and-confer regarding a potential agreement as to a bond amount to be set.[2] The Court further stated that because it is required to analyze the economic impact of the preliminary

---

[1] D.E. 7 ("PI Motion" or "PI Mot.").

[2] D.E. 61 ("PI Order" at 2-3).

junction,[3] the parties should provide additional information in the event the parties failed to reach an agreement.[4]

The parties did not reach an agreement. Over the past several weeks, the parties have filed a series of letters on the docket with their respective positions on the appropriate bond amount.[5] On December 24, 2025, the Court issued a memorandum order in which it (1) directed the parties to continue meeting-and-conferring regarding a potential agreement on bond and (2) ordered RedSense to provide a bond analysis similar to Defendant's Bond Analysis in the event the parties' discussions were unsuccessful.[6] Again, the parties could not reach an agreement, and RedSense provided its bond analysis on January 5, 2026.[7] Defendant replied to RedSense's Bond Analysis two days later.[8]

As the Court noted in its December 24, 2025 Order, a bond is a condition of preliminary injunctive relief, and under Federal Rule of Civil Procedure 65(c), a successful applicant for a preliminary injunction should normally post a bond "in such sum as the [district] court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party

---

[3] *Id.* at 3 (citing *In re Selenious Acid Litig.*, No. 24-7791, 2025 WL 1900949, at *26 (D.N.J. July 8, 2025)).

[4] *Id.*

[5] Defendant first filed a letter on December 16, 2025. D.E. 69 ("Defendant's December 16, 2025 Letter"). Pursuant to a Court Order, D.E. 70, RedSense replied on December 18, 2025. D.E. 72. ("RedSense's December 18, 2025 Letter"). On December 24, 2025, Defendant filed a responsive letter and an accompanying bond analysis. D.Es. 76 ("Defendant's December 24, 2025 Letter") & 76-2 ("Defendant's Bond Analysis").

[6] D.E. 79 ("December 24, 2025 Order").

[7] D.E. 85 ("RedSense's Bond Analysis").

[8] D.E. 87 ("Defendant's Reply Bond Analysis").

who is found to have been wrongfully enjoined."[9] The bond "provides a fund to use to compensate incorrectly enjoined defendants,"[10] and a "wrongfully enjoined [party] must establish what damages were proximately caused by the erroneously issued injunction in order to recover and the alleged damages cannot be speculative."[11] Indeed, "[i]t is generally settled that, with rare exceptions, a [party] wrongfully enjoined has recourse only against the bond."[12] Put another way, "the bond generally limits the liability of the applicant and informs the applicant of 'the price [it] can expect to pay if the injunction was wrongfully issued.'"[13] For that reason, "courts often conclude that '[w]hen setting the amount of security, [they] should err on the high side.'"[14]

To that end, the "Third Circuit requires a district court to provide 'analysis as to the economic impact of' the preliminary injunction."[15] In addition to considering the impact on a wrongfully enjoined party, the Court should also consider "the hardship that a bond requirement would impose on the applicant."[16] "Because setting the bond amount – like the preceding decision

---

[9] *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 239-40 (3d Cir. 2003).

[10] *Id.* at 240 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989)).

[11] *Air Express Int'l v. LOG-NET, Inc.*, No. 21-732, 2019 WL 1441195, at *13 (D.N.J. Mar. 31, 2019) (quoting *Va. Plastics Co. v. Biostim, Inc.*, 820 F.2d 76, 80 n.6 (3d Cir. 1987))

[12] *Sprint Commc'ns*, 335 F.3d at 240 (quoting *Instant Air Freight*, 882 F.2d at 804).

[13] *Id.* (quoting *Instant Air Freight*, 882 F.2d at 805).

[14] *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 06-1105, 2011 WL 4916397, at *4 (M.D. Pa. Oct. 17, 2011) (quoting *Scanvec Amiable Ltd. v. Chang*, No. 02-6950, 2002 WL 32341772, at *3 (E.D. Pa. Nov. 1, 2002)).

[15] *In re Selenious Acid Litig.*, 2025 WL 1900949, at *26 (quoting *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015)).

[16] *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996).

to order injunctive relief – 'is almost always based on an abbreviated set of facts' that 'requir[e] a delicate balancing' of the adverse parties' competing interests, the decision rests within the district court's sound discretion."[17]

It appears the parties both agree that the bond amount should derive from Defendant's lost profits during the scope of the injunction. *See* RedSense's Bond Analysis at 1; Defendant's Bond Analysis at 1. The problem, however, is that the parties have significantly different views on what Defendant's lost profits might be. In sum and substance, Defendant maintains that bond should be set at least $800,000,[18] while RedSense proposes the Court set bond at no more than $44,750.[19] Both parties have supported those proposals with analyses which, after making a series of assumptions, lead to their respective outcomes.

