Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 1 of 77 PageID: 1

Preetha Chakrabarti
CROWELL & MORING
LLP Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
pchakrabarti@crowell.com

Preetha Chakrabarti

Rachel Elaine Hsu (*pro hac vice* forthcoming)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
pchakrabarti@crowell.com
rhsu@crowell.com

Elissa N. Tenenbaum (*pro hac vice*)
CROWELL & MORING LLP 300
N La Salle Dr., Suite 2500 Chicago,
IL 60654
Telephone: (312) 321-4200
etenenbaum@crowell.com

Anna Z. Saber (*pro hac vice* forthcoming)
CROWELL & MORING LLP
3 Embarcadero, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827
asaber@crowell.com

*Attorneys for Plaintiff Red Sense LLC, Third-Party Defendant David Montanaro, and Third-Party Defendant Kevin Stear*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

Red Sense LLC

       Plaintiff,

   v.

Yelisey Bohuslavskiy,
a.k.a. Elisei Boguslavskii; Igor Dmitriev; Affix Advisory, LLC; and Igor Dmitriev d/b/a Irasel,

       ~~Defendant~~Defendants.

Civil Action No. 2:25-cv-12281

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**REDACTED PURSUANT TO L. CIV. R. 5.3**

NYACTIVE-26005445.8

Yelisey Bohuslavskiy,

Third-Party Plaintiff,

v.

David Montanaro and Kevin Stear,

Third-Party Defendants.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 2 of 77 PageID: 2

Plaintiff Red Sense LLC ("RedSense"), a Wyoming limited liability company with its principal place of business at One Boston Place, Suite 2600, Boston, Massachusetts 02018, brings this First Amended Complaint against Defendant Yelisey Bohuslavskiy ("Defendant" or "Bohuslavskiy"), an individual who RedSense is informed and believes resides at 7000 JFK Boulevard E, Apt. 42D, Guttenberg, New Jersey 07093; Defendant Igor Dmitriev ("Dmitriev"), an individual who RedSense is informed and believes resides in Montenegro; Defendant Affix Advisory, LLC ("Affix"), a New Jersey limited liability company of which Bohuslavskiy is the sole member, with a registered address at 7000 Kennedy Blvd. E, Apt. 42D, Guttenberg, NJ 07093; and Defendant Irasel, a sole proprietorship owned and operated by Dmitriev, with a principal place of business at Liman 2, Ulcinj, Montenegro, asserting claims for False Advertising under the Lanham Act, 15 U.S.C. § 1125; Tortious Interference with Contractual Relations; Tortious Interference with Prospective Contract; Trade Secret Misappropriation

3

under the Defend Trade ~~Secret~~Secrets Act, 18 U.S.C. § 1836 *et seq.*~~,~~; Fraud~~,~~; Conversion~~,~~; Unjust Enrichment~~,~~; Declaratory Relief pursuant to ~~22~~28 U.S.C. § 2201~~, and~~; Breach of Fiduciary Duty; Violation of the New Jersey Computer Related Offenses Act, N.J.S.A. § 2A:38A-3(a) and (e); Breach of Contract; and Civil Conspiracy. RedSense alleges as follows:

## INTRODUCTION

1.     On February 24, 2025, when Bohuslavskiy announced his resignation as Chief Research Officer of RedSense, he threatened to notify all of RedSense's current and prospective customers that the services the customers were contracting with RedSense to provide would no longer be offered by RedSense, and would instead be offered exclusively through Bohuslavskiy via Affix Advisory, LLC, Bohuslavskiy's single-member LLC ("Affix"). In short, it was not enough for Bohuslavskiy to announce his resignation; he wanted to destroy the RedSense customer relationships, steal the business away from RedSense for his own

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 3 of 77 PageID: 3

financial gain, and decimate the confidence customers had in RedSense to protect their cybersecurity concerns. And within days, these threats turned to action, as Bohuslavskiy methodically and persistently contacted RedSense customer after customer (using a personal Gmail email address), including RedSense's largest customers, where he raised vague "ethical" concerns about RedSense as a business, claimed that only he and his team (and, crucially, not RedSense) could provide the

cybersecurity services that the customers had been paying RedSense to provide, that unless the customer began working with Bohuslavskiy directly (instead of RedSense) the customer was at great risk of cybersecurity threats, and that RedSense was not equipped to service these relationships.

2.     Understandably, these customers were alarmed to receive such communications—the language used in these communications by Bohuslavskiy mirrored the language and tactics commonly used by cybercriminals or hackers in connection with phishing schemes, designed to trick the recipient into providing sensitive information that can then be used to unlawfully infiltrate computer systems. Customers, including RedSense's largest customers, began reaching out to RedSense, expressing concern and confusion. In particular, the customers did not know if this was a scam, if RedSense had been compromised, if Bohuslavskiy was speaking on behalf of RedSense (although Bohuslavskiy stated in his email that he had resigned as Chief Research Officer, his email contained numerous

references that he was still affiliated with RedSense), whether this dispute with Bohuslavskiy was indicative of RedSense's instability, and whether this dispute with Bohuslavskiy would undermine RedSense's ability to continue to provide valuable cybersecurity services to its customers.               Prospective customers actively engaged in sales conversations with RedSense expressed that until this situation was resolved, they did not feel comfortable bringing their cybersecurity business to RedSense.

3.      Concerned about the impact that Bohuslavskiy's conduct would have on RedSense's customer relationships and financial condition, RedSense immediately demanded that Bohuslavskiy cease and desist such communications with RedSense customers. This only emboldened Bohuslavskiy; his response to RedSense leadership was to threaten, "I will be informing each customer about this illegal action tomorrow, as well as what lead [sic] to it. With all screenshots and evidence attached." And then, he continued to contact customers repeatedly (often multiple times a week). Bohuslavskiy has ignored all requests to halt this destructive conduct, and to date, on information and belief, continues to date to contact RedSense customers.

4.      RedSense's investigation of Bohuslavskiy following his resignation has has only revealed more troubling conduct. Bohuslavskiy served as RedSense's Chief Research Officer where he was responsible for day-to-day management of the threat research business function, budget, and resourcing. This involved him

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 5 of 77 PageID: 5

working with third party vendors to procure assets for RedSense, such as source code these vendors developed, new product capability, threat intelligence, and other deliverables that RedSense would ultimately incorporate into the services it provided to its customers. Bohuslavskiy was responsible for managing these vendors, which included managing and approving payments to these vendors for the work they performed. The problem? As RedSense discovered during their investigation,

Bohuslavskiy was responsible for approving payments for work product that was either never completed or never provided to RedSense. And, given Bohuslavskiy's responsibilities for these vendors, he was in a position to know that these vendors were being improperly paid. In some instances, Bohuslavskiy even approved duplicate invoices, invoices on Affix paper and the original vendor invoices meaning that he was submitting requests to pay these vendors potentially *double* for work product that RedSense does not have any access to. If the work was performed, he hid RedSense intellectual property and other assets away from RedSense. If the work was not performed, Bohuslavskiy was complicit in a fraudulent scheme to steal from RedSense, deplete its funds, and cause it financial harm, all so that Bohuslavskiy and his team could line their pockets by obtaining payment for work never performed.

5.      As if that were not bad enough, simultaneous to Bohuslavskiy's resignation, RedSense became aware that the RedSense-owned systems used by him and his team

were accessed, any existing source code wasRedSense proprietary data directories and data contents were copied outand exfiltrated, and the file system was destroyed. RedSense's investigation into the incident revealed the credentials used to access the systems belonged to those RedSense provided to Igor Dmitriev ("Dmitriev"), Bohuslavskiy's brother and a RedSense Strategic Consultant, who Bohuslavskiy managed directly. Given the timing and the use of Dmitriev's credentials, RedSense is informed and

believes, and on that basis alleges, that this theft of RedSense property was done by or at the direction, request, or encouragement of Bohuslavskiy.

6.    This Complaint seeks to redress Bohuslavskiy's wrongs.

**THE PARTIES**

7.    Plaintiff RedSense is, and all times mentioned herein was, a Wyoming limited liability company organized under the laws of the state of Wyoming. RedSense's principal place of business is located at One Boston Place, Suite 2600, Boston, Massachusetts 02018. RedSense delivers actionable, context-rich threat intelligence to its customers, which can be leveraged by its customers to strengthen detection and response capabilities and enhance the ability to prevent and remediate cyber threats.

8.    Defendant Yelisey Bohuslavskiy, a.k.a. ~~Eliseii Boguslavskii~~Elisei Boguslavskü, is an individual who, RedSense is informed and believes, and on that basis alleges, resides in Guttenberg, New Jersey. From January 25, 2023 through February 24, 2025, Bohuslavskiy served as RedSense's Chief Research Officer until his resignation. Bohuslavskiy is the sole member of Affix Advisory, LLC and, at all times relevant hereto, managed and directed the activities of Dmitriev and Irasel in connection with the conduct alleged herein.

9.    Defendant Igor Dmitriev is an individual who, RedSense is informed and believes, and on that basis alleges, resides in Montenegro. Dmitriev is

10

Bohuslavskiy's brother. From August 1, 2023 through February 24, 2025, Dmitriev served as a Strategic Consultant to RedSense, under the guidance and direction of Bohuslavskiy. Dmitriev is also the sole proprietor of Irasel, a company registered at Liman 2, Ulcinj, Montenegro, with tax identification number 03531961 and registration number 5-1119372/001, incorporated on February 23, 2023, through which he provided services to RedSense. At all times relevant hereto, Dmitriev acted in concert with Bohuslavskiy and Affix in furtherance of the scheme alleged herein.

10. Defendant Affix Advisory, LLC ("Affix") is a New Jersey limited liability company with a registered address at 7000 Kennedy Blvd. E, Apt. 42D, Guttenberg, NJ 07093, of which Bohuslavskiy is the sole member and managing member. Affix was formed on or about October 28, 2021, and is registered with the New Jersey Division of Revenue under file number 450721054. Bohuslavskiy executed the Onboarding Agreement on behalf of himself and Affix. At all times relevant hereto, Affix served as the invoicing vehicle through which Bohuslavskiy submitted invoices to RedSense for his own compensation and for pass-through payments to EasyStaff, Dmitriev, Irasel, and Pyrus, and as the entity through which RedSense funds were received and, RedSense is informed and believes, diverted for Bohuslavskiy's personal benefit.

11. Defendant Irasel is a sole proprietorship owned and operated by Dmitriev, with a principal place of business at Liman 2, Ulcinj, Montenegro. Irasel

11

provided services to RedSense under Dmitriev's direction, and invoices for Irasel's services were submitted to RedSense on Affix paper by Bohuslavskiy. RedSense is informed and believes, and on that basis alleges, that funds paid by RedSense to Affix purportedly for Irasel's services may never have been disbursed to Irasel, and instead were retained by Bohuslavskiy and/or Affix for their own benefit.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 7 of 77 PageID: 7

2025, Bohuslavskiy served as RedSense's Chief Research Officer until his resignation.

**JURISDICTION AND VENUE**

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which provides jurisdiction over all actions brought pursuant to the laws of the United States, because RedSense is asserting claims which arise under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* and the Lanham Act, 15 U.S.C. § 1051 *et. seq.* This Court has supplemental jurisdiction over the remaining state law claims asserted herein under 28 U.S.C. § 1367.

13.    This Court has personal jurisdiction over Bohuslavskiy because RedSense is informed and believes (based on the information provided by Bohuslavskiy to RedSense in connection with his tax return), and on that basis alleges, that he is a resident of the State of New Jersey.

14.    Venue is proper in the District of New Jersey, Newark vicinage pursuant to 28 U.S.C. § 1391(b)(1) because RedSense is informed and believes, and

12

on that basis alleges, that Bohuslavskiy resides in the State of New Jersey and

specifically within the boundary lines of the Newark vicinage.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 8 of 77 PageID: 8

15.      This Court has personal jurisdiction over Dmitriev because Dmitriev purposefully directed tortious conduct at the State of New Jersey by: (1) remotely accessing computer systems owned and operated by RedSense, whose and Chief Research Officer operated from New Jersey through Affix, a New Jersey LLC, using credentials assigned to him by RedSense; (2) intentionally destroying data and source code stored on those systems, knowing that the harm caused by such destruction would be suffered by RedSense in New Jersey, where Affix—the entity through which all payments to Dmitriev were processed—is domiciled and where Bohuslavskiy, the individual who directed Dmitriev's work, resides; (3) submitting invoices, through Affix, that were processed and paid in New Jersey; (4) administering the Pyrus platform on behalf of RedSense and thereafter locking RedSense out of that platform; and (5) participating in a scheme, managed and directed from New Jersey through Affix, to submit fraudulent invoices to RedSense for services never performed—a scheme that constitutes the largest and most material fraud alleged herein, through which RedSense paid EasyStaff UAB approximately $412,657 for freelancers' purported services that were never delivered, all of which was orchestrated and approved by Bohuslavskiy operating through Affix in New Jersey. Dmitriev knew that Affix was a New Jersey LLC, that Bohuslavskiy resided in New Jersey, that his invoices were processed and paid through a New Jersey entity, that the computer systems he accessed and destroyed

14

were administered through a New Jersey entity, that his credentials and compensation were routed through Affix in New Jersey, and that the consequences of his actions—including the misappropriation of the RedSense Trade Secrets, the copying and destruction of source code, the destruction of RedSense's file system, the locking of RedSense out of the Pyrus platform, and the deprivation of access to RedSense's work product—would cause injury in New Jersey. The claims asserted against Dmitriev herein, including claims under the Defend Trade Secrets Act, arise directly from this forum-directed conduct.

16.     This Court has personal jurisdiction over Affix because Affix is a New Jersey limited liability company with a registered address in Guttenberg, New Jersey, and is therefore subject to general jurisdiction in this forum.

<strong><u>GENERAL ALLEGATIONS</u></strong>

**A. RedSense's Business**

~~12~~17. RedSense delivers cyber threat intelligence that is proactive, targeted,

and made easy for its customers. RedSense empowers organizations to stay ahead of evolving cyber threats with a flexible, defense-grade solution tailored to meet unique needs without the complexity of traditional approaches. RedSense offers its customers a variety of subscription services that the customer can select based on its cyber security needs.

15

18. The cyber threat intelligence market is highly competitive. The competitive nature of the market is driven, in part, by the increase in cyber threats and the need for customers to employ proactive and complex security measures to protect the systems fundamental to their business operation. To do this, customers rely on their service providers, such as RedSense, to provide innovative, high-quality, accurate, and timely threat intelligence data. Failure to provide this high-quality, accurate, and timely data has significant consequences. For example, if RedSense provides a customer with threat intelligence data that incorrectly identifies a potential threat, a customer could spend resources to protect itself from a threat, only to realize they devoted resources to prevent against the wrong threat. Likewise, if RedSense's threat intelligence is untimely, a customer could have

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 9 of 77 PageID: 9

already been attacked and would have to spend thousands of dollars to remediate something it could have prevented with timely threat intelligence.

14 19. For the same reason, customers in this market are highly attuned to the the reputation of their service providers. A hint or even a rumor regarding impropriety, ethical concerns, or a similar vulnerability is enough to ruin the service provider's reputation and cause a customer to seek their threat intelligence services from another, more reputable source that they can trust. If that trust is broken in this industry, it is nearly impossible to repair the relationship. To that end, RedSense is also obligated by way of its customer service agreements to uphold strict operational

security measures, perform under industry established and recognized standards, and that failure to do so is cause for breach and termination of said agreements— agreements that Bohuslavskiy has an intimate knowledge of.

15 20. RedSense has engaged significant efforts to be a threat intelligence service provider that its customers can rely on and trust. This includes, for example, entering into partner agreements with like-trusted industry leaders with strong reputations such as CISA (Cybersecurity and Infrastructure Security Agency, a division within the United States Department of Homeland Security) and other industry leaders, actively participating to support the FBI's cyber missions, and taking proactive measures to align itself with industry proven

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 10 of 77 PageID: 10
standards such as SOC 2.[1] As a result of this effort, RedSense has developed a

reputation of being reliable, trustworthy, and competent.

**B. Bohuslavskiy's Involvement with RedSense**

~~16~~21. In December 2022, David Montanaro, a partner of RedSense and its

current CEO, and Michael ~~Zieger~~Zeiger, a former partner of RedSense, connected with

Bohuslavskiy, who they both knew from a prior employment at AdvIntel, regarding

Bohuslavskiy potentially joining RedSense as a partner. At the time, Montanaro and

~~Montanaro and Zieger believed that, given Bohuslavskiy's experience in the threat~~

---

[1] SOC 2 is a cybersecurity compliance framework developed by the American Institute of Certified Public Accountants and is considered to be the industry gold standard for demonstrating commitment to protecting consumer data.

19

Zeiger believed that, given Bohuslavskiy's experience in the threat intelligence space

and his ability to provide threat intelligence data, he would add value to the RedSense

team.

~~17~~22

.                   On December 22, 2022, the then-existing RedSense Partners[2] voted
unanimously to onboard Bohuslavskiy as a partner of RedSense. As a result of this decision
to onboard Bohuslavskiy, the existing Partners and Bohuslavskiy executed the RedSense
Restructuring & New Owner Onboarding Agreement

---

[1] ~~SOC 2 is a cybersecurity compliance framework developed by the American Institute
of Certified Public Accountants and is considered to be the industry gold standard for
demonstrating commitment to protecting consumer data.~~

[2] ~~At the time, the existing partners of RedSense were David Montanaro, Kevin Stear,
Michael Zieger, and Bryan VanSickle.~~

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 11 of 77 PageID: 11
("Onboarding Agreement")[3]. A true and accurate copy of the Onboarding Agreement

as executed by Bohuslavskiy on January 25, 2023 is attached to this Complaint as **Exhibit

A**.

1823. Pursuant to the Onboarding Agreement, each partner of RedSense agreed to provide $100,000 in seed funding or, in the alternative, an "in-kind"

contribution for the formation of RedSense. Ex. A, § 1.1. Bohuslavskiy specifically

agreed to provide "'in kind funding' in the form of Threat Intelligence and Intellectual

Property for Company benefit and use by the Company in lieu of the $100,000 seed

funding contribution as part of this agreement with RedSense, LLC." *Id.* RedSense

understood, based on representations made by Bohuslavskiy, that the "in kind" funding

that Bohuslavskiy was obligated to provide included but was not

---

[2] At the time, the existing partners of RedSense were David Montanaro, Kevin Stear, Michael Zeiger, and Bryan VanSickle.

[3] "Partner," "Founder," and "Equal Owner" are used interchangeably within the Onboarding Agreement and have the same meaning.

21

limited to AdvIntel[4] threat intelligence reports and historical adversary infrastructure intelligence along with the associated data sets, reports, and access data (collectively, "Obligated In-Kind Funding"). Providing the Obligated In-Kind Funding was a condition precedent for Bohuslavskiy joining RedSense as an equal partner of the LLC. The existing Members of RedSense did not agree to accept alternative or substituted services from Bohuslavskiy from what he was obligated to provide under the Onboarding Agreement.

---

[3] "Partner," "Founder," and "Equal Owner" are used interchangeably within the Onboarding Agreement and have the same meaning.

[4] Bohuslavskiy, Zeiger, and Montanaro all worked at AdvIntel, and Bohuslavskiy was one of AdvIntel's co-founders. Prior to the founding of RedSense, AdvIntel ceased operations. As co-founder of AdvIntel, Bohuslavskiy represented to RedSense that he had ownership rights in certain intellectual property formerly belonging to AdvIntel.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 12 of 77 PageID: 12

19~~24~~. ~~As part of the Onboarding Agreement,~~ Bohuslavskiy represented and warranted that he was not party to any other agreement that would restrict his ability to perform his obligations under the Onboarding Agreement (including his obligation to provide the Obligated In-Kind Funding). Ex. A, § 6.1. He also represented and warranted that "no third party can claim any rights to any intellectual property or other proprietary right possessed by that Founder as it relates to [RedSense]." *Id.* Given that RedSense anticipated incorporating the threat intelligence and intellectual property that Bohuslavskiy provided into the data it provides to its customers (indeed, the promise to provide such threat intelligence and intellectual property was a material term of the ~~Onboarding~~

---

[4] Bohuslavskiy, Zeiger, and Montanaro all worked at AdvIntel, and prior to the founding of RedSense, AdvIntel ceased operations. Bohuslavskiy held himself out as a co-founder of AdvIntel, and based on his claimed role, represented to RedSense that he had ownership rights in certain intellectual property formerly belonging to AdvIntel.

Onboarding Agreement and is the sole reason that Bohuslavskiy was asked to join RedSense), it was critical that no third party could assert any rights to the Obligated In-Kind Funding Bohuslavskiy provided.[5] Accordingly, the Onboarding Agreement required Bohuslavskiy to expressly agree and acknowledge that the representation and warranty applied to him and compliance with the terms of the representation and warranty was an additional consideration for Bohuslavskiy joining RedSense as an equal partner. *Id*. In connection with these representations, Bohuslavskiy held himself out to the other RedSense partners as a co-founder of AdvIntel and represented that, as such, he had the right to convey the AdvIntel Threat Intelligence and Intellectual Property to RedSense. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy's representations regarding his role at AdvIntel were false and misleading: Bohuslavskiy has at various times claimed to have been a co-founder of AdvIntel, claimed to have been merely a contractor at AdvIntel, and falsely represented that AdvIntel had split into two separate entities—AdvIntel and Affix—none of which is true. These contradictory and self-serving representations were designed to justify his claim that he possessed the rights to the AdvIntel

---

and warranty applied to him and compliance with the terms of the representation

[5] If the threat intelligence or intellectual property Bohuslavskiy provided belonged to a third party, RedSense's use or incorporation of that threat intelligence data in deliverables to RedSense customers could constitute infringement. This would be ruinous to RedSense who would be precluded from further use of what Bohuslavskiy

24

25

provided as his Obligated In-Kind Funding and would mean that what Bohuslavskiy
provided had no value.

intellectual property and could convey it to RedSense as part of the Obligated In-Kind Funding.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 13 of 77 PageID: 13

and warranty was an additional consideration for Bohuslavskiy joining RedSense as an equal partner. *Id.*

2025. Bohuslavskiy executed the Onboarding Agreement on behalf of himself and Affix Advisory, LLC (a New Jersey LLC of which Bohuslavskiy is the sole member).