The Court is troubled by key assumptions underlying both RedSense's and Defendant's respective submissions. For example, the parties dispute how many of its clients RedSense should reasonably expect to retain. RedSense relies on "established industry metrics for annual enterprise customer churn rates, which widely average less than 10% per year"[20] to argue that it should be expected to retain at least 90% of the sixteen customers on the list in Subtotal (A) of Defendant's Bond Analysis. In turn, of the ▇▇▇▇ in total revenue from those sixteen customers' contracts, RedSense estimates that at most 10% (or ▇▇▇▇) is up for grabs, and, given RedSense has a

---

[17] *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 391-92 (3d Cir. 2021) (quoting *U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1048 (3d Cir. 1970)).

[18] *See* Defendant's Reply Bond Analysis at 1.

[19] RedSense's Bond Analysis at 3.

[20] *Id.* at 2 (citations omitted).

4

███ average net profit per contract, the lost profit (and appropriate bond amount) from these contracts is ███.[21]

Defendant raises several issues with RedSense's assumptions, including that its churn calculation should not apply to all sixteen entities in Subtotal (A) because some of those entities are no longer current RedSense customers.[22] In fact, Defendant suggests that RedSense's churn may be higher than industry average given it has "████████████████████████████████████████████████████████████████████████████████████████████"[23] Defendant proposes the Court use ██████████████████████████████████████████████████████████████████████████████████████"[24] Defendant also states that because he has lower delivery costs and can operate more efficiently than RedSense, he can operate a 70% profit margin, and therefore, he is able to convert more revenue into profit (further increasing his lost profits).[25] In addition, Defendant challenges RedSense's self-assessed ███ profit estimate given its "own figures show otherwise:

---

[21] *Id.*

[22] Defendant's Reply Bond Analysis at 3.

[23] *Id.* (quoting RedSense's Bond Analysis).

[24] *Id.*

[25] *Id.*

5

██████████████████████████████████████████

████ ,26

The Court agrees with Defendant that RedSense's methodologies for calculating churn and Defendant's profit margin are flawed. Nevertheless, the Court disagrees with Defendant that a sample of six customers is a reliable indicator of how the rest will act, especially considering RedSense's representation that some of these customers have contracts expiring beyond the one-year estimated injunction period.[27] Thus, Defendant's lost profits should not include customers whose business is not reasonably expected to be on the market while the injunction is in place.[28]

Beyond disputing how many customers may leave RedSense, the parties also disagree on how many would then retain Defendant. Defendant states that he conservatively should be expected to receive 25-30% of the revenue from the above-referenced contracts as profits—*i.e.*, his lost profits are at least ████ (25% of the ████).[29] According to Defendant, this 25% expected-profit factor includes both a "conservative win probability" of 40-45% and the 70% profit margin.[30] However, Defendant fails to explain where he derives this win-rate from or why the Court can rely on it to ascertain his expected lost profits.

---

[26] *Id.* at 3.

[27] *See* RedSense's Bond Analysis at 3.

[28] While the Court recognizes that some RedSense customers *may* terminate their contracts early, the Court cannot reasonably estimate what percent that may be nor the causes that may motivate those terminations.

[29] Defendant's Bond Analysis at 3.

[30] Defendant's Reply Bond Analysis at 1.

6

The Court also agrees with RedSense that Defendant's proposed $200,000 bond for his lost profits from RedSense's vendor-enabled collaborations is unreliable.[31] Defendant primarily bases this number on ▮▮▮▮▮ and then ▮▮▮▮▮.[32] But, as RedSense notes, ▮▮▮▮▮[33] Without more information, the Court cannot determine what percent of that revenue is attributable to the vendor, and in turn, the Court cannot calculate Defendant's lost profits based on this relationship.

As the above makes clear, the Court cannot reasonably adopt either party's estimate. When faced with similar circumstances, district courts across this circuit have noted their "obligation to ensure they provide[] adequate protection because 'the consequences of wrongfully enjoining a defendant could be dire if a district court were to significantly underestimate the economic impact of an injunction it issues.'" *In re Selenious Acid Litig.*, 2025 WL 1900949, at *26 (quoting *Mallet & Co. Inc.*, 16 F.4th at 391). The Third Circuit has further emphasized that a case-specific analysis is essential. *See Mallet & Co. Inc.*, 16 F.4th at 392.

It is not clear to the Court how much revenue Defendant is currently generating, but the injunction certainly limits his ability to earn business from several entities with which he had a working relationship while at RedSense (and some before that at AdvIntel). And, given Defendant's "multi-year history with AdvIntel legacy firms,"[34] the Court can reasonably assume that Defendant would likely succeed in winning more business from former RedSense customers

---

[31] RedSense Bond Analysis at 3.