2126. Pursuant to the Onboarding Agreement, the partners of RedSense expected that Bohuslavskiy would provide the required Obligated In-Kind Funding. And, at first, it appeared that Bohuslavskiy did provide this Obligated In-Kind Funding in the form of AdvIntel threat intelligence reports Threat Intelligence and Intellectual Property and historical adversary infrastructure intelligence along with the associated data sets, reports and access data because he and his team claimed to have incorporated these reports, intelligence, and data into the deliverables that RedSense offered its customers. Throughout 2023, the intelligence reports RedSense delivered to its customers was consistent with and appeared to incorporate what the other partners understood constituted the Obligated In-Kind Funding. Notably, even during this time Bohuslavskiy maintained sole access to the Obligated In-Kind Funding. RedSense relied on the representations made by Bohuslavskiy, and did not have an independent way of verifying that Bohuslavskiy had fulfilled his obligations under the Onboarding

26

Agreement. In reliance on the representation and warranty provided by Bohuslavskiy,

the other partners of RedSense treated Bohuslavskiy as a partner of the LLC.

of the LLC. This reliance was further reinforced when RedSense's accountant, Mighty Financial, transmitted to Bohuslavskiy the RedSense Partner Contributions Tax File for completion of the required details of his seed funding obligations as outlined in the Onboarding Agreement. Bohuslavskiy returned the completed Tax File to Mighty Financial, in which he represented and described his in-kind funding contribution as consisting of: (a) an initial $100,000 Asset Investment in Intellectual Property & Threat Intel, described as "The collection of 5-year research and product development from the AdvIntel timeframe. Collection of data, reports, and frameworks, developed by Yelisey through the AdvIntel timeframe"; (b) AdvIntel historic assets valued at $200,000, described as approximately 2,500 AdvIntel reports written, developed, and designed by Bohuslavskiy's team during AdvIntel, AdvIntel historic data from over 50 top-tier adversarial sources, and accesses into adversarial communities obtained and preserved during AdvIntel; (c) Assistance in building post-AdvIntel Pipeline valued at $50,000, described as the direct transfer

of in-depth customer relationships with                                        ; and (d) Labor and research valued at $250,000, described as total involvement including provision of accesses, intelligence, threat research, and other critical intellectual property conveyed by Bohuslavskiy to RedSense. Bohuslavskiy's total self-reported in-kind contribution, as reflected in the Tax File, was $600,000—all of which consisted entirely of AdvIntel intellectual property, reports, data, adversarial accesses, and

related assets. As confirmed by Mighty Financial, the in-kind funding as described in the Onboarding Agreement and as reflected in the completed Tax File returned by

Bohuslavskiy has been unable to be accounted for, with no other in-kind funding having been agreed to by the legal members, nor any superseding agreement having been entered into that would override, change, or modify the nature of the Obligated In-Kind Funding that Bohuslavskiy agreed to provide. In other words, the specific in-kind contribution Bohuslavskiy defined and valued in his own submission to Mighty Financial was never delivered to, received by, or capable of being accounted for in RedSense's books and records.

22 27. Additionally, because current RedSense partners had worked with Bohuslavskiy previously, at the outset, they did not have reason to distrust

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 14 of 77 PageID: 14

Bohuslavskiy's promises when he stated that he would provide the Obligated In-Kind Funding and that he was in possession of it. It was only in mid-2024—when RedSense observed a significant drop-off in reporting, and when RedSense was undertaking preparations for potential fundraising, migration to a C corporation structure, a valuation of the company and its intellectual property assets, and due diligence preparation—that RedSense had reason to investigate Bohuslavskiy's promise. Subsequently, every attempt by RedSense partners to access the Obligated In-Kind Funding was rebuked.

**C. Bohuslavskiy's Responsibilities as RedSense Chief Research Officer**

~~23~~28. As RedSense's Chief Research Officer, Bohuslavskiy was responsible for overseeing the day-to-day management of the threat research business function, budget, and resourcing. He led the RedSense Threat Intelligence Team. The Threat Intelligence Team is tasked with RedSense reporting, providing customer briefings, responding to requests for information from customers and potential customers, and participating in sales meetings. Additionally, Bohuslavskiy was responsible for managing and staffing the RedSense Engineering Team under his department.

~~24~~29. To staff the engineering team, Bohuslavskiy onboarded three freelance engineers who were freelancers with EasyStaff. EasyStaff is a third-party service that allows companies to hire freelancers. ~~In~~On March 14, 2023, RedSense and EasyStaff executed a services agreement, whereby RedSense would pay EasyStaff for the work performed by the freelancers.

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 15 of 77 PageID: 15

~~25~~30. Subsequently, Bohuslavskiy sought to hire his brother, Dmitriev, to serve as a strategic consultant to RedSense. Bohuslavskiy recommended to the other partners that RedSense should hire Dmitriev. It was anticipated that Dmitriev would be involved in strategic management, product development, team management, and other key product consulting roles, and would do these roles under the guidance and direction of Bohuslavskiy. Dmitriev joined RedSense as a strategic consultant on August 1, 2023. Dmitriev also served as the administrator of the Pyrus platform

31

used by Bohuslavskiy's team. Dmitriev provided services to RedSense through his sole proprietorship, Irasel, and his compensation was paid by RedSense to Affix at an annual rate of $90,000, paid as a 1099 contractor, which Affix purportedly disbursed to Dmitriev and/or Irasel. Pursuant to his engagement letter dated August 1, 2023, a true and accurate copy of which is attached to this Complaint as **Exhibit K**, Dmitriev's role encompassed strategic alignment, product development, team management, and operational process improvements, and he was also responsible for administration of the Pyrus platform. Dmitriev's engagement letter, dated August 1, 2023 and signed by Dmitriev in his personal capacity, specified an annual compensation of $90,000.00 USD per year, payable through Affix Advisory, LLC as a payment conduit only—Affix was not a party to the agreement. The letter specified no other benefits and imposed no obligation on RedSense to bear currency exchange costs or to pay any bonus not expressly agreed to in writing. The deliverables Dmitriev was expected to provide included strategic alignment, product development roadmaps, project plans, estimates for hours and budgets, and operational process improvements.

31.     At all times relevant hereto, Dmitriev served as the sole administrator of the Pyrus platform, which RedSense paid for and which was used by Bohuslavskiy's team to manage, track, and store the deliverables owed to RedSense. Dmitriev exercised exclusive administrative control over the Pyrus platform: he

32

alone controlled which accounts existed within the platform, what access rights were assigned to those accounts, and what data was stored, shared, or restricted therein. RedSense had no independent ability to access, monitor, audit, or verify the contents of the Pyrus platform without Dmitriev's cooperation and authorization. Dmitriev's administrative role gave him the discretionary authority to grant, restrict, or revoke RedSense's access to its own work product and data stored in the platform at any time, without notice to RedSense. As alleged herein, following his resignation on February 24, 2025, Dmitriev exploited this administrative control to lock RedSense out of the Pyrus platform, depriving RedSense of access to its own data and work product. Based on RedSense's investigation and communications with Pyrus support, RedSense subsequently learned that it was locked out of the Pyrus platform entirely and that no administrative recovery could be performed using any @redsense.com email account, as no such account had ever been registered as an administrator within the platform. Pyrus declined to provide a complete account member or administrator list, citing its terms of use and privacy policy. The absence of any @redsense.com administrator account is further evidenced by the fact that neither Bohuslavskiy's nor Dmitriev's RedSense email accounts were registered as administrators—despite the fact that, to the extent either Bohuslavskiy or Dmitriev were performing legitimate work for RedSense, it would make sense for them to use their RedSense email accounts to ensure that RedSense would be able to ensure

continuity of access. RedSense is informed and believes, and on that basis alleges, that the lockout of RedSense from the Pyrus platform was undertaken at the direction, request, or encouragement of Bohuslavskiy.

**D. Bohuslavskiy's Access to RedSense Confidential and Trade Secret Information**

26̶32. As part of Bohuslavskiy's role with RedSense, RedSense entrusted Bohuslavskiy with its existing and potential customer relationships and its confidential and trade secret information to use to ~~fulfil~~fulfill his responsibilities to RedSense, maintain existing relationships, and bring in new business. Because the other partners of RedSense believed that Bohuslavskiy had provided the Obligated In-Kind Funding to join as a RedSense partner (which later turned out to be a false belief), RedSense treated Bohuslavskiy as a partner, which meant that he had access ~~access~~ information that RedSense considers to be trade secret, including customer information and information about RedSense's offerings that were in development or had not been advertised to the public yet that RedSense leveraged to maintain a competitive advantage in the threat intelligence market. Specifically, RedSense

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 16 of 77 PageID: 16

treats the following information as trade secret information ("RedSense Trade

Secrets"):

a.

b.  c.

d.

e.

f.

REDACTED
REDACTED

REDACTED



Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 17 of 77 PageID: 17

**REDACTED**

27

. The RedSense Trade Secrets derive independent economic value from

not being generally known to, or readily ascertainable, by the public or to persons who

can obtain value from their use. If these secrets were known to customers, they would

not have to retain the services of RedSense. If known to competitors, they

could replicate the threat intelligence and other services that RedSense provides to its customers without incurring the substantial development costs that RedSense incurred to develop its trade secret information, thereby defeating RedSense's market advantage.

28 34.        Because these trade secrets are critical to its business, RedSense maintains the secrecy and confidentiality of this information and takes robust steps that align with standard industry practices to ensure that this information remains protected. For example, RedSense does not share this information absent a confidentiality agreement. This is true for both the customers that RedSense receive threat intelligence briefings and the employees or contractors that have access to the RedSense Trade Secrets to the extent necessary to perform their

responsibilities. When RedSense shares these intelligence briefings with customers, it does so via secure electronic communication, encrypted means, and with confidentiality markings. Internally, RedSense maintains secure storage and

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 18 of 77 PageID: 18

controls access of the secure storage only to those whose access is necessary for carrying out their responsibilities. Individuals and teams are given unique credentials and are prohibited from sharing them with others. When individuals leave RedSense, their access to the secure RedSense systems are immediately terminated to prevent unpermitted access to the RedSense Trade Secrets.

**E. Bohuslavskiy Fails to Deliver Work Product That RedSense Paid For**

35. Not only was the source code related to the AI-Driven Intel Search ("AIDIS")[6] Solution never uploaded to the GitHub repository, but Bohuslavskiy never delivered a single project roadmap nor produced a single deliverable related to the project. Other RedSense employees that were not part of Bohuslavskiy's team had to create and provide the project roadmap that Bohuslavskiy failed to deliver. The same thing happened with the Forum Scraping code project: Bohuslavskiy and his team were responsible for delivering this code, and no code was ever delivered (or possibly, even developed). RedSense is informed and believes, and on that basis alleges, that some or all of the EasyStaff freelancers may not have existed as actual individuals performing work for RedSense, and instead may have been phantom accounts used to receive funds on behalf of Bohuslavskiy. This inference is supported by Bohuslavskiy's refusal to provide the identities of the freelancers for verification, his refusal to comply with any company standard agreements, including the CIIAA, on their behalf, and the fact that EasyStaff confirmed there were no results in any of the accepted tasks going back to 2023. Indeed, when RedSense investigated the identity of the EasyStaff contractors, the results suggest that each of the EasyStaff contractors may be fictitious personas.

---

[6] AIDIS was the internal marketing name developed by RedSense's former Head of Product, Andy Klein, for the product known internally as Project Pylon.

42

29. On or around mid-2024 RedSense, it became apparent that although Bohuslavskiy was responsible for various teams and deliverables, there was a consistent failure to deliver work product as promised. All RedSense engineers who are responsible for writing code are obligated to check the source code into RedSense's GitHub repository. The purpose of this is to ensure that the code, which belongs to RedSense (and not to any one engineer), is accessible to the company and can be leveraged by RedSense as needed. This also ensures business continuity in the event an engineer or other staff leaves RedSense. This practice of checking the source code back into the GitHub repository is standard industry practice for companies that use GitHub to support their source code development. While the engineering staff that was *not* managed by Bohuslavskiy complied with this directive, the engineering team that was managed by Bohuslavskiy failed to upload completed source code to RedSense's GitHub repository. RedSense is informed and believes, and on that basis alleges, that the failure of Bohuslavskiy

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 19 of 77 PageID: 19

and his team to upload the source code to GitHub is either because Bohuslavskiy's engineering team did not write the lines of code (and thus, there was nothing to upload) or that they did complete the coding tasks, but intentionally chose to ignore standard practice so that Bohuslavskiy and his team – that he solely managed – were the only ones that had access to this code. By doing this, RedSense is informed and

43

believes, and on that basis alleges, Bohuslavskiy was in a position to abscond with the code that belonged to RedSense was in a position of leverage  if only Bohuslavskiy and his team could access the code, then Bohuslavskiy knew that he could extract what he wanted from RedSense.

3036.    An example of this failure to upload code that belonged to RedSense to the GitHub repository was with the AI-Driven Intel Search ("AIDIS")  Solution, an automation tool that Bohuslavskiy and his team were responsible for developing under the internal code name "Project Pylon."[7] AIDIS would allow RedSense to deliver more targeted threat intelligence to its customers based on a more rapid AI-driven search and report generation capability. RedSense socialized the use of this tool with customers and referenced the tool in customer reports as something RedSense utilized to support its customer relationships. Based on feedback from customers, RedSense is informed and believes, and on that basis alleges, that this automation tool was a valuable tool for customers to use and something that differentiated RedSense from other threat intelligence companies. In particular, RedSense isreceived direct

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 20 of 77 PageID: 20

feedback from                                    that AIDIS was a valuable offering, especially in light of the rapidly increasing demand for AI-driven cybersecurity products and solutions across the industry. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy also knew that this tool was a value-add for RedSense., as evidenced by his own prior conduct in previewing the tool to RedSense's largest customers and by the direct customer feedback RedSense

[7] "AIDIS" and "Project Pylon" refer to the same RedSense-provided tool. RedSense uses these terms interchangeably throughout the First Amended Complaint.

received confirming the tool's value. Indeed, Bohuslavskiy's own Signal messages confirm his awareness of the tool's value and commercial potential: on January 19, 2025, Bohuslavskiy described the Pylon project as "something we've been working on independently since January 2022, meaning it predates RedSense," and described it as a tool to "automate people like Vitali and me and scale that expertise"—an admission that he viewed the tool as belonging to him personally rather than to RedSense, despite the obligations of him and his team to deliver this tool to RedSense. *See* Ex. H.

3137. Not only was the source code related to AIDIS never uploaded to the GitHub repository, but Bohuslavskiy never delivered a single project roadmap nor produced a single deliverable related to the project. Other RedSense employees that were not part of Bohuslavskiy's team had to create and provide the project roadmap that Bohuslavskiy failed to deliver. The same thing happened with the Forum Scraping code project: Bohuslavskiy and his team were responsible for delivering this code, and no code was ever delivered (or possibly, even developed).

3238. In January 2025, RedSense conducted an asset inventory of the assets that Bohuslavskiy and the team he managed were responsible for delivering. This inventory was conducted because of ongoing concerns that Bohuslavskiy was failing to deliver the promised deliverables, even though RedSense was making payments for these deliverables. The objective of the inventory was to reconcile the invoices

46

that RedSense had received with the payments that had been made and the deliverables that had not been received.

3339. The results of this asset inventory were shocking. Bohuslavskiy was specifically asked to provide the following assets and to identify where the assets were stored within the RedSense environment: all deliverables that the EasyStaff freelancers worked on, the threat intelligence and intellectual property that was

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 21 of 77 PageID: 21

part of the Obligated In-Kind Funding that Bohuslavskiy was obligated to provide as a condition precedent for becoming a partner of RedSense, threat intelligence reports Bohuslavskiy was responsible for developing or sourcing, the AdvIntel reports, deliverables from Dmitriev that Bohuslavskiy oversaw, including product roadmap, project plan, estimates for hours and budgets, the Pyrus application (access, data, invoices), and an overall accounting for these assets. Bohuslavskiy declined to provide any of these assets. He also failed to provide information as to where any of these assets had been saved. This led the other partners of RedSense to conclude that either Bohuslavskiy was holding the assets hostage for leverage over the other partners, Bohuslavskiy had no intention of ever providing these assets, or no work had been done on any of these assets. In any event, this prompted RedSense to conduct a full-scale internal audit of all the money it had paid Bohuslavskiy and every member of his team.

**F. RedSense Discovers Evidence of Improper Invoicing by Bohuslavskiy; Dmitriev, Affix, and Irasel's Participation in the Fraudulent Scheme**

40.　　　　As alleged herein, on the evening of February 23, 2025, the RedSense systems used by Bohuslavskiy and his team were accessed using credentials assigned to Dmitriev, any existing source code was copied out, and the file system was destroyed. RedSense is informed and believes, and on that basis alleges, that Dmitriev personally accessed the RedSense systems using his assigned credentials and carried out, or permitted the carrying out of, the copying of source code and the destruction of the file system, at the direction, request, or encouragement of Bohuslavskiy. Critically, the sequence of commands executed during the February 23, 2025 session—including the navigation of specific directory paths, the identification and targeting of the Elasticsearch and PostgreSQL containers by their precise container IDs, the creation of a backup directory, and the subsequent deletion of the copied archives—reflects intimate familiarity with the RedSense system architecture that could only have been possessed by someone with prior authorized access to and working knowledge of those systems. This was not the conduct of a random external actor who stumbled upon the system; it was the deliberate and methodical conduct of someone who knew exactly where RedSense's most valuable data was stored and how to access, copy, and destroy it. The forensic investigation of the February 23, 2025 unauthorized access, the CLI history logs from which are attached to this Complaint as **Exhibit N**, revealed the following: (1) At

49

approximately 20:50:52 on February 23, 2025, an SSH connection was accepted from IP address 212.111.81.176—a virtual private server hosted by VDSINA in Amsterdam—using credentials associated with Dmitriev's account. (2) Following authentication, the user executed a series of commands beginning at 20:51:13, including navigating to the /mnt directory, creating a backup directory (/mnt/es_backup), changing ownership of that directory to the Elasticsearch user and group, and listing and inspecting running Docker containers. (3) Between approximately 20:53:54 and 21:50:18, the user repeatedly executed shell commands inside the Elasticsearch Docker container (container ID cb9366453ec9), including opening interactive Bash sessions as root, restarting the container, and re-entering the container multiple times. (4) At approximately 22:03:52, the user executed the command "docker mv cb9366453ec9:/mnt/es.zip ." and at 22:03:58 executed "docker cp cb9366453ec9:/mnt/es.zip .", copying a compressed archive of data from the running Docker container to the host system—consistent with the exfiltration of RedSense proprietary data directories and data contents, which stored all RedSense research reporting, all AdvIntel data, and all indicators of compromise from RedSense's threat research. (5) At approximately 22:32:18, the user executed "rm - rf es.zip," deleting the copied archive from the host system. (6) Between approximately 22:35:24 and 22:41:13, the user accessed the PostgreSQL database

container        (pgvector_db_container),        executed        "docker        cp

50

pgvector_db_container:/mnt/all_databases_backup.sql .” to copy a full database backup from the container to the host, and at 22:41:39 executed “zip all_databases_backup.zip all_databases_backup.sql” to compress the backup. (7) The IP address 212.111.81.176 had been used to access the RedSense systems on numerous prior occasions between February 5 and February 20, 2025, consistent with Dmitriev’s regular use of that IP address in connection with his role as Strategic Consultant and performing work for RedSense. (8) The CLI history log further reflects that on February 23, 2025, the user executed the command “who” at 22:08:56 and again at 22:35:02, checking which users were logged into the system— conduct consistent with an effort to determine whether the unauthorized access was being monitored. (9) The forensic investigation also revealed that the CLI history log contains a gap attributable to the use of TMUX, a terminal multiplexer that does not log commands by default, meaning that a portion of the commands executed on the evening of February 23, 2025 are not captured in the CLI history and the full scope of the data accessed, copied, or destroyed may be greater than what is reflected in the available logs. (10) Following the copying and exfiltration of the data archives, the user destroyed the RedSense proprietary data directories and data contents, and then attempted to destroy the remaining file system and any forensic evidence; this last attempt to destroy the forensic CLI history was unsuccessful. The scope of Dmitriev’s authorized access as Strategic Consultant was limited to the performance

51

of his contracted deliverables—strategic alignment, product development, and team management—and did not include the authority to copy out database backups, to access the systems for the purpose of exfiltrating their contents, or to destroy any portion of the RedSense file system. Dmitriev's affirmative acts of copying, compressing, and deleting data archives and destroying the file system constitute purposeful and knowing unauthorized access to, and alteration, damage, taking, and destruction of, RedSense's data, database, computer program, computer software, and computer equipment within the meaning of N.J.S.A. § 2A:38A-3(a) and (e). It is important to note that the CLI history logs attached as **Exhibit N** do not constitute a formal digital forensic incident response (DFIR) analysis; RedSense reserves the right to submit a comprehensive DFIR analysis at the appropriate stage of this litigation.