[32] *See id.*

[33] *Id.*

[34] Defendant's Reply Bond Analysis at 1.

than another standard competitor (suggesting an above-average win-rate). Accordingly, the Court agrees with Defendant that his lost damages while the injunction is in effect are meaningfully higher than what RedSense suggests.[35] At the same time, however, the Court finds Defendant's lost profit estimate over the one-year proposed injunction period of at minimum $800,000 to also be unreliable given the lack of support behind some of his most fundamental assumptions, including his win-rate,[36] as well as the fact that some of RedSense's clients have contracts that terminate after the one-year proposed injunction period.[37]

The Court is particularly mindful that "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."[38] Plus, setting a high bond does not automatically entitle Defendant to that amount in the case it is determined he was wrongfully enjoined. Indeed, Defendant "will still bear the burden of proof on the amount of its losses."[39] Moreover, RedSense "has not indicated that posting a higher security

---

[35] RedSense sought and obtained the "extraordinary remedy" of a preliminary injunction, and the Court views its proposed bond of $44,750 not reflective of the gravity of that relief. *See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *see* Defendant's Reply Bond Analysis at 1 (calculating that RedSense's $44,750 proposed bond amount is equivalent to about $860 per week in lost profits for Defendant).

[36] As RedSense notes, Defendant has not demonstrated that during the nine-month period preceding the injunction, he captured clients at or near the win-rate he proposes. RedSense's Bond Analysis at 2 n.5.

[37] While RedSense states that "some of these customers have contracts that expire in the latter half of 2026 or in 2027," *id.* at 3, it does not specify how many, nor does it distinguish between contracts which expire in 2026 or 2027.

[38] *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 770 n.14 (1983).

[39] *Arlington Indus.*, 2011 WL 4916397, at *5 (citing *Virginia Plastics Co. v. Biostim, Inc.*, 820 F.2d 76, 80 n.6 (3d Cir. 1987)).

will cause any hardship to it."[40] For that reason, the Court sees little to no harm in erring on the high side in setting bond: in the event that RedSense prevails, it will recover its bond; and in the event Defendant was wrongfully enjoined, he will then be obligated to establish its exact damages from the injunction.

Despite the uncertainty surrounding Defendant's potential lost profits, the Court must still set a bond, and to do so, will make a series of assumptions based on information provided by the parties, which, in its view, are reasonable and reflect the Court's intent to err on the high side given the bond is Defendant's only recourse if he is ultimately found to have been wrongfully enjoined.[41] As a starting point, the Court notes that the sixteen customers listed in Subtotal (A) of Defendant's Bond Analysis generate ▮▮▮▮ in revenue.[42] Given RedSense's representation that some of these contracts expire in 2027, the Court assumes: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[43] And, given his history providing services to these clients, the Court will adopt Defendant's proposed win-rate of 40% and assume he could

---

[40] *Id.*; *see* D.E. 32 at 15 ("RedSense is willing to post a bond amount that the Court determines would adequately compensate Bohuslavskiy for any costs he may incur being wrongfully enjoined.").

[41] *See supra* nn. 12-14.

[42] Defendant's Bond Analysis at 1-2.

[43] Defendant suggests that half of these entities are not current customers, and therefore, churn is inapplicable to them. Defendant's Reply Bond Analysis at 2. However, the Court is without information to determine whether this is accurate, especially in light of RedSense's representation that of the 30 entities on its initial no contact list, 17 entities are current customers. RedSense's December 18, 2025 Letter at 4 n.4.

win ▮. Moreover, in an effort to err on the high side, the Court will further assume that ▮ that Defendant would win are each worth ▮ (the highest amount of any contract on the list). Thus, Defendant's lost revenue would be ▮ Finally, if Defendant could add these two customers and continue operating with a 70% profit margin, his lost profits would amount to $280,000.[44]

Accordingly,

**IT IS**, on this **14th** day of January 2026,

**ORDERED** that RedSense shall post a bond amount in the amount of $280,000 for the one-year proposed injunction period.

*Evelyn Padin*

Evelyn Padin, U.S.D.J.

---

[44] As noted above, the Court cannot speculate on Defendant's lost profits from the vendor-enabled collaborations. It is not clear to the Court how much of RedSense's revenue was generated from the vendor's data, or how a collaboration between Defendant's competing venture and that vendor might result. Moreover, as RedSense notes, Defendant "treats this revenue stream as a guarantee absent an injunction, which he has also failed to substantiate." RedSense's Bond Analysis at 3. Accordingly, the Court sets Defendant's lost profits from this revenue stream as $0.

10