41.         Dmitriev served as the administrator of the Pyrus platform, which RedSense paid for and which was used by Bohuslavskiy's team to track and manage deliverables. Following his resignation on February 24, 2025, Dmitriev took steps to lock RedSense out of the Pyrus application. Specifically, on or about February 25, 2025, RedSense's account within the Pyrus platform was restricted, and RedSense was unable to access its own data and work product stored therein. When RedSense contacted Pyrus support to regain access, Pyrus confirmed that RedSense's email account was not listed as an administrator and that only the existing account

52

administrator—Dmitriev—had the authority to restore access. True and accurate copies of the Pyrus support communications referenced herein are attached to this Complaint as **Exhibit O**. Pyrus's support team informed RedSense that "settling any access issues with your existing account administrator is the best legal way to achieve your goal," and further confirmed that "[y]our organization administrator can terminate your account anytime and in this case you will not be able access to your data." Despite RedSense's repeated requests to Pyrus to restore access and to confirm whether the invoices submitted by Affix on behalf of Bohuslavskiy had in fact been paid to Simply Good Software, Inc. (the entity that issues Pyrus invoices), Pyrus declined to provide that confirmation, citing its terms of use and privacy policy. RedSense is informed and believes, and on that basis alleges, that Dmitriev's actions in locking RedSense out of Pyrus were taken at the direction, request, or encouragement of Bohuslavskiy, and were designed to deprive RedSense of access to its own work product and data. This inference is further supported by Signal messages exchanged between Bohuslavskiy and Dmitriev on or about May 13–14, 2025—months after their resignations—in which Dmitriev stated in Russian: "Бэкап у нас есть. Я начинаю удалять Pyrus," which translates to: "We have a backup. I am starting to delete Pyrus." These messages, which are reflected in the notes produced in this litigation, demonstrate that: (a) Dmitriev and Bohuslavskiy maintained unauthorized access to the Pyrus platform well after their resignations

53

on February 24, 2025, (b) Dmitriev, at the direction or with the knowledge of Bohuslavskiy, made a backup of RedSense's proprietary and confidential data stored in the Pyrus platform before deleting it, and (c) Dmitriev thereafter intentionally destroyed RedSense's proprietary and confidential data stored in the Pyrus platform, depriving RedSense of any ability to recover that data. This post-resignation conduct—accessing, backing up, and then destroying RedSense's data in the Pyrus platform—is the identical pattern of behavior that Dmitriev employed on the evening of February 23, 2025 with respect to the RedSense server infrastructure: copying data out and then destroying the source. RedSense is informed and believes, and on that basis alleges, that the backup made by Dmitriev prior to deleting the Pyrus data was retained by Bohuslavskiy and/or Dmitriev for their own use, and that the destruction of the Pyrus data was intended to prevent RedSense from ever recovering or auditing the work product that Bohuslavskiy's team had purportedly performed and for which RedSense had paid.

42.    Affix served as the invoicing intermediary through which Bohuslavskiy submitted invoices to RedSense for his own compensation and for pass-through payments to Dmitriev, Irasel, EasyStaff, and Pyrus. By routing all payments through Affix—an entity solely owned and controlled by Bohuslavskiy—Bohuslavskiy was able to insert himself as an intermediary between the vendors and RedSense, inflate or fabricate contractor invoices, and conceal whether the money was ultimately

54

disbursed to the third-party vendor or diverted for his own personal gain. Once funds were deposited into the Affix account, they entered a financial black box to which RedSense had no access, no visibility, and no ability to audit or trace the ultimate disposition of those funds. RedSense is informed and believes, and on that basis alleges, that Affix received payments from RedSense for services that were never performed and retained those funds, or disbursed them in a manner that benefited Bohuslavskiy personally rather than the purported vendors. Critically, at the time of his resignation on February 24, 2025, Bohuslavskiy demanded additional payments to Dmitriev d/b/a Irasel and the EasyStaff freelancers as a condition of his cooperation—notwithstanding that each had already been paid, and in many instances overpaid, for work that was never delivered to RedSense. RedSense is informed and believes, and on that basis alleges, that these demands were made not because any legitimate payment was outstanding, but as a further mechanism to extract funds from RedSense under the threat of withholding cooperation and access to RedSense's own assets and systems. In total, RedSense paid Affix approximately $578,359.60 across all categories, including: (a) approximately $476,277.62 in partner distributions and contractor-intel payments to Bohuslavskiy personally through Affix; (b) approximately $65,237.25 in sales bonus payments routed through Affix; (c) approximately $23,027.76 in payments to Affix purportedly for pass-through to Dmitriev d/b/a Irasel; (d) approximately $2,466 in Pyrus software

55

license payments routed through Affix; (e) approximately $1,500 in team building expenses; and (f) approximately $1,975.97 in meals and travel reimbursements. Separately, RedSense paid Dmitriev d/b/a Irasel directly or through Affix a total of approximately $105,650 for services purportedly rendered under Dmitriev's engagement letter, and paid EasyStaff UAB a total of approximately $412,657 for the freelancers' purported services. Across all of these vendor relationships, a consistent pattern of misconduct emerged: (i) there were no deliverables as prescribed in the applicable agreements—neither Dmitriev d/b/a Irasel, the EasyStaff freelancers, nor Pyrus produced any quantifiable work product that RedSense has been able to locate or verify; (ii) RedSense overpaid each vendor relative to the agreed-upon compensation, including unauthorized currency conversion markups, unapproved bonuses, and duplicate invoices; (iii) at the time of his resignation, Bohuslavskiy demanded additional payments to Dmitriev d/b/a Irasel and the EasyStaff freelancers as a condition of cooperation, notwithstanding that each had already been paid—and overpaid—for work that was never delivered; (iv) Bohuslavskiy refused to facilitate the execution of the CIIAA by Dmitriev, the EasyStaff freelancers, or any other member of his team, thereby preventing RedSense from confirming the assignment of any intellectual property or work product that may have been created; (v) Bohuslavskiy refused to provide an inventory of works or any accounting of the deliverables that Dmitriev d/b/a Irasel,

56

the EasyStaff freelancers, or Pyrus had purportedly produced for RedSense; (vi) Bohuslavskiy refused to provide proof of funds or evidence that payments received by Affix from RedSense on behalf of Dmitriev d/b/a Irasel were actually disbursed to Irasel, rather than retained by Bohuslavskiy and/or Affix for their own benefit; and (vii) Bohuslavskiy was the only vendor or vendor manager who refused to provide any original vendor invoices—that is, the underlying invoices from the actual vendors to Affix—to substantiate the amounts Affix invoiced to RedSense for reimbursement. This pattern was consistent across Irasel, EasyStaff, and Pyrus, and RedSense is informed and believes, and on that basis alleges, that it reflects a coordinated scheme by Bohuslavskiy to use Affix, with the help of Dmitriev and Irasel, as a vehicle to extract funds from RedSense under the guise of legitimate vendor payments.

43. Irasel, as Dmitriev's sole proprietorship, submitted invoices to RedSense—routed through Affix—for services purportedly rendered to RedSense. RedSense is informed and believes, and on that basis alleges, that Dmitriev d/b/a Irasel did not perform the services for which RedSense was invoiced, or that the deliverables for such services were withheld from RedSense. RedSense has not received any quantifiable deliverable from Dmitriev d/b/a Irasel that would justify the payments made. In total, RedSense paid Affix approximately $119,622.68 on account of Dmitriev d/b/a Irasel invoices. True and accurate copies of the Irasel

57

invoices referenced herein are attached to this Complaint as **Exhibit P**. The invoices include, among others: (i) $7,682.78 invoiced on September 13, 2023 for "Irasel services to Red Sense via Affix" for August 2023; (ii) $7,680.39 invoiced on February 5, 2024 for "Irasel services to Red Sense via Affix November"; (iii) $7,723.67 invoiced on December 25, 2023 for "Irasel services to Red Sense via Affix November"; (iv) $15,327.03 invoiced on April 1, 2024 for Irasel payments for January and February 2024; (v) $7,706.36 invoiced on April 18, 2024 for "Irasel Payment March"; (vi) $7,693.54 invoiced on May 15, 2024 for "Irasel Payment March"; (vii) $7,737.30 invoiced on August 2, 2024 for "Irasel Payment May"; (viii) $9,612.30 invoiced on August 2, 2024 for "Irasel Payment June" and "Irasel 2023 Bonus"; (ix) $7,691.71 invoiced on October 16, 2024 for "Irasel Payment July"; (x) $7,691.71 invoiced on October 16, 2024 for "Irasel Payment August"; (xi) $9,941.71 invoiced on October 16, 2024 for "Irasel Payment September" and a "Team Building Event" of $2,250; and (xii) $23,134.18 invoiced on January 6, 2025 for Irasel payments for October, November, and December 2024. Each of these invoices was submitted to RedSense on Affix letterhead by Bohuslavskiy, and each was approved by Bohuslavskiy for payment. With respect to the $2,250 "Team Building Event" charge included in the October 16, 2024 invoice, RedSense relented to this request because a separate team building event had been approved and actually took place for another RedSense team led by Kevin Stear, and Bohuslavskiy

complained that his team should receive the same benefit. RedSense is informed and believes, and on that basis alleges, that the funds invoiced for the purported team building event were never used for any such event (RedSense has no record of such event ever occurring) and were instead simply pocketed by Bohuslavskiy. The underlying Irasel invoices from Irasel to Affix were denominated in Euros, and the Affix invoices to RedSense reflected a currency conversion markup—for example, the September 2023 Irasel invoice to Affix was for €6,978, which Affix invoiced to RedSense at $7,682.78 (reflecting an exchange rate of approximately 1 EUR = 1.101 USD), even though Dmitriev's engagement letter with RedSense specified an annual salary payable in U.S. Dollars with no obligation for RedSense to bear currency exchange costs. The deliverables that Dmitriev was obligated to provide under his engagement letter dated August 1, 2023—including strategic alignment, product development roadmaps, project plans, estimates for hours and budgets, and operational process improvements—were never delivered to RedSense.

34 44.       As part of this audit, RedSense checked for the existence of the expected deliverables and supporting invoices for the monthly payments made to Dmitriev, because his Strategic Consultant agreement with RedSense states specific deliverables under the Product Development section (which RedSense contends is the core deliverable) and a specific annual salary paid in US Dollars with no other benefits provided (no bonus provision, no requirement for RedSense to pay the

to pay the salary in a currency other than US Dollars, and no obligation for

salary in a currency other than US Dollars, and no obligation for RedSense to incur the cost of currency exchange fees). RedSense received invoices on Affix paper for the tasks and deliverables Dmitriev "completed," which Bohuslavskiy was responsible for approving. In every instance, the invoice was for more than the expected amount. The underlying Irasel invoices from Irasel to Affix were denominated in Euros, and Affix converted those amounts to U.S. Dollars at the prevailing exchange rate, adding a currency conversion markup that RedSense had never agreed to pay. For example, an Irasel invoice dated August 22, 2023 for €6,978 was invoiced by Affix to RedSense at $7,682.78, reflecting an exchange rate of approximately 1 EUR = 1.101 USD. Bohuslavskiy himself confirmed this invoicing structure in an August 2, 2024 communication with RedSense's accounting team, a true and accurate copy of which is attached to this Complaint as **Exhibit I**, stating: "There are invoices for Irasel company and Affix pays based on these invoices. And then RedSense reimburses Affix for this. I always attach Irasel original invoices, so you can see that the numbers match up between the payment and reimbursement." In the same communication, Bohuslavskiy disclosed that the Irasel invoice contained an "Irasel 5% 2023 bonus" and noted that "the bonus number is lower in the invoice for RedSense than the one in the Irasel-to-Affix invoice. This is because there has been an internal bonus from Affix to Irasel, which is not covered by RedSense"— confirming that Affix and Irasel maintained undisclosed side arrangements for

was for more than the expected amount. Nevertheless, Bohuslavskiy approved

61

additional compensation beyond what RedSense had agreed to pay. It is important to note that Bohuslavskiy was trusted by the other RedSense partners to manage these vendor relationships and approve these payments in good faith and for the benefit of RedSense. The discrepancies in the invoicing were not discovered until RedSense's accounting team conducted a year-end reconciliation, at which point the pattern of overpayments, unauthorized charges, and missing deliverables became apparent. Nevertheless, Bohuslavskiy approved payment after payment to Affix. Because Bohuslavskiy managed Dmitriev, RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy knew that his brother had not performed the promised work and therefore, was not entitled to payment (beyond the annual compensation that RedSense is informed and believes, and on that basis alleges, that had already provided to Dmitriev under his agreement with ~~RedSense[6]~~RedSense[8]). Not only did the audit reveal that Bohuslavskiy approved payments for work that was never completed (that Bohuslavskiy knew was never completed because he managed these projects), Bohuslavskiy also approved payments for invoices for more than what he was entitled to under Dmitriev's agreement with RedSense, including for example, payments that appeared to be unapproved bonuses, payments in non-US Dollar ~~currencies, and~~

---

~~payments covering currency exchange rate—none of which RedSense had agreed~~

[8] Because Dmitriev's payments were paid directly to Affix (Bohuslavskiy's LLC) it is possible that Bohuslavskiy never made a subsequent payment to Dmitriev and instead kept the money for himself. Therefore, only Bohuslavskiy would know if *he* (via Affix) properly paid Dmitriev.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 23 of 77 PageID: 23

currencies, and payments covering currency exchange rate—none of which RedSense had agreed to pay. It was bad enough that RedSense had made payments for work that was not competedcompleted; it was even worse that Dmitriev was paid more for this non-existent work—from RedSense's perspective, any payment it has made to Dmitriev/Affix on behalf of Dmitriev represent an overpayment because RedSense has not received the deliverables it paid for. Affix's invoicing of currency conversion costs to RedSense was not merely unauthorized—it was directly contradicted by the express terms of Dmitriev's engagement letter, which specified a fixed annual salary in U.S. Dollars with "no other benefits."

3545. For tax purposes, Bohuslavskiy had requested that RedSense make payments to him via his LLC, Affix. Accordingly, Affix would invoice RedSense for the amount that Bohuslavskiy was due, Bohuslavskiy would approve the payment, and then Affix (Bohuslavskiy) would get paid. Bohuslavskiy confirmed this arrangement in an August 2, 2024 communication with RedSense's accounting team, stating: "all my bonuses, expanses, and salary (referred to as distribution) go directly to Affix account and are invoiced under Affix. They are paid to the same bank as any other Affix payment—i.e. Irasel payments." This admission confirms that all payments—whether for Bohuslavskiy's own compensation, Irasel pass-throughs, or expense reimbursements—were routed to the same Affix bank account controlled solely by Bohuslavskiy. In the same communication, Bohuslavskiy

disclosed that there existed an "internal bonus from Affix to Irasel, which is not covered by RedSense," confirming that Affix and Irasel maintained undisclosed side arrangements for additional compensation beyond what RedSense had agreed to pay. An audit of these invoices revealed thousands of dollars in payments in excess of what Bohuslavskiy was owed, all of which Bohuslavskiy had approved—either directly or tacitly—for himself. RedSense is informed and believes, and on that basis alleges, Bohuslavskiy knew he was not entitled to this extra payment when he approved the Affix invoices and approved these invoices for the sole purpose of defrauding RedSense into making payments to Bohuslavskiy.

3646.    The same was true when RedSense investigated the payments made to the EasyStaff freelancers. Payment records demonstrate that RedSense paid overapproximately $400,000 USD412,657 to the freelancers—Chingiz Akhmetov, Dmitry Anchenov, and Kirill Zverev—for tasks such as threat research and intelligence that *to date, RedSense has never received*. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy approved each of these EasyStaff invoices

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 24 of 77 PageID: 24

even though he had knowledge that the deliverable had not been provided to

RedSense. ~~Because EasyStaff is a freelance agency, RedSense understands that once a payment is made to EasyStaff, it is distributed to the freelancers based on time entries and task assignments in the portal. When RedSense contacted EasyStaff,~~ RedSense is further informed and believes, and on that basis alleges, that the purported freelancers used phony email accounts and phone numbers that cannot be independently verified, and that Bohuslavskiy refused to provide RedSense with the freelancers' true identities for verification or to facilitate the execution of the CIIAA

65

agreements that RedSense was entitled to require under the terms of the EasyStaff freelancer agreements—a right that RedSense possessed and that Bohuslavskiy obstructed. Because EasyStaff is a freelance agency, RedSense understands that once a payment is made to EasyStaff, it is distributed to the freelancers based on time entries and task assignments in the portal. RedSense's audit further revealed that the freelancers drew their payments from EasyStaff directly through Russian bank accounts, cryptocurrency, and prepaid MC/VISA cards—payment methods that are difficult to trace, but are consistent with and facilitate a scheme to obscure the ultimate disposition of RedSense funds, and based off of RedSense's experience in the cybersecurity industry, also the preferred choice of payment method of cyber criminals and ransomware syndicates. RedSense's records further show that payments to EasyStaff UAB were wired to a Revolut Bank UAB account in Vilnius, Lithuania (SWIFT/BIC: REVOLT21XXX), with EasyStaff's registered address at V. Nageviciaus st. 3 LT-08237, Vilnius, Lithuania—routing RedSense funds through foreign financial institutions that are difficult for RedSense to audit or trace. RedSense is informed and believes that to the extent any freelancer received money from RedSense, such accounts were under the control of Bohuslavskiy, which would give Bohuslavskiy the unilateral ability to move, allocate, and funnel those funds as he saw fit, with no oversight, audit rights, or visibility on the part of RedSense. To date, RedSense has no ability to verify whether those funds were disbursed to

66

EasyStaff, retained by Bohuslavskiy, or diverted elsewhere. The commingling of funds between Affix and EasyStaff is further evidenced by Bohuslavskiy's own August 12, 2024 admission to RedSense's accounting team, also included in **Exhibit I** hereto, that he "made a mistake in the invoices" and that a $7,875 engineer bonus "had to go directly to EasyStuff, [sic] not Affix," confirming that RedSense funds intended for EasyStaff were instead deposited into Bohuslavskiy's Affix account. In the same communication, Bohuslavskiy stated that he "currently have 4 EayStuff [sic] wire info sets" and that "there are some that the bank will decline when we try to use them"—an admission that is consistent with a scheme involving multiple accounts and payment channels designed to obscure the flow of funds. Notably, Bohuslavskiy was the only vendor or vendor manager who refused to provide any of the required original vendor invoices, proof of payment, or any data supporting the legitimacy of the expenses he submitted to RedSense for reimbursement. When RedSense contacted EasyStaff following Bohuslavskiy's resignation, Marina Mikhaylova, Senior Account Manager at EasyStaff UAB, confirmed in writing on March 7, 2025, a true and accurate copy of which is attached to this Complaint as **Exhibit J**, that: (1) mzeiger@redsense.com (Michael Zeiger, former RedSense partner) was the only user with access to accept tasks, (2) ybohuslavskiy@redsense.com (Bohuslavskiy's RedSense email address) had never signed up, meaning that account had no history, and (3) there were no results

in any of the accepted tasks going back to 2023—specifically, EasyStaff confirmed that the CIIAA contracts had not been signed and that there were no relevant details available in the Results section of any of the tasks. EasyStaff further confirmed that a review of the accepted tasks revealed that the former account manager had accepted tasks in January 2025 with no results in them, and that after a full review, there were no results in any of the accepted tasks going back to 2023. RedSense discovered that there were no time entries or task assignments, indicating no work had been performed by these freelancers for RedSense.

37 47. This led RedSense to understand that the freelancers retained by Bohuslavskiy did not perform that work that RedSense paid thousands of dollars

for. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy may have even used the EasyStaff freelancers as a way to funnel money to himself in a covert way. Specifically, RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy and the freelancers (to the extent they even exist) colluded together such that the payment for their nonexistent work would be paid to the freelancers, who would then "return" the payment to Bohuslavskiy. This inference is supported by Bohuslavskiy's own August 12, 2024 admission that a $7,875 engineer bonus intended for EasyStaff was instead deposited into his Affix account—demonstrating that funds designated for the freelancers were in fact flowing to Bohuslavskiy's personal entity—and by his offer to "send the wire from

68

my Affix account to Easystuff" to correct the "mistake," further confirming that Affix and EasyStaff funds were interchangeable and under Bohuslavskiy's sole control.

3848. Pyrus is a third-party hosted software application that includes accounts payable, knowledge base, service desk, and workflow management tools. At the request of Bohuslavskiy, RedSense paid $3,780 for software licenselicenses to the Pyrus application—specifically, $1,314 on September 13, 2023, $1,647 on October 7, 2024, and $819 in January 2025—so that Bohuslavskiy and his team would have access to the Pyrus

application. The idea was that Bohuslavskiy and his team would use the Pyrus application to track and manage the deliverables owed to RedSense. To pay for the software licenses (for the software that Bohuslavskiy and his team used for the work supposedly performed), Affix (Bohuslavskiy) invoiced RedSense, who would then in turn distribute payments to Affix for the expense, who supposedly used the money to pay Pyrus. When RedSense attempted to investigate the invoices and deliverables to reconcile the difference in the expenses compared to the software license fees, RedSense was blocked from doing so. Because the invoicing had been done by Affix (Bohuslavskiy), Bohuslavskiy was listed as the account administrator. When Bohuslavskiy resigned from RedSense in February 2025, he took steps to lock RedSense out of the Pyrus application. Pyrus confirmed to RedSense that no one at RedSense had access to this work product. ~~Therefore, it is unclear if~~ Moreover, RedSense's internal audit

70

revealed that there was no active Pyrus instance for RedSense, and that no accounts existed for Bohuslavskiy, Dmitriev, or any other RedSense members within the Pyrus platform. When RedSense contacted Pyrus support and provided the one Pyrus invoice that Bohuslavskiy had submitted for reimbursement, Pyrus support reviewed the invoice and confirmed that it was not valid. Therefore, it is unclear if Pyrus actually got paid by Affix, if Bohuslavskiy and his team actually used Pyrus to complete their assigned work, or if the Pyrus software licenses were simply a phony expense. In any event, RedSense paid for the software ~~license and deliverables and did not receive any work product. During the~~ licenses that were found to be invalid and deliverables for which it did not receive any work product, and has suffered an additional $25,000 in damages arising from Bohuslavskiy's allowing unauthorized use of RedSense data through the Pyrus platform. During the same time, Bohuslavskiy began cutting key RedSense employees out of meetings ~~meetings~~ with key customers. Based on the events that transpired after Bohuslavskiy's

~~Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 26 of 77 PageID: 26~~

resignation, RedSense is informed and believes, and on that basis alleges, that this was done intentionally in preparation for Bohuslavskiy's

 interference with RedSense

customers, because he wanted to push RedSense out of the picture so that he was in position to better usurp the relationships.

71

### G. Bohuslavskiy Refuses to Participate in the Operation of RedSense, Disclaims His Duties, and Resigns.

~~39~~49. By January 2025, RedSense had spent thousands of dollars on threat intelligence, reports, and source code, yet had no work product to show for it. Additionally, unbeknownst to RedSense partners at the time, Bohuslavskiy was responsible for approving invoices, including duplicate invoices (multiple invoices for the same amount for the same services within the same month), for work that was seemingly never performed. All the while, RedSense had ongoing obligations to its customers to provide high-quality, reliable, timely, and accurate threat intelligence. To satisfy these obligations, RedSense had to expend additional funds to source these assets from elsewhere, given that none of the assets Bohuslavskiy was responsible for had materialized.

~~40~~50. RedSense convened a special partner meeting on February 6, 2025 to discuss the immediate financial needs of RedSense and discuss the steps the partners would take both near and long term to protect RedSense and to ensure the business could benefit from expansion and growth opportunities. At the time, because the other RedSense partners believed that the threat intelligence and intellectual property that Bohuslavskiy provided to RedSense as his Obligated ~~In~~ In-Kind~~Kind~~ Funding had been properly conveyed to RedSense, and because they relied

on the representations of Bohuslavskiy to this effect, the other partners viewed Bohuslavskiy as a partner of RedSense. Accordingly, he was provided notice of the special partner meeting. Bohuslavskiy, however, chose not to attend. Bohuslavskiy's lack of participation was not particularly surprising given that on January

72

23, 2025, Bohuslavskiy sent an email to partners and non-partners self-suspending any

duties he had to RedSense.

4151.  While the other, then-current partners of RedSense (Montanaro, Stear, VanSickle) executed an agreement regarding the steps to take to protect RedSense finances, Bohuslavskiy refused. This again was consistent with the emails he was sending to both the other RedSense partners and nonpartners where he was disclaiming his duties to RedSense.

42.  During this time, RedSense was also making preparations to become compliant with SOC 2. 52.  As part of these preparations, RedSense revamped and instituted a companywide security program that required all partners, staff, and third-party vendors to executed various documents including a Confidential Information and Invention Assignment Agreement, commonly referred to as a "CIIAA." RedSense was also undertaking these measures in preparation for compliance audits and to seek investment for expansion and growth.

4353.  On February 18, 2025, Montanaro sent Bohuslavskiy an email, requesting that he sign the CIIAA. Given that the assets that Bohuslavskiy was responsible for and were not accounted for during the asset inventory, RedSense

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 28 of 77 PageID: 28

needed confirmation that the assets existed and that there was no dispute that the

assets belonged to RedSense.

4454. Not only did Bohuslavskiy refuse to sign the CIIAA, but he also

actively sent messages via the Signal messaging application to other individuals

including the entire RedSense staff, Dmitriev, and the EasyStaff freelancers

encouraging them to not sign. He claimed that EasyStaff freelancers were owed

outstanding payments and will not sign the CIIAA until paid. Of course, the subsequent invoice reconciliation revealed that EasyStaff was paid and overpaid— because RedSense still has not received the deliverables, RedSense believes that *any* payment to EasyStaff constitutes an overpayment.

45. 55.    On February 24, 2025 at 3:34 p.m., Montanaro informed Bohuslavskiy that he had made a good faith payment to EasyStaff to encourage the signing of the CIIAA. As the subsequent invoice reconciliation revealed, the good faith payment was an *overpayment*, and not something that was outstanding and as confirmed by EasyStaff, no work products or work location references existed in any of the completed and accepted tasks since inception.

4656. Approximately one hour later, at 4:49 p.m., Bohuslavskiy submitted a resignation on behalf of himself and Dmitriev.

4757. Simultaneous to Bohuslavskiy's resignation, RedSense became aware of a cyber incident an unauthorized access that occurred on the evening of February 23, 2025 whereby the

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 29 of 77 PageID: 29
RedSense systems used by Bohuslavskiy and his team were accessed, and ~~any existing source code was~~RedSense proprietary data directories and data contents were copied ~~out~~and exfiltrated, and the file system was destroyed. RedSense's investigation into the incident revealed the credentials used to access the systems were those used by Dmitriev, Bohuslavskiy's brother and a RedSense Strategic Consultant. Given the timing and the use of Dmitriev's credentials, RedSense is informed and believes,

and on that basis alleges, that this theft of RedSense property was done by or at the direction, request, or encouragement of Bohuslavskiy. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy's erratic conduct was a result of RedSense finally discovering Bohuslavskiy's misconduct and a desire to punish the remaining partners of RedSense in retaliation for the steps RedSense had taken. RedSense is further informed and believes, and on that basis alleges, that prior to his resignation, Bohuslavskiy was aware that           RedSense's largest customer, had expressed specific interest in the AIDIS (Project Pylon) tool, and that this interest was confirmed to RedSense by Terry Oehring of           RedSense is further informed and believes, and on that basis alleges, that Bohuslavskiy intended to leverage this customer demand by absconding with the AIDIS code and offering it through his own competing venture, and that Bohuslavskiy's awareness of           interest in AIDIS was a material factor in his decision to abscond with the tool rather than return it to RedSense upon his resignation.

4858

.        The next day following his resignation, Bohuslavskiy threatened to go public with his grievances against RedSense, including "informing each customer" of what he perceived to be "illegal action" on the part of RedSense (the requiring of its partners, staff, and vendors to execute CIIAA to formalize the assignment of the assets RedSense already owned). In a Signal message sent on February 25, 2025 to a third party, Bohuslavskiy stated: "I have offered Dave and the leadership a

78

resolution pass with a clear and honest contract. . . . They have time until 11 AM ET tomorrow to commit, otherwise my role as a CRO expires, and I will reach out to each customer and also on social media and begin providing intel via Affix." In the same message, Bohuslavskiy confirmed that he had already secured a contingency plan, stating: "I got a large tech firm . . . clearly interesting in acquiring my team and the subsequent product (it would be stupid to make an ultimatum like the one i made with out a clear back up plan, right?)." Bohuslavskiy further admitted: "RedSense did not bother to put any IP agreements in place, so I have preemptively backup all of what we have done on the intel side—from each email to each report." He also stated: "I already got confirmation from some customers that they will be likely filing a contract breach claim if the intel is gone," and threatened: "There is no way the Solis contract will be re-signed this June with out the intel, and their entire financial plan—again, as you know, is based on that renewal."

4959. As a result of Bohuslavskiy's threats, RedSense's corporate counsel issued a cease-and-desist letter to Bohuslavskiy demanding that he cease and desist communications with RedSense customers, partners, employees, and contractors. A true and accurate copy of the cease-and-desist letter dated February 25, 2025 is

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 30 of 77 PageID: 30
attached to this Complaint as **Exhibit B**. The letter specifically informed

Bohuslavskiy that his threats to contact RedSense customers and disparage

RedSense would irreparably harm the operations and business reputation of RedSense.

**H. Bohuslavskiy Launches Smear Campaign Repeatedly Disparaging RedSense to Its Existing and Prospective Customers.**

60. Bohuslavskiy made good on his threat to disparage RedSense customers and smear the reputation of RedSense. He began a campaign of contacting RedSense customers, disparaging RedSense, claiming he had "ethical concerns" about the company, insinuating that RedSense cannot adequately service the customer relationship, and advertising his own threat intelligence offerings, and encouraging customers to contact Bohuslavskiy directly to ensure "seamless intel provision and continuity."

61.    For example, beginning on March 6, 2025, Bohuslavskiy contacted at least a dozen RedSense customers, including

RedSense would irreparably harm the operations and business reputation of RedSense.

**H. Bohuslavskiy Launches Smear Campaign Repeatedly Disparaging RedSense to Its Existing and Prospective Customers.**

50. Bohuslavskiy made good on his threat to disparage RedSense customers and smear the reputation of RedSense. He began a campaign of

contacting RedSense customers, disparaging RedSense, claiming he had "ethical concerns" about the company, insinuating that RedSense cannot adequately service the customer relationship, and advertising his own threat intelligence offerings, and encouraging customers to contact Bohuslavskiy directly to ensure "seamless intel provision and continuity."

51.    For example, beginning on March 6, 2025, Bohuslavskiy contacted at least a dozen RedSense customers, including **REDACTED**

**REDACTED**    RedSense presently has no reason to believe that no less than all customers have been contacted repeatedly. A true and accurate copy of the customer emails that were forwarded to RedSense are attached

83

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 31 of 77 PageID: 31

attached to this Complaint as **Exhibit C**.[79] In these emails, he informed the customers of vague "ethical concerns" he had about RedSense, provided threat intelligence reports that were created by his team (and not RedSense) and encouraged the customers to contact him directly via phone, Signal, or email if the customer desired to engage his services. RedSense became aware of these emails when the customers forwarded the emails or reached out to RedSense, expressing concern and confusion about these emails, and raising questions as to whether RedSense and/or Bohuslavskiy had been compromised.

52 62. Also on March 6, Bohuslavskiy published a post to his public LinkedIn page regarding his resignation. *See* Figure 1. As with his customer emails, Bohuslavskiy explicitly complained of his ethical concerns regarding RedSense.

---

[79] A compendium containing the true and accurate copies of the customer emails Bohuslavskiy sent following his resignation is attached to this Complaint as **Exhibit C**.



Figure 1, Bohuslavskiy LinkedIn Post, dated March 6, ~~2025~~[8][2025][10]

---

[8][10] Yelisey Bohuslavskiy, *Professional Announcement*, LinkedIn (Mar. 6, 2025, (9:10 p.m. UTC), available at https://www.linkedin.com/posts/yelisey-bohuslavskiy-214a02bb_professional-announcement-last-week-activity-7303522308663435264-fyIj?utm_source=share&utm_medium=member_desktop&rcm=ACoAABl_jQ8Br3x-Nm5Cf1p2git35cVBYjV764U (last accessed Jun. 25, 2025).

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 33 of 77 PageID: 33

5363.    On March 17, 2025, ~~RedSense's~~RedSense's outside counsel, Crowell & Moring LLP ("Crowell"), sent Bohuslavskiy a further cease and desist letter demanding that he stop all communications with RedSense customers immediately. A true and accurate copy of this letter is attached to this Complaint as Exhibit D. The cease-and-desist letter did not deter Bohuslavskiy. Indeed, it emboldened him.

64. On March 17 and 18, Bohuslavskiy reached out to __ and potentially other customers, with an update regarding upcoming ransomware attacks targeting healthcare companies. *See* Ex. C. Like with the prior emails, Bohuslavskiy encouraged the customer to contact him and his team directly, claiming that his team and not RedSense could protect the ~~customer's~~customer's interests.

65. On April 29, 2025, Bohuslavskiy emailed __ and potentially other customers, with a request to meet for a Q1 intelligence briefing, which he claims that RedSense failed to deliver. *See* Ex. C. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy made these claims so that the customer would erroneously believe that RedSense was not honoring its contractual contractual obligations to __ This, of course, would make __ less likely to continue its relationship with RedSense or, at minimum, cause __ to have

86

obligations to        This, of course, would make        less likely to continue its

relationship with RedSense or, at minimum, cause        to have concerns about the

viability of RedSense as its provider of threat intelligence. Bohuslavskiy also emphasized

that the intelligence his team will present relies upon his "unique" access to adversarial

sources, and that he was not offering to deliver publicly available,

87

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 34 of 77 PageID: 34
deliver publicly available, open-source, or recycled intelligence. Once again, Bohuslavskiy instructed the customer to come to him with any questions.

5666.     Bohuslavskiy's conduct with respect to his customer outreach has not been in the best interest of RedSense or its customers. Specifically, customers have reached out to RedSense with confusion and concern. Because Bohuslavskiy sent these communications via a *personal Gmail* email address and included a statement that he resigned from RedSense, customers have asked whether the email is legitimate (because they expect RedSense communications to come via a RedSense email address), whether it is a scam, whether the email is a phishing lure, or whether the email is actually coming from Bohuslavskiy or if someone is

impersonating Bohuslavskiy. Based on communications with customers, RedSense is informed and believes, and on that basis alleges, that customers who expect to receive correspondence regarding the RedSense services via official RedSense channels are confused when communications come from personal email addresses and do not understand why they are coming from an individual who has stated in the outreach that he has resigned from RedSense. RedSense is informed and believes, and on that basis alleges, that customers, who are unfamiliar with the corporate structure of RedSense, are left wondering whether Bohuslavskiy is speaking on behalf of RedSense and whether he is authorized to do so. This is further compounded by Bohuslavskiy offering to provide continued threat

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 35 of 77 PageID: 35

intelligence through Affix

(Bohuslavskiy's LLC), which RedSense is informed and believes, and on that basis alleges, that would be an unknown and unfamiliar entity to RedSense's customers.

57. 67. Based on communications RedSense has had with its current customers, RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy is actively communicating with RedSense customers to date, despite multiple demands that he cease this damaging conduct immediately. Based on communications with its customers, RedSense is informed and believes, and on that basis alleges, that the customers have had to spend considerable time and resources dealing with Bohuslavskiy's emails because they have had to spend time to determine if Bohuslavskiy's emails are a scam, if RedSense can service the relationship, and whether the customer would be better served by Bohuslavskiy's team.

58. 68. Additionally, because of the nature of the threat intelligence industry, RedSense is informed and believes, and on that basis alleges, that an insinuation that there are "ethical concerns" surrounding RedSense would be enough to permanently damage RedSense's reputation within this market. Because of these increased sensitivities when dealing with cybersecurity protection, regardless of what the "ethical concern" is or whether there is any merit to it (there is not), such insinuations may lead a customer to believe that it can no longer entrust RedSense to service the relationship without compromise.

90

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 36 of 77 PageID: 36

insinuations may lead a customer to believe that it can no longer entrust RedSense

to service the relationship without compromise.

## I. RedSense Attempts to Resolve Dispute Amicably with Bohuslavskiy; Bohuslavskiy Refuses.

5969.      On March 17, Crowell sent Bohuslavskiy a cease and desist letter

demanding the return of the RedSense property that RedSense's investigation

revealed Bohuslavskiy had never provided to RedSense: (1) AIDIS (Project Pylon)

including all software and documentation; (2) Pyrus platform including all data since

since inception; (3) EasyStaff Deliverables, including code, data, research, LLM,

documentation; (4) Igor Dmitriev's deliverables as stated in the agreement dated

August 1, 2023; (5) Forum Scraping code and results to date; (6) OpenCTI instance

instance and all RedSense Threat Intelligence contained therein; and (7) All AdvIntel Reports

AdvIntel Reports and threat intelligence since inception. *See* Ex. D at 2. This wasRedSense is further informed

either property that RedSense had directly paid for, or, in the case of the AdvIntel

and believes, and on that basis alleges, that in addition to absconding with the AIDIS

tool, Bohuslavskiy also absconded with RedSense data and reports—including

threat intelligence reports, research data, and other RedSense proprietary

materials—that he had accumulated during his tenure as Chief Research Officer and

91

92

that constitute RedSense property. This was either property that RedSense had directly paid for, or, in the case of the AdvIntel reports and threat intelligence, constituted the Obligated In-Kind Funding that Bohuslavskiy was obligated to provide in consideration of him becoming an equal partner of RedSense and that he had represented and warranted that he had the ability to provide.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 37 of 77 PageID: 37
6070

.        Bohuslavskiy's response was concerning. A true and accurate copy of

Bohuslavskiy's response, dated March 31, 2025, is attached as to this Complaint as
**Exhibit E**.[9][11] In response to RedSense's demand that he return to RedSense the assets

and intellectual property that RedSense owns, he made the shocking admission that he

believed the transfer of such property would be "improper and legally unsound"

because "RedSense definitely has no claim to this IP and any such transfer — if it were

even possible — would violate binding agreements," including expressly that it would

violate binding agreements with Advanced Intelligence ("AdvIntel"). Ex. E at 2.

Bohuslavskiy also expressly stated that "RedSense clearly has no legal entitlement" to

the AdvIntel reports. *Id.* at 6. These admissions were consistent with statements

Bohuslavskiy had made on multiple prior occasions in emails and other

communications, in which he stated that AdvIntel data could not be owned by

RedSense. Moreover, Bohuslavskiy's own Signal messages reveal that he trained the

Pylon tool on AdvIntel data that he had in his possession—data that he simultaneously

claimed RedSense had no right to—further demonstrating that Bohuslavskiy possessed

and used the very intellectual property he represented he

_____

[11] In his March 31 response, Bohuslavskiy focused more on launching personal
attacks against Crowell & Moring LLP ("Crowell") and Ms. Chakrabarti (counsel
of record for RedSense) and questioning the validity of Crowell's representation of
RedSense, rather than on focusing the merits of the letter.

could convey to RedSense, while simultaneously denying RedSense's right to it. *See*

*Ex. H.*

61 71.  Bohuslavskiy has no basis to claim that it was "unsound" for

 RedSense
to demand the property it had paid for. Indeed, Bohuslavskiy knew that he had no basis
to refuse, given that he was the person responsible for approving the payments *from*
RedSense for this very property. But even more concerning

 was his admission that the transfer of the AdvIntel Treat Intelligence and Intellectual
Property was his admission that the transfer of the AdvIntel threat intelligence and
reports
        "would violate binding agreements"

[9] In his March 31 response, Bohuslavskiy focused more on launching personal
attacks against Crowell & Moring LLP ("Crowell") and Ms. Chakrabarti (counsel of
record for RedSense) and questioning the validity of Crowell's representation of
RedSense, rather than on focusing the merits of the letter.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 38 of 77 PageID: 38

6272. In 2023, when Bohuslavskiy executed the Onboarding Agreement, his joining RedSense as an equal partner was conditioned on two things: (1) the provision of Obligated In-Kind Funding in the form of intellectual property and threat intelligence, which the other RedSense partners understood to include AdvIntel threat intelligence reports and historical adversary infrastructure intelligence along with the associated data sets, reports and access data; and (2) representing and warranting that he was not party to any other agreement that would restrict his ability to perform his obligations under the Onboarding Agreement (including his obligation to provide the Obligated In-Kind Funding). This admission from Bohuslavskiy contradicted both of these promises: he admitted that this Obligated In-Kind Funding *had never been provided to RedSense at all* and that Bohuslavskiy *had no right to promise these reports*. In short, Bohuslavskiy revealed

that he never fulfilled the condition precedent that was required for him to join RedSense as an equal partner. Given this shocking admission, the other partners of RedSense realized that although they had been treating Bohuslavskiy as an equal partner of RedSense, he actually was in violation of the Onboarding Agreement and that with respect to Bohuslavskiy, there was a lack of consideration supporting the Onboarding Agreement. Accordingly, there were now serious questions as to whether Bohuslavskiy was ever a proper partner. Indeed, given the other misconduct of Bohuslavskiy that RedSense had uncovered

since his resignation, RedSense had concerns that not only did Bohuslavskiy not possess the rights to the AdvIntel ~~threat intelligence and reports~~Threat Intelligence and Intellectual Property, but he knew he did not possess the rights, never intended to convey the threat intelligence and

intellectual property to RedSense, and fraudulently made the representations and warranties ~~reports to RedSense, and fraudulently made the representations and warranties~~ contained in the Onboarding Agreement.

~~63~~73.          Over the next two months, RedSense tried to amicably resolve the outstanding issues with Bohuslavskiy. Yet Bohuslavskiy was never interested in addressing the substantive concerns raised by RedSense. He instead was more interested in blocking any meaningful discussion. For example, in nearly all of his communications, he has questioned the validity of Crowell's representation of RedSense and seeks privileged attorney-client communications between RedSense

and Crowell to "prove" the propriety of the representation. *See generally* Ex. F.~~10~~

12 Additionally, Bohuslavskiy has placed unreasonable and unrealistic demands on RedSense, including the demand that RedSense withdraw all its allegations it has asserted against Bohuslavskiy (as alleged in the March 17 cease and desist letter, Ex. ~~C~~D), the demand that RedSense unequivocally recognize his status as a legal partner of RedSense (despite serious doubts existing about his status as a partner given his admission that he never provided the Obligated In-Kind Funding that was

~~10 A true and accurate copy of correspondence between Bohuslavskiy and Crowell from April – June 2025 is attached to this Complaint as **Exhibit F**.~~
~~Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 40 of 77 PageID: 40~~
required to join as a partner, Ex. E), and the demand for immediate restoration of his, Dmitriev's, and EasyStaff freelancers' access to the RedSense systems, even though Bohuslavskiy had submitted resignations for each of them, effective February 24, 2025 and even though RedSense had good reason to believe that Bohuslavskiy or Dmitriev or someone acting at Bohuslavskiy's direction was responsible for stealing RedSense code and destroying the file system where the code was stolen from. *See* Ex. F at 8 – 9.

~~64~~74.

During this time, Bohuslavskiy sent a letter directly to RedSense's CEO, David Montanaro, on April 14, 2025. A true and correct copy of this letter is attached to this Complaint as **Exhibit G**. In this letter he demanded restoration of access to the RedSense systems (which he was not entitled to following his ~~resignation) and additional payments to the EasyStaff freelancers (which was~~

98

[12] A true and accurate copy of correspondence between Bohuslavskiy and Crowell from April – June 2025 is attached to this Complaint as **Exhibit F**.

resignation) and additional payments to the EasyStaff freelancers (which was

improper because EasyStaff had already been compensated for work they either

never performed or that was not delivered to RedSense as it was contracted for).

6575.    The most concerning part of this letter was what could only be

interpreted as a veiled cyber threat by Bohuslavskiy against RedSense in retaliation

to RedSense taking steps to protect the company and its rights. In connection with

his contention that the EasyStaff freelancers were improperly terminated (even

though Bohuslavskiy was the one who submitted a resignation on behalf of

EasyStaff), Bohuslavskiy stated:

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 41 of 77 PageID: 41

> In this case, the engineers who were terminated reside in a foreign jurisdiction, retain detailed knowledge of RedSense's internal systems, and operate within a global digital environment where anonymous and unregulated forums are known to exist. While I make no allegation of intent or misconduct on their part, it is well-documented within the cybersecurity industry that poorly managed terminations can lead to reputational, legal, and technical vulnerabilities — including the "leak" publication of company data on platforms such as XSS or BreachForums by disgruntled personnel claimed under a "company breached" banner. This is not a suggestion that any individual involved would act improperly, but an industry-known risk that must be treated with diligence.

Ex. G at 5. There is no other plausible explanation other than that this message

insinuated a cyberattack against RedSense was imminent unless RedSense caved to

Bohuslavskiy's demand. Given Bohuslavskiy's and the freelancers' knowledge of

100

RedSense code system and their skillset in the cybersecurity space, RedSense is

informed and believes, and on that basis alleges, that Bohuslavskiy and the

freelancers have the skill and capability to carry out such a cyberattack as

 threatened.

66 76.  During this time where Bohuslavskiy refused to engage meaningfully

in a potential amicable resolution, made unreasonable demands, and threatened

RedSense, he continued to communicate with RedSense's customers, denigrating

the services RedSense provided and encouraging the customers to obtain their threat

threat intelligence from Bohuslavskiy and his team directly. Although RedSense

attempted to reach resolution of this dispute amicably and without court intervention,

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 42 of 77 PageID: 42

intervention, Bohuslavskiy's responses demonstrated that he did not take the issue seriously and

seriously and would not halt absent court intervention.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION – FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125)
### (Against Bohuslavskiy)

6777.  RedSense repeats, realleges and incorporates by references paragraphs 1 through 6676 as if set forth herein.

6878.  In his March 6, 2025 LinkedIn post, Bohuslavskiy publicly indicated that he was departing from RedSense due to supposed ethical issues, casting a negative light on the company. He also claimed that he would continue to provide cybersecurity services to RedSense customers as contracted, attempting to obfuscate

103

the distinction between customers' relationship with RedSense and their relationship with him.

6979.	Beginning on March 6, 2025 and continuing to date, Bohuslavskiy has engaged in a rampant campaign of disparaging RedSense to its existing and potential customers, all the while peddling his own threat intelligence services, encouraging RedSense customers to forego their relationship with RedSense and

obtain threat intelligence services directly through Bohuslavskiy. In these communications he insisted that only he could service the needs of the customers and that RedSense was ill-equipped to manage the relationship. In these communications he made multiple references to his continued affiliation with

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 43 of 77 PageID: 43
RedSense but provided his personal contact information and encouraged customers to contact him directly.

~~70.~~ 80.    In doing so, Bohuslavskiy leveraged the existing customer relationship with RedSense (RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy used the RedSense name as a way to lend credibility to these communications) while advertising his personal ability to meet customers' needs and ~~fulfil~~fulfill RedSense's contractual duties (insinuating that RedSense *could not* ~~fulfil~~fulfill these duties), ultimately associating his name and services with the company from which he had already resigned, deceiving RedSense's customer base as to Bohuslavskiy's role within RedSense, his ability to speak on behalf of RedSense,

and creating customer confusion as to who (RedSense or Bohuslavskiy ) was the responsible party for servicing the customer account.

7181. In his emails to RedSense customers, Bohuslavskiy implied that the quality of the cybersecurity monitoring he and his team could provide surpassed the capabilities of other vendors, implying RedSense lacked his team's "unique" access. He also impugned the reliability of RedSense's services: in his April 29, 2025 email(s), Bohuslavskiy misrepresented to at least one customer that RedSense failed to meet its customary obligations to the customer by failing to present a Q1 intelligence briefing. He then offered to arrange a time for the customer to "meet with him instead of for an intelligence briefing.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 44 of 77 PageID: 44

72. 82.   After repeatedly charging RedSense with incapacity and misconduct                                                                     so severe as to influence customers' business decisions, Bohuslavskiy promoted his services—not just as an alternative, but as a "seamless" continuation of the customers' existing relationships with RedSense. In doing this, Bohuslavskiy actively materially deceived customers to divert business from RedSense to himself.

73. 83.   By making a public LinkedIn post and soliciting business from a broad sample of RedSense customers, Bohuslavskiy's misrepresentations were aimed at the purchasing public of cybersecurity coverage.

74<u>84</u>. The advertised services, which include providing threat intelligence and cybersecurity services to companies throughout the United States involves interstate commerce.

75<u>85</u>. Bohuslavskiy's use of false or misleading representations of fact in commercial advertising to current and future customers of RedSense misrepresent the nature, characteristics, or qualities of RedSense's threat intelligence services.

76<u>86</u>. Bohuslavskiy's use of false or misleading representation of fact has <u>the</u> the tendency to deceive a substantial portion of the target consumer audience or actually deceives the target consumers.

77<u>87</u>. Bohuslavskiy's false or misleading representations of fact are material because they are likely to influence the purchasing decision of target customers,

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 45 of 77 PageID: 45

specifically current customers of RedSense who are determining whether RedSense will adequately service their cybersecurity and threat intelligence needs as well as prospective customers who are evaluating whether RedSense can be entrusted to protect their cybersecurity needs.

78. 88.    Because of Bohuslavskiy's false or misleading commercial statements, RedSense has suffered and will continue to suffer substantial harm to its customer relationships, including potentially diverted business to Bohuslavskiy, decreased customer loyalty and trust, and irreparable harm to the reputation of RedSense, which in an industry as sensitive and competitive as the cybersecurity industry would

cause devastation to RedSense's ability to preserve its customer relationships and engage prospective customers.

89.	In his March 6, 2025 LinkedIn post, Bohuslavskiy publicly indicated that he was departing from RedSense due to supposed ethical issues, casting a negative light on the company. He also claimed that he would continue to provide cybersecurity services to RedSense customers as contracted, attempting to obfuscate the distinction between customers' relationship with RedSense and their relationship with him. On November 21, 2025, this Court granted RedSense's motion for a preliminary injunction, finding a likelihood of success on the merits of RedSense's tortious interference claims and irreparable harm, and enjoining Bohuslavskiy from soliciting or contacting RedSense's current and known prospective customers, denigrating RedSense's cybersecurity services, and making statements about RedSense for the purpose of stealing business away from RedSense. Notwithstanding the entry of that preliminary injunction, Bohuslavskiy has continued to engage in conduct that violates its terms, including by appearing as a speaker at the Health-ISAC June Monthly Threat Briefing on June 24, 2025, where he was listed as a "representative of RedSense" without RedSense's authorization, and by continuing to contact RedSense customers via Signal using an alias after at least one customer blocked his personal Gmail address.

110

## SECOND CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACT
## (Against Bohuslavskiy)

~~79~~90. RedSense repeats, realleges and incorporates by references paragraphs

1 through ~~78~~89 as if set forth herein.

~~80~~91. RedSense maintains contractual relationships with all of its customers,

including but not limited to:

| | |
|---|---|
| ~~including but not limited to:~~ | **~~REDACTED~~** |

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 46 of 77 PageID: 46

REDACTED                    In each of these instances, RedSense contracted to In each of these instances, RedSense contracted to provide cybersecurity threat monitoring and reporting services to customers.

92.    Prior to resigning from RedSense, Bohuslavskiy sent an email addressed to "RedSense Partners" where he aired various grievances against Stear. In addition to emailing the RedSense partners (Montanaro, Stear, VanSickle), he also included other RedSense staff. But most concerning is that Bohuslavskiy included a primary point of contact of customer REDACTED in the "TO" line of the email. The point of contact is not a partner of RedSense, he is not an employee of RedSense, and he is not a contractor or staff member of RedSense. Instead, the point of contact has a background as a digital forensic specialist and serves as Senior

112

Senior ~~REDACTED~~

REDACTED

contact

for the RedSense-          relationship.

~~82~~93.      RedSense is informed and believes, and on that basis alleges, that the inclusion of the point of contact was not accidental, but that Bohuslavskiy intentionally included the point of contact on the email airing out his internal dispute

~~dispute with RedSense so that~~          ~~(and specifically, someone integral to~~

with RedSense so that(and specifically, someone integral to          RedSense-relationship) would become aware of this dispute. The only reason for Bohuslavskiy to do that is to sow doubt in the mind of

~~83~~94.      When he resigned from RedSense, Bohuslavskiy threatened to go to all of RedSense customers. Based on conversations with customers and taking

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 47 of 77 PageID: 47

Bohuslavskiy at face value, RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy has contacted most, if not all, of RedSense's current customers.

84.

95.    Through his email campaign to, and conversations with, RedSense customers, Bohuslavskiy interfered with the relationship between RedSense and its customers by sowing confusion and doubt, falsely claiming RedSense has failed to meet its obligations, and arguing that his services were superior to those offered by other vendors, implicitly denigrating RedSense and the services it provides. In his April 29, 2025 email, Bohuslavskiy specifically claimed that RedSense failed to provide at least one customer with a customary Q1 intelligence briefing. This claim

114

is particularly damaging given that it was Bohuslavskiy's responsibility as Chief Research Officer to be prepare such briefing—thus he used his own shortcomings to make it seem like this was a failure on the part of *RedSense.* RedSense is informed and believes, and on that basis alleges, that based on Bohuslavskiy's correspondence with the other partners of RedSense, his sole purpose in contacting the customers was to ruin RedSense's customer relationships in retribution for his grievances with RedSense. He sent multiple emails soliciting customers to consult with him directly, inducing them to breach their contracts with RedSense. He actively took steps to undermine the trust that these customers had in RedSense and urged customers to retain his services instead.

85 96. As the former Chief Research Officer of RedSense, Bohuslavskiy was intimately familiar with the existence and contents of RedSense's contracts with its customers, including which customers RedSense considered its top customers and

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 48 of 77 PageID: 48

the individualized services RedSense provides for each customer. It is of no surprise that Bohuslavskiy has targeted RedSense's largest customers in his smear campaign. Furthermore, prior to his resignation and at the time when RedSense believed he was an equal partner of the LLC, Bohuslavskiy received sensitive information regarding RedSense's financial plans. Accordingly, he knew that interfering with the relationships RedSense has with its key customers would cause the most harm to RedSense.

8697. By denigrating RedSense's offerings as a cybersecurity provider, Bohuslavskiy understood his interference would likely undermine RedSense's existing business relationships.

8798. As a result of Bohuslavskiy's interference, RedSense's customers perceive RedSense as having failed to protect them from malicious and unwanted contact from Bohuslavskiy, causing the customers to lose the sense of security curated by RedSense's prior performance of the parties' contracts. Multiple customers contacted RedSense in confusion or alarm about Bohuslavskiy's missives, questioning whether they might be fraudulent phishing attempts. This question from customers implies that RedSense itself was compromised, and it was — not by hackers, but by someone misrepresenting his ongoing affiliation with RedSense.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 49 of 77 PageID: 49

~~88~~99. Based on ~~customer~~ communications RedSense has had with its current customers, RedSense is informed and believes, and on that basis alleges, that ~~its customers~~Bohuslavskiy is actively communicating with RedSense customers to date, despite multiple demands that he cease this damaging conduct immediately.

Based on communications with its customers, RedSense is informed and believes, and on that basis alleges, that the customers have had to spend considerable time~~, effort,~~ and resources ~~to deal with these unwanted~~dealing with Bohuslavskiy's emails because they have had to spend time to determine if Bohuslavskiy's emails are a scam, if RedSense can service the

relationship, and whether the customer would be better served by Bohuslavskiy's team. As a direct result of Bohuslavskiy's conduct, RedSense has lost customer relationships with, among others,

communications. Customers, such as but not limited to REDACTED who have otherwise been happy with the services that RedSense has provided, have informed RedSense this ongoing issue with Bohuslavskiy has caused a dark stain on RedSense's reputation and has undermined the otherwise high quality of services customers had come to expect from RedSense. In many instances the Chief Information Security Officers ("CISO") of RedSense's customers have expressed their concern or otherwise uneasinessRedSense respectfully requests that the Court order Bohuslavskiy to identify all current and prospective RedSense customers with whom he has communicated or to whom he has provided threat intelligence services since his resignation, so that RedSense may verify compliance with any injunctive

119

relief or bond entered by this Court. RedSense is informed and believes, and on that basis alleges, that ~~with respect to customers in the cybersecurity or threat intelligence space, it is the CISO who determines which service providers will be retained for threat intelligence. Therefore, the uneasiness of a CISO regarding a continued relationship with RedSense will likely result in that customer refusing to renew its contract or renegotiating it at a lower rate.~~ Bohuslavskiy has not complied with the existing bond and is currently servicing at least two former RedSense customers.

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 50 of 77 PageID: 50

89100. In at least one instance, REDACTED , which is RedSense's largest customer, has recently expressed disappointment regarding the issues between Bohuslavskiy and RedSense. REDACTED has also become noticeably less engaged and responsive to RedSense. Specifically, pursuant to the

RedSense and has yet to pay RedSense the outstanding amounts that are past due under the subscription contract REDACTED has with RedSense.

121

communication, a true and accurate copy of which is attached

122

to this Complaint as **Exhibit L.**

123



RedSense seeks to recover damages arising from Bohuslavskiy's tortious interference with the RedSense-          relationship, including

90101. RedSense is informed and believes, and on that basis alleges that Bohuslavskiy has been actively communicating with key stakeholders at REDACTED for the purpose of denigrating RedSense and seeking to steal the business from RedSense. Based on the timing of Bohuslavskiy's resignation and email smear campaign, his escalations as a result of RedSense's attempts to resolve the issue

REDACTED

amicably, and the timing of          first stopped payment of the amounts due under the contract with RedSense, RedSense is informed and believes that this is all a direct result of Bohuslavskiy's actions.

102. The most concerning part of this letter was what could only be interpreted as a veiled cyber threat by Bohuslavskiy against RedSense in retaliation

to RedSense taking steps to protect the company and its rights. In connection with his contention that the EasyStaff freelancers were improperly terminated (even though Bohuslavskiy was the one who submitted a resignation on behalf of EasyStaff), Bohuslavskiy stated: "In this case, the engineers who were terminated reside in a foreign jurisdiction, retain detailed knowledge of RedSense's internal systems, and operate within a global digital environment where anonymous and unregulated forums are known to exist. While I make no allegation of intent or misconduct on their part, it is well-documented within the cybersecurity industry that poorly managed terminations can lead to reputational, legal, and technical vulnerabilities — including the 'leak' publication of company data on platforms such as XSS or BreachForums by disgruntled personnel claimed under a 'company breached' banner. This is not a suggestion that any individual involved would act improperly, but an industry-known risk that must be treated with diligence." Ex. G at 5. There is no other plausible explanation other than that this message insinuated a cyberattack against RedSense was imminent unless RedSense caved to Bohuslavskiy's demand. Given Bohuslavskiy's and the freelancers' knowledge of RedSense code system and their skillset in the cybersecurity space, RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy and the freelancers have the skill and capability to carry out such a cyberattack as threatened.

125

91. ~~Prior to Bohuslavskiy's smear campaign, RedSense leadership and leadership routinely were in communication and continuing to discuss ways to enhance the partnership and increase the quality of the services RedSense~~

~~provided, or the value that~~ REDACTED ~~obtained from RedSense. Recently, however, (prior to them becoming less engaged and responsive) has raised questions about the quality of the services and the value-add RedSense can provide. Specifically, they have requested that RedSense provide the AIDIS Solution automation tool~~ REDACTED

~~Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 51 of 77 PageID: 51~~

~~that Bohuslavskiy previously previewed to~~ REDACTED ~~. The problem, however, is that Bohuslavskiy has absconded with the AIDIS code and refuses to return it to RedSense.~~

~~92~~103. Because Bohuslavskiy knows that RedSense does not have the AIDIS code (because he has refused RedSense's demand for its return), RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy is holding REDACTED hostage and leveraging the AIDIS Solution's functionality and capabilities in his conversations with ~~Red Sens~~RedSense customers to cause them to doubt RedSense's capabilities and value.

93. **REDACTED** ~~is another customer of RedSense. Retaining this~~

126

104.

customer is strategically important for RedSense, as this customer operates within RedSense's largest vertical—customers within the healthcare industry represent RedSense's largest market and largest potential customer base. By virtue of his involvement with RedSense, Bohuslavskiy would know of the strategic importance

of the relationship with                    . Following Bohuslavskiy's contacting of key

is another customer of RedSense. Retaining this

stakeholders at                    and disparaging RedSense, the Director of Cyber

Intelligence and Threat Engineering at                    has instructed RedSense that it

~~of the relationship with    REDACTED    Following Bohuslavskiy's contacting of key~~

~~stakeholders at                    and disparaging RedSense, the Director of Cyber~~

~~Intelligence and Threat Engineering at    REDACTED    has instructed RedSense that it~~

needs to "work it out with Bohuslavskiy." Like with ~~REDACTED~~ also received a preview of AIDIS and has requested that RedSense provide the AIDIS tool immediately. RedSense is informed and believes, and on that basis alleges, that the

127

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 52 of 77 PageID: 52

the demand to "work it out" is a result of REDACTED wanting access to AIDIS and the

the strain that Bohuslavskiy has placed on the RedSense- REDACTED   relationship.

Bohuslavskiy's actions have put RedSense in a position where it cannot provide this

tool, because Bohuslavskiy stole the tool and refuses to return it to RedSense.

RedSense is informed and believes, and on that basis alleges, that because

Bohuslavskiy is aware of the strategic importance of the ~~REDACTED~~ customer

relationship, Bohuslavskiy has incentive to market AIDIS capabilities as a selling

point as to why customers should use his services over those of RedSense.

~~resignation, Bohuslavskiy was supposed to conduct a scheduled briefing with~~

**~~REDACTED~~** is another RedSense customer. Prior to Bohuslavskiy's

~~REDACTED.~~ ~~Bohuslavskiy unilaterally cancelled the briefing without~~ resignation, Bohuslavskiy was supposed to conduct a scheduled briefing with

Bohuslavskiy unilaterally cancelled the briefing without explanation, did not reschedule

the meeting, and resigned soon after. RedSense is informed and believes, and on that

basis allege that, Bohuslavskiy conveniently cancelled the briefing knowing that he was

going to resign and knowing that he could

~~could~~ use the promise of delivering this briefing as a way to induce          to retain

Bohuslavskiy for the threat intelligence services.

~~95~~106. Additionally, many of RedSense's largest customers are within the

healthcare industry. RedSense's healthcare customers face unique concerns and have

heightened sensitivity regarding data protection and preventing breaches of health

information. RedSense is aware that many of its customers are members of

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 53 of 77 PageID: 53
Health-Information Sharing & Analysis Center ("Health-ISAC"), which is a

non-profit organization that provides a platform for security professionals in the

health industry to share insights, best practices, alerts, and intelligence.

96. 107. Based on RedSense's interactions with its customers in the health

sector, RedSense is informed and believes, and on that basis alleges, that Health-ISAC is the preeminent industry organization for key players in the industry, such as CISO's of RedSense's healthcare customers. Health-ISAC offers events for its members, including monthly threat briefings.

97. 108. On June 24, 2025, RedSense learned from several of its healthcare customers who had attended the Health-ISAC June Monthly Threat Briefing (that occurred earlier that day), that Bohuslavskiy was a speaker at the briefing and based on the event agenda was speaking as a "representative of RedSense." RedSense partners and leadership did not have any visibility into this speaking engagement. As such, it did not authorize Bohuslavskiy to speak at this event on "behalf" of RedSense or as its "representative" and did not approve any messaging that Bohuslavskiy presented at this event. Multiple RedSense customers who attended this event and had previously received correspondence from Bohuslavskiy reached out to RedSense with confusion. They asked whether Bohuslavskiy was "back at" RedSense and did not understand why Bohuslavskiy was advertised as being a "representative of RedSense." Although RedSense does not have visibility

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 54 of 77 PageID: 54

as to the substance of Bohuslavskiy's speaking engagement, given the tenor of his other communications to the industry and directly to RedSense's customers, RedSense is informed and believes, and on that basis alleges, that he did not "represent"

RedSense in a positive light. At minimum, he has further created confusion as he attempts to market his own threat intelligence offering while taking advantage and misusing RedSense's reputation to the detriment of RedSense's customer relationship.

98109. Because of Bohuslavskiy's interference with RedSense's contracts,

RedSense has suffered the loss of its vital business contracts. Because of the sensitive nature of this industry, it is unlikely that RedSense will ever be able to regain the trust of its customers, which has caused RedSense irreparable harm.

### THIRD CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH FUTURE ECONOMIC ADVANTAGE
### (Against Bohuslavskiy)

99110. RedSense repeats, realleges and incorporates by references paragraphs 1 through 98109 as if set forth herein.

100111. RedSense has maintained consistently positive relationships with its

major customers year over year, and thus it reasonably expects the maintenance of

its business relationships with its customers, including but not limited to: REDACTED

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 55 of 77 PageID: 55

RedSense

REDACTED                                              RedSense

also had an expectation in the growth of its customers based on its high-quality

services and the positive reputation that it had within the cybersecurity and threat intelligence industry.

101112. In his email smear campaign to RedSense customers, Bohuslavskiy repeatedly indicated that customers should distrust the quality of RedSense's services, and that they should turn to him instead for cybersecurity needs going forward.

102113. As the former Chief Research Officer of RedSense, Bohuslavskiy understood RedSense's continuing expectations of relationships with its major customers. By denigrating RedSense's offerings as a cybersecurity provider, Bohuslavskiy understood his interference would likely undermine RedSense's future economic advantages. Further, by presenting as a potential security breach or threat himself, Bohuslavskiy understood that his spam emails to the customers would cause customers to question RedSense's capabilities as a cybersecurity vendor in a manner that diminishes the likelihood that the customers would renew their contracts with RedSense.

103. For example, in 114. In at least one instance, RedSense and  engaged in serious REDACTED

RedSense. Accordingly, REDACTEDas as

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 56 of 77 PageID: 56

REDACTED

These discussions with

resignationsresignation

REDACTED

decrying of RedSense, come to a

halt. A          executive revealed to RedSense that there was too much of a cloud

135

over RedSense as a result of Bohuslavskiy's smear campaign and the rumors about

Bohuslavskiy and RedSense that have been circulating in the threat intelligence

industry. The same executive informed RedSense that unless RedSense is able to

resolve this issue, ~~REDACTED~~ ~~would~~ would not feel comfortable retaining RedSense's
services.

115. Additionally, the                              , a RedSense customer, elected

not to renew its contract with RedSense as a direct result of Bohuslavskiy's outreach

and interference, representing a concrete and quantifiable loss of
contract revenue.

 RedSense is informed and believes, and on that basis
alleges, that the

non-renewal is attributable to Bohuslavskiy's smear campaign and
his

interference with RedSense's customer relationships.

~~104~~116. Thus, because of Bohuslavskiy's interference with RedSense
contracts,

RedSense has lost credibility with its current and prospective customers, and as a

result, has suffered a loss of reasonably relied-upon future economic advantages.

**FOURTH CAUSE OF ACTION – VIOLATION OF THE DEFEND TRADE
SECRETS ACT (18 U.S.C. § 1836, *et seq.*)
(Against Bohuslavskiy)**

~~105~~117. RedSense repeats, realleges and incorporates by references
paragraphs

1 through ~~104~~116 as if set forth herein.

~~106~~118. RedSense owns the RedSense Trade Secrets.

136

~~107~~119. RedSense implements measures that are reasonable under the

circumstances to protect the secrecy of the RedSense Trade Secrets. As described

herein, RedSense takes steps that are consistent with standard industry practices to ensure the RedSense Trade Secrets are protected.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 57 of 77 PageID: 57

108120. RedSense expended considerable resources to design, develop, create, and implement the RedSense Trade Secrets, which are then implemented into the services provided by RedSense to its customers and leveraged by RedSense to maintain these customer relationships.

109121. The RedSense Trade Secrets derive substantial value from secrecy, and they provide RedSense with an important competitive advantage in the marketplace. 122. Bohuslavskiy misappropriated the RedSense Trade Secrets by: a. acquiring the RedSense Trade Secrets by improper means, including by directing, facilitating, or encouraging Dmitriev to use his assigned credentials to copy out source code and destroy the file system on the evening of February 23, 2025—conduct that constituted improper means within the meaning of 18 U.S.C. § 1839(6), including theft and espionage through electronic means; and

b. in the alternative, disclosing or using the RedSense Trade Secrets without express or implied consent, in that Bohuslavskiy, who acquired knowledge of the RedSense Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use—specifically, by virtue of his role as Chief Research Officer of RedSense, his

138

execution of the Onboarding Agreement, and his access to RedSense's confidential and trade secret information in connection with his management of the Threat Intelligence Team and Engineering Team—used and disclosed those trade secrets without RedSense's consent. At the time of such disclosure and use, Bohuslavskiy knew or had reason to know that his knowledge of the RedSense Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use, within the meaning of 18 U.S.C. § 1839(5)(B)(ü)(II). Bohuslavskiy's unauthorized use and disclosure of the RedSense Trade Secrets has been continuous and ongoing since at least February 24, 2025, and continues to the present, well after the effective date of the DTSA. Bohuslavskiy's misappropriation includes, without limitation, the following acts of unauthorized use and disclosure:

110. Bohuslavskiy misappropriated the RedSense Trade Secrets by: ai. Utilizing and leveraging the RedSense Trade Secrets, which includes its customer list, to direct his email smear campaign to the companies who would be most impacted by his denigration of RedSense (*i.e.*, RedSense's current customercustomers and prospective customers)., constituting unauthorized use of trade secret

139

information for a purpose adverse to RedSense and without RedSense's express or implied consent;

b̶ü. Utilizing the RedSense Trade Secrets, including information regarding RedSense's largest and most valuable customers, to interfere with the customer relationships that would be most critical to RedSense's operation if RedSense lost the relationship.̶, constituting unauthorized use of trade secret information without RedSense's express or implied consent;

c̶üi. Utilizing and leveraging the RedSense Trade Secrets, which include specific information

include specific information        **REDACTED**

**REDACTED** to target these customers with specificity and by capitalizing on these connection with his email smear campaign, constituting unauthorized use of trade secret information without RedSense's express or implied consent;

specificity and by capitalizing on these i connection with his email smear campaign.

div. Utilizing and leveraging the RedSense Trade Secrets regarding the unique and individualized services that RedSense provides to improperly compete with RedSense by knowing which services and features are most critical to RedSense's customers. 111. RedSense in has been and will continue to be harmed by Bohuslavskiy's misappropriation, which has also unjustly enriched Bohuslavskiy.,

constituting unauthorized use of trade secret information without RedSense's express or implied consent; and

v.        Directing, facilitating, or encouraging the copying of RedSense's proprietary source code out of the RedSense systems and the destruction of the file system on the evening of February 23, 2025, using credentials assigned to Dmitriev, for the purpose of depriving RedSense of access to its own trade secret information and conveying that information to Bohuslavskiy or others acting in concert with him—constituting both unauthorized use and disclosure of the RedSense Trade Secrets without RedSense's express or implied consent. Bohuslavskiy knew or had reason to know that the information he directed to be copied and destroyed constituted trade secrets of RedSense, and that his conduct was unauthorized and in breach of his duty to maintain the secrecy of the RedSense Trade Secrets.

123. RedSense has been and will continue to be harmed by Bohuslavskiy's misappropriation, which has also unjustly enriched Bohuslavskiy.

124. Bohuslavskiy's unauthorized use of the RedSense Trade Secrets is further evidenced by circumstantial evidence demonstrating his access to the RedSense Trade Secrets and the similarities between those trade secrets and the information Bohuslavskiy deployed in his smear campaign and competing business solicitations. Specifically, Bohuslavskiy's emails to RedSense customers demonstrate

142

knowledge of: (i) the identity of RedSense's current and prospective customers, which is not publicly available; (ii) the specific cybersecurity concerns and needs of individual customers, which Bohuslavskiy could only have known through his access to the RedSense Trade Secrets; (iii) the unique and individualized services RedSense provides to each customer; and (iv) the strategic importance of particular customer relationships to RedSense's business operations. The specificity and targeting of Bohuslavskiy's customer outreach—directed at RedSense's largest and most valuable customers, and tailored to each customer's unique cybersecurity needs—could not have been accomplished without Bohuslavskiy's unauthorized use of the RedSense Trade Secrets. Bohuslavskiy's continuing use of the RedSense Trade Secrets in his ongoing solicitation of RedSense customers constitutes a continuing misappropriation within the meaning of 18 U.S.C. § 1839(5)(B).

125. All acts of misappropriation alleged herein occurred after May 11, 2016, the effective date of the DTSA. Specifically: (i) the copying of RedSense's proprietary source code and the destruction of the file system occurred on the evening of February 23, 2025; (ii) Bohuslavskiy's unauthorized use and disclosure of the RedSense Trade Secrets in his email smear campaign commenced on or about March 6, 2025 and has continued to the present; and (iii) Bohuslavskiy's ongoing

143

solicitation of RedSense customers using the RedSense Trade Secrets constitutes a continuing misappropriation, as each act of use or disclosure without RedSense's consent gives rise to a separate and continuing violation within the meaning of 18 U.S.C. § 1839(5)(B). Bohuslavskiy's misappropriation is not a single discrete act but a continuing course of conduct that persists to the present day, and RedSense is entitled to seek relief for the full scope of that continuing misappropriation under the DTSA.

126. Bohuslavskiy's continuing use of the RedSense Trade Secrets after the DTSA's effective date is further demonstrated by the fact that his post-resignation conduct was driven by, and could not have been accomplished without, the operational knowledge he derived from the RedSense Trade Secrets. Specifically, Bohuslavskiy used the RedSense Trade Secrets to make the following categories of operational decisions after February 24, 2025, each of which constitutes a continuing act of use within the meaning of 18 U.S.C. § 1839(5)(B): (i) determining which customers to target in his email smear campaign—a purchasing decision that required knowledge of the identity of RedSense's current and prospective customers, which is not publicly available and constitutes a RedSense Trade Secret; (ü) determining which customer relationships to prioritize in his solicitation efforts based on his knowledge of which customers were most strategically important and most critical to RedSense's business operations—an operational goal-setting

decision that required knowledge of the RedSense Trade Secrets regarding the identity and strategic value of RedSense's largest and most valuable customers; (üi) tailoring his solicitations to each customer's unique cybersecurity concerns and needs—a targeting decision that required knowledge of the specific and individualized information RedSense maintains regarding each customer's unique vulnerabilities and service requirements, which constitutes a RedSense Trade Secret; and (iv) positioning his competing services as a superior alternative to RedSense's offerings by leveraging his knowledge of the unique and individualized services that RedSense provides to each customer, including the features and capabilities most critical to each customer's cybersecurity program. Each of these decisions constitutes a continuing use of the RedSense Trade Secrets for a purpose adverse to RedSense and without RedSense's express or implied consent, and each such act of use occurring after May 11, 2016 independently supports RedSense's DTSA claim.

### FIFTH CAUSE OF ACTION – FRAUD
#### (Against Bohuslavskiy)

~~112~~127. RedSense repeats, realleges and incorporates by references paragraphs

1 through ~~111~~126 as if set forth herein.

~~113~~128. In connection with Bohuslavskiy's role at RedSense (and his belief that

he was a partner of RedSense), Bohuslavskiy had authority to approve invoices

submitted by the third-party vendors whose work he managed. As a team leader,

145

Bohuslavskiy was also in a position to supervise the use of licensed software and inspect the deliverables supposedly produced by the freelance contractors.

114129. RedSense made payments on invoices received from the companies (Affix, Dmitriev d/b/a Irasel, EasyStaff, and Pyrus) for work that each of these companies

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 59 of 77 PageID: 59

purportedly performed for RedSense. Each of these payments was approved by Bohuslavskiy.

~~115~~130. To date, RedSense has not received these services, nor the technology promised to them, meaning RedSense has made thousands of dollars in payments and has received nothing in return. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy absconded with the AIDIS (Project Pylon) tool and related source code because he recognized its substantial and increasing value, particularly as the entire cybersecurity industry was recognizing the transformative impact that artificial intelligence could bring to threat intelligence and cybersecurity services. By stealing this tool, Bohuslavskiy positioned himself to offer AI-driven capabilities to RedSense's customers through his own competing venture, while simultaneously depriving RedSense of the ability to deliver the same capabilities.

~~116~~131. Given that Bohuslavskiy managed these vendors and acted on behalf of these vendors (including, *e.g.*, submitting a resignation on behalf of Dmitriev and the EasyStaff freelancers), RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy ~~would create and submit~~could have likely created and submitted these "third party

invoices" to RedSense, ~~approve~~approved the invoices, ~~remit~~remitted payment to Affix (which is solely owned by Bohuslavskiy) for the supposed dispersal of funds to the vendors, but would instead pocket the funds himself.

117132. By directly submitting these invoices to RedSense's Accounting Team on Affix paper, Bohuslavskiy was impliedly approving the invoiced amounts and intentionally misrepresenting that the work had been satisfactorily provided to RedSense such that the contractors warranted payment. By submitting invoices to RedSense from his personal LLC, Affix, rather than directly from the vendor, Bohuslavskiy inserted himself as an intermediary and provided cover that would have allowed him to inflate or even invent contractor invoices. Bohuslavskiy could then conceal whether the money was ultimately disbursed to the third-party

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 60 of 77 PageID: 60
vendor or transferred elsewhere for Bohuslavskiy's own personal gain. In reasonable reliance upon Bohuslavskiy as Chief Research Officer and a supposed partner of RedSense, the Accounting Team remitted payment on these invoices. Indeed, because Bohuslavskiy engaged in layers of obfuscation, it was only after RedSense conducted its audit that it learned of the deception.

118133. RedSense had made multiple requests for Bohuslavskiy to provide access to the deliverables and an accounting of what these third parties have provided to RedSense. In each instance, Bohuslavskiy denied RedSense's request. To date, RedSense has not received any quantifiable deliverable that would justify the payments, including but not limited to source code, documentation, data sets, original invoices, project roadmaps, task history, or time tracking.

payments, including but not limited to source code, documentation, data sets, original invoices, project roadmaps, task history, or time tracking. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy's refusal to provide transparency coincided with RedSense's preparations for SOC 2 compliance, compliance audits, and due diligence in anticipation of a potential capital raise, all of which required full transparency regarding the company's assets, intellectual property, and financial records. As part of these preparations, RedSense was asking Bohuslavskiy for transparency on everything: where the source code was stored, where the EasyStaff deliverables were, and, critically, where all of the data and threat intelligence he had purportedly provided as his Obligated In-Kind Funding in lieu of the $100,000 cash contribution required of every other founding partner was located. RedSense is informed and believes, and on that basis alleges, that it was at this point—when Bohuslavskiy realized that the SOC 2 compliance process, the pending capital raise, and the associated due diligence would expose his failure to deliver the Obligated In-Kind Funding, his fraudulent invoicing scheme, and the full scope of his misconduct— that he could no longer conceal his deception from the other RedSense partners. RedSense is further informed and believes, and on that basis alleges, that it was this realization that caused Bohuslavskiy to abandon any pretense of cooperation and instead act on his premeditated insider threat campaign: absconding with RedSense's assets and trade secrets, directing the

destruction of the RedSense file system, and resigning in a manner calculated to cause maximum harm to RedSense and its customer relationships.

119134. Given that it was Bohuslavskiy's responsibility to manage the work performed by EasyStaff, Dmitriev d/b/a Irasel, and Pyrus (which he did through Affix), this denial of access and accounting negates any claims from Bohuslavskiy that the work was done.

120135. Based on Bohuslavskiy's refusal to provide accounting, RedSense is informed and believes and on that basis alleges, that Bohuslavskiy has fraudulently appropriated RedSense funds for his own use.

121136. Bohuslavskiy, as manager of these vendors, knew that the work had not been performed or that its deliverables had been withheld from RedSense, and

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 61 of 77 PageID: 61

therefore neither he nor these third parties were entitled to compensation. Bohuslavskiy's deception and misrepresentation regarding the work that was not performed constitutes a material misrepresentation of fact.

122137. Bohuslavskiy was entrusted by RedSense to approve these payments for work actually done and to safeguard RedSense funds as a believed to be a member acting on the company's best behalf and Chief ResourceResearch Officer. RedSense reasonably believed that the invoices Bohuslavskiy submitted would be legitimate and, at the time payment was remitted, RedSense had no reason to suspect that these invoices existed to conceal or obfuscate Bohuslavskiy's appropriation of RedSense

152

funds. For example, by submitting invoices from Affix (rather than directly from the

vendor), Bohuslavskiy was able to approve the payment and then conceal whether

the money was disbursed to the vendor or transferred elsewhere for Bohuslavskiy's

own personal gain.

123138. Bohuslavskiy's submission of invoices on behalf of the third-party

vendors was designed with the intent to defraud RedSense, as RedSense relied on

the invoices and mistakenly believed it was remitting payment pursuant to valid

invoices for work actually performed.

124139. As a result of Bohuslavskiy's fraudulent invoicing, RedSense has

been harmed because it has made payment for work without ever receiving the work

product and, in some instances, has potentially made double payments on fraudulent

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 62 of 77 PageID: 62

invoices because Bohuslavskiy submitted or approved invoices that he knew

were duplicates of what had already been paid.

---

## SIXTH CAUSE OF ACTION – CONVERSION
### (Against Bohuslavskiy)

125140. RedSense repeats, realleges and incorporates by references paragraphs

1 through 124139 as if set forth herein.

126141. RedSense owns all rights, title, and interest in and to the following

assets and technology: (1) AIDIS (Project Pylon), including all software and

documentation;, (2) Pyrus platform including all data since inception;, (3) EasyStaff

Deliverables, including code, data, research, LLM, documentation;, (4) Igor

Dmitriev's deliverables as stated in the agreement dated August 1, 2023; (5) Forum Scraping code and results to date; (6) OpenCTI instance and all RedSense Threat Intelligence contained therein; and (7) all AdvIntel threat intelligence reports and historical adversary infrastructure intelligence along with the associated data sets, reports and access data All AdvIntel Reports and threat intelligence since inception.

127142. RedSense contracted and paid for all rights, title, and interest, and other associated ownership rights in and to the aforementioned assets and technology.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 63 of 77 PageID: 63

128143. Bohuslavskiy has, without authority, taken, absconded with, stolen, and refused to return on demand the property which RedSense owns, and which Bohuslavskiy does not own and has no legal right to, including the physical devices, storage media, and tangible copies on which such assets are stored and embodied.

129144. Bohuslavskiy has, without authority, intentionally exercised dominion or control over the property of RedSense as to interfere with RedSense's ownership rights and as to prevent RedSense from realizing the value of the property it owns.

130145. RedSense has made multiple demands for the return of such assets and technology from Bohuslavskiy, who has refused.                    Prior to Bohuslavskiy's resignation, RedSense conducted an asset inventory seeking information from Bohuslavskiy as to the location of the assets for which RedSense had contracted. Bohuslavskiy refused to identify the locations on the RedSense system where these assets were located. Following his resignation, RedSense demanded that the assets

be returned to RedSense, and Bohuslavskiy has refused to comply, claiming that RedSense has no legal right to the assets. Bohuslavskiy's position directly contradicts the representations and warranties he made in the Onboarding Agreement— representations that he signed and had notarized on January 25, 2023— in which he expressly warranted that he had the right to convey the Obligated In-Kind Funding and that no third party could claim any rights to the intellectual property he was obligated to provide. The other RedSense partners relied on those signed and notarized representations in granting Bohuslavskiy equal partnership status in lieu of the $100,000 cash contribution that every other founding partner provided.

131146. Bohuslavskiy, consistent with his involvement at RedSense, would have knowledge regarding RedSense's contracts which provide RedSense the right, title, and interest in and to this property. RedSense is informed and believes, and on this basis alleges, that Bohuslavskiy knew he did not have the right to withhold this property from RedSense.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 64 of 77 PageID: 64

132147. Concurrent with the resignation of Bohuslavskiy, part of the RedSense file system was wiped. Based on the credentials used to wipe the system, RedSense is informed and believes, and on this basis alleges that Bohuslavskiy directed, facilitated, or encouraged the file deletion and removal.

133. Bohuslavskiy's absconding with RedSense's property (in the case of the deleted and removed source code) and his refusal to return the property that RedSense is the legal owner of constitutes an unlawful conversion.

148. RedSense had a possessory interest in its source code, its OpenCTI threat intelligence database, and the files stored on its server infrastructure. Dmitriev, by copying those materials to an external destination and then destroying the file system on the evening of February 23, 2025, intentionally deprived RedSense of its property without authorization and without consent. The destruction of the file system and the exfiltration of the database archives constitutes an unlawful conversion of RedSense's property. As a direct and proximate result of Dmitriev's conversion, RedSense has suffered damages in an amount to be proven at trial, including the value of the data destroyed and the costs of investigation and remediation.

## SEVENTH CAUSE OF ACTION – UNJUST ENRICHMENT
### (Against Bohuslavskiy)

~~134~~149. RedSense repeats, realleges and incorporates by references paragraphs

1 through ~~133~~148 as if set forth herein.

~~135~~150. The acts of Bohuslavskiy complained of herein constitute unjust

enrichment of Bohuslavskiy at the expense of RedSense in violation of common law.

~~136~~151. Bohuslavskiy has received and retained an impermissible benefit by

absconding with property for which RedSense has paid and is the legal owner.

~~137~~152. Bohuslavskiy has received and retained and impermissible benefit by

authorizing payments by RedSense to third party vendors for work that was not

performed. RedSense is informed and believes, and on that basis alleges, that

Bohuslavskiy used these third-party vendors to obscure that the payments he

was

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 65 of 77 PageID: 65

approving were being rerouted to business entities that he owned for his own personal benefit.

138153. Bohuslavskiy, in his capacity as Chief Research Officer and his affiliation with RedSense, used RedSense as his personal bank by approving invoice payments for work that he knew he and others had failed to perform. This approval of payments for Bohuslavskiy's personal financial gain is in excess of the payments that Bohuslavskiy has already received from RedSense (either during the time that RedSense believed he was a partner or as compensation for the work performed).

139154. His retention of this property and money has allowed him to obtain profits and benefits to which he is not entitled. His retention of this property and money has been to the detriment of RedSense, who still does not have the work it paid for.

140155. Retention by Bohuslavskiy of the profits he derived from his malfeasance would be inequitable.

141156. RedSense seeks injunctive relief and compensatory and punitive damages in an amount to be proven at trial, including, without limitation, disgorgement of Bohuslavskiy's ill-gotten profits.

161

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 66 of 77 PageID: 66

## EIGHTH CAUSE OF ACTION – THE ONBOARDING AGREEMENT IS VOID AND UNENFORCEABLE AS TO BOHUSLAVSKIY DUE TO A LACK OF CONSIDERATION (28 U.S.C. § 2201)
### (Against Bohuslavskiy and Affix)

157. RedSense repeats, realleges and incorporates by references paragraphs

1 through 156 as if set forth herein.

158. Pursuant 28 U.S.C. § 2201, RedSense brings an action for declaratory

relief.

159. Pursuant to the Onboarding Agreement, which Bohuslavskiy executed

on January 25, 2023, Bohuslavskiy agreed to provide Obligated In-Kind Funding in

the form of threat intelligence and intellectual property in lieu of the monetary

contribution required to become a partner of RedSense.

160. The other partners of RedSense understood that Bohuslavskiy would

provide the AdvIntel threat intelligence reports and historical adversary

infrastructure intelligence along with the associated data sets, reports, and access

data to RedSense as part of the Obligated In-Kind Funding.

161. Bohuslavskiy represented and warranted that he had the right to provide

the Obligated In-Kind Funding, and that no third party could claim any rights with

162

163

~~rights with~~ respect to the assets that Bohuslavskiy was obligated to provide as a <u>condition</u>

~~condition~~ precedent to become a partner of RedSense.

~~147~~<u>162</u>. For two years following the execution of the Onboarding Agreement,

the other partners of RedSense treated Bohuslavskiy as a partner because they

163

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 67 of 77 PageID: 67
believed he had provided the Obligated In-Kind Funding that Bohuslavskiy was obligated to provide.

148163. On March 31, 2025, Bohuslavskiy, in connection with his refusal to return the AdvIntel ~~threat intelligence reports~~Treat Intelligence and Intellectual Property, violated both the Obligated In-Kind Funding provision and the representation and warranty provision of the Onboarding Agreement by admitting that "RedSense definitely has no claim to this IP and any such transfer — if it were even possible — would violate binding agreements," and that "RedSense clearly had no legal entitlement" to the AdvIntel reports.

149164. Because the Obligated In-Kind Funding was the consideration Bohuslavskiy was obligated to convey as a condition precedent to becoming a partner, his admission that he never had the right to convey the AdvIntel reports, and in fact never did provide the AdvIntel reports, means that there was a lack of consideration on the part of Bohuslavskiy with respect to joining the partnership. These admissions are particularly significant because they directly contradict the representations and warranties Bohuslavskiy made in the Onboarding Agreement— representations that he signed and had notarized on January 25, 2023, and upon which the other RedSense partners relied in granting Bohuslavskiy equal partnership status in lieu of the $100,000 cash contribution provided by every other founding partner. The Members of RedSense did not agree to accept alternative or substituted

164

services from Bohuslavskiy from what he was obligated to provide under the

Onboarding Agreement.

150165. RedSense will be unfairly harmed and Bohuslavskiy will be unjustly

enriched if RedSense is forced to perform under the Onboarding Agreement as to

Bohuslavskiy and recognize Bohuslavskiy as a partner of RedSense.

151166. Accordingly, RedSense seeks a declaration that the Onboarding

Agreement is void and unenforceable as to Bohuslavskiy because of lack of

consideration on the part of Bohuslavskiy.

## NINTH CAUSE OF ACTION – THE ONBOARDING AGREEMENT IS VOID AND UNENFORCEABLE AS TO BOHUSLAVSKIY DUE TO FRAUD (28 U.S.C. § 2201)
### (Against Bohuslavskiy and Affix)

~~152~~167. RedSense repeats, realleges and incorporates by references paragraphs

1 through ~~151~~166 as if set forth herein.

~~153~~168. Pursuant 28 U.S.C. § 2201, RedSense brings an action for declaratory

relief.

~~154~~169. Pursuant to the Onboarding Agreement, which Bohuslavskiy executed,

~~executed,~~ Bohuslavskiy agreed to provide Obligated In-Kind Funding in the form of threat

~~of threat~~ intelligence and intellectual property in lieu of the monetary contribution required

to become a partner of RedSense.

~~155~~170. The other partners of RedSense understood that Bohuslavskiy would

provide the AdvIntel threat intelligence reports and historical adversary

166

infrastructure intelligence along with the associated data sets, reports, and access data to RedSense as part of the Obligated In-Kind Funding.

156171. Bohuslavskiy represented and warranted that he had the right to provide the Obligated In-Kind Funding, and that no third party could claim any rights with respect to the assets that Bohuslavskiy was obligated to provide as a condition precedent to become a partner of RedSense.

157172. For two years following the execution of the Onboarding Agreement, the other partners of RedSense treated Bohuslavskiy as a partner because they

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 69 of 77 PageID: 69
believed he had provided the AdvIntel ~~threat intelligence~~<u>Treat Intelligence and Intellectual Property</u> reports that Bohuslavskiy was obligated to provide.

~~158~~<u>173</u>. On March 31, 2025, Bohuslavskiy, in connection with his refusal to return the AdvIntel ~~threat intelligence reports~~<u>Treat Intelligence and Intellectual Property</u>, violated both the Obligated In-Kind Funding provision and the representation and warranty provision by admitting that "RedSense definitely has no claim to this IP and any such transfer — if it were even possible — would violate binding agreements," and that "RedSense clearly had no legal entitlement" to the AdvIntel reports.

~~159~~<u>174</u>. To induce RedSense's other partners to grant him partnership rights, Bohuslavskiy represented that he had the ability and right to convey the threat intelligence and intellectual property to RedSense in lieu of the monetary contribution required of other partners. <u>Specifically, Bohuslavskiy held himself out</u>

to the other RedSense partners as a co-founder of AdvIntel and represented that, as such, he had ownership rights in the AdvIntel intellectual property and the unencumbered right to convey it to RedSense as the Obligated In-Kind Funding. In furtherance of this representation, Bohuslavskiy provided an Excel file that he described as containing AdvIntel data, which the other partners relied upon as evidence that Bohuslavskiy possessed and could convey the Obligated In-Kind Funding. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy's representations regarding his role at AdvIntel and his right to convey the AdvIntel intellectual property have been contradictory and self-serving: at various times, Bohuslavskiy has claimed to be a co-founder of AdvIntel, claimed to have been merely a contractor at AdvIntel, claimed that AdvIntel was a competitor of RedSense, claimed that RedSense was a follow-on entity of AdvIntel, and falsely represented that AdvIntel had split into two separate entities, AdvIntel and Affix, none of which is true. These contradictory and self-serving representations were designed to justify his claim that he possessed the rights to the AdvIntel intellectual property and could convey it to RedSense as part of the Obligated In-Kind Funding. RedSense is further informed and believes, and on that basis alleges, that Bohuslavskiy has at various times suggested that he provided other things of value in lieu of the AdvIntel reports and in lieu of the $100,000 cash contribution provided by every other founding partner. RedSense disputes this position. As confirmed by

169

RedSense's accountant, Mighty Financial, the in-kind contribution that Bohuslavskiy himself defined and valued at $600,000 in the RedSense Partner Contributions Tax File—which consisted entirely of AdvIntel intellectual property, reports, data, and adversarial accesses—has never been delivered to, received by, or capable of being accounted for in RedSense's books and records. No superseding agreement was ever entered into that would override, change, or modify the nature of the Obligated In-Kind Funding that Bohuslavskiy agreed to provide pursuant to the Onboarding Agreement, and no other in-kind contribution was agreed to by the legal members of RedSense as a substitute for the Obligated In-Kind Funding.

160175. Bohuslavskiy knew that RedSense relied on Bohuslavskiy's representations regarding his right and ability to convey the threat intelligence and intellectual property and would not have granted Bohuslavskiy partnership rights if Bohuslavskiy had not promised the Obligated In-Kind Funding and represented that he could provide the Obligated In-Kind Funding

161176. The Obligated In-Kind Funding and representation and warranty provisions were material terms of the Onboarding Agreement.

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 70 of 77 PageID: 70

162177. Based on the admissions made in Bohuslavskiy's March 31 letter,

RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy

knew that, in contravention to the representation and warranty he made in the

Onboarding Agreement, that he had no legal right to convey the threat intelligence and intellectual property and knew that such representation was false.

163178. RedSense and its other partners relied on the representation and warranty provided by Bohuslavskiy and his promise to convey the Obligated In-Kind Funding. Because RedSense and its other partners believed Bohuslavskiy to be truthful in his representation and warranty and promise to convey the Obligated In-Kind Funding, they allowed him to be a partner of RedSense, provided him with access to proprietary company information that only partners have access to, and entrusted him with management of RedSense as an equal partner.

164179. RedSense and its other partners would not have allowed Bohuslavskiy to join the RedSense partnership had they known that his representation and warranty was false and his purported Obligated In-Kind Funding was actually worthless because RedSense would never receive nor have legal right to the threat intelligence and intellectual property that was promised.

165180. RedSense will be unfairly harmed and Bohuslavskiy will be unjustly enriched if RedSense is forced to perform under the Onboarding Agreement as to Bohuslavskiy and recognize Bohuslavskiy as a partner of RedSense.

Case 2:25-cv-12281 Document 1 Filed 06/27/25 Page 71 of 77 PageID: 71

166181. Accordingly, RedSense seeks a declaration that the Onboarding

Agreement is void and unenforceable as to Bohuslavskiy because of fraud on the part

of Bohuslavskiy at the formation of the Onboarding Agreement.

---

**TENTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTIES**
**(Wyo. Stat. 17-29-409)**
**(Against Bohuslavskiy)**

~~167~~182. RedSense repeats, realleges and incorporates by references paragraphs

1 through ~~166~~181 as if set forth herein.

183. In the alternative, if it is determined that Bohuslavskiy is and was a

~~168. In the alternative, if it is determined that Bohuslavskiy is and was a~~ partner of RedSense pursuant to the Onboarding Agreement, Bohuslavskiy as a

partner of RedSense owes fiduciary duties of loyalty and care to the LLC and to the

other partners under the Wyoming LLC Act.

~~169~~184. The duty of loyalty requires Bohuslavskiy to refrain from dealing with

RedSense as or on behalf of a person having an interest adverse to RedSense.

~~170~~185. The duty of loyalty also requires Bohuslavskiy to refrain from

competing with RedSense in the conduct of RedSense's activities and business.

~~171~~186. By advertising his own threat intelligence services to existing RedSense

customers for the purpose of diverting the customers away from RedSense, sullying

RedSense's reputation, denigrating RedSense's services, and competing with

RedSense for this business, Bohuslavskiy violated his duty of loyalty to RedSense.
~~Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 72 of 77 PageID: 72~~

~~172~~187. Bohuslavskiy had an obligation to not compete with RedSense and not

174

use proprietary, confidential, and trade secret information belonging to RedSense to

usurp the opportunities that RedSense has taken time and care to cultivate.

173188. The duty of care requires Bohuslavskiy to act with the care that a person in a like position would reasonably exercise under similar circumstances.

174189. By approving invoices for work that had not been performed, by approving duplicate payments, by encouraging his brother and the EasyStaff freelancers not to sign the CIIAA, by failing to attend partner meetings to discuss crucial and critical issues such as the financial condition of RedSense, by ceasing to perform his responsibilities and yet maintaining the illusion that he and his team remained productive, by refusing to provide the intellectual property and assets that RedSense contracted and paid for (and that Bohuslavskiy was responsible for providing), by absconding with RedSense property, by facilitating, directing, requesting, or encouraging the wiping and destruction of the file system containing RedSense source code using credentials that were assigned to Dmitriev, by denigrating the reputation of RedSense to current and prospective customers, by providing false and misleading information to RedSense customers about RedSense, by harassing RedSense customers with multiple spam-like communications, by stealing the proprietary and trade secret information belonging to RedSense, and by encouraging RedSense customers to break their contracts with

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 73 of 77 PageID: 73

RedSense and retain Bohuslavskiy's services instead, by refusing to provide the identities of the EasyStaff freelancers for verification, by refusing to provide any original vendor invoices or proof of funds or payments from Affix to Irasel or any other vendor, and

177

by refusing to provide any data supporting the legitimacy of the expenses he submitted to RedSense, Bohuslavskiy failed to act with the care of a reasonable partner of RedSense.

175190. All of these acts carried out by Bohuslavskiy were adverse to the best interests of the company and have caused financial and reputational harm to RedSense.

176191. Bohuslavskiy has engaged and continues to engage in wrongful conduct as described herein that has adversely and materially affected and will continue to adversely and materially affect RedSense's activities.

177192. Bohuslavskiy has willfully and persistently committed and continues to willfully and persistently commit a material breach of his duties under Wyo. Stat. 17-29-409.

178193. Bohuslavskiy has engaged in and continues to engage in conduct relating to RedSense's activities which are to the detriment of RedSense, and it is no longer reasonably practical for RedSense to carry on its activities with Bohuslavskiy as a partner.

**ELEVENTH CAUSE OF ACTION – VIOLATION OF THE NEW JERSEY COMPUTER RELATED OFFENSES ACT (N.J.S.A. § 2A:38A-3) (Against Dmitriev)**

194. RedSense repeats, realleges and incorporates by reference paragraphs

178

1 through 193 as if set forth herein.

195. RedSense owns all rights, title, and interest in and to the source code, file system, data, and other digital assets that were stored on the RedSense systems accessed on the evening of February 23, 2025, all of which constitute "property" within the meaning of N.J.S.A. § 2A:38A-1(k), including financial instruments, information, data, and computer software in human readable or computer readable form.

196. Dmitriev, using credentials assigned to him by RedSense, initiated an SSH session to the RedSense systems on the evening of February 23, 2025, and thereafter purposefully and knowingly accessed, altered, damaged, took, and destroyed RedSense's data, source code, database archives, and file system, in violation of N.J.S.A. § 2A:38A-3(a) and (e). Specifically, Dmitriev's conduct violated subsection (a), which prohibits the purposeful and knowing altering, damaging, taking, or destruction of any data, database, computer program, computer software, or computer equipment, and subsection (e), which prohibits the purposeful and knowing accessing of any computer, computer system, or computer network and recklessly altering, damaging, destroying, or obtaining any data, database, computer program, computer software, or computer equipment. As established by the CLI history logs attached as **Exhibit N**, Dmitriev affirmatively copied RedSense proprietary data directories and data contents, deleted the copied archives from the host system, and destroyed the file system—conduct that goes far beyond mere

180

viewing or passive access and constitutes the affirmative taking and destruction of data actionable under the NJCROA. The CLI history logs further reflect that Dmitriev attempted to destroy the remaining file system and forensic evidence, though this last attempt to destroy the forensic CLI history was unsuccessful.

197. As a direct and proximate result of Dmitriev's purposeful and knowing unauthorized altering, damaging, taking, and destruction of RedSense's data, source code, and file system, RedSense has suffered damage to its business and property within the meaning of N.J.S.A. § 2A:38A-3, including the permanent loss of source code and data, the cost of investigation and remediation, and the loss of the value of the destroyed and misappropriated digital assets.

198. RedSense has demanded the return of its property and a full accounting of the data accessed, copied, and destroyed by Dmitriev, and Bohuslavskiy, who has acted as Dmitriev's representative, including by submitting Dmitriev's resignation on his behalf, has refused to comply on Dmitriev's behalf.

199. As a direct and proximate result of Dmitriev's violations of N.J.S.A. § 2A:38A-3, RedSense is entitled to recover compensatory and punitive damages, costs of suit, reasonable attorneys' fees, and costs of investigation and litigation, in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION – VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq.*) (Against Dmitriev)

200. RedSense repeats, realleges and incorporates by reference paragraphs 1 through 199 as if set forth herein.

201. RedSense owns the RedSense Trade Secrets, as described herein.

202. RedSense implements measures that are reasonable under the circumstances to protect the secrecy of the RedSense Trade Secrets, including, without limitation, assigning unique credentials to individuals whose access is necessary to perform their responsibilities and immediately terminating access when individuals leave RedSense.

203. Dmitriev, by virtue of his role as Strategic Consultant and his administration of the Pyrus platform, had access to RedSense's confidential and trade secret information, including source code, threat intelligence data, and other proprietary materials constituting RedSense Trade Secrets.

204. Specifically, the RedSense Trade Secrets misappropriated by Dmitriev

182

include:

183

include:



Each of these categories constitutes a RedSense Trade Secret as defined herein, and Dmitriev's conduct with respect to each category constitutes misappropriation within the meaning of 18 U.S.C. § 1839(5).

205. Dmitriev misappropriated the RedSense Trade Secrets by: (a) acquiring the RedSense Trade Secrets by improper means, including by exceeding the scope of his authorized access to the RedSense systems by using his assigned credentials to copy out source code and destroy the file system—conduct that was not within the scope of his authorization as Strategic Consultant and that constituted improper means within the meaning of 18 U.S.C. § 1839(6), including theft and espionage through electronic means; and (b) in the alternative, disclosing or using the

184

RedSense Trade Secrets without express or implied consent, in that Dmitriev, who acquired knowledge of the RedSense Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use, used and disclosed those trade secrets without RedSense's consent by copying them out of RedSense's systems for the purpose of conveying them to Bohuslavskiy or others acting in concert with him, and by destroying the file system to deprive RedSense of access to its own trade secret information. Dmitriev knew or had reason to know that his conduct was unauthorized and that the information he accessed, copied, and destroyed constituted trade secrets of RedSense. Dmitriev's misappropriation by use and improper acquisition may be established through circumstantial evidence, including evidence of his access to the RedSense Trade Secrets and the manner, scope, and suspicious timing of the February 23 session relative to his resignation the following day.

206. RedSense has been and will continue to be harmed by Dmitriev's misappropriation, which has also unjustly enriched Dmitriev and Bohuslavskiy.

### THIRTEENTH CAUSE OF ACTION – FRAUD
### (Against Dmitriev, Affix, and Dmitriev d/b/a Irasel)

207. RedSense repeats, realleges and incorporates by reference paragraphs 1 through 206 as if set forth herein.

208. Dmitriev, acting through his sole proprietorship Dmitriev d/b/a Irasel, submitted or caused to be submitted invoices to Affix for services purportedly performed for RedSense that were never performed or whose deliverables were

185

withheld from RedSense. Affix, acting as the invoicing intermediary and solely owned and controlled by Bohuslavskiy, submitted those invoices to RedSense's accounting team on Affix paper, thereby impliedly representing to RedSense that the services had been satisfactorily performed and that the invoiced amounts were legitimate obligations of RedSense. Bohuslavskiy, as the sole member and manager of Affix and the supervisor of Dmitriev, approved each such invoice submitted to RedSense, knowing that the underlying services had not been performed or that the deliverables had been withheld. The specific roles of each defendant in the scheme were as follows: (a) Dmitriev d/b/a Irasel generated or caused to be generated invoices for services not rendered and submitted them to Affix for pass-through to RedSense; (b) Affix received those invoices, placed them on Affix letterhead, and submitted them to RedSense's accounting team as if they were legitimate invoices for services rendered; and (c) Bohuslavskiy, as the sole member of Affix and the manager responsible for approving vendor payments, approved each such invoice for payment, knowing that the services had not been performed. These representations were false and fraudulent.

The deliverables Dmitriev ███████████████████████████ was contractually required to provide—including strategic alignment, product

development roadmaps, project plans, estimates for hours and budgets, and operational process improvements—were never delivered to RedSense. The invoiced amounts, denominated in Euros and marked up for currency conversion, were therefore not merely unearned—they were directly contrary to the express terms of the engagement letter Dmitriev himself executed.

209. Dmitriev knew, at the time the invoices were submitted, that the services purportedly covered by those invoices had not been performed or that the deliverables had been withheld from RedSense. Affix, acting through Bohuslavskiy as its sole member and manager, knew that the invoices it submitted to RedSense on behalf of Dmitriev d/b/a Irasel were for services not rendered. Bohuslavskiy, as the manager of Dmitriev and the sole member of Affix, knew that neither Dmitriev nor Dmitriev d/b/a Irasel had performed the services for which RedSense was being invoiced, and that RedSense was therefore not obligated to pay the invoiced amounts.

210. Dmitriev, Affix, and Bohuslavskiy submitted or caused to be submitted these invoices with the intent to deceive RedSense into making payments for services not rendered, and to divert those payments for the personal benefit of Bohuslavskiy and/or Dmitriev. Affix's submission of invoices on Affix letterhead was specifically designed to lend an appearance of legitimacy to the invoiced

187

amounts and to conceal whether the funds were ultimately disbursed to Dmitriev d/b/a Irasel or retained by Bohuslavskiy for his own personal gain.

211. RedSense reasonably relied on the invoices submitted by Affix and, in reasonable reliance thereon, remitted payment for the purported services.

212. As a direct and proximate result of the fraudulent invoicing by Dmitriev, Affix, and Dmitriev d/b/a Irasel, RedSense has been damaged in an amount to be proven at trial, including but not limited to the approximately paid by RedSense to Affix on account of Dmitriev d/b/a Irasel invoices. The specific invoices that were fraudulent are those identified in the General Allegations herein, including the twelve invoices described therein spanning from September 13, 2023 through January 6, 2025, each of which was submitted to RedSense on Affix letterhead by Bohuslavskiy, and each of which was approved by Bohuslavskiy for payment, notwithstanding that the deliverables for which RedSense was invoiced were never provided to RedSense.

213. RedSense's fraud claim against Dmitriev is not barred by the economic loss doctrine. The fraudulent invoicing scheme—fabricating invoices for services never performed, concealing undisclosed side arrangements between Affix and Irasel, and billing RedSense for currency exchange costs expressly prohibited by the engagement letter—constitutes independent tortious conduct extraneous to the performance of any contractual obligation. The economic loss doctrine does not bar

claims arising from conduct that is independent of, and not merely duplicative of, the contractual duties at issue.

**FOURTEENTH CAUSE OF ACTION – UNJUST ENRICHMENT**
**(Against Dmitriev, Affix, and Dmitriev d/b/a Irasel)**

214. RedSense repeats, realleges and incorporates by reference paragraphs 1 through 213 as if set forth herein, except to the extent that any such allegations establish the existence of an enforceable express contract governing the subject matter of this Count. This Fourteenth Cause of Action is pleaded in the alternative to the breach of contract and fraud claims asserted herein, pursuant to Fed. R. Civ. P. 8(d)(2). Federal Rule of Civil Procedure 8(d)(2) permits a party to plead claims in the alternative, and a plaintiff may plead unjust enrichment alongside breach of contract and fraud claims so long as the validity of the contract itself is actually disputed or the plaintiff alleges enrichment beyond contractual rights. To the extent that any contract between RedSense and Dmitriev, Affix, or Dmitriev d/b/a Irasel is found to be invalid, unenforceable, or inapplicable to the conduct alleged herein, or to the extent that Dmitriev, Affix, or Dmitriev d/b/a Irasel were enriched beyond their contractual rights, RedSense asserts this claim for unjust enrichment.

215. Dmitriev, Affix, and Dmitriev d/b/a Irasel received payments from RedSense for services that were never performed or deliverables that were never provided to RedSense.

189

216. Dmitriev, Affix, and Dmitriev d/b/a Irasel have retained the benefit of those payments without providing the contracted services or deliverables in return.

217. It would be inequitable and unjust to permit Dmitriev, Affix, and Dmitriev d/b/a Irasel to retain the payments received from RedSense for work that was never performed.

218. As a direct and proximate result of the unjust enrichment of Dmitriev, Affix, and Dmitriev d/b/a Irasel, RedSense has been damaged in an amount to be proven at trial, including, without limitation, disgorgement of all amounts improperly received and retained by Dmitriev, Affix, and Dmitriev d/b/a Irasel,

including: (a) the approximately                      paid by RedSense to Affix on account of Dmitriev d/b/a Irasel invoices for services that were never performed or whose deliverables were never provided to RedSense; and (b) to the extent that the EasyStaff freelancers—who were supervised and managed exclusively by Dmitriev and Bohuslavskiy through Affix—are found to have been phantom accounts or otherwise fictitious persons used to receive and divert RedSense funds, the

approximately                      paid by RedSense to EasyStaff UAB for freelancers' purported services that were never delivered to RedSense.

**FIFTEENTH CAUSE OF ACTION – BREACH OF CONTRACT**
**(Against Affix)**

219. RedSense repeats, realleges and incorporates by reference paragraphs 1 through 218 as if set forth herein.

190

220. Bohuslavskiy executed the Onboarding Agreement on behalf of himself and Affix. Affix is a party to the Onboarding Agreement and bound by its terms, including the obligation to provide the Obligated In-Kind Funding and the representations and warranties set forth in Section 6.1 thereof. First, Affix is a member-managed limited liability company of which Bohuslavskiy is the sole member; as such, Bohuslavskiy possessed actual authority to act on behalf of Affix and to bind Affix by executing agreements in a representative capacity. Second, the signature block of the Onboarding Agreement expressly states that it was executed "on behalf of Elisei Boguslavskii and AFFIX Advisory, LLC"—a direct and unambiguous expression of representative capacity that binds Affix as a party to the agreement to the same extent as if Affix had executed the agreement in its own name. Third, the notarization block referencing Bohuslavskiy by name authenticates the identity of the signer and does not negate, limit, or qualify the representative capacity in which Bohuslavskiy signed; Bohuslavskiy's express statement that he was signing on behalf of Affix is fully consistent with, and is not undermined by, the notary's acknowledgment of his individual identity. Fourth, Affix's status as a single-member LLC does not diminish its standing as a separate and distinct contracting party; Bohuslavskiy's exercise of ownership, influence, and governance over Affix as its sole member does not dissolve the distinction between member and entity for

191

purposes of contract formation, and Affix is bound by the Onboarding Agreement as a legal entity in its own right.

221. Affix breached the Onboarding Agreement by: (a) failing to provide the Obligated In-Kind Funding as required under Section 1.1 thereof; (b) making representations and warranties in Section 6.1 that were false at the time they were made, including the representation that no third party could claim any rights to the intellectual property that Affix and Bohuslavskiy were obligated to provide; (c) submitting invoices to RedSense for services not performed and receiving payment therefor, in violation of Affix's obligations to act in good faith and in the best interests of RedSense; and (d) disclosing the terms of the Onboarding Agreement and RedSense's confidential business information in violation of Section 3.1, which required that the terms of the agreement be kept confidential and disclosed only on an as-needed basis and only upon consent of all Founders.

222. As a direct and proximate result of Affix's breach of the Onboarding Agreement, RedSense has suffered damages in an amount to be proven at trial.

**SIXTEENTH CAUSE OF ACTION – DECLARATORY RELIEF: ONBOARDING AGREEMENT VOID AS TO AFFIX (28 U.S.C. § 2201) (Against Affix)**

223. RedSense repeats, realleges and incorporates by reference paragraphs 1 through 222 as if set forth herein.

192

224. Pursuant to 28 U.S.C. § 2201, RedSense brings an action for declaratory relief.

225. Affix executed the Onboarding Agreement alongside Bohuslavskiy on January 25, 2023. Affix's obligations under the Onboarding Agreement, including the obligation to provide the Obligated In-Kind Funding and the representations and warranties in Section 6.1, are subject to the same defenses of lack of consideration and fraud as those asserted against Bohuslavskiy in the Eighth and Ninth Causes of Action herein.

226. Because the Obligated In-Kind Funding was never provided, and because the representations and warranties made by Affix and Bohuslavskiy in the Onboarding Agreement were false at the time they were made, there was a failure of consideration and a fraud in the inducement with respect to Affix's participation in the Onboarding Agreement.

227. RedSense will be unfairly harmed and Affix will be unjustly enriched if RedSense is forced to perform under the Onboarding Agreement as to Affix.

228. Accordingly, RedSense seeks a declaration that the Onboarding Agreement is void and unenforceable as to Affix due to lack of consideration and fraud.

193

## SEVENTEENTH CAUSE OF ACTION – CIVIL CONSPIRACY
### (Against All Defendants)

229. RedSense repeats, realleges and incorporates by reference paragraphs 1 through 228 as if set forth herein.

230. Bohuslavskiy, Dmitriev, Affix, and Dmitriev d/b/a Irasel (collectively, the "Conspirators") entered into an agreement, combination, or understanding to engage in a common scheme to defraud RedSense, misappropriate RedSense's property and trade secrets, and cause financial and reputational harm to RedSense. Under New Jersey law, civil conspiracy requires: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages. Each element is satisfied here. The existence of this agreement is established by circumstantial evidence, including the complexity of the coordinated scheme, the multi-step execution required across multiple entities and individuals, the deliberate concealment of the scheme through the Affix invoicing structure, and the joint operation of the fraudulent invoicing arrangement and the February 23 unauthorized access — all of which support a finding that the Conspirators could not have acted as they did absent an agreement among them. The conspiracy was formed no later than September 2023, when Dmitriev d/b/a Irasel began submitting invoices through Affix for services not rendered, and continued through and including the destruction of the RedSense file

194

system on February 23, 2025, Bohuslavskiy's and Dmitriev's coordinated resignations on February 24, 2025, and Bohuslavskiy's ongoing smear campaign against RedSense's customers. This cause of action is not asserted as an independent tort but as a means of extending joint and several liability among the Conspirators for the underlying torts alleged herein, including fraud, violation of the New Jersey Computer Related Offenses Act, N.J.S.A. § 2A:38A-3, misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and breach of fiduciary duty as alleged in the Tenth Cause of Action against Bohuslavskiy.

231. To the extent the intra-corporate conspiracy doctrine might otherwise apply to bar conspiracy claims between Bohuslavskiy and entities he owns and controls, that doctrine does not bar the claims asserted herein for the following independent reasons: (1) Bohuslavskiy acted for his own sole personal benefit—not on behalf of Affix or in furtherance of any legitimate corporate purpose—when he directed the fraudulent invoicing scheme, the destruction of RedSense's file system, and the smear campaign against RedSense's customers, all of which were designed to enrich Bohuslavskiy personally and to harm RedSense; and (2) Dmitriev is an independent third party who joined the conspiracy, and his participation as a co-conspirator independently satisfies the requirement of two or more persons acting in concert.

195

232. In furtherance of this conspiracy, the Conspirators committed the following overt acts, among others:

(a) Bohuslavskiy, acting through Affix, submitted or caused to be submitted fraudulent invoices to RedSense for services purportedly performed by Dmitriev, Dmitriev d/b/a Irasel, EasyStaff, and Pyrus that were never performed or whose deliverables were withheld from RedSense;

(b) Dmitriev, acting through Dmitriev d/b/a Irasel, submitted or caused to be submitted invoices for services not rendered, routed through Affix, to deceive RedSense into making payments for work not performed;

(c) Affix received and retained payments from RedSense for services not rendered, and served as the vehicle through which RedSense funds were diverted for the personal benefit of Bohuslavskiy and/or Dmitriev;

(d) Dmitriev, using credentials assigned to him by RedSense, accessed the RedSense systems on the evening of February 23, 2025, copied out source code, and destroyed the file system, at the direction, request, or encouragement of Bohuslavskiy, for the purpose of depriving RedSense of its property and trade secrets;

(e) Bohuslavskiy and Dmitriev, who had exclusive control over the Pyrus platform and ensured that no @redsense.com email account was listed as an administrator, exploited that exclusive gatekeeping role to lock RedSense out

196

of the Pyrus platform following their resignations, thereby depriving RedSense of access to its own work product and data — conduct that was undertaken at the direction, request, or encouragement of Bohuslavskiy and that weaponized the informational dominance and position of dependence that their administrative control had created. Moreover, RedSense's internal audit revealed that the Pyrus invoice submitted by Bohuslavskiy for reimbursement was not valid, and it remains unclear whether any payments were ever made to Pyrus or whether the Pyrus software license charges were simply a phony expense designed to extract additional funds from RedSense; and

(f) Bohuslavskiy launched a campaign of contacting RedSense customers, disparaging RedSense, and soliciting customers to retain his services directly, using RedSense's confidential customer information and trade secrets to which he had access by virtue of his role at RedSense. In furtherance of this conspiracy, Bohuslavskiy sent Signal messages to Dmitriev and others detailing a premeditated contingency plan to abscond with RedSense's assets, intellectual property, and customer relationships in the event of a dispute with RedSense's other partners. As early as January 19, 2025, Bohuslavskiy stated in a Signal message: "We could go to another company for investment and start on our own—I already have solid options for this. But RedSense and Affix share the same market since nearly all of RedSense's clients originally

197

came from AdvIntel. So, if we launch our own thing, I would be approaching the same people whom I know and whom Dave and I originally brought in from AdvIntel." On January 21, 2025, Bohuslavskiy further stated: "Due to complete absence of any written agreements, our projects as of right now all belong to us—i.e. individual people working in Affix." On February 25, 2025—the day after his resignation—Bohuslavskiy sent a Signal message to a third party stating: "it would be stupid to make an ultimatum like the one i made with out a clear back up plan, right?" and confirming that he had "preemptively backup all of what we have done on the intel side—from each email to each report," and that "RedSense did not bother to put any IP agreements in place." In the same message, Bohuslavskiy stated: "I already got confirmation from some customers that they will be likely filing a contract breach claim if the intel is gone, and not proceed with their multi-year deals," and threatened: "There is no way the Solis contract will be re-signed this June with out the intel, and their entire financial plan—again, as you know, is based on that renewal." These communications further evidence that the cyber incident and data destruction were not accidental but rather part of a deliberate scheme orchestrated by or at the direction of Bohuslavskiy. True and accurate copies of the Signal messages referenced herein are attached to this Complaint as **Exhibit H**.

198

(g) In furtherance of the conspiracy, on or about May 21, 2024—while Bohuslavskiy was still serving as Chief Research Officer of RedSense— Bohuslavskiy disseminated RedSense's confidential 2024 Cash Forecast to Dmitriev, an unauthorized third party, via a Google Sheet. The 2024 Cash Forecast is a proprietary RedSense financial document containing highly sensitive information, including RedSense's revenue projections, customer subscription revenue, contractor costs, and financial position. Bohuslavskiy created a copy of the document, converted it to a Google Sheet, and shared it with Dmitriev, who is identified as the owner of the shared Google Sheet. This dissemination of RedSense's confidential financial information to an unauthorized third party was not authorized by RedSense's legal members, was not disclosed to RedSense's other partners, and constitutes a breach of Bohuslavskiy's fiduciary duties and RedSense's confidentiality policies. RedSense is informed and believes, and on that basis alleges, that Bohuslavskiy shared this and other confidential RedSense information with Dmitriev on multiple occasions during his tenure, and that this sharing of confidential information was part of the broader conspiracy to position Bohuslavskiy and Dmitriev to exploit RedSense's assets and customer relationships for their own benefit.

199

(h) In further furtherance of the conspiracy, on or about May 13–14, 2025— months after Bohuslavskiy's and Dmitriev's resignations on February 24, 2025— Dmitriev sent Bohuslavskiy a Signal message stating in Russian: "Бэкап у нас есть. Я начинаю удалять Pyrus," which translates to: "We have a backup. I am starting to delete Pyrus." This message demonstrates that: (i) Dmitriev and Bohuslavskiy maintained unauthorized access to the Pyrus platform well after their resignations; (ü) Dmitriev, at the direction or with the knowledge of Bohuslavskiy, made a backup of RedSense's proprietary and confidential data stored in the Pyrus platform before deleting it; and (üi) Dmitriev thereafter intentionally destroyed RedSense's proprietary and confidential data stored in the Pyrus platform, depriving RedSense of any ability to recover that data. This post-resignation conduct is the identical pattern of behavior that Dmitriev employed on the evening of February 23, 2025 with respect to the RedSense server infrastructure: copying data out and then destroying the source. RedSense is informed and believes, and on that basis alleges, that the backup made by Dmitriev prior to deleting the Pyrus data was retained by Bohuslavskiy and/or Dmitriev for their own use, and that the destruction of the Pyrus data was intended to prevent RedSense from ever recovering or auditing the work product that Bohuslavskiy's team had purportedly performed and for which RedSense had paid.

200

233. Each of the Conspirators acted with knowledge of the conspiracy and in furtherance of the common scheme to defraud RedSense.

234. As a direct and proximate result of the civil conspiracy among the Conspirators, RedSense has suffered damages in an amount to be proven at trial, including, without limitation, the amounts paid for services not rendered, the value of the source code and data destroyed or misappropriated, and the loss of customer relationships and future economic advantages caused by Bohuslavskiy's smear campaign. RedSense is entitled to hold each Conspirator jointly and severally liable for the full scope of the damages caused by the conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, RedSense prays that the Court:

a. Enter judgment in favor of RedSense and against Bohuslavskiy, Dmitriev, Affix, and Dmitriev d/b/a Irasel.

b. Declare that ~~Bohuslavskiy's~~the conduct of Bohuslavskiy, Dmitriev, Affix, and Dmitriev d/b/a Irasel has been willful, and that ~~Bohuslavskiy~~each has acted with fraud, malice, and oppression.

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 74 of 77 PageID: 74

c. Enter a preliminary and permanent injunction enjoining Bohuslavskiy from contacting current and prospective customers of RedSense and interfering with the relationships between RedSense and its current and prospective customers, specifically enjoining Bohuslavskiy from the following conduct:

(1) publicly or privately soliciting RedSense's current customers and prospective ~~customers[11]~~customers[13] for business, (2) publicly or privately denigrating the quality of RedSense's cybersecurity services, (3) publicly or privately using RedSense proprietary or trade secret information or RedSense property that rightfully belongs to RedSense (but that Bohuslavskiy has absconded with) to improperly compete with RedSense, (4) publicly or privately making false statements about RedSense, its products and services for the purpose of stealing the business away from RedSense, (5) publicly or privately making false statements about RedSense not honoring its customer contracts, (6) holding himself out as a representative of RedSense or as someone who is authorized to act on behalf of RedSense at industry events or via other public platforms, and (7) engaging in speaking engagements where he purports to speak as a representative of or on behalf of RedSense.

d. Require Bohuslavskiy to remove references to continued or ongoing affiliation with RedSense from his social media accounts and other personal marketing materials.

---

[11][13] By virtue of Bohuslavskiy's involvement with RedSense, he was aware of prospective customer relationships. RedSense seeks to limit the injunction with respect to the prospective customers to those relationships that were in the pipeline prior to Bohuslavskiy's resignation or that Bohuslavskiy otherwise had knowledge of.

Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 75 of 77 PageID: 75

~~or via other public platforms, and (7) engaging in speaking engagements where he purports to speak as a representative of or on behalf of RedSense.~~

~~d. Require Bohuslavskiy to remove references to continued or ongoing affiliation with RedSense from his social media accounts and other personal marketing materials.~~

e. Require Bohuslavskiy to remove references to "ethical concerns" at RedSense from his social media accounts.

f. Require Bohuslavskiy return the following property, to which RedSense owns all right, title, and interest and for which RedSense contracted and/or paid: (1) AIDIS (Project Pylon) including all software and documentation; (2) Pyrus platform including all data since inception; (3) Easy Staff Deliverables, including code, data, research, LLM, documentation; (4) Igor Dmitriev's deliverables as stated in the agreement dated August 1, 2023; (5) Forum Scraping code and results to date; (6) <u>all RedSense threat intelligence data and reports exfiltrated from the RedSense OpenCTI instance, including the Elasticsearch database archive and PostgreSQL database archive copied therefrom on or about February 23, 2025, including all RedSense research reporting, all AdvIntel data, and all indicators of compromise, together with compensation for the destruction of the RedSense </u>OpenCTI instance and ~~all RedSense Threat Intelligence contained therein; and (7) All~~<u>file system, which</u>

cannot be returned in kind and for which RedSense seeks damages adequate to reconstruct and restore the instance; (7) deliver to RedSense all AdvIntel threat intelligence reports and, historical adversary infrastructure intelligence along with the, and associated data setsdatasets, reports, and access data since inception. that Bohuslavskiy promised as his Obligated In-Kind Funding under the Onboarding Agreement but failed to

205

contribute, which RedSense is entitled to receive as contracted-for consideration regardless of and without prejudice to RedSense's position that Bohuslavskiy's membership interest never validly vested due to his failure to satisfy the conditions precedent set forth in the Onboarding Agreement; and (8) all RedSense data, intelligence, and reports from inception, including all copies, derivatives, and compilations thereof in Bohuslavskiy's possession, custody, or control.

g. Enter judgment awarding RedSense actual damages from Bohuslavskiy adequate to compensate RedSense for the activities and misconduct of Bohuslavskiy complained herein and for any injury complained herein,

Case 2:25-cv-12281    Document 1    Filed 06/27/25    Page 76 of 77 PageID: 76

including but not limited to interest and costs, in an amount to be proven at trial.

h. Enter judgment disgorging Bohuslavskiy's profits.

i. Enter judgment awarding enhanced, exemplary, and special damages, in an amount to be proven at trial; provided, however, that RedSense does not seek exemplary damages or attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)-(D) against Bohuslavskiy or Dmitriev.

i. Enter judgment awarding enhanced, exemplary, and special damages, in an amount to be proven at trial.

j.   Enter judgment awarding attorneys' fees and costs.

k. Order such other relief that the Court deems just and reasonable.

l. Enter judgment holding Bohuslavskiy, Dmitriev, Affix, and Dmitriev d/b/a Irasel jointly and severally liable for all damages arising from their civil conspiracy as alleged herein.

m. Require Dmitriev and Affix to return any and all RedSense property in their possession, custody, or control, and to provide a full accounting of all payments received from RedSense and the disposition of those funds.

## **DEMAND FOR JURY TRIAL**

RedSense respectfully requests a trial by jury on all issues so triable in accordance with Fed. R. Civ. P. 38.

208

~~Case 2:25-cv-12281   Document 1   Filed 06/27/25   Page 77 of 77 PageID: 77~~

Dated:        June ~~27~~29, ~~2025~~2026        CROWELL & MORING LLP

By: /s/ *Preetha Chakrabarti* Preetha Chakrabarti Chak

rabartipchakrabarti@crowell.com ~~RachelElai~~

211

Crowell & Moring LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134

Anna Z. Saber (*pro hac vice* for the com

212

i
n
g
)

asaber@crowell.com
Crowell & Moring LLP
3 Embarcadero, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

Elissa N. Tenenbaum (*pro hac vice*)
CROWELL & MORING LLP 300
N La Salle Dr., Suite 2500 Chicago,
IL 60654
Telephone: (312) 321-4200
etenenbaum@crowell.com

*Attorneys for Plaintiff Red Sense LLC, Third-Party Defendant David Montanaro, and Third-Party Defendant Kevin Stear*

213

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 6/29/2026 2:01:52 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 29637583.pdf | |
| **Modified filename:** REDACTED First Am Complaint.pdf | |
| **Changes:** | |
| Add | 923 |
| Delete | 607 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 1 |
| Table Delete | 20 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 2 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1553 |